**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| BRAEMAR HOTELS & RESORTS INC., | Civil Action No. _____ |
| Plaintiff, | |
| -against- | |
| BLACKWELLS CAPITAL LLC, BLACKWELLS ONSHORE I, LLC, BLACKWELLS HOLDING CO. LLC, VANDEWATER CAPITAL HOLDINGS, LLC, BLACKWELLS ASSET MANAGEMENT LLC, BW COINVEST MANAGEMENT I LLC, JASON AINTABI, MICHAEL CRICENTI, JENNIFER M. HILL, BETSY L. MCCOY, AND STEVEN J. PULLY, | |
| Defendants. | |

## COMPLAINT

Plaintiff Braemar Hotels & Resorts Inc. ("Braemar" or the "Company"), by its undersigned attorneys, for its Complaint against Defendants Blackwells Capital LLC ("Blackwells"), Blackwells Onshore I, LLC ("Blackwells Onshore"), Blackwells Holding Co. LLC, Vandewater Capital Holdings, LLC, Blackwells Asset Management LLC, BW Coinvest Management I LLC, and Jason Aintabi ("Aintabi," and collectively, the "Blackwells Defendants"), and Michael Cricenti, Jennifer M. Hill, Betsy L. McCoy, and Steven J. Pully (collectively, the "Purported Nominees," and together with the Blackwells Defendants, "Defendants"), alleges, on knowledge as to itself and upon information and belief as to all other matters, as follows:

## I.    NATURE OF THE ACTION

1.      It is perfectly legal to attempt to take control of a public company's board of directors while simultaneously planning to buy that company.  But it is unlawful to run a proxy

contest to take control of a public company's board of directors while simultaneously planning to buy that company without disclosing those plans.

2.      Through this action, Braemar seeks to prevent the stockholder vote on director candidates at its 2024 annual stockholder meeting (the "2024 Annual Meeting") from being infected with deception and misinformation in violation of the federal proxy rules and the Company's Fifth Amended and Restated Bylaws, as amended (the "Bylaws").  The federal proxy solicitation rules, promulgated by the Securities and Exchange Commission ("SEC") in Regulation 14A under the Securities Exchange Act of 1934 (the "Exchange Act"), promote corporate democracy by requiring full and fair disclosure to enable stockholders to make informed decisions in their capacity as voters.  In seeking to seize control of Braemar's Board of Directors (the "Board"), Blackwells has violated clear-cut disclosure requirements under the proxy rules and Bylaws, including outright misrepresenting its intention to seek to acquire the Company.

3.      As a result of Blackwells' non-compliance with the proxy rules and Bylaws, its nomination notice dated March 10, 2024 (the "Nomination Notice") is invalid and the individuals it seeks to nominate are not permitted to stand for election at the 2024 Annual Meeting. Nonetheless, Blackwells and its cohorts are primed to begin soliciting Braemar's stockholders to vote in favor of its ineligible slate.  Absent intervention from this Court, Defendants will imminently launch an invalid proxy solicitation, sow confusion and misinformation among the Company's stockholders, and cause irreparable harm to Braemar, its stockholders, and the integrity of the vote at the 2024 Annual Meeting.

4.      Headquartered in Dallas, Braemar is a publicly traded real estate investment trust ("REIT") that owns an iconic portfolio of resorts and urban hotels.  Blackwells is a New York hedge fund.  In late 2023, Blackwells turned its sights on Braemar, including, on December 1, 2023, submitting to the Company a written proposal to acquire 100% of the outstanding equity

interests of the Company. Blackwells, however, refused to provide the Company with basic information needed to assess the viability of its bid, including any evidence of its ability to secure committed financing. Instead of answering the Company's basic informational requests, Blackwells responded with baseless litigation threats, and launched a proxy contest to elect its hand-picked Purported Nominees to the Board.

5.    Braemar, like many public companies, has adopted advance notice provisions in its Bylaws setting forth notice, timing, and disclosure requirements applicable to stockholders seeking to nominate director candidates. Braemar's advance notice requirements are contained in Article I, Section 11 of the Bylaws (the "Advance Notice Requirements"), a copy of which is attached hereto as Exhibit A. The Advance Notice Requirements include provisions governing when a stockholder must provide notice of its intent to nominate director candidates or bring business before a meeting, as well as accompanying disclosures. It is widely recognized that advance notice bylaws can have a salutary effect, including by allowing boards to knowledgeably make recommendations about nominees and ensuring that stockholders cast well-informed votes.

6.    On March 10, 2024, Blackwells submitted to Braemar its Nomination Notice, pursuant to which Blackwells purported to nominate four individuals, the Purported Nominees, at the 2024 Annual Meeting. If elected, these Purported Nominees would control half of the Board. The Nomination Notice, however, failed to comply with the Advance Notice Requirements in critical respects.

7.    As an initial matter, the Nomination Notice misrepresented Blackwells' ongoing interest in acquiring the Company, an interest that is unquestionably material to stockholders evaluating Blackwells' director candidates, and that must be disclosed pursuant to the federal proxy rules and the Bylaws. The Advance Notice Requirements adopt and incorporate all disclosure requirements for the solicitation of proxies contained in Regulation 14A, including

the requirement to disclose "any arrangement or understanding . . . with respect to any future transactions to which the registrant or any of its affiliates will or may be a party."  Likewise, the Advance Notice Requirements require a nominating stockholder to disclose any "substantial interest"—including "any existing or prospective commercial, business, or contractual relationship"—with the Company.

8.     Notwithstanding Blackwells' recent written proposal to acquire the Company, the Nomination Notice asserts that Blackwells "has withdrawn any interest it had in pursuing this or any similar transaction with the [Company]."  But that does not square with Blackwells' actions and the documentary record, including its December 1, 2023 bid letter and December 22, 2023 letter from counsel reiterating its interest.  The notion that Blackwells has disavowed any interest in an acquisition is directly contradicted by a *March 2024* Blackwells 90-page investor presentation, attached as an exhibit to the Nomination Notice delivered on *March 10, 2024*, premised entirely on taking Braemar "private" and which included a detailed "LBO Analysis," together with a detailed proposed sources and uses of cash required to consummate an acquisition of the Company.  Notably, the investor presentation expressly stated that Blackwells' strategy was to utilize a proxy campaign as a cudgel to "open discussions" with the Company about an acquisition.

9.     Indeed, the contention that Blackwells now suddenly has no acquisition interest lacks all credibility: according to its Nomination Notice, Blackwells beneficially owns only 10,100 shares of the Company's common stock (an infinitesimal 0.015% of shares outstanding, 10,000 shares of which were purchased during the week preceding the delivery of the Nomination Notice, when the common stock was trading at approximately $2.00 per share).  As they say in Texas, Blackwells is "all hat, no cattle."  Yet Blackwells plans to spend $5 million in furtherance of its solicitation.  Why else would Blackwells devote so much money to such a small

investment of common stock worth less than $20,000?  Blackwells' dissimulation runs contrary to the requirements of Regulation 14A and the Advance Notice Requirements designed to protect investors and ensure an orderly meeting.

10.    In addition, the Nomination Notice failed to provide numerous categories of required information with respect to "Stockholder Associated Persons," a defined term encompassing those who acted "in concert" with Blackwells or engaged in activities "with the purpose or effect of changing or influencing control" of the Company or "as a participant in any transaction having such purpose or effect."  The Nomination Notice only identifies Blackwells Defendants as Stockholder Associated Persons of Blackwells, while omitting critical and material information with respect to limited partners and "external sources" that, by Blackwells' own representations to the Company, would help fund its bid to acquire the Company.  Likewise, the Nomination Notice fails to provide information required for Stockholder Associated Persons with respect to an investor with which Blackwells admittedly shared marketing materials regarding a potential acquisition of the Company, and which then went on to make its own bid to acquire the Company, at a ten cent ($0.10) increase over Blackwells' proposed price.

11.    The Nomination Notice failed to comply with the Advance Notice Requirements for additional reasons, including misleading and incomplete questionnaire responses submitted for Purported Nominees, and non-disclosure of information required under the Bylaws to be provided by stockholders that, like Blackwells, have made a proposal to acquire the Company within the prior 24 months.

