**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| BRAEMAR HOTELS & RESORTS INC.,<br><br>                Plaintiff,<br><br>        -against-<br><br>BLACKWELLS CAPITAL LLC, BLACKWELLS ONSHORE I, LLC, BLACKWELLS HOLDING CO. LLC, VANDEWATER CAPITAL HOLDINGS, LLC, BLACKWELLS ASSET MANAGEMENT LLC, BW COINVEST MANAGEMENT I LLC, JASON AINTABI, MICHAEL CRICENTI, JENNIFER M. HILL, BETSY L. MCCOY, AND STEVEN J. PULLY,<br><br>              Defendants. | Civil Action No. 3:24-cv-707 |

**PLAINTIFF BRAEMAR HOTELS & RESORTS INC.'S**
**MEMORANDUM IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ...............................................................................1

BACKGROUND ........................................................................................................4

    A.    Blackwells Targets Braemar. ..................................................................4

    B.    Braemar's Bylaws Contain Advance Notice Requirements. ...................7

    C.    Blackwells Submits a Deficient Nomination Notice ..............................8

        1.    Failure to Disclose Blackwells' Interest in Acquiring the Company .........9

        2.    Failure to Provide Required Information with Respect to "Stockholder Associated Persons".............................................11

    D.    The Board Exercises Its Business Judgment to Reject The Nomination Notice. ..........................................................13

ARGUMENT ...........................................................................................................14

I.    Braemar Is Substantially Likely to Succeed On the Merits. .............................14

    A.    Braemar Will Likely Prevail on Its Claim to Enjoin Defendants' Solicitation Pursuant to Section 14(a) of the Exchange Act.................14

    B.    Braemar Is Likely to Prevail on Its Claim for a Declaration That the Nomination Notice Is Invalid and the Purported Nominees Ineligible.................18

        1.    Blackwells Violated the Advance Notice Requirements ..........................18

        2.    The Board's Determination That The Purported Nominees Are Ineligible To Stand For Election Is Protected By Maryland's Business Judgment Rule .........................20

II.    Defendants' Solicitation of Proxies Would Cause Irreparable Harm to Braemar and Its Stockholders. .........................................22

III.    The Threatened Injury to Braemar and Its Stockholders Outweighs Any Potential Harm to Defendants.........................................24

IV.    A Preliminary Injunction Would Not Be Adverse to the Public Interest. ........................25

CONCLUSION..........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

### <u>Cases</u>

*22nd Century Techs., Inc. v. iLabs, Inc.*,
  2023 WL 3409063 (3d Cir. May 12, 2023) ................................................................24

*7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*,
  38 F.3d 211 (5th Cir. 1994) .......................................................................................15

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
  19 F.4th 145 (2d Cir. 2021) .......................................................................................16

*Am. Gen. Corp. v. Torchmark Corp.*,
  1990 WL 595282 (S.D. Tex. Apr. 11, 1990) .............................................................19

*Ashford Hosp. Prime, Inc. v. Sessa Cap. (Master), LP*,
  No. 3:16-CV-0527-N, 2016 WL 7852507 (N.D. Tex. May 20, 2016) .................... *passim*

*Ashford Hospitality Trust, Inc. v. Cygnus Capital, Inc.*,
  No. 3:21-cv-00125-M, 2021 WL 3631142 (N.D. Tex. Feb. 18, 2021) .....................23

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)....................................................................................................16

*Bender v. Schwartz*,
  172 Md. App. 648, 917 A.2d 142 (2007)..............................................................21, 22

*Boland v. Boland*,
  423 Md. 296, 31 A.3d 529 (2011) ..............................................................................21

*Bradley v. Bradley*,
  76 A.3d 395 (Md. App. 2013)......................................................................................19

*Calumet Indus., Inc. v. MacClure*,
  464 F. Supp. 19 (N.D. Ill. 1978) .................................................................................25

*Chacon v. Granata*,
  515 F.2d 922 (5th Cir. 1975) ......................................................................................18

*Chisholm v. Hyattstown Volunteer Fire Dep't, Inc.*,
  691 A.2d 776 (Md. Ct. Spec. App. 1997)...................................................................21

*Danielewicz v. Arnold*,
  769 A.2d 274 (Md. App. 2001)....................................................................................22

*Davis v. Mineta*,
   302 F.3d 1104 (10th Cir. 2002) ...........................................................24

*Delcath Sys., Inc. v. Ladd*,
   No. 06 Civ. 6420(LAP), 2006 WL 2708459 (S.D.N.Y. Sept. 20, 2006) ...............24

*Driver Opportunity Partners I, LP v. Adams*,
   No. CV 3:23-56, 2023 WL 3580039 (W.D. Pa. May 22, 2023) .......................22

*Eastland Food Corp. v. Mekhaya*,
   486 Md. 1, 301 A.3d 308 (2023) ...........................................................21

*Hartman Com. Properties REIT v. Hartman*,
   No. CV H-06-3897, 2007 WL 9751970 (S.D. Tex. Apr. 6, 2007),
   *aff'd sub nom. Reit v. Hartman*, 252 F. App'x 631 (5th Cir. 2007) .................24

*Hollis v. Hill*,
   232 F.3d 460 (5th Cir. 2000) ..............................................................18

*Humana, Inc. v. Jacobson*,
   804 F.2d 1390 (5th Cir. 1986) ............................................................23

*IBS Fin. Corp. v. Seidman & Assocs.*,
   136 F.3d 940 (3d Cir. 1998) ..............................................................22

*J. I. Case Co. v. Borak*,
   377 U.S. 426 (1964) ..................................................................15, 24

*Janvey v. Alguire*,
   647 F.3d 585 (5th Cir. 2011) .............................................................14

*Lichtenberg v. Besicorp Grp. Inc.*,
   43 F. Supp. 2d 376 (S.D.N.Y. 1999) ......................................................15

*Lone Star Steakhouse & Saloon, Inc. v. Adams*,
   148 F. Supp. 2d 1141 (D. Kan. 2001) .............................................23, 24, 25

*McEvoy v. Select Portfolio Servicing, Inc.*,
   No. 3:16-CV-2296-B, 2017 WL 2225402 (N.D. Tex. May 22, 2017) ...................14

*Mills v. Elec. Auto-Lite Co.*,
   396 U.S. 375 (1970) .......................................................................23

*MONY Grp., Inc. v. Highfields Cap. Mgmt., L.P.*,
   368 F.3d 138 (2d Cir. 2004) ..............................................................23

*Nerium SkinCare, Inc. v. Nerium Int'l, LLC*,
   No. 3:16-CV-1217-B, 2017 WL 10152284 (N.D. Tex. Nov. 13, 2017) ...............14

iii

*Nichting v. DPL Inc.*,
  Case No. 3:11-CV-141, 2011 WL 2892945 (S.D. Ohio July 15, 2011) ................................23

*Openwave Sys. Inc. v. Harbinger Cap. Partners Master Fund I, Ltd.*,
  924 A.2d 228 (Del. Ch. 2007) ................................................................................19

*Panella v. Tesco Corp.*,
  No. 4:17-CV-02904, 2019 WL 1606349 (S.D. Tex. Mar. 29, 2019) ....................................15

*Piper v. Chris-Craft Indus., Inc.*,
  430 U.S. 1 (1977) ................................................................................................4, 18