12.    As a consequence of any one of these deficiencies, pursuant to the Advance Notice Requirements, the Nomination Notice was invalid, and the Purported Nominees ineligible to stand for election.  Further, because Blackwells elected to deliver to the Company its Nomination Notice on the last day of the nominating window period, the period during which any

defects in the Nomination Notice could have cured has passed; this result is irremediable and irreversible. Accordingly, in an exercise of its business judgment protected under Maryland law, Braemar's Board rejected the Nomination Notice based on these deficiencies and resolved that the Purported Nominees are ineligible. Further, the Board considered factors bearing on Blackwells' and Aintabi's character and past dealings, and determined that it would not be in the best interest of the Company and its stockholders to waive Blackwells' non-compliance with the Advance Notice Requirements.

13.     Defendants nonetheless are prepared to imminently launch a campaign to solicit Braemar's stockholders to vote for the ineligible Purported Nominees at the 2024 Annual Meeting. On March 22, 2024, Defendants filed a preliminary proxy statement with the SEC, unequivocally establishing their intention to move forward with the solicitation. The proxy statement is materially misleading for multiple reasons, including because it fails to disclose Blackwells' interest in an acquisition, its concerted activity with third parties, and the invalidity of the Nomination Notice and ineligibility of the Purported Nominees. If permitted to proceed, Defendants will cause irreparable harm to Braemar and its stockholders by sowing confusion and compromising the integrity of the vote with false and misleading information, including the false and misleading assertion that Blackwells "has withdrawn" any interest in an acquisition and the suggestion that the Purported Nominees may stand for election at the 2024 Annual Meeting.

14.     Accordingly, through this action, Braemar seeks: (i) a preliminary and permanent injunction barring Defendants from soliciting proxies from Braemar stockholders or distributing any proxy materials to Braemar stockholders in connection with the 2024 Annual Meeting; (ii) a declaration that Blackwells' Nomination Notice is invalid and thus Blackwells' purported slate of nominees is ineligible to stand for election and Blackwells is barred from

bringing any other business before the 2024 Annual Meeting; and (iii) a declaration that Blackwells cannot cure its violations of the Advance Notice Requirements.

## II.    PARTIES

15.    Plaintiff Braemar Hotels & Resorts Inc. is a publicly traded Maryland corporation with its principal place of business at 14185 Dallas Parkway, Suite 1200, Dallas, Texas 75254. Braemar does not have any employees and is externally advised and asset managed by Ashford Hospitality Advisors, LLC, a subsidiary of Ashford Inc.

16.    Defendant Blackwells Capital LLC is a Delaware limited liability company with a principal place of business at 800 Third Avenue, 39th Floor, New York, New York 10022. Blackwells Capital LLC referred to itself as the "Nominating Stockholder" in its March 10, 2024 putative Nomination Notice.

17.    Defendant Blackwells Onshore I, LLC is a Delaware limited liability company with a principal place of business at 800 Third Avenue, 39th Floor, New York, New York 10022.

18.    Defendant Blackwells Holding Co. LLC is a Delaware limited liability company with a principal place of business at 800 Third Avenue, 39th Floor, New York, New York 10022.

19.    Defendant Vandewater Capital Holdings, LLC is a Delaware limited liability company with a principal place of business at 800 Third Avenue, 39th Floor, New York, New York 10022.

20.    Defendant Blackwells Asset Management LLC is a Delaware limited liability company with a principal place of business at 800 Third Avenue, 39th Floor, New York, New York 10022.

21.     Defendant BW Coinvest Management I LLC is a Delaware limited liability company with a principal place of business at 800 Third Avenue, 39th Floor, New York, New York 10022.

22.     Defendant Jason Aintabi is the Chief Investment Officer and managing member of Blackwells Capital LLC and an officer and/or director of the other Blackwells Entities. Upon information and belief, Aintabi is a resident of the State of New York and owns a residence in Canada.

23.     Upon information and belief, Aintabi is a member, director, or beneficial owner of Campden Hill Capital (a Canadian entity), Chelsey Investissement (a Luxembourgish entity), and Mayflower Monaco (a Monacan entity).

24.     The Nomination Notice identifies Defendants Blackwells Onshore I LLC, Blackwells Holding Co. LLC, Vandewater Capital Holdings LLC, Blackwells Asset Management LLC, BW Coinvest Management I LLC, and Aintabi as "Stockholder Associated Persons" within the meaning of the Advance Notice Requirements.

25.     Defendant Michael Cricenti resides at 3979 Clover Lane, Dallas, Texas 75220 and is a purported nominee for the Board pursuant to the Blackwells' Nomination Notice.

26.     Defendant Jennifer M. Hill resides at 9 Dancing Bear Road, Norwalk, Connecticut 06853 and is a purported nominee for the Board pursuant to the Blackwells' Nomination Notice.

27.     Defendant Betsy L. McCoy resides at 626 Coral Way, 505, Coral Gables, Florida 33134 and is a purported nominee for the Board pursuant to the Blackwells' Nomination Notice.

28.     Defendant Steven J. Pully resides at 4564 Meadowood Road, Dallas, Texas 75220 and is a purported nominee for the Board pursuant to the Blackwells' Nomination Notice.

29.     As disclosed in the Nomination Notice, Defendants collectively beneficially own in the aggregate approximately 10,100 shares of Braemar's common stock, or 0.015% of the common stock outstanding, equivalent to an investment of under $20,000 in the Company.

### III.     JURISDICTION AND VENUE

30.     This action arises under Section 14(a) of the Exchange Act and the rules and regulations promulgated thereunder, and seeks to enforce the rules and regulations thereunder, including the prevention of an imminent proxy contest in violation of federal law.  This Court has jurisdiction over the subject matter of this action because it alleges the violation of federal rules and regulations.

31.     This Court has jurisdiction over the state law claims in this action because the claims are premised on Defendants' violation of SEC rules and regulations, and interpretation of those rules and regulations are necessary and essential to resolution of the dispute.  The claims further raise substantial issues of federal law, namely the uniform application of securities rules and regulations, a subject matter in which the federal courts have special expertise. It would not upset the balance of federal and state judicial power for a federal court to decide questions of federal regulation.

32.     The Company Bylaws at issue in this action embed and incorporate disclosure requirements of Regulation 14A of the Exchange Act and the rules and regulations of agencies of the U.S. federal government in connection with acquisitions of control of a company, and the Defendants have indicated the intent to imminently begin sending proxies to Company shareholders.  Accordingly, the outcome of each of the claims brought in this action rests on giving effect to federal rules and regulations, rules and duties of paramount federal concern that traditionally arise in federal courts.

33.     This Court further has supplemental jurisdiction over Plaintiff's claims arising under state law based on 28 U.S.C. § 1367 because they derive from a common nucleus of operative fact and are so related to the federal law claims that they form part of the same case or controversy.

34.     Venue in this District is proper, under 28 U.S.C. § 1391 and Section 27 of the Exchange Act, as amended, 15 U.S.C. § 78aa, because various acts or transactions constituting the offenses herein occurred within the Northern District of Texas.  Among other things, Defendants' non-conforming and materially misleading nomination notice was addressed to and received by Braemar at its headquarters and principal place of business in this District, and Defendants aim to solicit proxies based on the same false and misleading information from Braemar's stockholders, including stockholders located in this District, to be used at Braemar's annual stockholders meeting intended to be held in this District.

35.     This Court has personal jurisdiction over the Defendants under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  This Court also has personal jurisdiction over the Defendants because Defendants purposefully availed themselves of conducting business in Texas by, among other things, purporting to serve a nomination notice for Braemar, a corporation headquartered in this state, and intending to solicit proxies for the purposes of director nominations and stockholder proposals pertaining to Braemar.  In addition, two Defendants, Cricenti and Pully, are residents of the Northern District of Texas.

## IV.     FACTUAL BACKGROUND

**A.     Braemar Seeks to Maximize Returns for Its Stockholders.**

36.     Headquartered in Dallas, Braemar is a REIT, organized under Maryland law, that owns an iconic portfolio of resorts and urban hotels.  Braemar's portfolio generates the

highest revenue per available room ("RevPAR") and represents the highest quality portfolio in the publicly traded lodging REIT space. Braemar currently owns interests in 16 hotel properties in seven states, the District of Columbia, Puerto Rico, St. Thomas, and the U.S. Virgin Islands, with 4,192 total rooms. The hotel properties in Braemar's portfolio are predominantly located in U.S. urban and resort locations with favorable growth characteristics. Braemar is listed on the New York Stock Exchange under the symbol "BHR."