*Strategic Inv. Opportunities LLC v. Lee Enters., Inc.*,
  2022 WL 453607 (Del. Ch. Feb. 14, 2022) .............................................................7

*Tackney v. U.S. Naval Academy Alumni Ass'n*,
  408 Md. 700 (2009) ........................................................................................19, 21

*Texas Partners v. Conrock Co.*,
  685 F.2d 1116 (9th Cir. 1982) .............................................................................16

*Transcon Lines v. A. G. Becker Inc.*,
  470 F. Supp. 356 (S.D.N.Y. 1979).......................................................................25

*Wittman v. Crooke*,
  707 A.2d 422 (Md. Ct. Spec. App. 1998) ..............................................................21

## **Statutes and Other Authorities**

Md. Code Ann., Corps. & Ass'ns § 2-405.1(g) ...........................................................21

Md. Code Ann., Corps. & Ass'ns § 2-504(f).................................................................18

2 Treatise on the Law of Corporations § 13:23 (3d ed. Nov. 2023 Update) ...................7

17 C.F.R. § 240.14a-9(a) .............................................................................................15

17 C.F.R. § 240.14a-101 ...................................................................................9, 17, 19

Plaintiff Braemar Hotels & Resorts Inc. ("Braemar" or the "Company") respectfully submits this memorandum of law in support of its motion for a preliminary injunction enjoining Defendants Blackwells Capital LLC ("Blackwells"), Blackwells Onshore I, LLC, Blackwells Holding Co. LLC, Vandewater Capital Holdings, LLC, Blackwells Asset Management LLC, BW Coinvest Management I LLC, and Jason Aintabi ("Aintabi," and collectively, the "Blackwells Defendants"), and Michael Cricenti, Jennifer M. Hill, Betsy L. McCoy, and Steven J. Pully (collectively, the "Purported Nominees," and, together with the Blackwells Defendants, "Defendants") from soliciting proxies from Braemar stockholders in connection with the Company's 2024 annual stockholder meeting (the "2024 Annual Meeting").

## PRELIMINARY STATEMENT

Braemar seeks preliminary injunctive relief to prevent the stockholder vote on director candidates at its 2024 Annual Meeting from being infected with deception and misinformation in violation of the federal proxy rules and the Company's Fifth Amended and Restated Bylaws (the "Bylaws"). Braemar is a Dallas-based, publicly traded corporation focused on investing in luxury hotels and resorts.

On March 10, 2024, Blackwells, a New York hedge fund, submitted to the Company a notice (the "Nomination Notice") of its intention to nominate the Purported Nominees to stand for election to the Company's Board of Directors (the "Board") at the 2024 Annual Meeting. The Nomination Notice, however, was rife with misstatements and omissions, including the demonstrably false assertion that Blackwells—which, only three months before, submitted a formal bid to purchase 100% of the equity interests in the Company—had "withdrawn" any interest in an acquisition. A separate letter sent by Blackwells to the Board on March 10 similarly states that Blackwells has "withdraw[n] any interest we had in a transaction with Braemar." The evidence belies Blackwells' contention. Indeed, the Nomination Notice attaches a 90-page

Blackwells investor presentation dated "March 2024" (*i.e.*, within ten days of the Nomination Notice's submission) entirely premised on a strategy to take Braemar "private."

As a result of these omissions and inaccuracies, the Nomination Notice failed to comply with multiple provisions of the Company's Bylaws (the "Advance Notice Requirements") that require stockholders to disclose specific categories of information, including any "substantial interest" in a transaction, in order to nominate director candidates. Consequently, the Nomination Notice is defective under the plain language of the Bylaws, and Blackwells' Purported Nominees who, if elected, would constitute half of the eight-person Board, are ineligible to stand for election. The deadline set forth in the Bylaws to cure such deficiencies for the 2024 Annual Meeting has passed. Accordingly, in an exercise of business judgment, the Board determined that the Nomination Notice is invalid and the Purported Nominees are ineligible to stand for election. That determination has been communicated to Blackwells.

Defendants nonetheless stand on the brink of commencing a solicitation, pursuant to the federal proxy rules under Regulation 14A of the Securities Exchange Act of 1934 (the "Exchange Act"), urging Braemar's stockholders to vote for the ineligible Purported Nominees at the 2024 Annual Meeting. Confirming their intent to solicit Braemar stockholders, Defendants have filed a preliminary proxy statement that is materially misleading, including by failing to disclose Blackwells' interest in an acquisition, its concerted activity with third parties, and the ineligibility of the Purported Nominees. If permitted to proceed, their solicitation will sow confusion among stockholders and inject misinformation (including falsely suggesting that the Purported Nominees may stand for election, and misrepresenting Blackwells' active and material interest in acquiring the Company) into the 2024 director election. The resulting harm to Braemar, its stockholders, and the integrity of the vote would be irreparable. Accordingly, the Court should grant Braemar's motion to preliminarily enjoin the solicitation, pending a final resolution of this action.

*First*, Braemar is likely to succeed on the merits of its claims for injunctive and declaratory relief. Enacted to prevent deceptive or inadequate disclosure in proxy solicitations, Section 14(a) of the Exchange Act, and Rule 14a-9 thereunder, expressly prohibit proxy solicitations by means of communications containing materially false or misleading statements or material omissions. There can be no question that any solicitation of Braemar's stockholders in support of the Purported Nominees would be materially misleading, inasmuch as the Purported Nominees are not eligible to stand for election and any votes cast in favor of them will not be counted. Moreover, Defendants' solicitation will be premised on Blackwells' false assertion that it has "withdrawn" any interest in acquiring the Company. No category of information is more material to a stockholder than a potential sale of the company, let alone to a person seeking to put forth nominees to the company's board of directors.

Likewise, Braemar is likely to prevail on its claim for declaratory judgment that the Nomination Notice was invalid and the Purported Nominees are ineligible to stand for election. As described below, the Nomination Notice failed to comply with multiple provisions of the Advance Notice Requirements, including by failing to disclose Blackwells' interest in acquiring the Company, and by failing to provide required information with respect to "Stockholder Associated Persons," among other deficiencies. The Board's subsequent determination as to the invalidity of the Nomination Notice and ineligibility of Blackwells' slate is entitled to the protection of Maryland's deferential business judgment rule and binding as to Defendants.

*Second*, absent an injunction, Defendants' proxy campaign will cause irreparable harm to Braemar and its stockholders. There is no question that Defendants plan to imminently commence their solicitation in support of ineligible Purported Nominees: by their own admission, they plan to spend as much as $5 million on the solicitation, and now have a preliminary proxy statement on file. Permitting the solicitation of proxies based upon the materially false and misleading

information which Blackwells will present is a bell that cannot be unrung, and will result in confusion and misinformation among the Company's stockholders. As the Supreme Court has observed, "in corporate control contests the stage of preliminary injunctive relief, rather than post-contest lawsuits, is the time when relief can best be given." *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 42 (1977) (citation omitted).

*Third*, the balance of equities favor preliminary relief. Allowing Defendants to solicit proxies would cause Braemar's stockholders to cast potentially meaningless votes and inject materially misleading information into the 2024 election of directors—harms that will be difficult if not impossible to unscramble. On the other hand, any hardship that may be suffered by Defendants would be self-inflicted and a result of their own failure to abide by the proxy rules and the Company's Bylaws. No cognizable harm would be suffered.