37. Similar to other publicly-traded REITs, Braemar is advised by an external adviser, Ashford Hospitality Advisors LLC ("Ashford LLC"), a subsidiary of publicly traded Ashford Inc., through an advisory agreement. Ashford LLC currently manages all of the hotel properties in Braemar's portfolio. Braemar is led by a management team including Chief Executive Officer and President Richard J. Stockton, and an eight-person Board of Directors, including lead director Stefani Danielle Carter. Monty J. Bennett serves as chairman of Braemar's board. Braemar does not have any employees. All of the advisory services that might be provided by employees are provided to Braemar by Ashford LLC.

38. Braemar's principal business objective is to generate attractive returns on capital and long-term growth in cash flow to maximize total returns for its stockholders. Braemar pursues a focused investment strategy investing in premium-branded and high-quality independent luxury hotels and resorts, and relies on Ashford LLC to actively manage the properties in its portfolio to help maximize the operating performance, cash flow, and value of each hotel. Braemar's management team has been successful in improving the operations and the overall productivity of the Company's portfolio since its inception. Braemar has delivered the highest RevPAR growth of 79% since inception (FY 2023 compared to FY 2014), outperforming the full-service lodging REIT average growth of 37%. Because of its high quality hotels, visible assets, and small size, Braemar is a repeat takeover target.

**B.     Blackwells Sets Its Sights on Braemar in Late 2023.**

39.     Founded in 2016, Blackwells is a hedge fund based in New York City. Blackwells is run by Aintabi, its Chief Investment Officer, whose family hails from Lebanon and Canada and invests in businesses around the world.

40.     In October 2023, Blackwells launched a targeted campaign against Braemar.  On October 21, 2023, as its opening salvo, Blackwells, through its counsel at Vinson & Elkins LLP, sent a terse letter to the Company purporting to demand that the Board investigate "potential breaches of fiduciary duty and/or other wrongdoing related to mismanagement or self-dealing by members of the Board and/or management in connection with the Company's relationship with Mr. Bennett and Ashford."  At the time, Blackwells owned only 100 shares of Braemar stock.

41.     Upon receipt of Blackwells' demand, the Board established a Review Committee on November 1, 2023 consisting of two independent directors (Kenneth H. Fearn, Jr. and Rebeca Odino-Johnson) by unanimous consent ("Review Committee Resolution").  The Review Committee Resolution delegated to the Review Committee full authority of the Board to investigative, review, and analyze the facts and circumstances forming the basis for the demand and make a recommendation to the full Board as to whether to pursue any claims implied or asserted in the demand.  The Review Committee qualified as independent under New York Stock Exchange standards, had no conflicts of interest to impair its judgment, and was authorized to select and retain counsel and other advisors to represent and assist it, as it deemed reasonably necessary or appropriate to perform its duties.  The Review Committee retained a nationally recognized law firm as external counsel to fulfill its mandate.  The Review Committee was also assisted by a nationally recognized financial advisory firm with respect to benchmarking and analyzing the performance of the Company.

42.     After undertaking a full investigation with the assistance of the law firm and financial advisory firm, the Review Committee recommended that the Board not take the actions set forth in Blackwells' demand.  The Board followed that recommendation and resolved not to pursue the proposed actions.  That decision and the detailed bases for reaching it were communicated to Blackwells, via letter, on January 9, 2024.

43.     Blackwells' demand letter, however, was a mere prelude to the next step in its campaign:  a bid to acquire the entire Company.  On December 1, 2023, Blackwells sent a letter to Braemar's Board, with the header "Proposal for Acquisition of Braemar," containing a "preliminary proposal for the negotiated acquisition" of the Company.  Blackwells proposed to acquire 100% of the outstanding equity interests in the Company for $4.50 per share in cash, which it characterized as "a substantial premium to recent trading prices of the stock."  The letter enclosed a 12-page due diligence request list, as well as a proposed form of exclusivity agreement.  The letter noted that Blackwells "would expect to finance the Transaction with a combination of debt and equity," including, with respect to equity, funding from "Blackwells' internal resources, as well as LP commitments."  At the time of its bid, Blackwells still owned only 100 shares of Braemar stock.

## C.     Blackwells Refuses to Provide Braemar with Information Necessary to Evaluate Its Acquisition Bid.

44.     On December 6, 2023, Braemar's counsel sent Blackwells a letter acknowledging receipt of the acquisition bid.  The letter noted that, in its October 21 demand letter, Blackwells presented itself as acting on behalf of all shareholders in demanding the Company pursue its directors for alleged breach of fiduciary duty, but in its bid letter, Blackwells presented itself as acting in its own interest, making a proposal to acquire the entire Company and requesting exclusivity, to the detriment of all other shareholders.  Accordingly, prior to the Board and

management expending further time and resources, Braemar's counsel's December 6 letter presented certain threshold questions so that the Board could appropriately assess the credibility of Blackwells' interest.  As noted in the letter, the Board takes its role as fiduciaries seriously, and wanted to ensure that it was not being asked to divert its attention to a proposal with no more than a modest chance of success.  In particular, the letter noted concern expressed by the Company's advisors that Blackwells would have difficulty securing strong third-party committed financing.

45.     To assist the Board in assessing Blackwells' interest, the December 6 letter invited Blackwells to provide certain information, including:

- Blackwells' aggregate beneficial ownership interest in the Company, including any derivative interests;

- Blackwells' acquisition experience, including whether it has ever consummated the acquisition of a public company;

- Blackwells' ability to obtain financing, which the bid letter only said would be a combination of equity and debt, including debt commitment letters, evidence of Blackwells' internal resources, information with respect to proposed equity funding (including providers and internal approvals), and the identity and domicile of any offshore financing sources so the Board can assess any potential political, national security, or regulatory risks; and

- Blackwells' advisors, including financial advisors, accounting firm, and other advisors engaged to assist with the bid.

46.     On December 22, 2023, Blackwells, through Vinson & Elkins, sent a one-page response.  Rather than providing the requested information, the December 22 letter restated that "Blackwells would finance the Transaction with a combination of debt and equity from internal and external sources."  Blackwells offered to provide "additional confidential

information" regarding its "financing sources," but only "after Blackwells receives confirmation that the Board is interested in engaging in a discussion regarding Blackwells' proposal."

47.     That letter preceded yet another volley in Blackwells' campaign, a December 28, 2023 letter on behalf of Blackwells and Aintabi from a new law firm, Quinn Emanuel.  This letter purported to raise "concerns" regarding "potential violations of the federal securities laws" by Braemar, allegedly resulting from an article "Vinson & Elkins Helps New York Activist Investor Invade Texas" published in *The Dallas Express*.[1]  The article truthfully described the campaign launched by Blackwells against Braemar, and included a quote from Mr. Bennett noting accurately that Aintabi "owns only 100 common shares of record" and "wish[ing] Mr. Aintabi and Blackwells would engage in constructive dialogue instead of issuing threatening Vinson & Elkins authored lawyer-letters right out of the gates."  Nonetheless, the December 28 letter threatened that, absent a response by January 5, 2024, "court intervention will be necessary to resolve this matter."

48.     On January 2, 2024, Braemar's counsel emailed Blackwells' counsel acknowledging that the December 22 letter had been shared with the Company's Board.  In the email, Braemar's counsel noted that the purpose of the questions posed in the December 6 letter was to evaluate Blackwells' ability to complete its proposed transaction, including its ability to obtain fully committed financing for all necessary funds, which was particularly relevant since Blackwells had apparently never acquired a public company.  Braemar's counsel stated that the Board remained fully committed to doing what was in the best interests of the Company and its stockholders, and reiterated the request for the information presented in the December 6 letter.

---

[1] Mr. Bennett serves as publisher for *The Dallas Express*.

49.     That same day, Blackwells sent a letter to the Company requesting a written questionnaire required under the Company's Bylaws to nominate candidates for election to the Board.  Blackwells' share ownership at the time of its request remained at 100 shares.

**D.     The Company's Bylaws Contain Advance Notice Requirements to Ensure Fulsome Disclosure in Connection with the Election of Directors.**

50.     As a Maryland corporation, Braemar's internal affairs are governed by Maryland law.  Maryland corporate law—like that of many other states, including Delaware—is silent on how a stockholder should nominate a director candidate for election.  As a result, public companies commonly implement "advance notice bylaws" to promote orderly meetings and election contests.

51.     Advance notice bylaws have two primary functions: timing and disclosure. With respect to timing, advance notice bylaws typically set a deadline by which stockholders are required to notify the corporation of their intention to nominate director candidates in advance of an annual stockholder meeting.  With respect to disclosure, advance notice bylaws require stockholders to provide information allowing boards to knowledgeably make recommendations about nominees and ensuring that stockholders cast well-informed votes.