*Fourth*, the requested injunction would serve the public interest. An injunction premised on full and fair disclosure in advance of a stockholder vote would promote the objectives of Section 14(a) of the Exchange Act and the federal proxy rules, while ensuring consistent enforcement of corporate bylaws and application of Maryland corporate law.

## BACKGROUND

### A.    Blackwells Targets Braemar.

Headquartered in Dallas, Braemar is a real estate investment trust ("REIT"), organized under Maryland law, which owns an iconic portfolio of resorts and hotels. Declaration of Alex Rose ("Rose Decl.") Ex. 2, App. ("A.") 39-40. Braemar currently owns interests in 16 hotel properties in seven states, the District of Columbia, Puerto Rico and St. Thomas, U.S. Virgin Islands, with 4,192 total rooms. *Id.* Braemar is led by a management team, including Chief Executive Officer and President Richard J. Stockton and an eight-person Board of Directors,

including lead director Stefani Danielle Carter.  Monty J. Bennett serves as chairman of Braemar's board.  Rose Decl. ¶ 3, A.2.

Blackwells is a hedge fund founded in 2016 by Defendant Jason Aintabi, its Chief Investment Officer, and based in New York, New York.[1]  Declaration of Adam K. Magid ("Magid Decl.") Ex. G, A.535. In October 2023, Blackwells began a targeted campaign directed at Braemar, starting with a demand letter from Blackwells' counsel leveling allegations of "potential breaches of fiduciary duty and/or other wrongdoing."  Rose Decl. Ex. 3, A.41.[2]  Upon receipt, the Board established a Review Committee consisting of two independent directors by unanimous consent. *Id.*[3]  After undertaking an investigation with the assistance of experienced counsel, the Review Committee recommended that the Board not take the actions set forth in Blackwells' demand letter. Rose Decl. ¶ 13, A.4.  The Board followed that recommendation and resolved not to pursue the proposed actions.  *Id*. Ex. 4, A.46.  That decision and the detailed bases for reaching it were communicated to Blackwells, by letter, on January 9, 2024.  *Id*.

On December 1, 2023, Blackwells sent another letter to the Board, with the header "Proposal for Acquisition of Braemar," containing a "preliminary proposal for the negotiated acquisition" of the Company.  *Id*. Ex. 5, A.52.  Through the letter, Blackwells proposed to acquire 100% of the outstanding equity interests in the Company for $4.50 per share in cash, which it

---

[1] The Blackwells Defendants, which are investment funds owned by Aintabi and associated with Blackwells, were each identified in the Nomination Notice as "Stockholder Associated Persons." Rose Decl. Ex. 7, A.72.

[2] At the time, Blackwells' holdings of Braemar stock amounted to only 100 shares of record. Rose Decl. Ex. 7, A.150.  Blackwells would go on to buy only 10,000 shares more, all on March 4, 2024, six days before it submitted its Nomination Notice.  *Id*.

[3] The Review Committee, which qualified as independent under New York Stock Exchange standards, was delegated full authority of the Board to investigate, review, and analyze the facts and circumstances forming the basis for the demand and make a recommendation to the full Board as to whether to pursue any claims implied or asserted in the demand.  Rose Decl. Ex. 3, A.41-45.

characterized as "a substantial premium to recent trading prices of the stock." *Id*. The letter enclosed a 12-page due diligence request list, as well as a proposed form of exclusivity agreement. *Id.*, A.55. The letter noted that Blackwells "would expect to finance the Transaction with a combination of debt and equity," including, with respect to equity, funding from "Blackwells' internal resources, as well as LP commitments." *Id.*, A.53.

On December 6, 2023, the Company, through counsel, sent Blackwells a letter presenting certain threshold questions so that the Board could assess the viability of Blackwells' bid, including with respect to its ability to obtain financing. Magid Decl. Ex. A, A.522. On December 22, Blackwells, through its counsel at Vinson & Elkins LLP, sent a response letter that did not provide any of the requested information, and only would do so "after Blackwells receives confirmation that the Board is interested in engaging in a discussion regarding Blackwells' proposal." *Id*. Ex. B, A.525. Less than a week later, different counsel, Quinn Emanuel, sent a letter on behalf of Blackwells and Aintabi threatening to file litigation against Braemar, purportedly based on an article "Vinson & Elkins Helps New York Activist Investor Invade Texas" published in *The Dallas Express*. *Id*. Ex. C, A.527.[4]

On January 2, 2024, Braemar's counsel emailed Blackwells' counsel, acknowledging that the December 22 letter had been shared with the Board and reiterating its request for the information presented in Braemar's December 6 letter. Rose Decl. Ex. E, A.532-33. That same day, Blackwells requested from the Company the questionnaire required under the Bylaws to nominate director candidates. *Id*. Ex. 6, A.70-71.

---

[4] The article truthfully described Blackwells' campaign against Braemar, and included a quote from Mr. Bennett noting accurately that Aintabi "owns only 100 common shares of record" and "wish[ing] Mr. Aintabi and Blackwells would engage in constructive dialogue instead of issuing threatening Vinson & Elkins authored lawyer-letters right out of the gates." Magid Decl. Ex. D, A.530.

**B.    Braemar's Bylaws Contain Advance Notice Requirements.**

Advance notice bylaws require a shareholder who intends to nominate directors or introduce other business at a shareholder meeting to submit notice in advance.  *See, e.g.*, 2 Treatise on the Law of Corporations § 13:23 (3d ed. Nov. 2023 Update).  In addition to setting deadlines for nomination notices, advance notice bylaws may require stockholders to provide information "allowing boards of directors to knowledgably make recommendations about nominees and ensuring that stockholders cast well-informed votes."  *Strategic Inv. Opportunities LLC v. Lee Enters., Inc.*, 2022 WL 453607, at *9 (Del. Ch. Feb. 14, 2022).

Braemar, like many public companies, has adopted Advance Notice Requirements which are contained in Article I, Section 11 of its Bylaws.  Rose Decl. Ex. 1, A.8.  The Advance Notice Requirements are the "exclusive means" for a stockholder to make director nominations and propose other business at an annual meeting of stockholders.  *Id*. § 11(a)(1), A.15.  The Advance Notice Requirements require, for any nomination or other business to be properly brought before an annual meeting, a stockholder to have given "timely notice thereof in writing" to the Company's secretary.  *Id*. § 11(a)(2), A.15.  To be "timely," the stockholder's notice must "set forth all information required under this Section 11" and be delivered to the corporate secretary not earlier than the 90th day nor later than the 60th day prior to the first anniversary of the date of the preceding year's annual meeting.  *Id*.

Article I, Section 11(a)(3) of the Bylaws sets forth the information that must be provided in the stockholder's notice.  For example, the stockholder or any "Stockholder Associated Person" must disclose, with respect to any business other than a nomination, "any material interest in such business," including any "anticipated benefit to the stockholder or the Stockholder Associated person therefrom."  *Id*. § 11(a)(3)(A), A.16.  "Stockholder Associated Person" is defined to include various categories of persons affiliated or acting in concert with the nominating stockholder in

connection with its investment and activities with respect to the Company. *See id*. § 11(a)(6), A.18.