52.     Advance notice bylaws have evolved beyond requiring a stockholder to notify the company of its intention to nominate by a certain time before the meeting date and provide basic information about the stockholder and its nominees.  In recent years, public companies have frequently adopted advance notice bylaws including provisions that mandate completion of nominee questionnaires, disclosure of derivative positions, compensation information, and persons acting in concert with the stockholder and its nominees, as well as additional information disclosure requirements deemed, in the exercise of business judgment by a company's board of directors, important to the development of recommendations and a fully

informed vote.  The scope of advance notice bylaws continues to evolve as new case law, rules, and regulations emerge.

53.     Braemar, like many other public companies, has had Advance Notice Requirements in place for years, set forth in Article I, Section 11 of the Bylaws.  *See* Ex. A.  The Advance Notice Requirements permit stockholders to nominate individuals for election to the Board and propose other business to be considered by stockholders at an annual meeting, so long as the stockholder is a stockholder of record at the time of the giving of notice, and, at the time of the annual meeting, is entitled to vote and has complied with the Advance Notice Requirements. *See* Bylaws, art. I, §11(a)(1).  The mechanisms provided in the Advance Notice Requirements are the "exclusive means" for a stockholder to make director nominations and propose other business at an annual meeting of stockholders.  *Id.*

54.     The Advance Notice Requirements require, for any nomination or other business to be properly brought before an annual meeting, a stockholder to have given "timely notice thereof in writing" to the Company's secretary. *Id*. §11(a)(2).  To be "timely," the stockholder's notice must "set forth all information required under this Section 11" and be delivered to the corporate secretary not earlier than the 90th day nor later than the 60th day prior to the first anniversary of the date of the preceding year's annual meeting.  *Id.*

55.     A critical component of the Advance Notice Requirements is Section 11(a)(3), which enumerates the information that must be set forth in the stockholder's notice.  For example, the stockholder or any "Stockholder Associated Person" must disclose, with respect to any business other than a nomination, "any material interest in such business," including any "anticipated benefit to the stockholder or the Stockholder Associated person therefrom."  *Id*. § 11(a)(3)(A).  "Stockholder Associated Person" is defined to include various categories of persons

affiliated or acting in concert with the nominating stockholder in connection with its investment and activities with respect to the Company. *See Id*.

56.    Additionally, the Advance Notice Requirements require, as to the stockholder giving notice, and the individual the stockholder proposes to nominate, and any Stockholder Associated Person various categories of information relating to their ownership of stock or other securities of the Company, including "the date on which each such Company Security was acquired," "the investment intent of such acquisition," and "any short interest," as well as identification of any "hedging, derivative or other transaction or series of transactions" within the prior six months. *Id*. § 11(a)(3)(C)(i), (iii). The nominating stockholder must also disclose any "substantial interest, direct or indirect (including without limitation any existing or prospective commercial, business or contractual relationship) . . . of such stockholder . . . in the Corporation." *Id*. § 11(a)(C)(iv).

57.    The Advance Notice Requirements require disclosure of "all information relating to the stockholder, the Proposed Nominee or the Stockholder Associated Person that would be required to be disclosed in connection with the solicitation of proxies pursuant to Regulation 14A (or any successor provision) under the Exchange Act." *Id*. § 11(a)(3)(D)(iii). For example, Item 5(b)(1) of Rule 14a-101, promulgated under Section 14(a) of the Securities Exchange Act of 1934, requires "any arrangement or understanding . . . with respect to any future transactions to which the registrant or any of its affiliates will or may be a party." 17 C.F.R. § 240.14a-101, Item 5(b)(1).

58.    In addition, as amended on January 9, 2024, the Advance Notice Requirements contain disclosure requirements for potential acquirors coextensive with applicable federal rules and regulations (including rules and regulations which had been proposed and not withdrawn). In light of the sensitivities surrounding an attempt by a would-be acquirer to install

directors on the Board, the Advance Notice Requirements provide that, where the stockholder "has in the twenty-four months immediately preceding the date of such notice made a proposal to acquire control of the Corporation (whether through the acquisition of a majority of outstanding securities of the Corporation, the acquisition of all or substantially all of the Corporation's assets or otherwise)," the stockholder must disclose in its notice "all information relating to the stockholder . . . that would be disclosed in any notices, forms or filings required by U.S. federal laws or the rules and regulations of any agency, department or other instrumentality of the U.S. federal government ('U.S. Federal Agency') in connection with the direct or indirect acquisition by such person of control of the Corporation."  Bylaws, Art. I, § 11(a)(3)(D)(iv).  That disclosure must include (i) "all information that would be set forth under any U.S. federal laws or the rules and regulations of any U.S. Federal Agency that have been proposed and not withdrawn" and (ii) "all information that would be set forth in a voluntary filing made by an acquiror in connection with any transaction subject to the jurisdiction of any U.S. Federal Agency."  *Id*.

59.    Bylaw Section 11(a)(3)(D) is accordingly inclusive of, for example, all information that would be required to be provided to the Federal Trade Commission with a Hart-Scott-Rodino Antitrust Improvements Act Notification and Report Form, as well as information that would be set forth in a voluntary filing to the Committee on Foreign Investment in the United States ("CFIUS") in reviewing proposed transactions.  A CFIUS filing would require an acquiring foreign person to disclose, *inter alia*, information concerning: (i) all sources of financing for the proposed transaction; (ii) a statement as to whether a party to the transaction is stipulating that the proposed transaction is a "covered transaction" and the basis for such stipulation; (iii) a statement as to whether a party to the transaction is stipulating that the proposed transaction is a "foreign government-controlled transaction" and the basis for such stipulation; (iv) a description as to any involvement in substantive decision-making of the target with respect to certain infrastructure,

technologies, or personal data; (v) the name and address of the ultimate parent of the acquiring

foreign person; (vi) complete organizational charts (pre- and post-transaction) of the acquiring

foreign person; (vii) information regarding foreign ownership in the acquiring foreign person's

ownership structure, including nationality and percentage of ownership; (viii) a statement as to

whether any party to the transaction has been party to another transaction previously submitted to

CFIUS; and (ix) a statement as to whether the acquiring foreign person or any parent or subsidiary

has been convicted in the last 10 years of a crime in any jurisdiction.

60.     The Advance Notice Requirements require a certificate executed by each

proposed nominee that (i) certifies that the proposed nominee is not and will not become a party

to any agreement, arrangement, or understanding that has not been disclosed to the Company, and

will serve as a director elected, and (ii) attaching a completed proposed nominee questionnaire,

which will include all information relating to the proposed nominee that would be required to be

disclosed in connection with the solicitation of proxies pursuant to Regulation 14A under the

Exchange Act.  *Id*. § 11(a)(4).

61.     Complete and accurate disclosure of all requested information is essential

for compliance with the Advance Notice Requirements.  Pursuant to Article I, Section 11(c) of the

Bylaws, "[i]f information submitted pursuant to this Section 11 by any stockholder proposing a

nominee for election as a director or any proposal for other business at a meeting of stockholders

shall be inaccurate in any material respect, such information may be deemed not to have been

provided in accordance with this Section 11." *Id*. § 11(c)(1).

62.     And the Bylaws contain strict time limits on correcting any inaccuracies in

a stockholder's notice, requiring a stockholder to provide notice to the Company of any inaccuracy

or change "within two Business Days of becoming aware of such inaccuracy or change."  *Id*.

Moreover, the Bylaws provide no mechanism for a stockholder to cure any defect in its Nomination

Notice after the last day on which a Nomination Notice would be "timely." *See id.* § 11(a)(2) (to be "timely," notice "shall set forth all information required under this Section 11" *and* "shall be delivered to the secretary" by the nomination deadline); *id* § 11(c)(1) (information that is "inaccurate in any material respect" may be deemed "not to have been provided in accordance with this Section 11").

**E.    Blackwells Submits a Deficient Nomination Notice That Fails to Disclose Information Required by the Advance Notice Requirements.**

63.    Braemar's Annual Meeting in 2023 was held on May 10, 2023.  The 60th day prior to May 10, 2024 was March 11, 2024.  Accordingly, the deadline to submit all written notices for the 2024 Annual Meeting was March 11, 2024.  *See* Bylaws, Art. I, § 11(a)(2).