The Advance Notice Requirements require complete and accurate disclosure of all information required under Section 11(a)(3) for a stockholder's notice to be valid and for its purported nominees to stand for election. *See id.* § 11(c)(1), A.19 (providing that if information submitted is "inaccurate in any material respect, such information may be deemed not to have been provided in accordance with this Section 11"). They also contain strict time limits for correcting any inaccuracies or omissions, requiring a stockholder to provide notice to the Company of any inaccuracy or change "within two Business Days of becoming aware of such inaccuracy or change." *Id*. Moreover, the Bylaws provide no mechanism for a stockholder to cure any defect in its Nomination Notice after the last day on which a Nomination Notice would be "timely." *See id.* §§ 11(a)(2), A.15, 11(c)(1), A.19-20.

### C.    Blackwells Submits a Deficient Nomination Notice.

On March 10, 2024, the day before the advance notice deadline for the 2024 Annual Meeting, Blackwells delivered by email to Braemar the Nomination Notice. Rose Decl. ¶ 16, A.5.[5] A physical copy followed the next day. *Id*. The Nomination Notice purported to nominate four individuals, the Purported Nominees, to stand for election to the Board and propose certain business proposals for consideration at the 2024 Annual Meeting. *Id*. Ex. 7, A.72-98. As detailed below, however, the Nomination Notice failed to provide complete and accurate disclosure as required under the Advance Notice Requirements.

---

[5] Braemar's Annual Meeting in 2023 was held on May 10, 2023. Rose Decl. ¶ 10, A.4. The 60th day prior to May 10, 2024 is March 11, 2024. *Id*. Accordingly, the deadline to submit all written notices for the 2024 Annual Meeting was March 11, 2024. *Id*.

1.      **Failure to Disclose Blackwells' Interest in Acquiring the Company**

The Advance Notice Requirements require a stockholder's notice to include "all information relating to the stockholder, the Proposed Nominee or the Stockholder Associated Person that would be required to be disclosed in connection with the solicitation of proxies pursuant to Regulation 14A (or any successor provision) under the Exchange Act."  Rose Decl. Ex. 1 § 11(a)(3)(D)(iii), A.17.  That encompasses the requirement under Item 5(b)(1), Rule 14a-101 of Regulation 14A to disclose "any arrangement or understanding . . . with respect to any future transactions to which the registrant or any of its affiliates will or may be a party."  17 C.F.R. § 240.14a-101, Item 5(b)(1).  In addition, the Advance Notice Requirements require the notice to disclose any "substantial interest, direct or indirect (including without limitation any existing or prospective commercial, business or contractual relationship) . . . of such stockholder . . . in the Corporation."  Rose Decl. Ex. 1, Art. I § 11(a)(3)(c), A.16-17.

The Nomination Notice, however, did not disclose Blackwells' "interest" or "understanding" with respect to a future acquisition of the Company pursuant to the above provisions.  *Id*. Ex. 7, A.72.  Instead, the Nomination Notice states that Blackwells "has withdrawn any interest it had in pursuing this or any similar transaction with the Corporation."  *Id*., A.81.  A separate letter sent by Blackwells to the Board on March 10 similarly states that Blackwells has "withdraw[n] any interest we had in a transaction with Braemar."  *Id*. Ex. 8, A.517.  The evidence directly contradicts the Nomination Notice's assertion and leaves no doubt that Blackwells' interest in acquisition is live and active.  That evidence includes:

***Formal bid letter and follow up.***  On December 1, 2023, Blackwells made a written bid to acquire 100% of the outstanding interests of the Company for $4.50 per share.  Rose Decl. Ex. 5, A.52-69.  On December 22, 2023, Blackwells sent another letter to the Company reiterating its interest.  Magid Decl. Ex. B, A.525-26.  The Nomination Notice was delivered less than three

months later.  Prior to delivery of the Nomination Notice, Blackwells never retracted its bid.  Rose Decl. ¶ 14, A.5.[6]

*March 2024 investor presentation*.  The Nomination Notice attaches a 90-page Blackwells investor presentation on Braemar dated "March 2024" (*i.e.*, within ten days of the Nomination Notice) premised on taking Braemar "private."  Rose Decl. Ex. 7, A.153-242.  The presentation notes that Blackwells believes that "an expensive/contentious proxy fight is unlikely to produce an optimal result," but that "the unspoken threat of public criticism/action by Blackwells will compel [Monty] Bennett to open discussions with Blackwells at which point an appeal to Bennetts [sic] pocketbook may produce win-win-win (Shareholders, Take Private Interested Parties, Bennett) range of options."  *Id.*, A.157.  The presentation assumes that Braemar "will put up strong resistance to a sale for anything other than a godfather offer plus a robust multiple," but that "in light of the current market dynamics Bennett may find some options favorable enough to contemplate in earnest."  *Id.*  A slide on "Take Private Considerations" discusses factors in favor of "Privatiz[ing] a Large and High-Quality Luxury Hotel Portfolio Primed for Growth" and Braemar's "Exceptional Returns with Significant Margin of Safety."  *Id.*, A.158.  The presentation includes an extended section entitled "LBO Model," which includes illustrative sources and uses with respect to an acquisition of the Company, and a "LBO Model – Returns Summary" analyzing potential returns if, after an acquisition of the Company, it were sold five years later.  *Id.*, A.212-19.

*Small ownership stake/large investment in proxy fight*.  Blackwells beneficially owns only 10,100 shares of the Company's stock, 10,000 of which were purchased during the week preceding the delivery of the Nomination Notice when the common stock was trading at

---

[6] The assertion that Blackwells had "withdrawn" its interest in a transaction was repeated in a March 10, 2023 letter from Aintabi to the Board.  Rose Decl. Ex. 8, A.517.

approximately $2.00 per share (*i.e.*, an investment of only $20,000).  *Id.*, A.150.  Blackwells'

ownership stake amounts to a miniscule 0.015% of the shares outstanding.  Magid Decl. Ex. I,

A.595.  Nonetheless, the Nomination Notice states that Blackwells plans to spend $5 million in

furtherance of its proxy solicitation, and already has spent $500,000, without presenting a plausible

motivation aside from the transaction-focused goals in the March 2024 presentation.  Rose Decl.

Ex. 7, A.91.

*Express reference to possible "future" bid.*  The Nomination Notice states that Blackwells

"could in the future make a bid to acquire the Corporation."  *Id.*, A.78.  That statement, however,

is misleading because Blackwells already has made a bid and, as stated in the March 2024

presentation, its proxy contest is simply part of the plan to get the Company to come to the table.

\*      \*      \*

In short, the evidence (including Blackwells' own materials) eviscerates Blackwells'

belated attempt to disclaim an acquisition interest for the purpose of its Nomination Notice.

Pursuant to the Advance Notice Requirements, that interest should have been disclosed.