64.    On March 10, 2024, on the evening before the deadline, Blackwells delivered by email to Braemar a *Notice of Intention to Nominate Individuals for Election as Directors and to Submit Business Proposals for Stockholder Consideration at the 2024 Annual Meeting of Stockholders of Braemar Hotels & Resorts Inc.* (the "Nomination Notice").  A physical copy was delivered to the Company's principal executive office, as required by the Bylaws, on the deadline date: March 11, 2024.

65.    The Nomination Notice purported to nominate, and notify Braemar of its intent to nominate Michael Cricenti, Jennifer M. Hill, Betsy L. McCoy, and Steven J. Pully, the Purported Nominees, for election to the Board at the 2024 Annual Meeting.

66.    Additionally, the Nomination Notice proposed to bring certain business proposals before the 2024 Annual Meeting, including proposals to amend the Bylaws and the Corporate Governance Guidelines.

67.    The Nomination Notice stated that it was providing "information required by Article I, Section 11 of the Bylaws."  However, as detailed below, the Nomination Notice

contained misstatements, inaccuracies, and omissions in violation of multiple provisions of the Advanced Notice Requirements.

**1.    The Nomination Notice Failed to Disclose Blackwells' Interest in Acquiring the Company as Required Under Regulation 14A and the Advance Notice Requirements.**

68.    The Advance Notice Requirements require a stockholder to disclose in its notice "all information relating to the stockholder, the Proposed Nominee or the Stockholder Associated Person that would be required to be disclosed in connection with the solicitation of proxies pursuant to Regulation 14A (or any successor provision) under the Exchange Act." Bylaws, Art. I, § 11(a)(3)(D)(iii).

69.    Regulation 14A contains the SEC's proxy solicitation rules, which apply to the process of soliciting the vote of shareholders of a U.S. company whose shares are registered under the Securities Exchange Act of 1934.  Under Regulation 14A, if a U.S. company's shares are registered under Section 12 of the Exchange Act and a party is soliciting proxies, it may not begin the "solicitation" until it mails shareholders a proxy statement containing specified information. *See* 17 C.F.R. §§ 240.14a-2, 240.14a-3(a)(2)-(3); 17 C.F.R. § 240.14a-101.

70.    Among the information required to be disclosed in Regulation 14A is "any arrangement or understanding . . . with respect to any future transactions to which the registrant or any of its affiliates will or may be a party."  17 C.F.R. § 240.14a-101, Item 5(b)(1).  A potential future acquisition of the registrant qualifies as an "arrangement or understanding" with respect to a "future transaction" for which disclosure is required under Item 5(b)(1).

71.    Likewise, Section 11(a)(3)(C) of the Bylaws requires a nominating stockholder to disclose any "substantial interest, direct or indirect (including without limitation any existing or prospective commercial, business or contractual relationship) . . . of such stockholder . . . in the Corporation."

72.     In its Nomination Notice, Blackwells disclaims any interest in a transaction with the Company.  Blackwells claims that the only purpose of its ownership of Company shares was "to serve as a long-term investment" and "to influence the Corporation or the Corporation's management or Board" as to certain matters.  Although acknowledging that it made an acquisition proposal to the Company in December 2023, Blackwells nonetheless asserts that it "has withdrawn any interest it had in pursuing this or any similar transaction with the Corporation."

73.     The assertion, however, is demonstrably false.  The Nomination Notice attaches a Blackwells investor presentation on Braemar dated "March 2024" that is entirely premised on taking Braemar "private."



74.     The presentation notes that Blackwells believes that "an expensive/contentious proxy fight is unlikely to produce an optimal result," but that "the unspoken threat of public criticism/action by Blackwells will compel Bennett to open discussions with Blackwells at which point an appeal to Bennetts [sic] pocketbook may produce win-win-win (Shareholders, Take Private Interested Parties, Bennett) range of options."

75.     According to the presentation, Blackwells assumes that Braemar "will put up strong resistance to a sale for anything other than a godfather offer plus a robust multiple," but

that "in light of the current market dynamics Bennett may find some options favorable enough to contemplate in earnest."

Blackwells believes that an expensive/contentious proxy fight is unlikely to produce an optimal result, but that the unspoken threat of public criticism/action by Blackwells will compel Bennett to open discussions with Blackwells at which point an appeal to Bennetts pocketbook may produce a win-win-win (Shareholders, Take Private Interested Parties, Bennett) range of outcomes
- BHR is Bennett's trophy portfolio
- BHR generated ~$20mm management fees per year to external manager pre-COVID
- Bennett has also received personal compensation for $1.7mm, $2.1mm, and $0.5mm for 2020, 2019 and 2018 respectively
  - Baseline assumption is that Bennett/Company will put up strong resistance to a sale for anything other than a godfather offer plus a robust multiple on the management fee stream, but that in light of the current market dynamics Bennett may find some options favaorable enough to contemplate in earnest

76.     The presentation goes on to detail multiple topics related to a potential acquisition.  For example, a slide on "Take Private Considerations" discusses factors in favor of "Privatiz[ing] a Large and High-Quality Luxury Hotel Portfolio Primed for Growth" and Braemar's "Exceptional Returns with Significant Margin of Safety."

**TAKE PRIVATE CONSIDERATIONS**

- Privatize a Large and High-Quality Luxury Hotel Portfolio Primed for Growth
  - Sizeable portfolio of high-quality institutional real estate priced at discount to net asset value (NAV)
  - Significant option value in acquiring successful platform focused on these markets
  - Well-located in high growth markets that are poised to benefit from travel trends
  - Scaled platform provides immediate platform growth opportunity to capitalize on current market dislocations

77.     The presentation includes an extension section entitled "LBO Model" which includes illustrative sources and uses with respect to an acquisition of the Company, and an "LBO Model – Returns Summary" analyzing potential returns if, after an acquisition of the Company, it were sold five years later.

78.     The March 2024 presentation confirms that Blackwells' interest in acquiring the Company is live and active.  In fact, the purpose of Blackwells' proxy campaign is to "compel" the Company to "open discussions" with regard to such a transaction.

79.     Blackwells' assertion that it "has withdrawn" any interest it had in acquiring the Company is not credible.  According to the Nomination Notice, Blackwells beneficially owns only 10,100 shares of the Company's common stock (it purchased 10,000 shares on March 4, six days before it submitted its Nomination Notice).  Yet it plans to spend ***$5 million*** in furtherance of the solicitation.  The Nomination Notice discloses that Blackwells has already spent $500,000 in support of the proxy campaign.  Given its small ownership stake, only the transaction-focused rationale described in the March investor presentation would cause Blackwells' outsized monetary investment in a proxy solicitation to make any sense.

80.     Indeed, the Nomination Notice hedges its bets, noting on page 7 that "the Nominating Stockholder could in the future make a bid to acquire the Corporation."  That statement is misleading.  Blackwells already decided to make a bid.  And as the March 2024 investor presentation shows, the proxy contest is simply part of the plan to "compel" discussions.

81.     The necessity for full and fair disclosure of a stockholder of Blackwells' interest with respect to a transaction with the Company is essential for a proper evaluation of its proposed nominees.  Although it is legal and permissible for a stockholder to seek to acquire a company, there is an inherent conflict of interest when that stockholder is simultaneously putting forth candidates to serve on the company's board.  When a company is being sold, the board's responsibility is to seek the highest price possible.  By contrast, the would-be acquirer's aim is to achieve the lowest price possible.  Stockholders should know the relative incentives, especially where, as here, the Purported Nominees put forth by Blackwells would comprise half the Board.

82.     The Nomination Notice's failure to accurately disclose Blackwells' intentions with respect to such potential transaction violates Item 5(b) of Rule 14a-101 under Regulation 14A and, accordingly, Sections 11(a)(3)(D)(iii) and Section 11(a)(3)(C) of the Bylaws.

2.     **The Nomination Notice Failed to Provide Required Information with Respect to "Stockholder Associated Persons"**

83.     A key element of the Advance Notice Requirements is that the disclosure requirements contained therein apply not only to the nominating stockholder itself (here, Blackwells) but also to "any Stockholder Associated Person," a defined term.  For example, any notice of nomination must disclose, as to any Stockholder Associated Person:

- "any material interest" in business the stockholder proposes to bring before the meeting, including "any anticipated benefit" to the Stockholder Associated Person (Bylaws, Art. I, § 11(a)(3)(a));

- information required pursuant to SEC Rule 14a-19(b) if the Stockholder Associated Person intends to engage in a solicitation in support of director nominees (*Id*. §11(a)(3)(B));

- the number of all shares of the corporation beneficially owned, including date acquired, short interest, and whether the person has engaged in hedging or derivative transactions in the last six months (*Id*. § 11(a)(3)(C));

- "any substantial interest" in the Company, including "any existing prospective commercial, business or contractual relationship" (*Id*. § 11(a)(3)(C)(iv));

- all information that would be required to be disclosed in connection with the solicitation of proxies pursuant to Regulation 14 (*Id*. § 11(a)(3)(D)(iii)); and

- the name and address of the Stockholder Associated Person (*Id*. § 11(a)(3)(E)).