### 2.    Failure to Provide Required Information with Respect to "Stockholder Associated Persons"

The Advance Notice Requirements require, in numerous instances, disclosure not only for

the nominating stockholder, but also with respect to "any Stockholder Associates Person."  For

example, any notice of nomination must disclose, as to any Stockholder Associated Person: (i)

"any material interest" in or "any anticipated benefit" from business that the stockholder proposes

to bring before the meeting (Rose Decl. Ex. 1, Art. I, § 11(a)(3)(a), A.16); (ii) the number of all

shares of the corporation beneficially owned, including date acquired, short interest, and whether

the person has engaged in hedging or derivative transactions in the last six months (*id.*

§ 11(a)(3)(C), A.16); (iii) all information that would be required to be disclosed in connection with

the solicitation of proxies pursuant to Regulation 14 (*id*. § 11(a)(3)(D)(iii), A.17); and (iv) the name and address of each (*id*. § 11(a)(3)(E), A.18).

Pursuant to Section 11(a)(6) of the Bylaws, a "Stockholder Associated Person" of any stockholder is defined to include any one of eight separate categories of persons, including any person (i) "acting in concert with such stockholder" and (ii) "that, together with such stockholder and/or its affiliates and associates, has engaged in activities undertaken with the purpose or effect of changing or influencing control of the Corporation or in connection with or as a participant in any transaction having such purpose or effect." Rose Decl. Ex. 1, A.18-19. As Blackwells' own correspondence and Nomination Notice show, however, Blackwells failed to disclose the required information for all such persons.[7]

*First*, Blackwells did not provide the required disclosures for multiple financing sources on debt and equity with respect to its acquisition bid. Blackwells' December 1, 2023 bid letter stated that it expected to finance any acquisition "with a combination of debt and equity" and that "LP [limited partner] commitments" would help "fund the equity portion" of the transaction. Rose Decl. Ex. 5, A.53. The December 22, 2023 letter from Blackwells' counsel asserted again that Blackwells would finance the transaction "with a combination of debt and equity from internal

---

[7] The Nomination Notice contains additional inaccuracies and omissions. For example, the director questionnaire submitted for Jennifer M. Hill identifying Hill as having served as "the Chief Financial Officer of Bank of America Merrill Lynch (NYSE: BAC), an investment bank and financial services holding company, from July 2011 to December 2014." Rose Decl. Ex. 7, A.333. In fact, Hill served as the CFO of a *division* of Bank of America. Magid Decl. Ex. G, A.535-36. Hill's responses also fail to provide any substantive discussion of the circumstances surrounding her departure, noting only that she "left willingly to pursue another business opportunity." Rose Decl. Ex. 7, A.334. Further, the Nomination Notice did not include certain information that may have been required due to Blackwells' submission of a bid to acquire the Company within the prior 24 months. *See* Rose Decl. Ex. 1, Art. I, § 11(a)(3)(D)(iv), A.17-18 (requiring disclosure of "all information relating to the stockholder . . . that would be disclosed in any notices, forms or filings required by U.S. federal laws or the rules and regulations of any agency, department or other instrumentality of the U.S. federal government ('U.S. Federal Agency') in connection with the direct or indirect acquisition by such person of control of the Corporation").

and external sources." Magid Decl. Ex. B, A.522. As funding sources for Blackwells' contemplated acquisition, these limited partners and "external sources" would qualify as persons who, "together with" Blackwells, have engaged in "activities undertaken with the purpose or effect of changing or influencing control of the Corporation or in connection with or as a participant in any transaction having such purpose or effect." The Nomination Notice fails to provide the information required as to Stockholder Associated Persons for these persons, nor even their identities.

*Second*, Blackwells did not provide disclosures for certain individuals and entities with which Blackwells acted in concert. As stated in the Nomination Notice, Blackwells "contacted representatives of the following complex financial institutions, and high net worth individuals and in some instances, provided them with marketing materials relating to the Proposed Acquisition: TPG Real Estate Finance Trust, Barclays plc, Hudson Bay Capital Management, Invesco, Sixth Street, Willett Advisors, Spartan Investment Management Ltd., Related Fund Management, Berkadia, Tom Barrack, Todd Schuster and Karim Khatoun." Rose Decl. Ex. 7, A.83. One of those investors in fact sent an indication of interest to the Company at roughly the same time, revealing a likelihood of concerted activity. Rose Decl. ¶ 18, A.6. No corresponding Stockholder Associated Persons disclosures, however, were provided.

**D.    The Board Exercises Its Business Judgment to Reject The Nomination Notice.**

Upon receipt, the Nomination Notice was provided to the Company's Board for review. In consultation with its legal advisors, the Board carefully reviewed the Nomination Notice and found it to be deficient because it contained material misstatements, inaccuracies, and omissions, and therefore, was not provided in accordance with the Advance Notice Requirements in Braemar's Bylaws. *Id*. ¶ 17, A.6. Accordingly, the Board determined that Blackwells' refusal to comply with the Advance Notice Requirements rendered its Purported Nominees ineligible to stand for

election at the 2024 Annual Meeting. *Id.*  Further, the Board considered factors bearing on Blackwells' and Aintabi's character and past dealings, and determined that it would not be in the best interest of the Company and its stockholders to waive Blackwells' non-compliance with the Advance Notice Requirements. *Id.*

<u>**ARGUMENT**</u>

In order to obtain a preliminary injunction, the movant must establish: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).  All four factors favor preliminary relief here.

**I.    Braemar Is Substantially Likely to Succeed On the Merits.**

To satisfy its burden of establishing a "substantial likelihood of success," the movant need not provide that it is entitled to summary judgment or certain to win at trial.  *Nerium SkinCare, Inc. v. Nerium Int'l, LLC*, No. 3:16-CV-1217-B, 2017 WL 10152284, at *3 (N.D. Tex. Nov. 13, 2017).  Rather, the movant "need only present a *prima facie* case."  *McEvoy v. Select Portfolio Servicing, Inc.*, No. 3:16-CV-2296-B, 2017 WL 2225402, at *5 (N.D. Tex. May 22, 2017) "Ordinarily, it will be enough if the plaintiff raises questions going to the merits 'so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.'"  *Id*. (citation omitted).  Braemar's claims under Section 14(a) of the Exchange Act and the Bylaws more than meet this standard.

**A.    Braemar Will Likely Prevail on Its Claim to Enjoin Defendants' Solicitation Pursuant to Section 14(a) of the Exchange Act.**

The purpose of Section 14(a) of the Exchange Act and its accompanying rules and regulations is "to prevent management or others from obtaining authorization for corporate action

by means of deceptive or inadequate disclosure in proxy solicitation." *J. I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964). Section 14(a) "was intended to control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which had frustrated the free exercise of the voting rights of stockholders." *Id*. (internal quotations omitted). Rule 14a-9, in turn, provides that "[n]o solicitation subject to this regulation shall . . . contain[] any statement, which at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a); *see Panella v. Tesco Corp.*, No. 4:17-CV-02904, 2019 WL 1606349, at *3 (S.D. Tex. Mar. 29, 2019) ("Omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading." (internal citations omitted)).