84.     Pursuant to Section 11(a)(6) of the Bylaws, a "Stockholder Associated Person" of any stockholder is defined to include any one of eight separate categories of persons, including any person (i) "acting in concert with such stockholder" and (v) "that, together with such stockholder and/or its affiliates and associates, has engaged in activities undertaken with the purpose or effect of changing or influencing control of the Corporation or in connection with or as a participant in any transaction having such purpose or effect."

-26-

85.     Blackwells' Nomination Notice identifies only Defendants Blackwells Onshore I LLC, Blackwells Holding Co. LLC, Vandewater Capital Holdings LLC, Blackwells Asset Management LLC, BW Coinvest Management I LLC, and Aintabi as Stockholder Associated Persons.  Where information is required to be provided under the Advance Notice Requirements as to Stockholder Associated Persons, the Nomination Notice only provides information as to these Blackwells Defendants.

86.     Blackwells' own correspondence and Nomination Notice show, however, that more than these Blackwells Defendants qualify as "Stockholder Associated Persons" pursuant to the plain language of the definition.

87.     For example, Blackwells has claimed repeatedly to have multiple financing sources on debt and equity with respect to its acquisition bid.  Blackwells' December 1, 2023 bid letter stated that it expected to finance any acquisition "with a combination of debt and equity" and that "LP [limited partner] commitments" would help "fund the equity portion" of the transaction.  Likewise, the December 22, 2023 letter from Blackwells' counsel asserted again that Blackwells would finance the transaction "with a combination of debt and equity from internal and external sources," and offered to provide "additional confidential information" regarding its "financing sources," but only "after Blackwells receives confirmation that the Board is interested in engaging in a discussion regarding Blackwells' proposal."  As funding sources for Blackwells' contemplated acquisition, these limited partners and "external sources" would plainly qualify as persons who, "together with" Blackwells, have engaged in "activities undertaken with the purpose or effect of changing or influencing control of the Corporation or in connection with or as a participant in any transaction having such purpose or effect."  Yet the Nomination Notice fails to provide the information required as to Stockholder Associate Persons for these persons, let alone their identities.

88.     Additionally, the Nomination Notice reveals that in connection with the proposed acquisition, Blackwells "contacted representatives of the following complex financial institutions, and high net worth individuals and in some instances, provided them with marketing materials relating to the Proposed Acquisition:  TPG Real Estate Finance Trust, Barclays plc, Hudson Bay Capital Management, Invesco, Sixth Street, Willett Advisors, Spartan Investment Management Ltd., Related Fund Management, Berkadia, Tom Barrack, Todd Schuster and Karim Khatoun."  One of those investors in fact sent an indication of interest to the Company at roughly the same time, revealing a likelihood of concerted activity.  But Blackwells identified neither that investor nor any of the others with whom it admittedly communicated with respect to a potential acquisition as Stockholder Associated Person, nor did it provide the required information for such persons.

### 3.     The Nomination Notice Contained Additional Defects.

89.     The Nomination Notice contains additional inaccuracies and omissions. For example, pursuant to the Advance Notice Requirements, a stockholder's notice, with respect to any proposed nominee, must attach "a completed Proposed Nominee questionnaire" to be provided by the Company upon request.  Bylaws, Art. I, § 11 (a)(4).  Among the questions in the questionnaire provided by the Company to Blackwells was for the proposed nominee to "describe your comprehensive business history and experience," including "your current and prior principal occupations and employment" and "the reason for your departure from any prior position."

90.     The questionnaire submitted with respect to Jennifer M. Hill, however, includes a potential material misstatement in identifying Hill as having served as "the Chief Financial Officer of Bank of America Merrill Lynch (NYSE: BAC), an investment bank and financial services holding company, from July 2011 to December 2014."  In fact, Hill served as the CFO of a *division* of Bank of America.

91.    Further, with regard to the "reason" for Ms. Hill's departure from her various prior positions, the questionnaire states tersely only that "[i]n each case, I left willingly to pursue another business opportunity." The questionnaire does not offer any substantive discussion of the circumstances surrounding her departures, rendering her response materially incomplete.

92.    The questionnaire for Betsy L. McCoy also, upon information and belief, contains material deficiencies, including with respect to failure to disclose bankruptcy matters, which are required by the questionnaire and incomplete information with respect to other financial matters.

93.    Additionally, the Advance Notice Requirements require, for any stockholder, such as Blackwells, that "has in the twenty-four months immediately preceding" the date of the notice "made a proposal to acquire control" of the Company, disclosure of "all information relating to the stockholder . . . that would be disclosed in any notices, forms or filings required by U.S. federal laws or the rules and regulations of any agency, department or other instrumentality of the U.S. federal government ('U.S. Federal Agency') in connection with the direct or indirect acquisition by such person of control of the Corporation." Bylaws, Art. I, § 11(a)(3)(D)(iv). By its terms, the Bylaw encompasses "voluntary" filings by an acquirer under federal law, such as, where applicable, to CFIUS pursuant to the Defense Production Act of 1950, as amended. *Id*. CFIUS is an interagency committee authorized to review certain transactions involving foreign investment in the United States to determine the effect on U.S. national security.

94.    Blackwells chose not to provide any disclosures required in a CFIUS filing, including basic information like the specific identity of the acquiring person, its ownership structure and parent and subsidiaries, whether that entity has foreign ownership, whether the proposed transaction would come within the scope of a transaction over which CFIUS has jurisdiction or involve the potential for control by a foreign government. Notably, Blackwells does

not provide any information of the sources of funding for a potential transaction or whether it has previously been a party to a transaction where a CFIUS filing was made. In this regard, Blackwells is run by Aintabi, a member of a wealthy family that hails from Lebanon and Canada and which has business interests around the globe. Various press reports indicate that Blackwells invests "family money."

95.     In its Nomination Notice, Blackwells makes much about Section 11(a)(3)(D)(iv), calling it "ambiguous," and claiming that it calls for information that is either "outside the scope of the legitimate corporate interest of the Corporation" or "redundant." Blackwells, however, never raised these concerns with the Company before submitting its Nomination Notice, nor did it approach the Company concerning what disclosures would be deemed to satisfy its requirements. Moreover, a target's board has a legitimate interest in understanding what information will be provided by a particular potential acquiror to federal regulatory authorities, in order to assess the likelihood that those authorities would approve (or reject) any such transaction after reviewing the information provided. That is particularly true for Braemar, which has access to customer data and owns properties in sensitive locations, including walking distance to the White House. Regardless, Section 11(a)(3)(D)(iv) is only one of the multiple Advance Notice Requirements with which Blackwells did not comply, each of which independently renders the Nomination Notice non-compliant and defective.

**F.    The Board Properly Exercises Its Business Judgment To Reject The Nomination Notice.**

96.     As explained above, Blackwells' Notice of Nomination failed to provide all information required under the Advance Notice Requirements of Section 11 of the Bylaws, and Blackwells did not correct those inaccuracies within two business days of delivery, or by the timeliness deadline of March 11, 2024. Accordingly, pursuant to the Bylaws, the Company was

empowered to reject the Purported Nominees and decline to permit them to stand for election at the 2024 Annual Meeting.  Bylaws §§ 11(a)(2), 11(c)(1).

97.    Upon receipt, the Nomination Notice was provided to the Company's Board for review.  In consultation with its legal advisors, the Board carefully reviewed the Nomination Notice and found it to be deficient because it contained material misstatements, inaccuracies, and omissions, and therefore, was not provided in accordance with the Advance Notice Requirements in Braemar's Bylaws.  Accordingly, the Board resolved that Blackwells' refusal to comply with the Advance Notice Requirements rendered its Purported Nominees ineligible to stand for election at the 2024 Annual Meeting and barred Blackwells from bringing any other business before the 2024 Annual Meeting.