If permitted to proceed with proxy solicitation, Defendants will materially mislead voters by falsely suggesting that the Purported Nominees are eligible director candidates when they are not. *See 7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 230 (5th Cir. 1994) (purpose of causes of action under Section 14(a) "is to protect the voting process as a whole from misinformation; it is simply a recognition that the stockholder is bound by the collective action of his other stockholders who may have been misled by the statement"); *Lichtenberg v. Besicorp Grp. Inc.*, 43 F. Supp. 2d 376, 390 (S.D.N.Y. 1999) (forcing shareholders to vote on the basis of a materially misleading proxy is precisely the "harm sought to be prevented by § 14(a) of the [Exchange Act]"); *Ashford Hosp. Prime, Inc. v. Sessa Cap. (Master), LP*, No. 3:16-CV-0527-N, 2016 WL 7852507, at *4 (N.D. Tex. May 20, 2016) (preliminarily enjoining proxy solicitation in favor of "ineligible" nominees because "[a]llowing the [] nominees to stand for election or solicit

-15-

proxy votes or distribute proxy materials regarding the nominees when they are ineligible will cause [plaintiff] irreparable injury") (citing *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 384 (1970)).[8]

Defendants' solicitation will also inject the materially misleading statement that Blackwells has "withdrawn" any interest in acquiring Braemar, while denying stockholders full and fair disclosure as to Blackwells' acquisition intentions. There is no question that a stockholder's interest in acquiring a company is material to the company's stockholders evaluating the stockholder's nominees to serve on the Board, particularly where, as here, the stockholder made a bid to acquire 100% of the Company barely four months ago and seeks to install Purported Nominees who would comprise half of the Company's Board. *See Basic Inc. v. Levinson*, 485 U.S. 224, 238-40 (1988) (agreeing that "a merger in which it is bought out is the most important event that can occur in a small corporation's life, to wit, its death") (citation omitted). The obvious divide in incentives between the would-be acquirer (who naturally wants the lowest price possible) and the stockholders (who would benefit from the highest sales price) makes full and fair disclosure of the former's true intentions of the utmost importance. *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150-51 (2d Cir. 2021) (finding misstatements that group "does not have any current plans" to execute a relisting transaction were material); *Texas Partners v. Conrock Co.*, 685 F.2d 1116, 1120-21 (9th Cir. 1982) (omission of information regarding potential takeover attempt sufficiently material under Section 14(a) of Exchange Act).

Blackwells' assertion that it has "withdrawn any interest" in an acquisition or other transaction with the Company is not remotely credible. Blackwells made a bid to acquire 100% of the Company less than four months before it submitted the Nomination Notice, and never

---

[8] Braemar was previously known as Ashford Hospitality Prime, Inc., but changed its name to Braemar in 2018.

retracted it.  *See* Rose Decl. Ex. 5, A.52.  Blackwells' investor presentation dated "March 2024"—
*i.e.,* within ten days of issuance of the Nomination—is entirely premised on taking Braemar
"private," and includes a slide on "Take Private Considerations" discussing factors in favor of
"Privatiz[ing] a Large and High-Quality Luxury Hotel Portfolio Primed for Growth."  *Id*. Ex. 7,
A.158.  Blackwells has invested barely $20,000 in the Company and has a 0.015% ownership stake
in the Company, yet expects to spend $5 million in furtherance of its solicitation.  *See supra* at  10-
11.  And even in the Nomination Notice, Blackwells has obfuscated, stating that it "could in the
future make a bid to acquire the Corporation."  Rose Decl. Ex. 7, A.78.  Undeniably, Blackwells'
interest in an acquisition or other transaction with the Company is alive and acute.  *See Ashford*,
2016 WL 7852507, at *4 (noting with approval board's apparent disbelief "that a sophisticated
hedge fund would engage in expensive litigation and a difficult proxy contest without any plans
for the company after it seized control").[9]

As Blackwells has declared that it "intends to solicit proxies" in support of the Purported
Nominees, and already has spent $500,000 in furtherance of its solicitation, it is clear that the
solicitation is imminent.  Rose Decl. Ex. 7, A.91.  Indeed, on March 22, 2024, Defendants filed a
preliminary proxy statement establishing without a shred of doubt that they intend to press ahead.
Magid Decl. Ex. H, A.537-74.  That proxy statement, moreover, is materially misleading for
multiple reasons, including because it fails to disclose Blackwells' interest in an acquisition, its
concerted activity with third parties, and the invalidity of the Nomination Notice and the
ineligibility of the Purported Nominees.  Absent an injunction, Blackwells' dissemination of

---

[9] For the same reasons, a solicitation that does not fully and fairly disclose Blackwells' acquisition
interest would violate Item 5(b)(1), Rule 14a-101 of Regulation 14A, which requires disclosure of
"any arrangement or understanding . . . with respect to any future transactions to which the
registrant or any of its affiliates will or may be a party."  17 C.F.R. § 240.14a-101, Item 5(b)(1).
*See supra* at 9-11.

materially misleading information to stockholders in violation of Section 14(a) will be a *fait accompli*.  *See Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975) (an injunction is appropriate where, as here, "the anticipated injury is imminent and irreparable"); *Piper*, 430 U.S. at 42 (relief can "best be given" in corporate control contests through preliminary injunctive relief).

### B.    Braemar Is Likely to Prevail on Its Claim for a Declaration That the Nomination Notice Is Invalid and the Purported Nominees Ineligible.

In issuing a deficient Nomination Notice, Blackwells clearly contravened multiple provisions of the Company's Advance Notice Requirements, which are "exclusive means" for a stockholder to make director nominations and propose other business at an annual meeting.  Rose Decl. Ex. 1, Art. I, § 11(a)(1), A.15.  The Board's rejection of the Nomination Notice was a proper exercise of its business judgment entitled to deference under Maryland law.

### 1.    Blackwells Violated the Advance Notice Requirements.

Maryland law recognizes that Maryland corporations may include advance notice requirements in corporate bylaws.  *See* Md. Code Ann., Corps. & Ass'ns § 2-504(f) (permitting bylaws to require stockholders to "provide advance notice of the nomination . . . to the corporation"). [10]  "Advance notice bylaws, provisions that require stockholders to provide the corporation with prior notice of their intent to nominate directors along with information about their nominees, are 'commonplace,'" *Openwave Sys. Inc. v. Harbinger Cap. Partners Master Fund I, Ltd.*, 924 A.2d 228, 238-39 (Del. Ch. 2007) (citation omitted), and "permit orderly meetings and election contests and [] provide fair warning to the corporation so that it may have sufficient time to respond to stockholder nominations."  *Id.* at 239.  Advance notice bylaws are "often construed and frequently upheld" by courts. *Openwave Sys. Inc.*, 924 A.2d at 239; *see Am. Gen. Corp. v.*

---

[10] Under the internal affairs doctrine, Maryland law governs claims concerning a stockholder's compliance with the corporate bylaws of Braemar, a Maryland corporation.  *See Hollis v. Hill*, 232 F.3d 460, 465 (5th Cir. 2000).

*Torchmark Corp.*, 1990 WL 595282, at \*4 (S.D. Tex. Apr. 11, 1990) ("Advance notice provisions . . . are common among large American corporations and have been upheld as valid.").

Under Maryland law, the ordinary principles of contract interpretation apply to corporate bylaws. *See Tackney v. U.S. Naval Academy Alumni Ass'n,* 408 Md. 700, 716 (2009) ("It is a fundamental principle that the rules used to interpret statutes, contracts, and other written instruments are applicable when construing corporate charters and bylaws.") (citation and internal quotation marks omitted). Maryland courts interpret contracts "subject to the law of objective interpretation" and "give effect to the plain language of the clear and unambiguous provisions of the contract." *Bradley v. Bradley*, 76 A.3d 395, 398 (Md. App. 2013). Applying these principles, it is clear that Blackwells violated multiple provisions of the Advance Notice Requirements, rendering its Nomination Notice defective. *See* Rose Decl. Ex. 1, Art. I, § 11(a)(2), A.15-16 (requiring a stockholder seeking to nominate director candidates to submit a notice of nomination that "set[s] forth all information required under [] Section 11").