98.    Additionally, in an exercise of its business judgment, the Board considered additional factors bearing on Blackwells' and Aintabi's character and past dealings, including:

- Blackwells' lack of candor over the course of its interactions with the Company since October 2023, including its refusal to provide requested information concerning the viability of its bid, and the implausible assertion that it has "withdrawn" any interest in a transaction with the Company;

- Blackwells' and Aintabi's erratic and inconsistent behavior as directed toward Braemar, including demand letters, litigation threats, and changing law firms, followed by a bid for the Company, the launch of a proxy contest, and the purported withdrawal of its bid;

- Blackwells' and Aintabi's negative reputation in the business community, including:

  - a January 2024 report by research and advisory service "13D Monitor" describing Blackwells' approach to The Walt Disney Company: "enter Goofy - in the form of Blackwells Capital with a $5 million position, who has been making a mockery of shareholder activism with every move they make at Disney"; and

  - a March 21, 2024 report by Institutional Shareholder Services (ISS) describing Blackwells' "inconsistencies" which "make it hard to

ascertain Blackwells' precise intention with [the Disney] campaign";

- Aintabi's checkered personal history and record of filing petty lawsuits, including:

  - a 2009 lawsuit against a hotel management company employee whom Aintabi accused of defamation based on the statement that plaintiffs "don't close," which was subsequently dismissed by the court (*Aintabi v. Horn*, Index No. 108363/2009 (N.Y. Sup.)); and

  - a 2014 lawsuit against another hotel management company employee whom Aintabi accused of defamation for reporting misbehavior, including what appeared to be Aintabi taking a shot of alcohol from a woman's cleavage, to high-level employees, which was discontinued with prejudice (*Jesta Hospitality CT LLC v. Chesapeake Hospitality II LLC*, Index No. 156200/2014 (N.Y. Sup.)); and

- a 2013 settlement agreement between Jesta Digital, LLC (owned by Aintabi's father, who installed Aintabi as the company's CEO) and the Federal Trade Commission in which Jesta Digital paid a $1.2 million fine on top of refunds to customers and agreed to a stipulated permanent injunction arising out of a series of deceptive practices undertaken by Jesta Digital, including running phone virus-scan ads on mobile devices and misusing a novel billing technique to place charges on users' mobile phone bills without the need to obtain payment information directly from the consumers (*Federal Trade Commission v. Jesta Digital*, 1:13-cv-01272 (D.D.C.)).

99.    Based on the totality of these factors, the Board determined that it would not be in the best interest of the Company and its stockholders for it to waive Blackwells' non-compliance with the Advance Notice Requirements and permit its Purported Nominees to stand for election.

## G.    Defendants File a Materially Misleading Preliminary Proxy Statement with the SEC.

100.    Demonstrating unequivocally their intention to proceed with their solicitation, on March 22, 2024, Defendants Blackwells, Blackwells Onshore, Aintabi, and the Purported Nominees filed a Preliminary Proxy Statement, Schedule 14A, with the SEC.  The proxy

statement announces that they "are soliciting proxies from the Corporation's stockholders" on multiple matters, including "[t]he election of each of our director nominees," the Purported Nominees, and multiple stockholder proposals described as the "Blackwells Proposals."

101.    The preliminary proxy statement is materially misleading for multiple reasons.  It states that "Blackwells stated in the Nomination Notice that . . . Blackwells withdrew any interest it had in pursuing the Proposed Acquisition or any similar transaction with the Corporation."  It fails to disclose, however, that Blackwells has a live and active interest in acquiring the Company, as demonstrated by the evidence described above (including its March 2024 investor presentation premised on an acquisition).

102.    The proxy statement is also materially misleading because it fails to disclose that Blackwells has engaged in concerted activity with multiple third parties with respect to the Company, including in connection with a potential acquisition of the Company.

103.    Importantly, the proxy statement materially misleads the investing public by soliciting stockholder votes in favor of the Purported Nominees and Blackwells Proposals, while failing to disclose that, as a result of Blackwells' violations of the Company's Advance Notice Requirements, it is not permitted to put forth director candidates or other business before the 2024 Annual Meeting, and votes cast for the Purported Nominees or the Blackwells Proposals will not be counted.

**H.    Absent Judicial Intervention, Defendants' Imminent Campaign Will Irreparably Harm Braemar and Its Stockholders.**

104.    Unless enjoined, Defendants' proxy campaign in support of the Purported Nominees will cause irreparable harm to Braemar and its stockholders.

105.    There is no question that Defendants plan to imminently commence their solicitation of Braemar stockholders.  As stated in the Nomination Notice, Blackwells has already

spent $500,000 in furtherance of its solicitation, and expects to ultimately spend $5 million. On March 22, 2024, Defendants filed a preliminary proxy statement, Schedule 14A, with the SEC, establishing unequivocally that they will solicit proxy votes from Braemar's stockholders in support of the ineligible Purported Nominees unless enjoined.

106.    Defendants thus stand on the precipice of soliciting proxies in support of Purported Nominees with inadequate and misleading disclosures in violation of Regulation 14A, including the demonstrably false assertion that Blackwells has "withdrawn" any interest in acquiring the Company, a statement repeated on page 5 of Defendants' March 22 preliminary proxy statement.

107.    Further, the launch of a proxy solicitation would sow confusion and misinformation among the Company's stockholders, by suggesting that the Purported Nominees may stand for election, when they are in fact ineligible as a result of Blackwells' failure to comply with the Advance Notice Requirements and the Board's determination that they are ineligible.

108.    It is well recognized that the threat of an uninformed stockholder vote constitutes irreparable harm. Moreover, in corporate control contests the stage of preliminary injunctive relief, rather than post-contest lawsuits, is the time when relief can best be given.

## FIRST CLAIM FOR RELIEF

**(Injunctive Relief Against Solicitation of Proxies in Violation of Section 14(a) of the Exchange Act and Rules and Regulations Thereunder)**

109.    Braemar hereby incorporates the allegations contained in the paragraphs above as if fully set forth herein.

110.    The SEC's proxy solicitation rules, promulgated in Regulation 14A under the Exchange Act, promote corporate democracy by requiring full and fair disclosure of material facts to enable stockholders to make informed decisions in their capacity as voters.

111.    Rule 14a-9 under the Exchange Act, 17 C.F.R. § 240.14a-9, prohibits making a solicitation "by means of any . . . communication, written or oral, containing any statement, at which time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."

112.    Absent an injunction, Defendants will imminently commence a proxy solicitation, within the meaning of Rule 14a-9, that materially misleads that Company's stockholders by suggesting that the Purported Nominees may stand for election at the 2024 Annual Meeting, when in reality they are ineligible to stand for election due to Blackwells' failure to comply with the Advance Notice Requirements and the Board's determination that the Purported Nominees are ineligible.

113.    In the Nomination Notice, Blackwells acknowledges that it made an acquisition proposal to the Company in December 2023.  Nonetheless, Blackwells asserts in the Nomination Notice that it "has withdrawn any interest it had in pursuing this or any similar transaction with the [Company]."   In a letter sent on March 10, 2024 accompanying the Nomination Notice, Blackwells reiterated the assertion that it had "withdraw[n] any interest we had in a transaction with Braemar."

114.    That is false.  Among other reasons, the Nomination Notice attaches a Blackwells investor presentation on Braemar dated "March 2024" that is entirely premised on taking Braemar "private."

115.    Absent an injunction, Defendants will imminently disseminate its materially false and misleading statement that it "has withdrawn any interest" in acquiring the Company among Braemar's stockholders in connection with their solicitation.

116.    In addition, on March 22, 2024, Defendants filed a preliminary proxy statement with the SEC that is materially misleading in violation of Rule 14a-9, including because: (i) it fails to disclose Blackwells' ongoing interest in an acquisition; (ii) it fails to disclose Blackwells' concerted activity with third parties with respect to the Company, including a potential acquisition of the Company; and (iii) it fails to disclose that, as a result of Blackwells' violations of the Company's Advance Notice Requirements, it is not permitted to put forth director candidates or other business before the 2024 Annual Meeting, and votes cast for the Purported Nominees or the Blackwells Proposals will not be counted.

117.    In addition, Item 5(b)(1) of Rule 14a-101, promulgated under Section 14(a) of the Securities Exchange Act of 1934, requires "any arrangement or understanding . . . with respect to any future transactions to which the registrant or any of its affiliates will or may be a party." 17 C.F.R. § 240.14a-101, Item 5(b)(1).

118.    A potential future acquisition of the registrant qualifies as an "arrangement or understanding" with respect to a "future transaction" for which disclosure is required under Item 5(b)(1).

119.    Blackwells' failure to disclose its interest in a potential acquisition of the Company, and its false assertion that it has "withdrawn" such interest, would constitute violations of the disclosure requirements in Item 5(b)(1) of Rule 14a-101.