*First*, Blackwells violated Bylaw Sections 11(a)(3)(D)(iii) and 11(a)(3)(c) by failing to disclose its interest in an acquisition. Section 11(a)(3)(D)(iii) requires disclosure of all information "that would be required to be disclosed in connection with the solicitation of proxies pursuant to Regulation 14A." Item 5(b)(1) of Rule 14a-101 under Regulation 14A, in turn, requires "any arrangement or understanding . . . with respect to any future transactions to which the registrant or any of its affiliates will or may be a party." 17 C.F.R. § 240.14a-101, Item 5(b)(1). Likewise, Section 11(a)(3)(c) requires disclosure of "substantial interest"—including "any existing or prospective commercial, business or contractual relationship"—in the Company. As discussed above, contrary to its assertions in the Nomination Notice, Blackwells has a live interest in such a transaction that should have been disclosed, as evidenced by its December bid, its March 2024 investor presentation premised on taking Braemar "private," the gaping disparity between its share

-19-

ownership and monetary commitment to its proxy campaign, and its reference to a possible "future" bid.  *See supra* at 9-11.

*Second*, Blackwells violated numerous Bylaw provisions by failing to provide requisite information for "Stockholder Associated Persons."  A "Stockholder Associated Person" includes any person (i) "acting in concert with such stockholder" and (ii) "that, together with such stockholder and/or its affiliates and associates, has engaged in activities undertaken with the purpose or effect of changing or influencing control of the Corporation or in connection with or as a participant in any transaction having such purpose or effect."  Rose Decl. Ex. 1, Art. I, § 11(a)(6), A.18-19.  Here, Blackwells disclosed no Stockholder Associated Person information for unnamed limited partners and "external sources" that it stated would serve as funding sources for its acquisition—activity that would unquestionably have the purpose of "changing or influencing control" of the Company.  *Id*.  Nor did it disclose such information for others with which it engaged in concerted activity, including an investor that received marketing materials from Blackwells and contemporaneously made its own bid.  Rose Decl. ¶ 18, A.6.

As a result of these and other violations, whether independently or collectively, Blackwells' Nomination Notice did not, as required, "set forth all information required under this Section 11" and therefore was not "timely."  Rose Decl. Ex. 1, Art. I, § 11(a)(2), A.15-16.  Because the deadline to cure any defects in the Nomination Notice has passed, *see* Rose Decl. ¶ 10, A.4, the deficiencies in the Nomination Notice are locked in and cannot be cured.  Rose Decl. Ex. 1, Art. I, §§ 11(a)(2), A.15; 11(c)(1), A.19-20.

### 2.    The Board's Determination That The Purported Nominees Are Ineligible To Stand For Election Is Protected By Maryland's Business Judgment Rule.

Under Maryland law, courts review the Board's exercise of business judgment to enforce the Bylaws and invalidate the nomination of the Purported Nominees under the business judgment

rule, which creates "a presumption that directors of a corporation acted in good faith and in the best interest of the corporation." *Wittman v. Crooke*, 707 A.2d 422, 425 (Md. Ct. Spec. App. 1998); *Boland v. Boland*, 423 Md. 296, 328, 31 A.3d 529, 548 (2011) ("The default standard is the deferential business judgment rule, which insulates the business decisions made by the director from judicial review.") (quotations omitted).  Moreover, in Maryland, the business judgment rule is codified by statute. Md. Code Ann., Corps. & Ass'ns § 2-405.1(g) (statutory presumption that a director's acts are in accordance with the requirements of good faith, loyalty, and due care); *see Eastland Food Corp. v. Mekhaya*, 486 Md. 1, 301 A.3d 308 (2023) ("[S]ection 2-405.1 is the 'sole source' of directors' duties to the corporation and its shareholders.").

In applying Maryland's business judgment rule, the Court asks "whether any rational business person could have reached that result, proceeding independently and in good faith with the best interests of the corporation in mind." *Bender v. Schwartz*, 172 Md. App. 648, 667, 917 A.2d 142, 152 (2007).  The rule thus "insulates business decisions from judicial review absent a showing of fraud or bad faith." *Chisholm v. Hyattstown Volunteer Fire Dep't, Inc.*, 691 A.2d 776, 781 (Md. Ct. Spec. App. 1997) (citations omitted); *see Tackney*, 408 Md. at 715 (courts will "intervene in the dispute at hand only if the Board's actions were fraudulent or arbitrary").  "The burden is on the party challenging the decision [of the directors] to establish facts rebutting the presumption that the directors acted reasonably and in the best interests of the corporation." *Bender*, 917 A.2d at 153 (citations omitted).

Defendants cannot meet their burden here.  The Advance Notice Requirements provide that "[o]nly such individuals who are nominated in accordance with [the Advance Notice Requirements] shall be eligible for election by stockholders as directors[.]"  Rose Decl. Ex 1, Art. I, § 11(c)(2), A.20.  Given Blackwells' violations described in the preceding section, it was sensible—and more than rational—for the Board to conclude that the Nomination Notice was

invalid and the Purported Nominees were ineligible to stand for election at the 2024 Annual Meeting.  *See Ashford*, 2016 WL 7852507, at \*4-5 ("The Court concludes that the business judgment rule protects Ashford Prime's board's decision to deny approving the Sessa candidates for the proxy contest and election."); *IBS Fin. Corp. v. Seidman & Assocs.,* 136 F.3d 940, 948 (3d Cir. 1998) (reversing district court order allowing a defective nomination to appear on ballot and cautioning that permitting the nomination to appear would improperly "empower a court to veto a board of directors' exercise of a discretionary authority vested in the board by the certificate of incorporation."); *Driver Opportunity Partners I, LP v. Adams*, No. CV 3:23-56, 2023 WL 3580039, at \*8 (W.D. Pa. May 22, 2023) ("Ameriserv was justified in rejecting the Nomination Notice for its failure to comply with the validly enacted Advance Notice Bylaw.").  Likewise, it was an appropriate exercise of the Board's business judgment to consider Blackwells' and Aintabi's character and past dealings (including lack of candor, negative reputation in the business community, and checkered personal history) in determining that it was in the best interest of the Company and its stockholders not to waive Blackwells' non-compliance.  *See Danielewicz v. Arnold*, 769 A.2d 274, 285 (Md. App. 2001) (directors owe fiduciary duties "to the corporation and all its stockholders"; "they are not trustees for the individual stockholders") (citation omitted). That determination should not be disturbed by this Court.

## II.    Defendants' Solicitation of Proxies Would Cause Irreparable Harm to Braemar and Its Stockholders.

To establish irreparable harm, a movant must show "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986) (citations omitted).  Unless enjoined, Defendants' imminent proxy campaign in support of the Purported Nominees will cause irreparable harm to Braemar and its stockholders.