120.    If Defendants are permitted to launch their proxy solicitation, Braemar and its stockholders will suffer irreparable harm, including as a result of confusion and misinformation being injected into the election of directors at the 2024 Annual Meeting. In particular, absent judicial intervention, unaligned shareholders of Braemar would be subject to confusion and may inadvertently vote in favor of director candidates who are not eligible to serve. Braemar and its stockholders would be irreparably injured by being denied the opportunity to consider fulsome and

accurate information material to the evaluation of ability, integrity, and motivations of the purported director candidates in connection with the election to take place at Braemar's 2024 Annual Meeting.

121.    This harm is concrete and imminent.  Blackwells, having already submitted the invalid Nomination Notice replete with false statements, has declared its intent to begin soliciting proxies in favor of its ineligible slate of Purported Nominees and filed a preliminary proxy statement with the SEC.  An injunction is appropriate where, as here, the anticipated injury is imminent and irreparable.

122.    Braemar has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

**(Declaratory Judgment That Blackwells' Slate of Purported Nominees Is Invalid Due to Blackwells' Violations of Braemar's Bylaws)**

123.    Braemar hereby incorporates the allegations contained in the paragraphs above as if fully set forth herein.

124.    The Advance Notice Requirements are unambiguous and valid under applicable law.

125.    The Advance Notice Requirements require stockholders to provide "timely notice" for stockholder nominations to be brought properly before an annual meeting.  To be timely, the stockholder's notice "shall set forth all information required under [] Section 11" of the Company's Bylaws.

126.    As alleged above, Blackwells has failed to provide complete and accurate information in its Notice of Nomination and violated the Advance Notice Requirements in multiple respects:

(a)    Blackwells failed to disclose its interest in acquiring the Company as required under Regulation 14A and the Advance Notice Requirements.  Bylaws, Art. I, §§ 11(a)(3)(D)(iii), 11(a)(3)(C);

(b)    Blackwells failed to provide required information with respect to "Stockholder Associated Persons." *Id*. § 11(a)(6);

(c)    Blackwells submitted a misleading questionnaire response as to Purported Nominees. *Id*. § 11 (a)(4); and

(d)    Blackwells failed to provide all required or voluntary disclosures under U.S. federal laws, rules, and regulations in connection with an acquisition of the Company. *Id*. § 11(a)(3)(D)(iv).

127.    Given Blackwells' violations of the Advance Notice Requirements, its Notice of Nomination is invalid and its Purported Nominees are ineligible to stand for election and no other business may be brought by Blackwells at the 2024 Annual Meeting.

128.    Further, based on Blackwells' violations of the Advanced Notice Requirements, in an exercise of business judgment, the Board rejected the Nomination Notice and determined that the Purported Nominees are ineligible to stand for election at the 2024 Annual Meeting.  The Board's determination was proper and entitled to the protections of Maryland's business judgment rule and are binding on Defendants.

129.    There is a real and justiciable controversy between Braemar and Defendants.

130.    If declaratory judgment is not given and the Purported Nominees are permitted to stand for election, the rights of Braemar and its stockholders will be adversely affected and they will suffer irreparable harm.

131.    Braemar is entitled to a declaratory judgment that: (i) the Nomination Notice is invalid due to Blackwells' failure to comply with the Advance Notice Requirements; and (ii) as a result, Blackwells' slate of purported nominees is invalid and ineligible to stand for election by the stockholders as directors of Braemar and no other business proposed by Blackwells may be brought before the 2024 Annual Meeting.

## THIRD CLAIM FOR RELIEF

**(Declaratory Judgment That Blackwells Cannot Cure Its Violations of Braemar's Bylaws and Is Barred from Nominating Directors For Stockholder Vote and Bringing Business Before Braemar's 2024 Annual Meeting)**

132.    Braemar hereby incorporates the allegations contained in the paragraphs above as if fully set forth herein.

133.    The Advance Notice Requirements are unambiguous and valid under applicable law.

134.    The Advance Notice Requirements provide that if any information submitted by a Nominating Stockholder is inaccurate in any material respect, such information may be deemed not to have been provided in accordance with the Advance Notice Requirements.

135.    The Advance Notice Requirements also impose an obligation on Nominating Stockholders to notify the Company of any inaccuracy or material change within two business days of becoming aware of such inaccuracy or material change.

136.    The Advance Notice Requirements provide that only individuals who are nominated in accordance with the Advance Notice Requirements shall be eligible for election as directors and only business brought in accordance with the Advance Notice Requirements may be properly brought before an annual meeting.

137.    The Nomination Notice did not comply with the Advance Notice Requirements for the reasons stated above.

138.    The Company's Bylaws do not permit Blackwells to cure deficiencies in the Nomination Notice after the notice deadline.  *See* Bylaws, Art. I, §§ 11(a)(2), 11(c)(1).  Under the Advance Notice Requirements, a nominating stockholder must submit any such materials at least 90 days prior to the first anniversary of the date of the proxy statement for the preceding year's annual meeting.  The deadline for nominating director candidates for election to the Board at the 2024 Annual Meeting was March 11, 2024.

139.    Because that deadline has passed, the Nomination Notice is now final and not subject to revision, Blackwells' non-compliance cannot be cured, and Blackwells is barred from nominating individuals for election to the Board or bringing any other business before the 2024 Annual Meeting.

140.    There is a real and justiciable controversy between Braemar and Defendants.

141.    If a declaratory judgment is not given and the Purported Nominees are permitted to stand for election for the Braemar Board or businesses permitted to be brought on the basis of the belated delivery of the information required by the Advance Notice Requirements, the rights of the Company and its stockholders will be adversely affected and they will suffer irreparable harm.

142.    Braemar is entitled to a declaratory judgment that Blackwells cannot cure their violations of the Advance Notice Requirements.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Braemar respectfully requests that the Court enter judgment against Defendants as follows:

(a)    Preliminarily and permanently enjoining Defendants from soliciting proxies from Braemar stockholders or distributing any proxy materials to Braemar stockholders in

connection with the 2024 Annual Meeting, including with respect to the Purported Nominees or any other business proposed to be brought before the 2024 Annual Meeting;

(b)     In the alternative, enjoining Defendants from soliciting proxies from Braemar stockholders or distributing any proxy materials to Braemar stockholders in connection with the 2024 Annual Meeting, including with respect to the Purported Nominees or any other business proposed to be brought before the 2024 Annual Meeting, unless such solicitation is accompanied by a disclosure that the Purported Nominees are ineligible to stand for election and any such business cannot be brought before the 2024 Annual Meeting;

(c)     Declaring that (i) the Nomination Notice is invalid due to Blackwells' failure to comply with the Advance Notice Requirements, and (ii) as a result, their slate of Purported Nominees is invalid and ineligible to stand for election and any business proposed in the Nomination Notice cannot be brought before the Annual Meeting;

(d)     Declaring that Defendants cannot cure their violations of the Advance Notice Requirements;

(e)     Ordering Defendants to withdraw any proxy statement filed by Defendants with the SEC in connection with the 2024 Annual Meeting and enjoining Defendants from filing any further proxy statement in connection with the 2024 Annual Meeting;

(f)     Ordering expedited consideration of this action;

(g)     Awarding Plaintiff Braemar the costs and disbursements of this action, including reasonable attorneys' fees and other legal costs; and

(h)     Granting Plaintiff Braemar such other and further relief as this Court may deem just and proper.

Dated: March 24, 2024                              Respectfully submitted,

CADWALADER WICKERSHAM & TAFT         AKIN GUMP STRAUSS HAUER & FELD
LLP, Of Counsel                      LLP

Adam K. Magid (Application for Pro Hac     _/s/M. Scott Barnard_____
Vice forthcoming)                    M. Scott Barnard
New York Bar No. 5233036             Texas Bar No. 24001690
Samuel G. Mann (Application for Pro Hac    2300 N. Field Street
Vice forthcoming)                    Ste. 1800
New York Bar No. 5233036             Dallas, TX 75201
Sanders Keyes Gilmer (Application for Pro  Telephone: (214) 969-4299
Hac Vice forthcoming)                Facsimile: (214) 969-4343
D.C. Bar No. 90019265                Email: sbarnard@akingump.com
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000                  **ATTORNEYS FOR PLAINTIFF**
Facsimile: (212) 406-6666
Email: adam.magid@cwt.com
        samuel.mann@cwt.com
        keyes.gilmer@cwt.com