Defendants stand on the precipice of soliciting proxies in support of Purported Nominees with inadequate and misleading disclosures in violation of Regulation 14A, including the demonstrably false assertion that Blackwells has "withdrawn" any interest in acquiring the Company.  Magid Decl. Ex. H, A. 537.  It is well recognized that the threat of an uninformed stockholder vote constitutes irreparable harm.  *See Mills*, 396 U.S. at 384; *MONY Grp., Inc. v. Highfields Cap. Mgmt., L.P.*, 368 F.3d 138, 147-48 (2d Cir. 2004) (directing district court to enter preliminary injunction barring stockholder from soliciting stockholders without complying with disclosure rules);  *Lone Star Steakhouse & Saloon, Inc. v. Adams*, 148 F. Supp. 2d 1141, 1150 (D. Kan. 2001) (finding that "irreparable injury would occur absent an injunction prohibiting the voting of proxies based upon false and misleading information"); *Nichting v. DPL Inc.*, Case No. 3:11-CV-141, 2011 WL 2892945, at *4 (S.D. Ohio July 15, 2011) (ordering expedited discovery because irreparable injury may be suffered if a stockholder's voting decision was based on inadequate information); *Ashford Hospitality Trust, Inc. v. Cygnus Capital, Inc.*, No. 3:21-cv-00125-M, 2021 WL 3631142, at *5 (N.D. Tex. Feb. 18, 2021).

Further, the launch of a proxy solicitation would sow confusion and misinformation among the Company's stockholders by suggesting that the Purported Nominees may stand for election, when they are in fact ineligible as a result of Blackwells' failure to comply with the Advance Notice Requirements and pursuant to the Board's determination.  *See Hartman Com. Properties REIT v. Hartman*, No. CV H-06-3897, 2007 WL 9751970, at *12 (S.D. Tex. Apr. 6, 2007) (irreparable harm where shareholder confusion would result from injecting allegedly false and misleading information into proxy materials), *aff'd sub nom. Reit v. Hartman*, 252 F. App'x 631 (5th Cir. 2007).  This type of harm cannot adequately compensated with monetary damages or remedied after the fact.  *See, e.g., Lone Star*, 148 F. Supp. 2d at 1150 ("Monetary damages cannot restore the right of shareholders to effectively exercise their corporate suffrage rights. Nor can

post-vote relief be considered an effective remedy."); *Delcath Sys., Inc. v. Ladd*, No. 06 Civ. 6420(LAP), 2006 WL 2708459, at *5 (S.D.N.Y. Sept. 20, 2006) (irreparable injury present because the proxy materials were "based on incomplete or misleading information" and were thus "tainted"); *Ashford*, 2015 WL 7852507, at *5.

### III.    The Threatened Injury to Braemar and Its Stockholders Outweighs Any Potential Harm to Defendants.

Without prompt injunctive relief, Defendants' solicitation will inject materially misleading information and sow confusion among the Company's stockholders in connection with the 2024 Annual Meeting, the very evils Section 14(a) was enacted to prevent. *Borak*, 377 U.S. 426, 431. Any hardship that Defendants may suffer from an injunction is self-inflicted and outweighed by the irreparable harm incurred by Braemar and its stockholders. *See 22nd Century Techs., Inc. v. iLabs, Inc.*, 2023 WL 3409063, at *6 (3d Cir. May 12, 2023) (finding that "self-inflicted" harm is "not the sort of harm the law seeks to protect against."); *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002) (balance of harms weighs in favor of injunction where "defendants are largely responsible for their own harm"). Defendants simply cannot demonstrate any hardship because no stockholder has the right to nominate nominees for election to the Board based on misinformation and in violation of the Bylaws. *See Ashford*, 2016 WL 7852507, at *5 ("balance of the hardships weighs in favor of . . . preliminary injunction because allowing [fund] to solicit proxies could potentially cause . . . stockholders to cast meaningless votes for invalid nominees").

Indeed, no cognizable harm at all would be suffered by Defendants from an injunction where, as here, the Purported Nominees have not been nominated in accordance with the Company's Bylaws. As the SEC has recognized in its Compliance and Disclosure Interpretations, a company is only required to include duly nominated director candidates on its proxy card. Rule 14a-19, Sec. Com. Discl. 3707273 (Dec. 6, 2022), Question 139.04. And in the event that the

Company's determination as to candidates' invalidity is later found to be incorrect, any harm can be remedied, including by discarding any previously furnished proxy card and ensuring that shareholders are provided with sufficient time to receive and cast their votes on a universal proxy card. *Id.*, Question 139.05. By contrast, if a stockholder vote proceeds based on materially false and misleading information, the consequences may be "difficult to unscramble." *Calumet Indus., Inc. v. MacClure*, 464 F. Supp. 19, 28 (N.D. Ill. 1978).

## IV.    A Preliminary Injunction Would Not Be Adverse to the Public Interest.

Finally, a preliminary injunction is warranted here because "the public interest always lies with the truth." *Lone Star*, 148 F. Supp. 2d at 1150. An injunction affirms the enforceability of the Bylaws and Maryland law and precludes dangerous confusion and the possibility that the Company's stockholders may cast meaningless votes for invalid nominees. *See Ashford*, 2016 WL 7852507, at *5 ("[G]ranting the preliminary injunction is in the public interest because an injunction will diminish shareholder confusion at the annual meeting."); *Transcon Lines v. A. G. Becker Inc.*, 470 F. Supp. 356, 376 (S.D.N.Y. 1979) ("Certainly, if defendants had firm plans to acquire control of Transcon or to make major changes in its management, business or corporate structure, those plans should have been disclosed.").

## CONCLUSION

Braemar respectfully requests that the Court grant its motion for preliminary injunction as outlined above.

[*Signature Block Follows on Next Page*]

Dated: March 24, 2024                         Respectfully submitted,


CADWALADER WICKERSHAM & TAFT          AKIN GUMP STRAUSS HAUER & FELD
LLP,  Of Counsel                             LLP

Adam K. Magid (Application for Pro Hac       /s/M. Scott Barnard_____
Vice forthcoming)                            M. Scott Barnard
New York Bar No. 5233036                     Texas Bar No. 24001690
Samuel G. Mann (Application for Pro Hac      2300 N. Field Street
Vice forthcoming)                            Ste. 1800
New York Bar No. 5233036                     Dallas, TX 75201
Sanders Keyes Gilmer (Application for Pro    Telephone: (214) 969-4299
Hac Vice forthcoming)                        Facsimile: (214) 969-4343
D.C. Bar No. 90019265                        Email: sbarnard@akingump.com
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000
Facsimile: (212) 406-6666                    **ATTORNEYS FOR PLAINTIFF**
Email: adam.magid@cwt.com
        samuel.mann@cwt.com
        keyes.gilmer@cwt.com




## CERTIFICATE OF SERVICE


        On March 24, 2024, a true and correct copy of the foregoing Brief in Support was
submitted via the Court's ECF Filing System. Because opposing counsel is unknown,
undersigned counsel will serve Defendants with a copy of the Motion for Preliminary Injunction,
Brief in Support, and Appendix to accompany the Complaint and summons as soon as possible.

                                             /s/M. Scott Barnard_____
                                             M. Scott Barnard
                                             Texas Bar No. 24001690
                                             2300 N. Field Street
                                             Ste. 1800
                                             Dallas, TX 75201
                                             Telephone: (214) 969-4299
                                             Facsimile: (214) 969-4343
                                             Email: sbarnard@akingump.com