**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| BRAEMAR HOTELS & RESORTS INC., | |
| Plaintiff, | |
| -against- | Civil Action No. 3:24-cv-707-L |
| BLACKWELLS CAPITAL LLC, BLACKWELLS ONSHORE I, LLC, BLACKWELLS HOLDING CO. LLC, VANDEWATER CAPITAL HOLDINGS, LLC, BLACKWELLS ASSET MANAGEMENT LLC, BW COINVEST MANAGEMENT I LLC, JASON AINTABI, MICHAEL CRICENTI, JENNIFER M. HILL, BETSY L. MCCOY, AND STEVEN J. PULLY, | |
| Defendants. | |

**APPENDIX TO BRAEMAR HOTELS & RESORTS INC.'S**
**REPLY IN SUPPORT OF ITS MOTION FOR EXPEDITED DISCOVERY**
**AND EXPEDITED BRIEFING SCHEDULE**

Pursuant to Local Rule 7.1(i), Plaintiff Braemar Hotels & Resorts Inc. ("Braemar") respectfully submits this Appendix to its Reply in Support of Its Motion for Expedited Discovery and Expedited Briefing Schedule.

| Document | Appendix Pages |
|---|---|
| Declaration of Adam K. Magid dated April 15, 2024 | App. 1-3 |
| **Exhibit A**: April 3, 2024 Definitive Proxy Statement filed by Blackwells Capital LLC, Blackwells Onshore I LLC, Jason Aintabi, Michael Cricenti, Jennifer M. Hill, Betsy L. McCoy, and Steven J. Pully | App. 4-43 |
| **Exhibit B**: April 10, 2024 Press Release Issued by Blackwells Capital LLC | App. 44-51 |

**APPENDIX TO PLAINTIFF BRAEMAR HOTELS & RESORTS INC.'S REPLY IN**
**SUPPORT OF ITS MOTION FOR EXPEDITED DISCOVERY AND EXPEDITED**
**BRIEFING SCHEDULE**

| Document | Appendix Pages |
|---|---|
| **Exhibit C**: March 26, 2024 Supplement to Blackwells Capital LLC's Notice of Intention to Nominate Individuals for Election as Directors and to Submit Business Proposals for Stockholder Consideration at the 2024 Annual Meeting of Stockholders of Braemar Hotels & Resorts Inc. | App. 52-154 |
| **Exhibit D**: April 11, 2024 Complaint for Declaratory and Injunctive Relief filed by Blackwells Capital LLC in *Blackwells Capital LLC v. Braemar Hotels & Resorts Inc., et al.*, Case 3:24-cv-984-N | App. 155-239 |
| **Exhibit E**: May 19, 2020 Form 8-K filed with the SEC by Braemar Hotels & Resorts Inc. | App. 240-43 |
| **Exhibit F**: May 11, 2021 Form 8-K filed with the SEC by Braemar Hotels & Resorts Inc. | App. 244-47 |
| **Exhibit G**: May 11, 2022 Form 8-K filed with the SEC by Braemar Hotels & Resorts Inc. | App. 248-52 |
| **Exhibit H**: May 10, 2023 Form 8-K filed with the SEC by Braemar Hotels & Resorts Inc. | App. 253-57 |
| **Exhibit I**: Excerpt of March 28, 2024 Proxy Statement filed with the SEC by Braemar Hotels & Resorts Inc. | App. 258-61 |
| Declaration of Paul Schulman dated April 15, 2024 | App. 262-63 |

**APPENDIX TO PLAINTIFF BRAEMAR HOTELS & RESORTS INC.'S REPLY IN SUPPORT OF ITS MOTION FOR EXPEDITED DISCOVERY AND EXPEDITED BRIEFING SCHEDULE**

Dated:  April 15, 2024                      Respectfully submitted,


CADWALADER, WICKERSHAM & TAFT          AKIN GUMP STRAUSS HAUER & FELD
LLP, Of Counsel                        LLP


Adam K. Magid (Admitted *Pro Hac Vice*)    */s/ M. Scott Barnard*
New York Bar No. 4652202               M. Scott Barnard
Samuel G. Mann (Admitted *Pro Hac Vice*)   Texas Bar No. 24001690
New York Bar No. 5233036               Tabitha M. Kempf
Sanders Keyes Gilmer (Admitted *Pro Hac*   Texas Bar No. 24139777
*Vice*)                                2300 N. Field Street
D.C. Bar No. 90019265                  Ste. 1800
200 Liberty Street                     Dallas, TX 75201
New York, NY 10281                     Telephone: (214) 969-4299
Telephone:  (212) 504-6000             Facsimile: (214) 969-4343
Facsimile:  (212) 406-6666             Email: sbarnard@akingump.com
Email:  adam.magid@cwt.com                     tkempf@akingump.com
        samuel.mann@cwt.com
        keyes.gilmer@cwt.com           **ATTORNEYS FOR PLAINTIFF**


**APPENDIX TO PLAINTIFF BRAEMAR HOTELS & RESORTS INC.'S REPLY IN
SUPPORT OF ITS MOTION FOR EXPEDITED DISCOVERY AND EXPEDITED
BRIEFING SCHEDULE**

## <u>CERTIFICATE OF SERVICE</u>

Undersigned counsel certifies that on April 15, 2024, a true and correct copy of the foregoing Appendix to Braemar Hotels & Resorts Inc.'s Reply in Support of Its Motion for Expedited Discovery and Expedited Briefing Schedule was filed via the Court's CM/ECF filing system and served on all counsel of record.

*/s/ M. Scott Barnard*
M. Scott Barnard

**APPENDIX TO PLAINTIFF BRAEMAR HOTELS & RESORTS INC.'S REPLY IN SUPPORT OF ITS MOTION FOR EXPEDITED DISCOVERY AND EXPEDITED BRIEFING SCHEDULE**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| BRAEMAR HOTELS & RESORTS INC.,<br><br>                        Plaintiff,<br><br>              -against-<br><br>BLACKWELLS CAPITAL LLC, BLACKWELLS<br>ONSHORE I, LLC, BLACKWELLS HOLDING CO. LLC,<br>VANDEWATER CAPITAL HOLDINGS, LLC,<br>BLACKWELLS ASSET MANAGEMENT LLC, BW<br>COINVEST MANAGEMENT I LLC, JASON AINTABI,<br>MICHAEL CRICENTI, JENNIFER M. HILL, BETSY L.<br>MCCOY, AND STEVEN J. PULLY,<br><br>                        Defendants. | Civil Action No. 3:24-cv-707-L |

## DECLARATION OF ADAM K. MAGID

My name is Adam K. Magid. I am over 21 years old, and the information contained in this Declaration is based upon my personal knowledge.

1.      I am a Partner of the law firm Cadwalader, Wickersham & Taft LLP ("Cadwalader"). I represent Braemar Hotels & Resorts Inc. ("Braemar") in this matter. I respectfully submit this Declaration to place before the Court certain materials referenced in Braemar's Reply in Support of Its Motion for Expedited Discovery and Expedited Briefing Schedule, filed concurrently herewith.

2.      A true and correct copy of a definitive proxy statement filed with the Securities and Exchange Commission ("SEC") on April 3, 2024 by Blackwells Capital LLC ("Blackwells"), Blackwells Onshore I LLC, Jason Aintabi, Michael Cricenti, Jennifer M. Hill,

-1-

Betsy L. McCoy, and Steven J. Pully (collectively, the "Blackwells Defendants") is attached to my Declaration as **Exhibit A** and is incorporated by reference.

        3.      A true and correct copy of a press release issued by Blackwells on April 10, 2024 titled *Blackwells Files Definitive Proxy Statement for Braemar Hotels & Resorts Inc.'s 2024 Annual Meeting* is attached to my Declaration as **Exhibit B** and is incorporated by reference. The press release is publicly available at https://www.globenewswire.com/fr/news-release/2024/04/10/2860659/0/en/Blackwells-Files-Definitive-Proxy-Statement-for-Braemar-Hotels-Resorts-Inc-s-2024-Annual-Meeting.html.

        4.      A true and correct copy of Blackwells' "Supplement to Notice of Intention to Nominate Individuals for Election as Directors and to Submit Business Proposals for Stockholder Consideration at the 2024 Annual Meeting of Stockholders of Braemar Hotels & Resorts Inc.," dated March 26, 2024, is attached to my Declaration as **Exhibit C** and is incorporated by reference.

        5.      A true and correct copy of Complaint for Declaratory and Injunctive Relief filed by Blackwells in the U.S. District Court for the Northern District of Texas on April 11, 2024 in the action captioned, *Blackwells Capital LLC v. Braemar Hotels & Resorts Inc., et al.*, Case 3:24-cv-00894-N, is attached to my Declaration as **Exhibit D** and is incorporated by reference.

        6.      A true and correct copy of a Form 8-K filed by Braemar with the SEC on May 19, 2020 is attached to my Declaration as **Exhibit E** and is incorporated by reference.

        7.      A true and correct copy of a Form 8-K filed by Braemar with the SEC on May 11, 2021 is attached to my Declaration as **Exhibit F** and is incorporated by reference.

        8.      A true and correct copy of a Form 8-K filed by Braemar with the SEC on May 11, 2022 is attached to my Declaration as **Exhibit G** and is incorporated by reference.

9.     A true and correct copy of a Form 8-K filed by Braemar with the SEC on May 10, 2023 is attached to my Declaration as **Exhibit H** and is incorporated by reference.

10.    A true and correct copy of an excerpt from a proxy statement filed by Braemar with the SEC on March 28, 2024 is attached to my Declaration as **Exhibit I** and is incorporated by reference.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed in New York, New York on April 15, 2024.

Adam K. Magid

-3-

# EXHIBIT A

DEFC14A 1 ea0202363-02.htm PROXY STATEMENT

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

—————————

**SCHEDULE 14A**

—————————

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934

Filed by the Registrant ☐

Filed by a Party other than the Registrant ☒

Check the appropriate box:

☐   Preliminary Proxy Statement
☐   Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
☒   Definitive Proxy Statement
☐   Definitive Additional Materials
☐   Soliciting Material under §240.14a-12

# Braemar Hotels & Resorts Inc.

(Name of Registrant as Specified In Its Charter)

**Blackwells Capital LLC**
**Blackwells Onshore I LLC**
**Jason Aintabi**
**Michael Cricenti**
**Jennifer M. Hill**
**Betsy L. McCoy**
**Steven J. Pully**

(Name Of Person(s) Filing Proxy Statement, if Other Than the Registrant)

Payment of Filing Fee (Check all boxes that apply):

☒   No fee required.

☐   Fee paid previously with preliminary materials.

☐   Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(1) and 0-11.

**BLACKWELLS CAPITAL LLC**

April 3, 2024

Dear Fellow Stockholder:

Blackwells Capital LLC ("Blackwells Capital"), Blackwells Onshore I LLC ("Blackwells Onshore") and Jason Aintabi (collectively with Blackwells Onshore and Blackwells Capital, "Blackwells" or "we"), together with the other participants in this solicitation, own an aggregate of 752,092 shares of common stock, $0.01 par value per share (the "Common Stock"), of Braemar Hotels & Resorts Inc., a Maryland corporation ("Braemar" or the "Corporation"). For the reasons set forth in the attached Proxy Statement, we believe changes to the composition of the Board of Directors of the Corporation (the "Board") and to the Corporation's governance policies are necessary in order to help ensure that the Corporation is operating in a manner consistent with the best interests of all stockholders. The attached Proxy Statement and the enclosed **WHITE** Universal Proxy Card are first being made available to stockholders on April 3, 2024.

We are seeking your support at the Corporation's 2024 Annual Meeting of Stockholders, which is scheduled to be held at 14185 Dallas Parkway, Suite 1200, Dallas, Texas 75254 on May 15, 2024 at 9:00 A.M. Central Daylight Time (including any other meeting of stockholders held in lieu thereof, and adjournments, postponements, reschedulings or continuations thereof, the "Annual Meeting"). We are soliciting proxies from the Corporation's stockholders on the following matters:

- The election of each of our director nominees — Michael Cricenti, Jennifer M. Hill, Betsy L. McCoy and Steven J. Pully (collectively, the "Blackwells Nominees") — to the Board, each to serve as a director on the Board for a one-year term or until his or her respective successor is duly elected and qualified;

- Blackwells' non-binding stockholder proposal to urge the Board to amend the Corporation's Fifth Amended and Restated Bylaws, as amended (the "Bylaws") to remove the Overreaching Advance Notice Provision (as defined in the Proxy Statement) (Proposal 2);

- Blackwells' non-binding stockholder proposal to urge the Board to amend the Bylaws to preclude any current or former employee, director, officer, or control person of the Corporation or Ashford (as defined in the Proxy Statement) and Ashford's affiliates from serving as the Corporation's chairman of the Board (Proposal 3);

- Blackwells' non-binding stockholder proposal to require the Board to disclose all extraordinary transaction proposals made by stockholders, affiliates and third parties during the two most recently completed calendar years and the terms of those proposed transactions (Proposal 4);

- Blackwells' non-binding stockholder proposal to require the Board to disclose all compensation paid by the Corporation to members of the Bennett family, *The Dallas Express* and employees, directors or agents of *The Dallas Express*, including Louis Darrouzet (Proposal 5);

- The Corporation's proposal to approve, on an advisory basis, executive compensation (Proposal 6); and

- The Corporation's proposal to ratify the appointment of BDO USA, P.C. as the Corporation's independent registered public accountants for fiscal year 2024 (Proposal 7).

Together, Proposals 2, 3, 4 and 5 are referred to as the "Blackwells Proposals." In addition, stockholders may consider such other matters as may properly come before the Annual Meeting and any postponement or adjournment thereof.

We further believe that the Blackwells Proposals will contribute to the Corporation's continued growth and governance efforts, ensuring the future success of the Corporation. We urge you to carefully consider the information contained in the attached Proxy Statement and then support our efforts by signing, dating and returning the enclosed **WHITE** Universal Proxy Card today.

Pursuant to the universal proxy rules adopted by the Securities and Exchange Commission (the "SEC"), the enclosed **WHITE** Universal Proxy Card also includes the names of the Corporation's nominees. As Blackwells is using a "universal" proxy card, there is no need to use the Corporation's gold proxy card or voting instruction form,

regardless of how you wish to vote. We ask that you only cast your votes "**FOR**" Mr. Cricenti, Ms. Hill, Ms. McCoy and Mr. Pully and "**WITHHOLD**" your votes on each of the Corporation's nominees. We also ask you to vote "**FOR**" the non-binding Blackwells Proposals, which would allow the Board to restore proper governance, limit the appearance of self-dealing appointments and transactions and increase corporate transparency.

Unfortunately, the Board has again taken what we believe to be a baseless and unfounded position in what appears to be an effort to entrench itself and reject legitimate stockholder feedback. The Board has purported to reject as invalid our nominations to elect the Blackwells Nominees and determined that our notice is purportedly non-compliant with the Bylaws and defective. On March 24, 2024, the Corporation brought suit against Blackwells, Blackwells Onshore I, LLC, Blackwells Holding Co. LLC, Vandewater Capital Holdings, LLC, Blackwells Asset Management LLC, BW Coinvest Management I LLC, Jason Aintabi and the Blackwells Nominees in the United States District Court for the Northern District of Texas (the "District Court"), seeking injunctive relief against solicitation of proxies by Blackwells and a declaratory judgment that Blackwells' nomination is invalid due to Blackwells' alleged violations of the Corporation's Bylaws, and, as a result, Blackwells' slate of purported nominees is invalid and ineligible to stand for election by the Corporation's stockholders. Ultimately, we believe the Corporation's claims have no merit. The outcome of the Corporation's lawsuit and any related litigation may affect our ability to deliver proxies submitted to us on the enclosed **WHITE** Universal Proxy Card.

As the Corporation has disclosed in its proxy statement, if Blackwells' nominations and proposals are determined to be valid by the District Court, the Corporation will need to furnish new proxy cards to stockholders, including the Blackwells Nominees and the Blackwells Proposals. If you vote on the Corporation's gold proxy card accompanying its proxy statement and any subsequent litigation results in the conclusion that our nominations and proposals are valid, your votes on the Corporation's gold proxy card will not be recognized or tabulated at the Annual Meeting and you will need to vote again for your vote to be counted. Stockholders are urged to use the **WHITE** Universal Proxy Card only, which contains the names of all directors up for election at the Annual Meeting, to ensure their vote is counted at the Annual Meeting.

Stockholders should refer to the Corporation's preliminary proxy statement, filed with the SEC on April 2, 2024, and the Corporation's definitive proxy statement, when available, for the names, backgrounds, qualifications and other information concerning the Corporation's nominees. You may access the Corporation's proxy statement without cost on the SEC's website. There is no assurance that any of the Corporation's nominees will serve as directors if one or more of the Blackwells Nominees are elected.

If you have any questions or require any assistance with voting your shares, please contact our proxy solicitor, MacKenzie Partners, Inc., at its address and toll-free numbers listed below.

Thank you for your support,

/s/ Jason Aintabi
_____
Jason Aintabi
Founder and Chief Investment Officer
Blackwells Capital LLC

If you have any questions or need assistance in voting your **WHITE** Universal Proxy Card, or need additional copies of Blackwells' proxy materials, please contact:

MacKenzie Partners, Inc.
1407 Broadway, 27th Floor
New York, NY 10018
Call Toll Free: 1-800-322-2885
Email: proxy@mackenziepartners.com

**2024 ANNUAL MEETING OF STOCKHOLDERS**
**OF**
**BRAEMAR HOTELS & RESORTS INC.**

———————————

**PROXY STATEMENT**
**OF**
**BLACKWELLS CAPITAL LLC**

———————————

**PLEASE SIGN, DATE AND RETURN THE ENCLOSED <u>WHITE</u> UNIVERSAL PROXY CARD TODAY**

Blackwells Capital LLC ("Blackwells Capital"), Blackwells Onshore I LLC ("Blackwells Onshore") and Jason Aintabi (collectively with Blackwells Onshore and Blackwells Capital, "Blackwells" or "we"), together with the other participants in this solicitation, own an aggregate of 752,092 shares of common stock, $0.01 par value per share (the "Common Stock"), of Braemar Hotels & Resorts Inc., a Maryland corporation ("Braemar" or the "Corporation"). For the reasons set forth in the attached Proxy Statement, we believe changes to the composition of the Board of Directors of the Corporation (the "Board") and to the Corporation's governance policies are necessary in order to help ensure that the Corporation is operating in a manner consistent with the best interests of all stockholders. The attached Proxy Statement and the enclosed <u>WHITE</u> Universal Proxy Card are first being made available to stockholders on or about April 3, 2024.

We are seeking your support at the Corporation's 2024 Annual Meeting of Stockholders, which is scheduled to be held at 14185 Dallas Parkway, Suite 1200, Dallas, Texas 75254 on May 15, 2024 at 9:00 A.M. Central Daylight Time (including any other meeting of stockholders held in lieu thereof, and adjournments, postponements, reschedulings or continuations thereof, the "Annual Meeting"). We are soliciting proxies from the Corporation's stockholders on the following matters:

- "**FOR**" each of our director nominees — Michael Cricenti, Jennifer M. Hill, Betsy L. McCoy and Steven J. Pully (collectively, the "Blackwells Nominees") — to the Board, each to serve as a director on the Board for a one-year term or until his or her respective successor is duly elected and qualified;

- "**FOR**" Blackwells' non-binding stockholder proposal to urge the Board to amend the Bylaws to remove the Overreaching Advance Notice Provision (as defined in the Proxy Statement) (Proposal 2);

- "**FOR**" Blackwells' non-binding stockholder proposal to urge the Board to amend the Bylaws to preclude any current or former employee, director, officer, or control person of the Corporation or Ashford (as defined in the Proxy Statement) and Ashford's affiliates from serving as the Corporation's chairman of the Board (Proposal 3);

- "**FOR**" Blackwells' non-binding stockholder proposal to require the Board to disclose all extraordinary transaction proposals made by stockholders, affiliates and third parties during the two most recently completed calendar years and the terms of those proposed transactions (Proposal 4);

- "**FOR**" Blackwells' non-binding stockholder proposal to require the Board to disclose all compensation paid by the Corporation to members of the Bennett family, *The Dallas Express* and employees, directors or agents of *The Dallas Express*, including Louis Darrouzet (Proposal 5);

- "**AGAINST**" the Corporation's proposal to approve, on an advisory basis, executive compensation (Proposal 6); and

- "**FOR**" the Corporation's proposal to ratify the appointment of BDO USA, P.C. as the Corporation's independent registered public accountants for fiscal year 2024 (Proposal 7).

Together, Proposals 2, 3, 4 and 5 are referred to as the "Blackwells Proposals." In addition, stockholders may consider such other matters as may properly come before the Annual Meeting and any postponement or adjournment thereof.

We urge you to carefully consider the information contained in this Proxy Statement and support our efforts by signing, dating and returning the enclosed **WHITE** Universal Proxy Card today.

Pursuant to the universal proxy adopted by the Securities and Exchange Commission (the "SEC"), the enclosed **WHITE** Universal Proxy Card also includes the names of the Corporation's nominees. As Blackwells is using a "universal" proxy card, there is no need to use the Corporation's gold proxy card or voting instruction form, regardless of how you wish to vote. We ask that you only cast your votes "**FOR**" Mr. Cricenti, Ms. Hill, Ms. McCoy and Mr. Pully and "**WITHHOLD**" your votes on each of the Corporation's nominees. We also ask you to vote "**FOR**" the non-binding Blackwells Proposals, which would allow the Board to restore proper governance, limit the appearance of self-dealing appointments and transactions and increase corporate transparency.

Stockholders should refer to the Corporation's proxy statement, filed with the SEC on April 2, 2024, for the names, backgrounds, qualifications and other information concerning the Corporation's nominees. You may access the Corporation's proxy statement without cost on the SEC's website. There is no assurance that any of the Corporation's nominees will serve as directors if one or more of the Blackwells Nominees are elected.

On March 24, 2024, the Corporation brought suit against Blackwells, Blackwells Onshore I, LLC, Blackwells Holding Co. LLC, Vandewater Capital Holdings, LLC, Blackwells Asset Management LLC, BW Coinvest Management I LLC, Jason Aintabi and the Blackwells Nominees in the United States District Court for the Northern District of Texas (the "District Court"), seeking injunctive relief against solicitation of proxies by Blackwells and a declaratory judgment that Blackwells' nomination is invalid due to Blackwells' alleged violations of the Corporation's Bylaws, and, as a result, Blackwells' slate of purported nominees is invalid and ineligible to stand for election by the Corporation's stockholders. Ultimately, we believe the Corporation's claims have no merit. The outcome of the Corporation's lawsuit and any related litigation may affect our ability to deliver proxies submitted to us on the enclosed WHITE Universal Proxy Card.

As the Corporation has disclosed in its proxy statement, if Blackwells' nominations and proposals are determined to be valid by the District Court, the Corporation will need to furnish new proxy cards to stockholders including the Blackwells Nominees and the Blackwells Proposals. If you vote on the Corporation's gold proxy card accompanying its proxy statement and any subsequent litigation results in the conclusion that our nominations and proposals are valid, your votes on the Corporation's gold proxy card will not be recognized or tabulated at the Annual Meeting and you will need to vote again for your vote to be counted. Stockholders are urged to use the **WHITE** Universal Proxy Card only, which contains the names of all directors up for election at the Annual Meeting, to ensure their vote is counted at the Annual Meeting.

If you have already voted on the Corporation's gold proxy card, you have every right to change your vote by (i) signing, dating and returning a later dated **WHITE** Universal Proxy Card, (ii) voting via the Internet, by following the instructions on the **WHITE** Universal Proxy Card, or (iii) voting at the Annual Meeting.

If your shares are registered in more than one name, the **WHITE** Universal Proxy Card should be signed and dated by all such persons to ensure that all shares are voted for each of the Blackwells Nominees and the Blackwells Proposals.

This Proxy Statement is soliciting proxies to elect the Blackwells Nominees and for the Blackwells Proposals. See "Voting and Proxy Procedures" below for additional information.

The Corporation has set the close of business on March 14, 2024 as the Record Date (the "Record Date") for determining stockholders entitled to notice of and to vote at the Annual Meeting. Stockholders of record at the close of business on the Record Date will be entitled to vote at the Annual Meeting. According to the Corporation, as of the Record Date, there was an aggregate of 84,453,761 shares of voting stock outstanding, consisting of 66,520,711 shares of Common Stock, 16,158,870 shares of Series E Preferred Stock and 1,774,180 shares of Series M Preferred Stock. The principal executive offices of the Corporation are located at 14185 Dallas Parkway, Suite 1200, Dallas, Texas 75254. Holders of record of shares on the Record Date are urged to submit the **WHITE** Universal Proxy Card, even if such shares have been sold after that date. Each share of Common Stock and preferred stock is entitled to one vote at the Annual Meeting.

If you have any questions or need assistance in voting your **WHITE** Universal Proxy Card, or need additional copies of Blackwells' proxy materials, please contact MacKenzie Partners, Inc., by phone at 1-800-322-2885 (toll-free for stockholders) or 212-929-5500 (call collect for banks, brokers, trustees and other nominees), or by email at proxy@mackenziepartners.com.

The solicitation is being made by Blackwells, Mr. Cricenti, Ms. Hill, Ms. McCoy and Mr. Pully, and not on behalf of the Board or management of the Corporation. Other than as described in this Proxy Statement, we are not aware of any other matters to be brought before the Annual Meeting. Should other matters, which we are not made aware of within a reasonable time before this solicitation, be brought before the Annual Meeting, the persons named as proxies in the enclosed **WHITE** Universal Proxy Card will vote on such matters in their discretion.

BLACKWELLS URGES YOU TO SIGN, DATE AND RETURN THE **WHITE** UNIVERSAL PROXY CARD "**FOR**" EACH OF THE BLACKWELLS NOMINEES AND THE BLACKWELLS PROPOSALS.

YOU MAY HAVE ALREADY RECEIVED, OR WILL SOON RECEIVE, A PROXY CARD FROM THE CORPORATION. **PLEASE RETURN ONLY THE ENCLOSED WHITE UNIVERSAL PROXY CARD AND DO NOT RETURN ANY CORPORATION PROXY CARD UNDER ANY CIRCUMSTANCES.** WE URGE YOU TO DISREGARD AND NOT TO RETURN ANY CORPORATION PROXY CARD AND RETURN THE **WHITE** UNIVERSAL PROXY CARD. ONLY THE LATEST DATED PROXY CARD YOU SUBMIT COUNTS. EVEN IF YOU RETURN THE CORPORATE PROXY CARD MARKED "**WITHHOLD**" AS A PROTEST AGAINST THE CORPORATION'S NOMINEES, IT WILL REVOKE ANY PROXY CARD YOU MAY HAVE PREVIOUSLY SENT TO US. ANY PROXY MAY BE REVOKED AT ANY TIME PRIOR TO THE ANNUAL MEETING BY (I) DELIVERING A WRITTEN NOTICE OF REVOCATION OR A LATER DATED PROXY FOR THE ANNUAL MEETING, (II) VOTING VIA THE INTERNET BY FOLLOWING THE INSTRUCTIONS ON THE **WHITE** UNIVERSAL PROXY CARD OR (III) VOTING AT THE ANNUAL MEETING.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting**

**This Proxy Statement and WHITE Universal Proxy Card are available at**
***www.viewourmaterial.com/BHR.***

## BACKGROUND OF THE SOLICITATION

*The summary below details certain events related to this solicitation by Blackwells, Mr. Cricenti, Ms. Hill, Ms. McCoy and Mr. Pully (collectively, the "Participants"). This summary does not purport to catalogue every event, action or circumstance committed by or related to the Participants in connection with this solicitation.*

Blackwells made its initial investment in the Corporation in 2023.

On October 21, 2023, a representative of Blackwells sent the Corporation a letter calling for an immediate investigation of potential breaches of fiduciary duty and/or other wrongdoing related to mismanagement or self-dealing by members of the Board and/or management in connection with the Corporation's relationship with Mr. Bennett and Ashford (as defined in Proposal 3) (the "Demand Letter").

On October 23, 2023, Charles Grand, on behalf of *The Dallas Express*, sent Jason Aintabi and certain representatives of Blackwells an e-mail asking about details regarding the Demand Letter. Shortly thereafter, Mr. Aintabi responded to Charles Grand asking whether Montgomery Bennett, a director of the Corporation, owns *The Dallas Express*.

On October 26, 2023, a representative of Braemar responded to the Demand Letter, acknowledging receipt.

On December 1, 2023, Blackwells submitted a proposal (the "Bid Letter") for a negotiated transaction pursuant to which Blackwells would acquire 100% of the outstanding equity interests in the Corporation for $4.50 per share in all cash, a 114.3% premium to the Corporation's then current share price, to unlock stockholder value and curtail mismanagement (the "Proposed Acquisition").

On December 6, 2023, outside legal counsel to the Corporation sent a letter to Blackwells that did not address the terms of the Proposed Acquisition but instead requested extensive information regarding Blackwells and its financing (the "December 6 Letter").

On December 22, 2023, at the request of Blackwells, Blackwells' outside legal counsel sent a letter in response to the December 6 Letter, responding to certain questions, noting that Blackwells would provide additional confidential information about its financing sources and thoughts regarding the termination fee owed to Ashford Inc. in connection with the Proposed Acquisition after receiving confirmation that the Board is interested in engaging in a discussion regarding the Proposed Acquisition, and emphasizing Blackwells' desire to work collaboratively with the Board to discuss and advance the Proposed Acquisition.

On December 27, 2023, outside legal counsel for Mr. Aintabi and Blackwells sent a cease and desist letter to *The Dallas Express* with respect to certain articles published by *The Dallas Express* that contained defamatory statements and demanded that *The Dallas Express* retract all claims made in such article.

On December 28, 2023, outside legal counsel for Mr. Aintabi and Blackwells sent a letter to representatives of the Corporation requesting information regarding, among other things, potential violations of the Federal Securities laws by Mr. Bennett, the nature of any relationship between the Corporation and *The Dallas Express*, the monetary relationship between the Corporation and *The Dallas Express* and the disclosure of information from the Corporation to *The Dallas Express* (the "Information Request Letter").

On January 2, 2024, outside legal counsel to the Corporation responded to the December 22, 2023 letter by reiterating that the Board would not respond to the Bid Letter until it received responses to all of the questions included in the December 6 Letter and that, based on the information provided by Blackwells, the Board did not view the Proposed Acquisition as actionable.

Also on January 2, 2024, following what Blackwells perceived as a stubborn failure on the part of the Board to engage constructively, Blackwells sent a letter to the Corporation requesting a copy of the Corporation's form of written questionnaire and any other exhibits, forms, agreements or other materials within the Corporation's possession that the Corporation believes its Articles of Amendment and Restatement, as amended and supplemented, and/or Bylaws require to be completed by stockholders in connection with the submission of any notice of qualifying stockholder nominations or proposals.

On January 9, 2024, the Corporation responded to the Demand Letter with a report from the Corporation's review committee, law firm and a securities advisor, denying a breach of fiduciary duty and providing no further action pursuant to the Demand Letter's suggestions.

Also on January 9, 2024, the Board approved the Fifth Amended and Restated Bylaws of the Corporation (the "Bylaws"), which included the Overreaching Advanced Notice Provision (as defined herein).

On January 17, 2024, a representative of the Corporation sent Blackwells, via a Blackwells representative, the Corporation's form of questionnaire.

On January 24, 2024, a representative of Blackwells sent a letter to the Corporation reiterating the demands set forth in the Information Request Letter.

On February 27, 2024, the Board passed a resolution adopting Amendment No. 1 to the Bylaws of the Corporation, which reduced the quorum required for any matter proposed by the Board at an annual meeting of stockholders from a majority to one-third of all votes entitled to be cast at such meeting.

On March 10, 2024, Blackwells sent a letter (the "Nomination Notice") by email to Mr. Rose announcing its intention to nominate the Blackwells Nominees for election to the Board at the Annual Meeting and to submit the Blackwells Proposals for consideration by the Corporation's stockholders, each on a non-binding, advisory basis, at the Annual Meeting. The Nomination Notice also provided notice to the Corporation pursuant to Rule 14a-19 under the Securities Exchange Act of 1934, as amended (the "Exchange Act") of Blackwells' intent to solicit proxies for the Blackwells Nominees from the holders of shares representing at least 67% of the voting power of shares entitled to vote on the election of directors in support of director nominees other than the Corporation's nominees. The Nomination Notice was also delivered by mail to the principal offices of the Corporation on March 11, 2024. Among other things, Blackwells stated in the Nomination Notice that after engaging with the Corporation as described in this section, Blackwells withdrew any interest it had in pursuing the Proposed Acquisition or any similar transaction with the Corporation. Blackwells noted that it believed certain portions of the advance notice provisions contained in the Bylaws are invalid. Blackwells stated its investment intent with respect to the Corporation was, among other things, to influence the Corporation's management or Board, which may include (1) nominating director candidates for election and submitting business proposals for consideration by stockholders at the Annual Meeting and future annual meetings of stockholders, (2) submitting proposals to effect the termination of any and all relationships between the Corporation and Ashford Inc. and its affiliates, (3) finding a suitable replacement external advisor, asset manager and provider of hotel management services and design and construction services and (4) investigating any relationships between the Corporation and *The Dallas Express*.

Also on March 10, 2024, Blackwells sent a letter by email to Mr. Rose expressing its concern with the Corporation's latest amendments to its Bylaws and reiterating its willingness to have an ongoing constructive dialogue with the Corporation.

On March 21, 2024, a representative of the Corporation provided representatives of Blackwells with notice of the Corporation's intent to nominate Monty J. Bennett, Stefani D. Carter, Candace Evans, Kenneth H. Fearn, Jr., Rebeca Odino-Johnson, Matthew D. Rinaldi, Richard J. Stockton and Abteen Vaziri to the Board at the Annual Meeting.

On March 22, 2024, Blackwells filed a preliminary proxy statement with the SEC.

On March 24, 2024, outside counsel for the Corporation sent a letter to Blackwells' counsel informing it that the Corporation has rejected and disregarded Blackwells' nominations.

Also on March 24, 2024, the Corporation filed a complaint and motion for preliminary injunction in the United States District Court for the Northern District of Texas, Dallas Division (the "Federal Action"), against the Nominating Stockholder, Blackwells Onshore I, LLC, Blackwells Holding Co. LLC, Vandewater Capital Holdings, LLC, Blackwells Asset Management LLC, BW Coinvest Management I LLC, Jason Aintabi and the Blackwells Nominees in connection with the Nomination Notice submitted to the Corporation by Blackwells.

On each of March 26, 2024, March 27, 2024 and March 28, 2024, Blackwells' outside counsel sent a letter to the Corporation's counsel supplementing certain information set forth in the Nomination Notice.

On March 28, 2024, the Corporation filed a definitive proxy statement and definitive additional materials with the SEC.

5

On March 29, 2024, outside legal counsel for Blackwells sent an email to the Corporation's counsel regarding its client's improper filing of a definitive proxy statement on March 28, 2024, including a demand that the Corporation withdraw such proxy statement and file a preliminary proxy statement.

On April 2, 2024, the Corporation filed a preliminary proxy statement with the SEC.

Also on April 2, 2024, Blackwells' outside counsel sent a letter to the Corporation's counsel supplementing certain information set forth in the Nomination Notice.

On April 3, 2024, Blackwells filed a definitive proxy statement with the SEC.

6

## REASONS FOR THE SOLICITATION

Blackwells has nominated four highly qualified Board candidates — Mr. Cricenti, Ms. Hill, Ms. McCoy and Mr. Pully — each of whom is prepared and committed to objectively evaluate opportunities for the Corporation to help unlock value for all stockholders. The professionals that Blackwells has nominated have extensive leadership experience in capital allocation, real property law, real estate and corporate governance. If elected, the Blackwells Nominees have the necessary background and expertise to objectively evaluate the Corporation's performance, adjust the Corporation's strategy and enhance the Corporation's governance practices to align with the best interests of all stockholders. The Blackwells Nominees are independent of influence from the Corporation's advisor and intend to fully review the Corporation's business, assets, capital structure, capital allocation priorities, strategies, operations and policies to ensure that the Corporation is operating at optimal levels. As an investor in the Corporation, we are disappointed with the current management and Board and we believe that there is significant potential in the Corporation, but that potential can only be unlocked through transformative change. Blackwells' commitment to transforming the Corporation is demonstrated by the Blackwells Proposals, which would allow the Board to restore proper governance, limit the appearance of self-dealing and increase corporate transparency. We believe these changes are necessary to provide stockholders with a Board that embodies the Corporation's five guiding principles: "ethical, innovative, profitable, engaging and tenacious."[1]

### *The Blackwells Nominees Align With the Needs of Stockholders*

Stockholders need a Board that is equipped to evolve and respond to changes — changes in the market, changes in consumer preferences and changes in technology. While the Board's current makeup includes valuable skills and institutional knowledge, the current directors have acquiesced to poor governance practices and have permitted the Corporation's management to entrench themselves at the expense of stockholder value. However, the Blackwells Nominees possess skills and experience that will enhance the Board's qualifications. Each of Mr. Cricenti, Ms. Hill, Ms. McCoy and Mr. Pully are experienced in governance matters, executive leadership of companies and importantly, will each be independent directors, primed to drive stockholder returns.

### *The Current Board Has Presided Over Negative Returns for Stockholders*

The Corporation has underperformed significantly. Over the past one, three and five years, the Corporation's stock is down 48.3%, 69.4% and 83.4%, respectively.[2]

### *The Corporation's External Advisory Agreement is Off-Market and Self-Dealing*

The Corporation continues to spend significant amounts of money on what Blackwells believes is an off-market and self-dealing advisory agreement between the Corporation and its external manager, Ashford Hospitality Advisors LLC. Ashford Hospitality Advisors LLC ("Ashford LLC"), a subsidiary of Ashford Inc., provides advisory services to the Corporation through this advisory agreement. All of the hotel properties in the Corporation's portfolio are currently asset-managed by Ashford LLC. In addition, the Corporation does not have any employees, and all of the advisory services that might have been provided by employees are provided to the Corporation by Ashford LLC. Even the Corporation's senior management team has been provided to the Corporation by Ashford LLC. Although the Corporation's total stockholder return continues to be very poor — down 83.4% since March 2019 — the Corporation pays Ashford LLC handsomely for its management and administrative services. All the while, Monty J. Bennett, the Chairman of the Board, serves as Chief Executive Officer and Chairman of the Board of Directors of Ashford Inc. The Corporation has stated that pursuant to the advisory agreement, regardless of Ashford LLC's performance and without consideration to the Corporation's financial outlook, the total amount of fees and reimbursements paid to Ashford LLC "as a percentage of market capitalization will never be less than the average of internalized expenses of our industry peers" and may "greatly [exceed] the average of internalized expenses" of the Corporation's industry peers.[3] This external advisory agreement, which has allowed exorbitant resources to be diverted away from the Corporation and its stockholders and to its external managers, Ashford Inc., its subsidiary Ashford LLC and Mr. Bennett, shamefully perverts the entire ethos of commercial agreements.

---

1    "Guiding Principles" of the Corporation as stated on the Corporation's website.
2    Yahoo Finance, as of March 21, 2024.
3    *See* the Corporation's Annual Report on Form 10-K for the fiscal year ending December 31, 2023 ("***The aggregate amount of fees and expense reimbursements paid to our advisor will exceed the average of internalized expenses of our industry peers (as provided in our advisory agreement), as a percentage of total market capitalization. As a part of these fees, we must pay a minimum advisory fee to our advisor regardless of our performance.***") (emphasis in original).

APP.013

***Investors Deserve Transparency***

Mr. Bennett controls both the Corporation and Ashford Inc. on the one hand, and is the co-founder and publisher of *The Dallas Express* on the other. We believe this causes *The Dallas Express* to essentially function as an undisclosed public relations arm of the Corporation. This has allowed Mr. Bennett and *The Dallas Express* to disseminate false and misleading information to the Corporation's investors, at the detriment of the Corporation's stockholders. Further, the Corporation does not currently disclose all compensation, if any, paid to members of the Bennett family or to *The Dallas Express*.

***The Current Board Continues to Severely Limit Stockholders' Rights***

Blackwells believes that the Corporation's corporate governance demonstrates that the Board's focus is not on creating long-term value for the Corporation's investors. The Corporation's troubling governance practices include the Overreaching Advanced Notice Provision. On January 9, 2024, the Corporation amended Section 11(a)(3)(D) of Article I of its Bylaws. The new provision requires that in the event any stockholder or any of such stockholder's "Proposed Nominees" (as such term is used in the Bylaws) or Stockholder Associated Persons has in the twenty-four months immediately preceding the date of the submission by such stockholder of a notice pursuant to Article I, Section 11 of the Bylaws, made a proposal to acquire control of the Corporation, all information relating to such stockholder, the Proposed Nominee or the Stockholder Associated Person, as applicable, that would be disclosed in any notices, forms or filings required by U.S. federal laws or the rules and regulations of any agency, department or other instrumentality of the U.S. federal government in connection with such direct or indirect acquisition would have to be included in any notice submitted under Article I, Section 11. This provision was adopted by an entrenched Board without a stockholder vote as an illegitimate effort to unduly restrict stockholders' rights.

We believe that this and certain other provisions in the Corporation's Bylaws and Charter that are intended to have an anti-takeover effect demonstrate an unwillingness on the part of the Board and management to consider all options to create value for stockholders.

## PROPOSAL 1

## ELECTION OF DIRECTORS

We are seeking your support at the Annual Meeting to elect our four highly qualified Blackwells Nominees. Each of the Blackwells Nominees has consented to serve as a nominee, being named as a nominee in this Proxy Statement and serve as a director, if elected. The information below concerning name, age and employment and material occupations, positions or offices of the Blackwells Nominees has been furnished by each of the Blackwells Nominees. Except as described in this Proxy Statement, none of the Blackwells Nominees beneficially owns any Common Stock.

Each director elected will hold office until the next annual meeting of stockholders and until his or her successor is elected and qualified or, if sooner, until the director's death, resignation or removal.

Each of Mr. Cricenti, Ms. Hill, Ms. McCoy and Mr. Pully presently is, and if elected as a director of the Corporation, would, in our view, be an "independent director" within the meaning of (i) New York Stock Exchange ("NYSE") listing standards applicable to board composition, (ii) Section 301 of the Sarbanes-Oxley Act of 2002, (iii) Item 407(a) of Regulation S-K of the rules and regulations of the SEC ("Regulation S-K") and (iv) the Corporation's Amended and Restated Corporate Governance Guidelines. No Blackwells Nominee is a member of the Corporation's Audit, Compensation, Nominating/Corporate Governance or Related Party Transactions Committees.

If elected, the Blackwells Nominees will represent four out of eight members of the Board, and therefore it is not guaranteed that they will be able to implement any actions that they may believe are necessary to enhance stockholder value.[4] However, we believe the election of the Blackwells Nominees is an important step in the right direction for enhancing long-term value at the Corporation.

We do not endorse any of the Corporation's director nominees. You should refer to the Corporation's proxy statement, available at no charge on the SEC's website at *http://www.sec.gov*, for the names, background, qualifications and other information concerning the Corporation's nominees.

Proxies cannot be voted for a greater number of persons than the current size of the Board; however, we reserve the right to nominate additional person(s), in accordance with the Bylaws and applicable law, if the Corporation increases the size of the Board above its existing size or increases the number of directors whose terms expire at the Annual Meeting. Blackwells does not expect that any of the Blackwells Nominees will be unable to stand for election or for good cause will not serve as a director, but if any vacancy in the slate of the Blackwells Nominees occurs for any reason (including if the Corporation makes or announces any changes to its Bylaws or takes or announces any other action that has, or if consummated would have, the effect of disqualifying any or all of the Blackwells Nominees), the shares represented by the **WHITE** Universal Proxy Card received by Blackwells and not properly revoked will be voted for the substitute nominee(s) properly nominated by Blackwells in compliance with the rules of the SEC and any other applicable laws and, if applicable, the Bylaws.

If Blackwells lawfully identifies or nominates substitute nominee(s) before the Annual Meeting, Blackwells will file an amended proxy statement that identifies any such substitute nominee(s), discloses whether such nominee(s) has or have consented to being named in the revised proxy statement and includes all disclosure requirements required by Schedule 14A with respect to such substitute nominee(s).

---

4    The following is a list of agreements that contain change of control provisions that the Corporation and the respective counterparty may, in the event of the Blackwells Nominees being elected, interpret as having been triggered, depending on the outcome of the Annual Meeting: Braemar Hotels & Resorts, Inc. Second Amended and Restated 2013 Equity Incentive Plan, as amended, and the award agreements thereunder; Second Amended and Restated Credit Agreement, dated as of October 25, 2019, by and among Braemar Hotels & Resorts Inc., Braemar Hospitality Limited Partnership, Bank of America, N.A. and the other lenders party thereto, as amended; Credit Agreement, dated as of July 31, 2023, by and among Braemar Hospitality Limited Partnership, Braemar Hotels & Resorts Inc., the lenders party thereto and Bank of America, N.A.; Ashford Hospitality Prime, Inc. Advisor Equity Incentive Plan, dated as of November 5, 2013; and Richard Stockton's Restricted Stock Award Agreement, dated as of November 2, 2016. The foregoing list is based on a review of the Corporation's material contracts and agreements that are publicly available on the SEC's electronic data gathering, analysis and retrieval system. The Nominating Stockholder does not believe that any change of control provisions have been triggered as a result of the nomination of the Blackwells Nominees.

**Information About the Blackwells Nominees**

| Name | Age | Principal Occupation | Business Address |
|---|---|---|---|
| Michael Cricenti | 39 | Managing Partner and Chief Investment Officer of Magis Capital Partners | 3979 Clover Ln. Dallas, Texas 75220 |
| Jennifer M. Hill | 58 | Founder and CEO of Murphy Hill Consulting LLC | 9 Dancing Bear Rd. Norwalk, Connecticut 06853 |
| Betsy L. McCoy | 62 | General Counsel and Vice President for The Related Group | 2850 Tigertail Avenue Suite 800, Miami, Florida 33133 |
| Steven J. Pully | 64 | Chairman of the Board of Directors and part-time Chief Executive Officer of Harvest Oil and Gas Corporation | 4564 Meadowood Dr. Dallas, Texas 75220 |

We believe the Blackwells Nominees have the experience and qualifications to address the Corporation's strategic, operational and governance deficiencies and possess the skill sets required to address the Corporation's current needs.

*Michael Cricenti*

Michael Cricenti, age 39, currently serves as Managing Partner and Chief Investment Officer of Magis Capital Partners, a private investment firm that employs a fundamental, value-oriented approach to investing in special situations, since January 2017. Mr. Cricenti also served as a Senior Real Estate Investment Advisor at IsZo Capital Management LP, a hedge fund, from January 2017 to November 2021. Previously, from September 2009 until January 2017, Mr. Cricenti served as Managing Director at Bluestem Asset Management ("Bluestem"), an investment firm with more than $1.5 billion in assets under management based in Charlottesville, Virginia. Mr. Cricenti worked as a mergers and acquisitions analyst at Harris Williams & Co., a leading middle-market advisory firm, in June 2007 until July 2009. He also worked as a Summer Analyst at JP Morgan Private Bank, a private banking facility that has been in operation for more than 200 years, from May 2006 to August 2006.

Mr. Cricenti has served as the Chairman of the board of directors of Nam Tai Property Inc. (OTC: NTPIF), a publicly-traded international real estate developer in turnaround, since November 2021.

Mr. Cricenti received a Bachelor of Science in Business Administration with a concentration in finance and quantitative methods from Babson College in 2007.

Blackwells believes that Mr. Cricenti's extensive experience in capital allocation, corporate governance and finance, as well as his background in mergers and acquisitions in the public market qualify him to serve as a director of the Corporation.

*Jennifer M. Hill*

Jennifer M. Hill, age 58, currently serves as the Founder and CEO of Murphy Hill Consulting LLC, a Connecticut-based consulting business providing consulting services focused on the financial services, asset management, insurance and risk management industries, since January 2015. Ms. Hill served as the Chief Financial Officer of Bank of America Merrill Lynch (NYSE: BAC), an investment bank and financial services holding company, from July 2011 to December 2014.[1] Prior to joining Bank of America, Ms. Hill was Group Director of Strategy and Corporate Finance at Royal Bank of Scotland (now known as NatWest Group PLC (NYSE: NWG)), a banking and insurance holding company, from July 2008 to July 2011. From September 2006 to July 2008, Ms. Hill served as the Chief Financial Officer of Tisbury Capital Management, an event-driven hedge fund, and from September 1996 to September 2006, Ms. Hill served as a Managing Director of Goldman Sachs & Co. (NYSE: GS), an investment banking, securities and investment management firm. Ms. Hill also served as a Vice President at Citigroup Inc. (NYSE: C), an investment bank and financial services company, from June 1994 to August 1996. Ms. Hill also served as an Assistant Vice President at Credit Lyonnais, a French banking network now part of the Crédit Agricole Group, from February 1989 to June 1994, and served as an Assistant Treasurer at the European American Bank, a banking network that is now part of Citigroup Inc., from June 1987 to February 1989.

---

1    Bank of America Merrill Lynch was the marketing name for a division of Bank of America.

Ms. Hill has served as Chairman of the Board of Directors and member of the Audit Committee of ExcelFin Acquisition Corp. (NASDAQ: XFIN), a blank check company focused in the financial technology sector, since April 2021. Ms. Hill also serves as a member of the Board of Directors and Chairman of the Compensation Committee of Cantor Fitzgerald Europe, an integrated, full-service investment bank, since February 2021. She also serves as a member of the Board of Directors and Chairman of the Compensation Committee of Xplor Technologies, a company providing enterprise-grade SaaS solutions, since October 2021. Ms. Hill served as a member of the Board of Directors and Chair of the Audit Committee of BlockFi, a cryptocurrency lending platform, from October 2021 to December 2023, a member of the Board of Directors of Melqart Funds, which are London-based hedge funds focused on event-driven strategies, from January 2015 to October 2022, a member of the Board of Directors of Keal Funds, hedge funds focused on event-driven strategies, from August 2015 to September 2022, a member of the Board of Directors of Arkadia Systematic Equity Fund, a hedge fund, from August 2019 to February 2022 and a member of the Board of Directors of LaCrosse Milling Company, an oat milling company, from July 2018 to June 2021.

As a volunteer, Ms. Hill served as a Regional Director on the Board of Directors of buildOn, a community service organization, from January 1994 to December 2017. She also served as the Chairman of the Board of Advisors to the Richard Paul Richman Center at Columbia University, a research university, from January 2013 to June 2022. Ms. Hill further served as a member of the Board of Trustees of Hamilton College, a liberal arts college, from January 2009 to January 2013.

Ms. Hill received a Bachelor of Arts in Government and French from Hamilton College in 1987 and a Master's in Business Administration from Columbia University in 1994. She has held Series 7 and 27 certifications.

Blackwells believes Ms. Hill's leadership, board experience, and extensive knowledge of and background in investing, real estate and innovation qualify her to serve as a director of the Corporation.

### *Betsy L. McCoy*

Betsy L. McCoy, age 62, currently serves as General Counsel and Vice President for The Related Group, a private real estate development company, a position she has served in since May 2010. In her role, Ms. McCoy oversees the in-house legal department, including all aspects of compliance, management of legal services, legal reporting to executives, and legal guidance and as legal and business counsel to an affiliated real estate management company. From January 2008 to May 2013, Ms. McCoy served as Associate General Counsel and Vice President of The Related Group. She currently is an Adjunct Professor in the Real Property Development L.L.M. program at the University of Miami School of Law since January 2016. Ms. McCoy also serves as the President of McCoy Real Estate Advisors and Lawyers, LLC, a private real estate advisory company, since 2013 and as President of REEL McCoy Productions 5 LLC, a private productions company, since October 2023. Prior to this, Ms. McCoy was in private practice as a principal and stockholder of her law firm, Law Offices of Betsy L. McCoy P.A., from 2000 to 2008. Ms. McCoy was partner in Solomon & Benedict, P.A., a law firm located in Tampa, Florida, specializing in Business Litigation, Commercial Law, Bankruptcy, Banking, Real Estate Finance, and Real Property Law, from 1990 to 2000. Ms. McCoy maintains her real estate license in Florida since 2018 and is associated with Related Realty LLC, a Florida real estate sales broker, since May 2021.

Ms. McCoy serves as the President and as a director for Gables on the Green Condominium Association West, Inc., a private luxury condominium association, beginning in July 2022. Ms. McCoy previously served on the board of directors for the Mayor's Beautification Program of Tampa, a committee formed to make suggestions to the City Commission in matters related to City Parks and Beautification, from 1996 to 2000; she also served as Chairman of the Board on the committee from 1999 to 2000.

Ms. McCoy graduated from Creighton University, College of Arts and Sciences, in Omaha, Nebraska in 1984, where she earned a Bachelor's Degree. She also attended Creighton University School of Law where she earned her Juris Doctorate degree in 1987, as well as the University of Miami School of Law, where Ms. McCoy earned an L.L.M. in real property development in 2007.

Blackwells believes Ms. McCoy's vast legal experience — including her recognized expertise in business litigation and mastery of real property development law — as well as her extensive background in real estate, executive management, education, and public service qualify her to serve as a director of the Corporation.

*Steven J. Pully*

Steven J. Pully, age 64, serves on public and private company boards, he provides investment banking and consulting services through Speyside Partners LLC, an investment banking firm he co-founded in 2017, and he serves as an expert witness in legal disputes, generally in connection with his expertise in governance matters. Over the course of his board service, he has served on boards of companies involved in a variety of different industries, he has served as Executive Chairman, Chairman and Lead Director of various boards, and he has chaired a variety of board committees.

From January 2008 to September 2014, Mr. Pully served as General Counsel and as a partner of Carlson Capital, L.P., a multi-strategy hedge fund. Prior to joining Carlson Capital, Mr. Pully served as the President of Newcastle Capital Management, L.P. ("Newcastle"), a deep value, control-oriented hedge fund, from 2002 to 2007. Prior to working in the hedge fund business, Mr. Pully worked for several large investment banks, including as a Managing Director at Banc of America Securities (now, Bank of America, NYSE: BAC), an investment banking firm and as a Senior Managing Director in the investment banking department of The Bear Stearns Companies, Inc. Mr. Pully began his career at a private, full-service law firm, Baker Botts L.L.P., practicing in areas such as securities, M&A, and restructuring.

Mr. Pully serves as Chairman of the Board of Directors and Chair of the Audit Committee of Enzo Biochem, Inc. (NYSE: ENZ), a biomedical research and development company, since October 2023, and as chairman of its Compensation and Nominating and Governance Committees since January 2024., Mr. Pully has served as Chairman of the Board of Directors for RumbleOn, Inc. (NASDAQ: RMBL) ("RumbleOn"), a retailer of powersports vehicles, since December 2023 and previously served as its Executive Chairman from July 2023 to December 2023. Mr. Pully served as the Chair of the Audit Committee at RumbleOn in July of 2023. He was initially appointed to the board of RumbleOn in May 2023. Mr. Pully also serves as the part-time Chief Executive Officer and Chairman of Harvest Oil & Gas Corp., a company that is currently in the process of dissolving. Mr. Pully joined the board in June 2018 when the company was a public company; he became the Chief Executive Officer in January 2021.

Within the past five years, he has also served on the boards of the following public companies: VAALCO Energy, Inc. (NYSE: EGY), an oil and gas company, from August 2015 to June 2020, and served as Chair of the Compensation Committee from 2018 to June 2019 and Chair of the Governance Committee from June 2019 to June 2020; Goodrich Petroleum Corporation (NYSE: GDP) from March 2017 to August 2019, Bellatrix Exploration Ltd., a Western Canadian based oil and gas company from January 2015 to May 2019, and of Titan Energy, an and oil and gas company, from May 2017 to April 2021.

Mr. Pully is licensed as an attorney and CPA in the state of Texas and also holds the Chartered Financial Analyst (CFA) designation. Mr. Pully also holds FINRA certifications (Series 7, 63 and 79). He received his undergraduate degree with honors in Accounting from Georgetown University in 1982 and received a J.D. from The University of Texas School of Law in 1985.

Blackwells believes Mr. Pully's executive management and board experience and extensive background in investment banking, corporate governance, law and accounting qualify him to serve as a director of the Corporation.

If elected, the Blackwells Nominees will be entitled to such compensation from the Corporation as is consistent with the Corporation's practices for services of non-employee directors.

On March 26, 2024, Blackwells Onshore, Blackwells Capital, Mr. Aintabi and each of the Blackwells Nominees entered into a Joint Filing and Solicitation Agreement pursuant to which, among other things, each of Blackwells Onshore, Blackwells Capital, Mr. Aintabi and the Blackwells Nominees agreed to the joint filing on behalf of each of them to allow for the solicitation of proxies for the election of the Blackwells Nominees and in favor of the Blackwells Proposals.

On April 2, 2024, Messrs. Cricenti and Pully and Ms. Hill each engaged Vinson & Elkins L.L.P. ("V&E") to represent them in connection with the Federal Action. On April 3, 2024, Ms. McCoy engaged V&E to represent her in connection with the Federal Action. Blackwells has agreed to pay for V&E's legal fees in connection with its representation of the Nominees in the Federal Action.

APP.018

Other than as described in this Proxy Statement, there are no arrangements or understandings between or among any Blackwells Nominee and any other person pursuant to which any Blackwells Nominee was or is to be selected as a director or nominee.

**Share Ownership of the Blackwells Nominees**

The following table contains a summary of the total number of shares of Common Stock beneficially owned by the Blackwells Nominees as of the Record Date.

The address for each Blackwells Nominee is listed below. The information in the following table has been furnished to us by the respective Blackwells Nominees. Percentage of beneficial ownership is based on 84,453,761 shares outstanding as of the Record Date, as disclosed in the Corporation's proxy statement.

| Name and Address | Number of Shares Beneficially Owned | Percentage of Shares Beneficially Owned |
|---|---|---|
| Michael Cricenti<br>3979 Clover Ln.,<br>Dallas, Texas 75220 | 0 | 0% |
| Jennifer M. Hill<br>9 Dancing Bear Rd.,<br>Norwalk, Connecticut 06853 | 0 | 0% |
| Betsy L. McCoy<br>2850 Tigertail Avenue Suite 800,<br>Miami, Florida 33133 | 0 | 0% |
| Steven J. Pully<br>4564 Meadowood Dr.,<br>Dallas, Texas 75220 | 0 | 0% |

Blackwells will be using a universal proxy card for voting on the election of directors at the Annual Meeting, which will include the names of all nominees for election to the Board. Stockholders will have the ability to vote for up to eight nominees on the enclosed **WHITE** Universal Proxy Card. Any stockholder who wishes to vote for one or more of the Corporation's nominees in addition to one or more of the Blackwells Nominees may do so on Blackwells' **WHITE** Universal Proxy Card. **The Corporation's gold proxy card is not a universal proxy card and does not include the names of the Blackwells Nominees or the Blackwells Proposals. There is no need to use the Corporation's gold proxy card, regardless of how you wish to vote.**

Stockholders are permitted to vote for fewer than eight nominees or for any combination (up to eight total) of the Blackwells Nominees, the Corporation's nominees and on the **WHITE** Universal Proxy Card. Voting "**FOR**" fewer than eight nominees will result in your shares being voted "**FOR**" only those nominees you have so marked and default to a "**WITHHOLD**" vote with respect to any nominee left unmarked. If you vote "**FOR**" more than eight nominees, your vote regarding the election of directors will be invalid and will not be counted.

**WE URGE YOU TO VOTE "FOR" THE ELECTION OF THE BLACKWELLS NOMINEES ON THE ENCLOSED WHITE UNIVERSAL PROXY CARD AND INTEND TO VOTE OUR SHARES "FOR" THE BLACKWELLS NOMINEES.**

13

**PROPOSAL 2**

**NON-BINDING STOCKHOLDER PROPOSAL TO URGE THE BOARD TO AMEND THE BYLAWS
TO REMOVE THE OVERREACHING ADVANCE NOTICE PROVISION**

Blackwells is asking stockholders to indicate their support at the Annual Meeting for a non-binding, advisory proposal urging the Board to amend the Bylaws to remove clause (iv) of Section 11(a)(3)(D) of Article I (the "Overreaching Advance Notice Provision") of the Bylaws, in effect as of the date hereof (such proposal, the "Amendment to Advance Notice Provisions Proposal").

The following is the text of the proposed resolution:

"RESOLVED, that the stockholders hereby urge the Board to amend Braemar Hotels & Resorts Inc.'s Fifth Amended and Restated Bylaws, as amended, to delete clause (iv) of Section 11(a)(3)(D) of Article I of the Bylaws in its entirety."

We favor this proposal at the Annual Meeting because the Overreaching Advance Notice Provision requires that in the event any stockholder or any of such stockholder's "Proposed Nominees" (as such term is used in the Bylaws) or Stockholder Associated Persons has in the twenty-four months immediately preceding the date of the submission by such stockholder of a notice pursuant to the Advance Notice Bylaws, made a proposal to acquire control of the Corporation (whether through the acquisition of a majority of the outstanding securities of the Corporation, the acquisition of all or substantially all of the Corporation's assets or otherwise), all information relating to such stockholder, the Proposed Nominee or the Stockholder Associated Person, as applicable, that would be disclosed in any notices, forms or filings required by U.S. federal laws or the rules and regulations of any agency, department or other instrumentality of the U.S. federal government in connection with such direct or indirect acquisition would have to be included in any notice submitted under the Advance Notice Bylaws.

The Overreaching Advance Notice Provision was not adopted on a proverbial clear day but rather was adopted by what could be categorized as an entrenched board of directors without a stockholder vote in the immediate wake of the Corporation having received from Blackwells, a good faith proposal to acquire 100% of the outstanding equity interests in the Corporation for a cash price equal to an approximate 114.3% premium to the then current share price of the Common Stock. Blackwells supports the Amendment to Advance Notice Provisions Proposal at the Annual Meeting because it believes that the Overreaching Advance Notice Provision was an illegitimate effort to unduly restrict the stockholder franchise. Blackwells believes that the Overreaching Advance Notice Provision requires disclosures that (i) require the assumption of hypothetical events, resulting in the provision being ambiguous and (ii) are either outside of the scope of the legitimate corporate interest of the Corporation or are already required under the other paragraphs of the Advance Notice Bylaws and are, therefore, redundant.

Other than as described elsewhere in this Proxy Statement, Blackwells does not have any material interest in this proposal, individually or in the aggregate, including any anticipated benefit to us. As the Amendment to Advance Notice Provisions Proposal is non-binding, it does not require the Board or the Corporation to take any action, even if approved by the requisite number of stockholder votes.

**WE URGE YOU TO VOTE "FOR" PROPOSAL 2 AND INTEND TO VOTE OUR SHARES "FOR"
THIS PROPOSAL.**

14

**PROPOSAL 3**

**NON-BINDING STOCKHOLDER PROPOSAL TO URGE THE BOARD TO AMEND THE BYLAWS TO PRECLUDE ANY CURRENT OR FORMER EMPLOYEE, DIRECTOR, OFFICER, OR CONTROL PERSON OF THE CORPORATION OR ASHFORD AND ASHFORD'S AFFILIATES FROM SERVING AS THE CORPORATION'S CHAIRMAN OF THE BOARD**

Blackwells is asking stockholders to indicate their support at the Annual Meeting for a non-binding, advisory proposal to amend the Corporation's Corporate Governance Guidelines, as revised on March 24, 2023 (the "Corporate Governance Guidelines"), to add a provision precluding any current or former employee, director, officer or control person of Ashford Hospitality Trust, Inc., a Maryland corporation, Ashford Hospitality Limited Partnership, a Delaware limited partnership, Ashford Inc., a Nevada corporation, Ashford Hospitality Advisors LLC, a Delaware limited liability company and the asset manager of the Corporation, Premier Project Management LLC, a Maryland limited liability company, Remington Lodging & Hospitality, LLC, a Delaware limited liability company, or any of the affiliates of the foregoing (collectively, "Ashford") from serving as the Corporation's chairman of the board of directors (such proposal, the "Governance Guidelines Amendment Proposal").

The following is the text of the proposed resolution:

"RESOLVED, that the stockholders hereby urge the Board to amend Braemar Hotels & Resorts Inc.'s Corporate Governance Guidelines to add the following new paragraph at the end of Section VII ("Board Composition and Size"):

Notwithstanding anything to the contrary contained in these Guidelines, any current or former employee, officer, director or control person of Ashford Hospitality Trust, Inc., a Maryland corporation, Ashford Hospitality Limited Partnership, a Delaware limited partnership, Ashford Inc., a Nevada corporation, Ashford Hospitality Advisors LLC, a Delaware limited liability company and the asset manager of the Corporation, Premier Project Management LLC, a Maryland limited liability company, Remington Lodging & Hospitality, LLC, a Delaware limited liability company, or any of the affiliates of the foregoing shall be precluded from serving as the Chairman."

We favor this proposal at the Annual Meeting so that the Board chairman does not owe conflicting loyalties to the Corporation and to its asset manager. Ashford Hospitality Advisors LLC, a subsidiary of Ashford Inc., provides advisory services to the Corporation through an advisory agreement. All of the hotel properties in the Corporation's portfolio are currently asset-managed by Ashford LLC. Asset management functions include acquisition, renovation, financing and disposition of assets, operational accountability of managers, budget review, capital expenditures and property-level strategies. In addition, the Corporation does not have any employees, and all of the advisory services that might be provided by employees are provided to the Corporation by Ashford LLC. Even the Corporation's senior management team has been provided to the Corporation by Ashford. And while the Corporation's total stockholder return has been poor, the Corporation pays Ashford handsomely for its management and administrative services. All the while, Monty J. Bennett, the Chairman of the Board of the Corporation, serves as Chief Executive Officer and Chairman of the Board of Directors of Ashford Inc.

Blackwells believes that the Governance Guidelines Amendment Proposal will help to prevent the Board from being beholden to the interests of Ashford and its owners and will, in fact, serve the Board's only legitimate purpose — protecting the interests of the Corporation and its stockholders.

Other than as described elsewhere in this Proxy Statement, Blackwells does not have any material interest in this proposal, individually or in the aggregate, including any anticipated benefit to us. As the Governance Guidelines Amendment Proposal is non-binding, it does not require the Board or the Corporation to take any action, even if approved by the requisite number of stockholder votes.

**WE URGE YOU TO VOTE "FOR" PROPOSAL 3 AND INTEND TO VOTE OUR SHARES "FOR" THIS PROPOSAL.**

**PROPOSAL 4**

**NON-BINDING STOCKHOLDER PROPOSAL TO REQUIRE THE BOARD TO DISCLOSE ALL EXTRAORDINARY TRANSACTION PROPOSALS MADE BY STOCKHOLDERS, AFFILIATES AND THIRD PARTIES DURING THE TWO MOST RECENTLY COMPLETED CALENDAR YEARS AND THE TERMS OF THOSE PROPOSED TRANSACTIONS**

Blackwells is asking stockholders to indicate their support at the Annual Meeting for a non-binding, advisory proposal to require the Board to disclose all extraordinary transaction proposals made by stockholders, affiliates and third parties during the two most recently completed calendar years and the terms of those proposed transactions (such proposal, the "Extraordinary Transaction Disclosure Proposal").

The following is the text of the proposed resolution:

"RESOLVED, that the Corporation shall disclose any and all extraordinary transactions, including proposed change in control transactions, mergers, acquisitions and dispositions of all or substantially all assets of the Corporation, which were proposed to the Corporation by its stockholders, and affiliates and by third parties during the two most recently completed calendar years."

We favor this proposal at the Annual Meeting to shine light on what extraordinary transactions have been presented to and considered by the Board so that stockholders can assess the independence of the Board and the Corporation from Ashford, Bennett and their respective affiliates and to permit stockholders to assess whether the Board is open to all options to maximize value.

Other than as described elsewhere in this Proxy Statement, Blackwells does not have any material interest in this proposal, individually or in the aggregate, including any anticipated benefit to us. As the Extraordinary Transaction Disclosure Proposal is non-binding, it does not require the Board or the Corporation to take any action, even if approved by the requisite number of stockholder votes.

**WE URGE YOU TO VOTE "FOR" PROPOSAL 4 AND INTEND TO VOTE OUR SHARES "FOR" THIS PROPOSAL.**

APP.022

## PROPOSAL 5

### NON-BINDING STOCKHOLDER PROPOSAL TO REQUIRE THE BOARD TO DISCLOSE ALL COMPENSATION PAID BY THE CORPORATION TO MEMBERS OF THE BENNETT FAMILY, *THE DALLAS EXPRESS* AND EMPLOYEES, DIRECTORS OR AGENTS OF *THE DALLAS EXPRESS*, INCLUDING LOUIS DARROUZET

Blackwells is asking stockholders to indicate their support at the Annual Meeting for a non-binding, advisory proposal to require the Board to disclose all compensation paid by the Corporation to members of the Bennett family, *The Dallas Express* and employees, directors or agents of *The Dallas Express*, including Louis Darrouzet (the "Compensation Disclosure Proposal").

The following is the text of the proposed resolution:

"RESOLVED, that the Corporation shall disclose any and all compensation that was paid by the Corporation to Monty Bennett, the Bennett family more broadly and *The Dallas Express* (a general interest daily news source published by Monty Bennett) and its employees, directors and agents, including Louis Darrouzet, during the two most recently completed calendar years."

We favor this proposal at the Annual Meeting to shine light on the relationships among the Corporation, Mr. Bennett, the Bennett family more broadly and *The Dallas Express* and its employees. Blackwells believes that disclosure of the foregoing compensation will provide stockholders with critical information to assess the Corporation's independence from Mr. Bennett, the Bennett family and its affiliates, including *The Dallas Express*.

Other than as described elsewhere in this Proxy Statement, Blackwells does not have any material interest in this proposal, individually or in the aggregate, including any anticipated benefit to us. As the Compensation Disclosure Proposal is non-binding, it does not require the Board or the Corporation to take any action, even if approved by the requisite number of stockholder votes.

**WE URGE YOU TO VOTE "FOR" PROPOSAL 5 AND INTEND TO VOTE OUR SHARES "FOR" THIS PROPOSAL.**

17

## <u>OTHER MATTERS TO BE CONSIDERED AT THE ANNUAL MEETING</u>

**Proposal 6: Advisory Vote on Executive Compensation**

As discussed in further detail in the Corporation's proxy statement, the Corporation is asking stockholders to vote on the following advisory resolution:

RESOLVED, that the Corporation's stockholders hereby approve, on an advisory basis, the compensation of the named executive officers of Braemar Hotels & Resorts Inc. as disclosed in the Corporation's proxy statement for the 2024 annual meeting of stockholders, in accordance with the SEC's compensation disclosure rules. As disclosed in the Corporation's proxy statement, the vote on this proposal is non-binding, but the Compensation Committee of the Board will take the voting results into account when considering future executive compensation decisions. Further information regarding the Corporation's executive compensation can be found in the section of the Corporation's proxy statement.

As disclosed in the Corporation's proxy statement, the Corporation provides its stockholders with this advisory vote to approve executive compensation on an annual basis.

We encourage all stockholders to review the Corporation's disclosures related to this proposal in the Corporation's proxy statement in detail.

**WE RECOMMEND YOU VOTE "AGAINST" PROPOSAL 6 AND INTEND TO VOTE OUR SHARES "AGAINST" THIS PROPOSAL.**

**Proposal 7: Ratification of the Appointment of BDO USA, P.C. as the Corporation's Independent Auditor**

As discussed in further detail in the Corporation's proxy statement, the Audit Committee of the Board (the "Audit Committee") has selected BDO USA, P.C. as the Corporation's independent registered public accounting firm for the fiscal year ending December 31, 2024. The Corporation is submitting its selection of BDO USA, P.C. for ratification by the stockholders at the Annual Meeting.

As disclosed in the Corporation's proxy statement, stockholder approval is not required to appoint BDO USA, P.C. as the Corporation's independent registered public accounting firm, but the Corporation is submitting the selection of BDO USA, P.C. to stockholders for ratification as a matter of good corporate governance. If the stockholders fail to ratify the selection, then the Corporation has indicated that the Audit Committee will reconsider the appointment. The Corporation has further disclosed that even if the appointment is ratified by stockholders, the Audit Committee may in its discretion select a different registered public accounting firm at any time during the year if it determines that such a change would be in the best interests of the Corporation and its stockholders.

We encourage all stockholders to review the Corporation's disclosures related to this proposal in the Corporation's proxy statement in detail.

**WE RECOMMEND YOU VOTE "FOR" PROPOSAL 7 AND INTEND TO VOTE OUR SHARES "FOR" THIS PROPOSAL.**

APP.024

## WHO CAN VOTE AT THE ANNUAL MEETING

The Record Date for determining stockholders entitled to notice of, and to vote at, the Annual Meeting is March 14, 2024. Stockholders of the Corporation at the close of business on the Record Date are entitled to one vote for each share of Common Stock, Series E Redeemable Preferred Stock ("Series E Preferred Stock") and Series M Redeemable Preferred Stock ("Series M Preferred Stock") owned as of the Record Date. Based on publicly available information, we believe that the Corporation's voting equity securities include: shares of Common Stock, Series E Preferred Stock and Series M Preferred Stock. Each share of Common Stock, Series E Preferred Stock and Series M Preferred Stock entitles the holder to one vote. The Series E Preferred Stock and Series M Preferred Stock will vote together with the holders of Common Stock as a single class on all matters. According to the Corporation's proxy statement, the number of shares of Common Stock outstanding as of the Record Date is 84,453,761, the number of shares of Series E Preferred Stock as of the Record Date is 16,158,870 and the number of shares of Series M Preferred Stock as of the Record Date is 1,774,180.

Only stockholders as of the close of business on the Record Date will be entitled to vote at the Annual Meeting. If you were a stockholder on the Record Date, then you will retain your voting rights for the Annual Meeting even if you sold your shares after the Record Date. Accordingly, it is important that you vote the shares held by you on the Record Date, or grant a proxy to vote such shares, even if you sold such shares after the Record Date.

## HOW TO VOTE BY PROXY

To vote in favor of the election of the Blackwells Nominees to the Board and to vote in favor of the Blackwells Proposals, promptly complete, sign, date and return the enclosed **WHITE** Universal Proxy Card in the enclosed postage-paid envelope. Whether you plan to attend the Annual Meeting or not, we urge you to complete and return the enclosed **WHITE** Universal Proxy Card. Please contact our proxy solicitor, MacKenzie Partners, Inc., by phone at 1-800-322-2885 (toll-free for stockholders) or 212-929-5500 (call collect for banks, brokers, trustees and other nominees), or by email at proxy@mackenziepartners.com if you require assistance in voting your shares or need additional copies of our proxy materials.

Properly executed proxies will be voted in accordance with the directions indicated thereon. If you sign the **WHITE** Universal Proxy Card but do not make any specific choices, your proxy will vote your shares as follows:

- Vote "**FOR**" the election of each of our director nominees — Michael Cricenti, Jennifer M. Hill, Betsy L. McCoy and Steven J. Pully (collectively, the "Blackwells Nominees") — to the Board, each to serve as a director on the Board for a one-year term or until his or her respective successor is duly elected and qualified;

- Vote "**FOR**" Blackwells' non-binding stockholder proposal to urge the Board to amend the Bylaws to remove the Overreaching Advance Notice Provision. (Proposal 2);

- Vote "**FOR**" Blackwells' non-binding stockholder proposal to urge the Board to amend the Bylaws to preclude any current or former employee, director, officer, or control person of the Corporation or Ashford and Ashford's affiliates from serving as the Corporation's chairman of the Board (Proposal 3);

- Vote "**FOR**" Blackwells' non-binding stockholder proposal to require the Board to disclose all extraordinary transaction proposals made by stockholders, affiliates and third parties during the two most recently completed calendar years and the terms of those proposed transactions (Proposal 4);

- Vote "**FOR**" Blackwells' non-binding stockholder proposal to require the Board to disclose all compensation paid by the Corporation to members of the Bennett family, *The Dallas Express* and employees, directors or agents of *The Dallas Express*, including Louis Darrouzet (Proposal 5);

- Vote "**AGAINST**" the Corporation's proposal to approve executive compensation (Proposal 6); and

- Vote "**FOR**" the Corporation's proposal to ratify the appointment of BDO USA, P.C. as the Corporation's independent registered public accountants for fiscal year 2024 (Proposal 7).

Blackwells will be using a universal proxy card for voting on the election of directors at the Annual Meeting, which will include the names of all nominees for election to the Board. Stockholders will have the ability to vote for up to eight nominees on Blackwells' enclosed **WHITE** Universal Proxy Card. Stockholders are permitted to vote for fewer than eight nominees or for any combination (up to eight total) of the Blackwells Nominees or the Corporation's nominees on the **WHITE** Universal Proxy Card. Voting "**FOR**" fewer than eight nominees will result in your shares being be voted "**FOR**" only those nominees you have so marked and default to a "**WITHHOLD**" vote with respect to any nominee left unmarked. If you vote "**FOR**" more than eight nominees, your vote regarding the election of directors will be invalid and will not be counted. **The Corporation's gold proxy card is not a universal proxy card and does not include the names of the Blackwells Nominees or the Blackwells Proposals. There is no need to use the Corporation's gold proxy card, regardless of how you wish to vote.** There is no need to use the Corporation's gold proxy card or voting instruction form, regardless of how you wish to vote. If Blackwells withdraws its solicitation or fails to comply with the universal proxy rules, any votes cast in favor of the Blackwells Nominees will be disregarded and not be counted, whether such vote is provided on our **WHITE** Universal Proxy Card or the Corporation's gold proxy card.

Rule 14a-4(c)(3) of the Exchange Act governs our use of our discretionary proxy voting authority with respect to a matter that is not known by us a reasonable time before our solicitation of proxies. It provides that if we do not know within a reasonable time before making our solicitation that a matter is to be presented at the meeting, then we are allowed to use our discretionary voting authority when the proposal is raised at the meeting, without any discussion of the matter in this Proxy Statement. If any other matters are presented at the Annual Meeting for which we may exercise

APP.026

discretionary voting, your proxy will be voted in accordance with the discretion of the persons named as proxies on the attached **WHITE** Universal Proxy Card. At the time this Proxy Statement was made available, we knew of no matters which needed to be acted on at the Annual Meeting, other than those discussed in this Proxy Statement.

If any of your shares are held in the name of a brokerage firm, bank, bank nominee or other institution on the Record Date, only that entity can vote your shares and only upon its receipt of your specific instructions. Accordingly, please contact the person responsible for your account at such entity and instruct that person to execute and return the **WHITE** Universal Proxy Card on your behalf. You should also sign, date and return the voting instruction that your broker or banker sends you (or, if applicable, vote by following the instructions supplied to you by your brokerage firm or bank, including voting via the Internet). Please do this for each account you maintain to ensure that all of your shares are voted.

A large number of brokerage firms and banks are participating in a program that allows eligible stockholders to vote via the Internet. If a stockholder's brokerage firm or bank is participating in the Internet voting program, then such brokerage firm or bank will provide the stockholder with instructions for voting via the Internet on the voting form. Internet voting procedures, if available through a stockholder's brokerage firm or bank, are designed to authenticate stockholders' identities to allow stockholders to give their voting instructions and to confirm that their instructions have been properly recorded. Stockholders voting via the Internet should understand that there might be costs that they must bear associated with electronic access, such as usage charges from Internet access providers. If a stockholder's brokerage firm or bank does not provide the stockholder with a voting form, but the stockholder instead receives our **WHITE** Universal Proxy Card, then such stockholder should mark our **WHITE** Universal Proxy Card, date and sign it, and return it in the enclosed postage-paid envelope. Stockholders are encouraged to submit their votes on the **WHITE** Universal Proxy Card or voting instructions form.

APP.027

## VOTING AND PROXY PROCEDURES

The Board currently consists of eight individuals. Under the current structure, if elected, Michael Cricenti, Jennifer M. Hill, Betsy L. McCoy and Steven J. Pully would each serve as a director on the Board for a one-year term or until his or her respective successor is duly elected and qualified.

Stockholders entitled to cast at least one-third of all of the votes entitled to be cast at the Annual Meeting, represented in person or by proxy, constitute a quorum. No business may be conducted at the Annual Meeting if a quorum is not present. If you submit a properly executed proxy card or authorize a proxy via the Internet, you will be considered part of the quorum. Withhold votes (in the case of the election of directors) and abstentions will be included in the number of stockholders present at the Annual Meeting for the purpose of determining the presence of a quorum.

A "broker non-vote" results when a broker who holds shares for another person has not received voting instructions from the owner of the shares and either chooses not to vote those shares on a routine matter or does not have discretionary authority to vote on a matter under the applicable rules. Brokers are not permitted to vote shares without instructions on proposals that are not considered "routine." The NYSE rules determine whether proposals are routine or not routine. If a proposal is routine, a broker holding shares for an owner in street name may vote on the proposal without voting instructions. For brokerage accounts that receive proxy materials from, or on behalf of, the Corporation and Blackwells, all of the matters to be voted on at the Annual Meeting will be considered "non-routine" matters and there will be no broker non-votes by such broker. In that case, if you do not submit any voting instructions to your broker, your broker will not have discretionary authority to vote your shares at the Annual Meeting on any proposal, your shares will not be counted in determining the outcome of any of the proposals at the Annual Meeting and your shares will not be counted for purposes of determining whether a quorum exists. However, for brokerage accounts that receive proxy materials only from the Corporation, the broker will be entitled to vote shares held for a beneficial owner on routine matters without instructions from the beneficial owner of those shares and will not be entitled to vote the shares on non-routine items. The only proposal that would be considered routine would be Proposal 7. Accordingly, if you receive proxy materials only from the Corporation, your broker may exercise discretion to vote your shares on the ratification of BDO USA, P.C. as the Corporation's independent registered public accounting firm, even in the absence of your voting instruction. If your shares are voted on the ratification of BDO USA, P.C. as the Corporation's independent registered public accounting firm, as directed by your broker, your shares will constitute "broker non-votes" on each of the non-routine proposals. Any broker non-votes will be counted in determining whether a quorum exists at the Annual Meeting, but will not be counted as votes cast.

*Proposal 1: Election of Directors* — The Corporation has adopted a plurality voting standard for director elections, meaning the nominees who receive the highest number of votes cast **"FOR"** their election will be elected to the Board. Stockholders may vote **"FOR"** up to eight nominees and **"WITHHOLD"** for up to eight nominees. With respect to the election of directors, **"WITHHOLD"** votes and broker non-votes will be counted for purposes of determining if there is a quorum at the Annual Meeting for this proposal but will not be counted as "votes cast" and therefore, will have no direct effect on the outcome of the election of directors.

*Proposal 2: The Amendment to Advance Notice Provisions Proposal* — The affirmative vote of a majority of all votes cast at the annual meeting will be required for approval. Abstentions and broker non-votes, if any, will not be included in the vote totals and will not be considered as "votes cast," and accordingly will have no effect on the outcome. As Proposal 2 is non-binding, it does not require the Board or the Corporation to take any action, even if approved by the requisite number of stockholder votes.

*Proposal 3: The Governance Guidelines Amendment Proposal* — The affirmative vote of a majority of all votes cast at the annual meeting will be required for approval. Abstentions and broker non-votes, if any, will not be included in the vote totals and will not be considered as "votes cast," and accordingly will have no effect on the outcome. As Proposal 3 is non-binding, it does not require the Board or the Corporation to take any action, even if approved by the requisite number of stockholder votes.

*Proposal 4: The Extraordinary Transaction Disclosure Proposal* — The affirmative vote of a majority of all votes cast at the annual meeting will be required for approval. Abstentions and broker non-votes, if any, will not be included in the vote totals and will not be considered as "votes cast," and accordingly will have no effect on the outcome. As Proposal 4 is non-binding, it does not require the Board or the Corporation to take any action, even if approved by the requisite number of stockholder votes.

APP.028

*Proposal 5: The Compensation Disclosure Proposal* — The affirmative vote of a majority of all votes cast at the annual meeting will be required for approval. Abstentions and broker non-votes, if any, will not be included in the vote totals and will not be considered as "votes cast," and accordingly will have no effect on the outcome. As Proposal 5 is non-binding, it does not require the Board or the Corporation to take any action, even if approved by the requisite number of stockholder votes.

*Proposal 6: Advisory Vote on Executive Compensation* — According to the Corporation's proxy statement, the affirmative vote of a majority of all votes cast at the annual meeting will be required for approval. According to the Corporation's proxy statement, abstentions and broker non-votes, if any, will not be included in the vote totals and will not be considered as "votes cast," and accordingly will have no effect on the outcome.

*Proposal 7: Ratification of Appointment of Independent Registered Accountant* — According to the Corporation's proxy statement, the affirmative vote of a majority of all votes cast at the annual meeting will be required for approval.

None of the applicable Maryland law, the Charter, nor the Bylaws provides for appraisal or other similar rights for dissenting stockholders in connection with any of the proposals set forth in this Proxy Statement. Accordingly, you will have no right to dissent and obtain payment for your shares in connection with such proposals.

Any proxy may be revoked by you at any time prior to the time a vote is taken by delivering a notice of revocation bearing a later date, by delivering a duly executed proxy bearing a later date or by attending and voting at the Annual Meeting (but attendance at the Annual Meeting will not by itself constitute revocation of a prior delivered proxy). The revocation may be delivered either to Blackwells, at c/o Corporate Election Services, P.O. Box 3230, Pittsburgh, PA 15230 or to the Corporation's Secretary at 14185 Dallas Parkway, Suite 1200, Dallas, Texas 75254 or any other address provided by the Corporation.

ALTHOUGH YOU MAY VOTE MORE THAN ONCE, ONLY YOUR LATEST-DATED, VALIDLY EXECUTED PROXY WILL BE COUNTED AT THE ANNUAL MEETING.

If you have already sent a proxy card to the Corporation, you can revoke that proxy card by (i) signing, dating and mailing the **WHITE** Universal Proxy Card, (ii) voting via the Internet, by following the instructions on the **WHITE** Universal Proxy Card or (iii) voting at the Annual Meeting.

23

## SOLICITATION OF PROXIES; EXPENSES

The solicitation of proxies under this Proxy Statement will be made by Blackwells.

We have provided the required notice to the Corporation pursuant to the Universal Proxy Rules, including Rule 14a-19(a)(1) under the Exchange Act, and intend to solicit proxies from the holders of shares representing at least 67% of the voting power of shares entitled to vote on the election of directors in support of the Blackwells Nominees' election in accordance with applicable law and intend to comply with applicable requirements of the Exchange Act.

Proxies may be solicited by Blackwells by mail, facsimile, telephone, electronic mail, Internet, in person or by advertisements. Blackwells will bear the entire cost of this solicitation. As of the date of this Proxy Statement, Blackwells does not intend to seek reimbursement from the Corporation of any expenses it incurs in connection with its solicitation of proxies for the election of the Blackwells Nominees and for the Blackwells Proposal at the Annual Meeting. While no precise estimate of the cost of solicitation can be made at the present time, Blackwells currently estimates that it will spend a total of approximately $5,000,000 for its solicitation of proxies, including fees for attorneys, accountants, public relations or financial advisers, solicitors, advertising, printing, transportation, litigation and related expenses. As of the date hereof, Blackwells estimates that it has incurred proxy solicitation expenses of approximately $2,000,000.

Brokerage houses, banks and other custodians and fiduciaries will be requested to forward proxy solicitation material to their customers for whom they hold shares and Blackwells will reimburse them for their reasonable out-of-pocket expenses.

Solicitations may be made by certain of the respective directors, officers, members and employees of Blackwells, none of whom will, except as described elsewhere in this Proxy Statement, receive additional compensation for such solicitation. Certain of Blackwells' full-time employees will assist in the solicitation and will, among other things, communicate with stockholders. The Blackwells Nominees may make solicitations of proxies but, except as described herein, will not receive compensation for acting as Blackwells Nominees.

Blackwells will also reimburse brokers, fiduciaries, custodians and other nominees, as well as persons holding stock for others who have the right to give voting instructions, for out-of-pocket expenses incurred in forwarding this Proxy Statement and related materials to, and obtaining instructions or authorizations relating to such materials from, beneficial owners of Common Stock. Blackwells will pay for the cost of these solicitations, but these individuals will receive no additional compensation for these solicitation services.

Blackwells has engaged MacKenzie Partners, Inc. as proxy solicitor in connection with this solicitation. Blackwells anticipates that certain employees of MacKenzie Partners, Inc. may communicate in person, by telephone or otherwise with a limited number of institutions, brokers or other persons who are stockholders of the Corporation for the purpose of assisting in the solicitation of proxies for the Annual Meeting. Approximately 20 employees of MacKenzie Partners, Inc. will solicit holders of the Common Stock in connection with the Annual Meeting. Blackwells expects to pay a fee up to $180,000 for its services in connection with the solicitation of proxies for the Annual Meeting.

APP.030

## ADDITIONAL PARTICIPANT INFORMATION

Under the applicable SEC regulations, Blackwells Capital, Blackwells Onshore I, Jason Aintabi, Mr. Cricenti, Ms. Hill, Ms. McCoy and Mr. Pully are participants in the solicitation of proxies from the Corporation's stockholders to vote in favor of the election of the Blackwells Nominees to the Board and the approval of the Blackwells Proposal.

Additional information regarding the purchases and sales of securities of the Corporation during the past two years by the Participants is set forth on Schedule I to this Proxy Statement and is incorporated into this Proxy Statement by reference. Information in this Proxy Statement about each Participant was provided by that Participant.

The principal business of Blackwells Onshore is the proprietary trading of securities. The principal business of Blackwells Capital is the proprietary trading of securities. The principal occupation of Mr. Aintabi is serving as the managing partner of Blackwells Capital. The principal occupation of Mr. Cricenti is serving as Managing Partner and Chief Investment Officer of Magis Capital Partners. The principal occupation of Ms. Hill is serving as the Founder and CEO of Murphy Hill Consulting LLC. The principal occupation of Ms. McCoy is serving as the General Counsel and Vice President for The Related Group. The principal occupation of Mr. Pully is serving as the Chairman of the Board of Directors and part-time Chief Executive Officer of Harvest Oil and Gas Corporation.

The business address of Blackwells Capital, Blackwells Onshore and Mr. Aintabi is 400 Park Ave., 4th Floor, New York, New York 10022. Blackwells Capital's address is 400 Park Ave., 4th Floor, New York, New York 10022. Mr. Cricenti's business address is 3979 Clover Ln., Dallas, Texas 75220. Ms. Hill's business address is 9 Dancing Bear Rd., Norwalk, Connecticut 06853. Ms. McCoy's business address is 2850 Tigertail Avenue, Suite 800, Miami, Florida 33133. Mr. Pully's business address is 4564 Meadowood Dr., Dallas, Texas 75220.

Each of Blackwells Onshore and Blackwells Capital is a Delaware limited liability company. Each of Mr. Aintabi, Mr. Cricenti, Ms. Hill, Ms. McCoy and Mr. Pully is a citizen of the United States of America.

As of the Record Date, Blackwells Capital beneficially owned an aggregate of 100 shares of Common Stock.

As of the Record Date, Blackwells Onshore beneficially owned an aggregate of 10,000 shares of Common Stock.

As of the Record Date, Mr. Aintabi beneficially owned an aggregate of 10,100 shares of Common Stock.

As of the Record Date, none of Mr. Cricenti, Ms. Hill, Ms. McCoy or Mr. Pully owned any shares of Common Stock or has entered into any transactions in securities of the Corporation during the past two years.

For information regarding the transactions in securities of the Corporation during the past two years by Blackwells Onshore, Blackwells Capital, Mr. Aintabi, Mr. Cricenti, Ms. Hill, Ms. McCoy or Mr. Pully, see Schedule I.

As discussed further in the "Background of the Solicitation," on March 24, 2024, the Corporation initiated the Federal Action.

Other than as set forth in this Proxy Statement, there are no material proceedings to which any Participant or any associate of any Participant has been a party which is adverse to the Corporation or any of its subsidiaries, nor does any Participant or any associate of any Participant have a material interest adverse to the Corporation or any of its subsidiaries. Except as described herein, no Participant nor any of his or its respective associates has any interest in the matters to be voted upon at the Annual Meeting, other than an interest, if any, as a stockholder of the Corporation. Other than as disclosed in this Proxy Statement, there are no arrangements or understandings between Blackwells or its affiliates and the Blackwells Nominees or any other person pursuant to which the nominations are to be made by Blackwells.

Except as set forth in this Proxy Statement (including the Schedules hereto), (i) during the past ten years, no Participant has been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors); (ii) no Participant directly or indirectly beneficially owns any securities of the Corporation; (iii) no Participant owns any securities of the Corporation which are owned of record but not beneficially; (iv) no Participant has purchased or sold any securities of the Corporation during the past two years; (v) no part of the purchase price or market value of the securities of the Corporation owned by any Participant is represented by funds borrowed or otherwise obtained for the purpose of acquiring or holding such securities; (vi) no Participant is, or within the past year was, a party to any contract, arrangement or understanding with any person with respect to any securities of the Corporation, including,

but not limited to, joint ventures, loan or option arrangements, puts or calls, guarantees against loss or guarantees of profit, division of losses or profits, or the giving or withholding of proxies; (vii) no associate of any Participant owns beneficially, directly or indirectly, any securities of the Corporation; (viii) no Participant owns beneficially, directly or indirectly, any securities of any parent or subsidiary of the Corporation; (ix) no Participant or any of his or its associates, nor any immediate family member of any Participant or any Participant's associates, had a direct or indirect interest in any transaction, or series of similar transactions, since the beginning of the Corporation's last fiscal year, or is a party to any currently proposed transaction, or series of similar transactions, to which the Corporation or any of its subsidiaries was or is to be a party, in which the amount involved exceeds $120,000; (x) no Participant or any of his or its associates has any arrangement or understanding with any person with respect to any future employment by the Corporation or its affiliates, or with respect to any future transactions to which the Corporation nor any of its affiliates will or may be a party; (xi) no Participant has a substantial interest, direct or indirect, by securities holdings or otherwise in any matter to be acted on at the Annual Meeting; (xii) no Participant holds any positions or offices with the Corporation; (xiii) no Participant has a family relationship with any director, executive officer, or person nominated or chosen by the Corporation to become a director or executive officer; and (xiv) no companies or organizations, with which any of the Participants has been employed in the past five years, is a parent, subsidiary or other affiliate of the Corporation. Except as set forth in this Proxy Statement (including the Schedules hereto), (i) there are no material proceedings to which any Participant or any of his or its associates is a party adverse to the Corporation or any of its subsidiaries or has a material interest adverse to the Corporation or any of its subsidiaries and (ii) none of the events enumerated in Item 401(f)(1)-(8) of Regulation S-K occurred during the past ten years.

Blackwells has not paid any compensation to the Blackwells Nominees as a result of their nomination for election as directors of the Corporation by Blackwells at the Annual Meeting. There are no other arrangements or understandings with either of the Blackwells Nominees, other than as set forth herein.

26

## OTHER MATTERS

Other than as discussed in this Proxy Statement, Blackwells is unaware of any other matters to be considered at the Annual Meeting. However, should other matters, which Blackwells is not aware of a reasonable time before this solicitation, be brought before the Annual Meeting, the persons named as proxies on the enclosed **WHITE** Universal Proxy Card will vote on such matters in their discretion.

## STOCKHOLDER PROPOSALS FOR THE 2025 ANNUAL MEETING

### Stockholder Proposals for Inclusion in the Corporation's Proxy Statement

Stockholders interested in presenting a proposal for inclusion in the Corporation's proxy statement for the 2025 Annual Meeting of Stockholders (the "2025 Annual Meeting") may do so by following the procedures in Rule 14a-8 under the Exchange Act. To be eligible for inclusion in the Corporation's proxy statement, stockholder proposals must be received at the Corporation's principal executive offices no later than the close of business on the date that we expect will be disclosed in the Corporation's proxy statement.

### Stockholder Nominations for Directors for Inclusion in the Corporation's Proxy Statement

According to the Corporation's Bylaws, written notice of stockholder nominations to the Board that are to be included in the Corporation's proxy statement for the 2025 Annual Meeting of Stockholders pursuant to the proxy access provisions in Article I, Section 12 of the Corporation's Bylaws must be delivered to the Corporation's secretary at its principal executive offices not later than 90 nor earlier than 120 days prior to the first anniversary of the date of the preceding year's proxy statement.

### Stockholder Proposals and Nominations for Directors to be Presented at the Annual Meeting

Pursuant to the Bylaws, nominations of individuals for election to the Board and the proposal of other business to be considered by stockholders at the 2025 Annual Meeting of Stockholders, but not included in the Corporation's proxy statement, may be made by a person who is a stockholder of record at the time of giving notice, and at the time of the 2025 Annual Meeting of Stockholders, who delivers notice along with the additional information and materials required by the Bylaws to the Corporation's Secretary at its principal executive offices not later than 5:00 p.m., Eastern Time on the 60th day nor earlier than the 90th day prior to the first anniversary of the preceding year's Annual Meeting of Stockholders.

In addition to satisfying the requirements under the Bylaws described in the immediately preceding paragraph, to comply with the universal proxy rules under the Exchange Act, any stockholder who intends to solicit proxies in support of director nominees other than the Board's nominees must provide notice that sets forth the information required by Rule 14a-19 under the Exchange Act no later than the date that we expect will be disclosed in the Corporation's proxy statement. However, if the date of the 2025 Annual Meeting is more than 30 days before or after the anniversary of the date of the prior year's annual meeting, then such notice must be delivered by the later of (x) the tenth day following the public announcement of the date of the 2025 Annual Meeting is first made by the Corporation and (y) the date which is 60 days prior to the date of the 2025 Annual Meeting.

The incorporation of this information in this Proxy Statement should not be construed as an admission by Blackwells that such procedures are legal, valid or binding.

## YOUR VOTE IS IMPORTANT

Your proxy is important no matter how many shares of Common Stock you own. Be sure to vote "**FOR**" the Blackwells Nominees and "**FOR**" the Blackwells Proposal on the **WHITE** Universal Proxy Card. Blackwells urges you NOT to sign any proxy card sent to you by the Corporation or any other party. **The Corporation's gold proxy card is not a universal proxy card and does not include the names of the Blackwells Nominees or the Blackwells Proposals. There is no need to use the Corporation's gold proxy card, regardless of how you wish to vote.**

If you have already submitted a proxy card to the Corporation for the Annual Meeting, you may change your vote to a vote "**FOR**" the election of the Blackwells Nominees by (i) signing, dating and returning the enclosed **WHITE** Universal Proxy Card, which must be dated after any proxy card you may previously have submitted to the Corporation, (ii) voting via the Internet, by following the instructions on the **WHITE** Universal Proxy Card or (iii) voting at the Annual Meeting. Only your latest dated proxy card will count at the Annual Meeting.

If any of your shares are held in the name of a bank, broker or other nominee, only it can vote such shares of Common Stock and only upon receipt of your specific instructions. Depending on your broker or custodian, you may be able to vote via the Internet. Please contact the person responsible for your account and direct him or her to vote on the **WHITE** Universal Proxy Card "**FOR**" the election of the Blackwells Nominees.

If you hold your shares in more than one type of account or your shares are registered differently, you may receive more than one **WHITE** Universal Proxy Card. We encourage you to vote each **WHITE** Universal Proxy Card that you receive.

NO MATTER HOW MANY OR HOW FEW SHARES YOU OWN WE ARE SEEKING YOUR SUPPORT. PLEASE VOTE "**FOR**" THE BLACKWELLS NOMINEES — MR. CRICENTI, MS. HILL, MS. MCCOY AND MR. PULLY — AND "**FOR**" THE BLACKWELLS PROPOSALS BY SIGNING, DATING AND RETURNING THE **WHITE** UNIVERSAL PROXY CARD IN THE ENCLOSED POSTAGE-PAID ENVELOPE AS SOON AS POSSIBLE. ONLY YOUR LATEST DATED PROXY COUNTS. EVEN IF YOU HAVE ALREADY RETURNED A PROXY CARD TO THE CORPORATION, YOU HAVE EVERY LEGAL RIGHT TO REVOKE SUCH PROXY CARD BY (I) SIGNING, DATING AND MAILING THE ENCLOSED **WHITE** UNIVERSAL PROXY CARD, (II) VOTING VIA THE INTERNET, BY FOLLOWING THE INSTRUCTIONS ON THE **WHITE** UNIVERSAL PROXY CARD OR (III) VOTING AT THE ANNUAL MEETING.

## PLEASE CALL IF YOU HAVE QUESTIONS.

If you have any questions or require any assistance in voting your **WHITE** Universal Proxy Card or need additional copies of Blackwells' proxy materials, please contact:

MacKenzie Partners, Inc.
1407 Broadway, 27th Floor
New York, NY 10018
Call Toll Free: 1-800-322-2885
Email: proxy@mackenziepartners.com

**IT IS IMPORTANT THAT YOU RETURN YOUR <u>WHITE</u> UNIVERSAL PROXY CARD PROMPTLY. PLEASE SIGN AND DATE YOUR <u>WHITE</u> UNIVERSAL PROXY CARD AND RETURN IT IN THE ENCLOSED POSTAGE-PAID ENVELOPE TO AVOID UNNECESSARY EXPENSE AND DELAY. NO POSTAGE IS NECESSARY.**

**CERTAIN ADDITIONAL INFORMATION**

WE HAVE OMITTED FROM THIS PROXY STATEMENT CERTAIN DISCLOSURE REQUIRED BY APPLICABLE LAW THAT IS EXPECTED TO BE INCLUDED IN THE CORPORATION'S PROXY STATEMENT RELATING TO THE ANNUAL MEETING BASED ON OUR RELIANCE ON RULE 14A-5(C) UNDER THE EXCHANGE ACT. THIS DISCLOSURE IS EXPECTED TO INCLUDE, AMONG OTHER THINGS, CURRENT BIOGRAPHICAL INFORMATION ON THE CORPORATION'S DIRECTORS, INFORMATION CONCERNING EXECUTIVE COMPENSATION AND DIRECTOR COMPENSATION, INFORMATION CONCERNING THE COMMITTEES OF THE BOARD AND OTHER INFORMATION CONCERNING THE BOARD, INFORMATION CONCERNING CERTAIN RELATIONS AND RELATED PARTY TRANSACTIONS, INFORMATION ABOUT THE EFFECT OF CHANGE OF CONTROL PROVISIONS IN CERTAIN OF THE CORPORATION'S MATERIAL AGREEMENTS AND HOUSEHOLDING OF PROXY MATERIALS. SEE SCHEDULE II FOR INFORMATION REGARDING PERSONS WHO BENEFICIALLY OWN MORE THAN 5% OF THE SHARES AND THE OWNERSHIP OF THE SHARES BY THE DIRECTORS AND MANAGEMENT OF THE CORPORATION. WE DO NOT MAKE ANY REPRESENTATION AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THE CORPORATION'S PROXY STATEMENT.

The information concerning the Corporation contained in this Proxy Statement and the Schedules attached hereto has been taken from, or is based upon, publicly available information.

**Blackwells Capital LLC**
**April 3, 2024**

29

## SCHEDULE I

**TRANSACTIONS IN THE CORPORATION'S SECURITIES DURING THE PAST TWO YEARS**

Information relating to any transactions in securities of the Corporation by the Participants during the past two years is reflected in the table below.

### BLACKWELLS CAPITAL LLC

| Nature of the Transaction | Securities Purchased (Sold) | Date of Purchase/Sale |
|---|---|---|
| Purchase of Common Stock | 100 | 6/26/2023 |
| Purchase of Common Stock | 656,161 | 3/26/2024 |
| Purchase of Common Stock | 36,447 | 3/27/2024 |
| Purchase of Common Stock | 24,692 | 3/28/2024 |
| Purchase of Common Stock | 24,692 | 4/1/2024 |

### BLACKWELLS ONSHORE I LLC

| Nature of the Transaction | Securities Purchased (Sold) | Date of Purchase/Sale |
|---|---|---|
| Purchase of Common Stock | 10,000 | 3/4/2024 |

### JASON AINTABI

None.

### MICHAEL CRICENTI

None.

### JENNIFER M. HILL

None.

### BETSY L. MCCOY

None.

### STEVEN J. PULLY

None.

Except as otherwise stated in this Proxy Statement, no part of the purchase price or market value of any of the securities specified in the transactions listed in this Schedule I was represented by funds borrowed or otherwise obtained for the purpose of acquiring or holding such securities.

APP.036

### SCHEDULE II

*The following tables are reprinted from the Corporation's proxy statement filed with the SEC on March 28, 2024:*

### Security Ownership of Management and Certain Beneficial Owners

The following table sets forth information as of March 14, 2024 regarding the ownership of our equity securities by (i) each person known to us who beneficially owns, directly or indirectly, more than five percent of our outstanding shares of voting stock, (ii) each of our directors and named executive officers and (iii) all of our directors and executive officers as a group. In accordance with SEC rules, each listed person's beneficial ownership includes: (i) all shares the person owns beneficially; (ii) all shares over which the person has or shares voting or dispositive control (such as in the capacity of a general partner of an investment fund); and (iii) all shares the person has the right to acquire within 60 days. Unless otherwise indicated, each person or entity named below has sole voting and investment power with respect to all shares of our voting stock shown to be beneficially owned by such person or entity. As of March 14, 2024, we had an aggregate of 84,453,761 shares of voting stock outstanding, consisting of 66,520,711 shares of our common stock, 16,158,870 shares of our Series E Preferred Stock and 1,774,180 shares of our Series M Preferred Stock. Except as indicated in the footnotes to the table below, the address of each person listed below is the address of our principal executive office, 14185 Dallas Parkway, Suite 1200, Dallas, Texas 75254.

### Security Ownership of Management and Directors

| Name of Beneficial Owner | Common Stock | | Series E Preferred Stock | | Series M Preferred Stock | |
|---|---|---|---|---|---|---|
| | Amount and Nature of Beneficial Ownership[1] | Percent of Class[2] | Amount and Nature of Beneficial Ownership | Percent of Class | Amount and Nature of Beneficial Ownership | Percent of Class |
| Monty J. Bennett | 321,318[3] | * | 44,444 | * | — | * |
| Richard J. Stockton | 230,247 | * | — | * | — | * |
| Deric S. Eubanks | 305,189 | * | — | * | — | * |
| Mark L. Nunneley | 434,822 | * | 18,000 | * | — | * |
| Alex Rose | — | * | — | * | — | * |
| Stefani D. Carter | 82,421 | * | — | * | — | * |
| Candace Evans | 33,292 | * | 1,206 | * | — | * |
| Kenneth H. Fearn, Jr. | 70,626 | * | — | * | — | * |
| Rebeca Odino-Johnson | 14,925 | * | — | * | — | * |
| Matthew D. Rinaldi | 91,764 | * | 4,444 | * | — | * |
| Abteen Vaziri | 46,940 | * | — | * | — | * |
| All directors and executive officers as a group (11 persons) | 1,197,329 | 1.8% | 51,205 | * | — | * |

---

\* Denotes less than 1.0%

(1) Ownership includes common units of Braemar OP issued in connection with our spin-off from Ashford Trust in November 2013. Beginning one year from the issuance date, such common units issued are redeemable by the holder for cash or, at our option, shares of our common stock on a one-for-one basis. Assumes that all common units of our operating partnership held by such person or group of persons are redeemed for common stock (regardless of when such units are redeemable). The number includes LTIP units in our operating partnership that have achieved economic parity with the common units as of March 14, 2024 but excludes any LTIP units (including Performance LTIPs) issued subsequent to March 14, 2024 or that have not yet achieved economic parity or PSUs, LTIP units or Performance LTIPs that have not yet vested. All LTIP units that have achieved economic parity with the common units are, subject to certain time-based and/or performance-based vesting requirements, convertible into common units, which may be redeemed for either cash or, at our sole discretion, up to one share of our common stock. Ownership does not include shares of our Series C Preferred Stock, none of which have been issued. The Company has no immediate plans to issue any Series C Preferred Stock.

APP.037

(2)    In computing the percentage ownership of a person or group, we have assumed that the common units of Braemar OP held by that person or the persons in the group have been redeemed for shares of our common stock and the LTIP units held by that person or the persons in the group that have achieved economic parity with the common units are redeemed for common stock and that those shares are outstanding but that no common units or LTIP units held by other persons are redeemed for shares of our common stock.

(3)    Includes 246,954 common units held directly by Ashford Financial Corporation, 50% of which is owned by Mr. Monty J. Bennett. Mr. Monty J. Bennett disclaims beneficial ownership in excess of his pecuniary interest in such common units.

**Security Ownership of Certain Beneficial Owners**

The following table sets forth information as of March 14, 2024 regarding the ownership of our equity securities by the persons known to Braemar to be the beneficial owners of five percent or more of our common stock, our Series E Preferred Stock or Series M Preferred Stock, by virtue of the filing of a Schedule 13D or Schedule 13G with the SEC. To our knowledge, other than as set forth in the table below, there are no persons owning more than five percent of any class of Braemar's common stock.

| Name and Address of Beneficial Owner | Common Stock | | Series E Preferred Stock | | Series M Preferred Stock | |
| --- | --- | --- | --- | --- | --- | --- |
| | Amount and Nature of Beneficial Ownership[1] | Percent of Class | Amount and Nature of Beneficial Ownership | Percent of Class | Amount and Nature of Beneficial Ownership | Percent of Class |
| BlackRock, Inc. | 9,963,188[2] | 15.0% | — | * | — | * |
| Al Sham Investments Limited | 6,563,000[3] | 9.8% | — | * | — | * |
| Zazove Associates, LLC | 6,701,446[4] | 9.68% | — | * | — | * |
| The Vanguard Group | 3,399,117[5] | 5.15% | — | * | — | * |

_____

(1)    As of March 14, 2024, there were outstanding and entitled to vote 66,520,711 shares of common stock. Ownership does not include shares of our Series C Preferred Stock, none of which have been issued. The Company has no immediate plans to issue any Series C Preferred Stock.

(2)    Based on information provided by BlackRock, Inc. in a Schedule 13G filed with the SEC on January 22, 2024. Per such Schedule 13G, BlackRock, Inc. has sole voting power over 9,223,186 shares and sole dispositive power of all of such shares. The principal business address of BlackRock, Inc. is 50 Hudson Yards, New York, New York 10001.

(3)    Based on information provided by Al Shams Investments Limited in a Schedule 13G filed with the SEC on February 14, 2023. Per such Schedule 13G, Al Shams Investments Limited has shared voting power over all of such shares and shared dispositive power of all of such shares. The principal business address of Al Shams Investments Limited is 5B Waterloo Lane, Pembroke HM 08, Bermuda.

(4)    Based on information provided by Zazove Associates, LLC in a Schedule 13G filed with the SEC on January 10, 2024. Per such Schedule 13G, Zazove Associates, LLC has sole voting power over all of such shares and sole dispositive power of all of such shares. The principal business address of Zazove Associates, LLC is 1001 Tahoe Blvd., Incline Village, NV 89451.

(5)    Based on information provided by The Vanguard Group in a Schedule 13G filed with the SEC on February 13, 2024. Per such Schedule 13G, The Vanguard Group has shared voting power of 29,625 shares, sole dispositive power of 3,345,921 shares and shared dispositive power of 53,196 shares. The principal business address of The Vanguard Group is 100 Vanguard Blvd., Malvern, PA 19355.

APP.038

**YOUR VOTE IS IMPORTANT. PLEASE VOTE TODAY.**

**VOTE BY INTERNET – QUICK AND EASY**

**IMMEDIATE – 24 HOURS A DAY, 7 DAYS A WEEK OR BY MAIL**

### Braemar Hotels & Resorts Inc.

s a stockholder of Braemar Hotels & Resorts Inc. (the "Company"), you have the option of voting your shares electronically through the Interne r by telephone, eliminating the need to return the **WHITE** proxy card. Your electronic or telephonic vote authorizes the named proxies to vot our shares in the same manner as if you marked, signed, dated and returned the **WHITE** proxy card. Votes submitted electronically over th nternet or by telephone must be received by 11:59 p.m., Eastern Time, on May 14, 2024.

**OTE BY INTERNET – WWW.CESVOTE.COM**

se the Internet to transmit your voting instructions. Have your **WHITE** proxy card in hand when you access the web site and follow the instructions create an electronic voting instruction form.

**OR**

**OTE BY TELEPHONE – 1-888-693-8683**

se any touch-tone telephone to transmit your voting instructions. Have your **WHITE** proxy card in hand when you call and then follow e instructions.

**OR**

**OTE BY MAIL**

lark, sign and date your **WHITE** proxy card and return it in the postage-paid envelope we have provided to: Blackwells Capital LLC, c/o Corporate lection Services, P.O. Box 3230, Pittsburgh, PA 15230.

If you vote by Internet or by telephone, you do NOT need to mail back your **WHITE** proxy card.

---

CONTROL NUMBER ➔

---

⬇   **If submitting a proxy by mail, please sign and date the card below and fold and detach card at perforation before mailing.**   ⬇

---

Election of Directors -- Instructions for Proposal 1: While you may mark instructions to any or all of the nominees, you may mark a vote "FOR" only eight nominees in total. You are permitted to vote fo fewer than eight nominees. If you vote "FOR" fewer than eight nominees, your shares will be voted "FOR" those nominees you have marked and default to a "WITHHOLD" vote with respect to an nominee left unmarked. If you vote "FOR" more than eight nominees, your elections in Proposal 1 will be invalid, and, depending on your broker, bank, or other nominee through which you hold share your votes on all other proposals before the 2024 Annual Meeting of Stockholders (including any adjournments, postponements, or continuations thereof, the "Annual Meeting") may also be invalid. W will also transact any other business that may properly come before the Annual Meeting.

ackwells recommends you vote FOR the Blackwells nominees

| BLACKWELLS NOMINEES | FOR | WITHHOLD |
|---|---|---|
| 1a. Michael Cricenti | ☐ | ☐ |
| 1b. Jennifer M. Hill | ☐ | ☐ |
| 1c. Betsy L. McCoy | ☐ | ☐ |
| 1d. Steven J. Pully | ☐ | ☐ |
| COMPANY NOMINEES | FOR | WITHHOLD |
| 1e. Monty J. Bennett | ☐ | ☐ |
| 1f. Stefani D. Carter | ☐ | ☐ |
| 1g. Candace Evans | ☐ | ☐ |
| 1h. Kenneth H. Fearn, Jr. | ☐ | ☐ |
| 1i. Rebeca Odino-Johnson | ☐ | ☐ |
| 1j. Matthew D. Rinaldi | ☐ | ☐ |
| 1k. Richard J. Stockton | ☐ | ☐ |
| 1l. Abteen Vaziri | ☐ | ☐ |

Blackwells recommends you vote FOR the following Blackwells proposals:

| | FOR | AGAINST | ABST. |
|---|---|---|---|
| 2. The Blackwells proposal, if properly presented at the meeting, to adopt a non-binding, advisory resolution to urge the Board to amend the Company's Bylaws to remove clause (iv) of Section 11(a)(3)(D) of Article I of the Company's Bylaws. | ☐ | ☐ | ☐ |
| 3. The Blackwells proposal, if properly presented at the meeting, to adopt a non-binding, advisory resolution urging the Board to amend the Company's Corporate Governance Guidelines to add a provision precluding any current or former employee, director, officer, or control person of Ashford Hospitality Trust, Inc., a Maryland corporation, Ashford Hospitality Limited Partnership, a Delaware limited partnership, Ashford Inc., a Nevada corporation, Ashford Hospitality Advisors, LLC, a Delaware limited liability company and the asset manager of the Corporation, Premier Project Management LLC, a Maryland limited liability company, Remington Lodging & Hospitality, LLC, a Delaware limited liability company, or any of the affiliates of the foregoing from serving as the Company's chairman of the Board. | ☐ | ☐ | ☐ |
| 4. The Blackwells proposal, if properly presented at the meeting, to adopt a non-binding, advisory resolution requiring the Board to disclose all extraordinary transaction proposals made by stockholders, affiliates and third parties during the two most recently completed calendar years and the terms of those proposed transactions...... | ☐ | ☐ | ☐ |
| 5. The Blackwells proposal, if properly presented at the meeting, to adopt a non-binding, advisory resolution requiring the Board to disclose all compensation paid by the Company to members of the Bennett family, The Dallas Express and employees, directors or agents of The Dallas Express, including Louis Darrouzet. ............. | ☐ | ☐ | ☐ |

Blackwells recommends you vote AGAINST the following Company proposal:

| | FOR | AGAINST | ABST. |
|---|---|---|---|
| 6. To obtain advisory approval of the Company's executive compensation. | ☐ | ☐ | ☐ |

Blackwells recommends you vote FOR the following Company proposal:

| | FOR | AGAINST | ABST. |
|---|---|---|---|
| 7. To ratify the appointment of BDO USA, P.C., a national public accounting firm, as the Company's independent auditors for the fiscal year ending December 31, 2024. .......................................................................... | ☐ | ☐ | ☐ |

_____ , 2024
Date

_____
(Signature)

_____
(Signature if Held Jointly)

APP.039

NOTE: Please sign exactly as name(s) appear(s) hereon. When signing as attorney, executor, administrator or other fiduciary, please give full title as such. Joint owners should each sign personally. If a corporation, limited liability company or partnership, please sign in full corporate, limited liability company or partnership name by authorized officer or person.

---

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting**
The Proxy Statement is available at:  www.viewourmaterial.com/BHR

---

If you have questions or require any assistance with voting your shares,
please contact Blackwells' proxy solicitor listed below:



1407 Broadway, 27th Floor
New York, New York 10018
Call Collect: (212) 929-5500

or

**Toll-Free (800) 322-2885**

Email: proxy@mackenziepartners.com

---

⬇  **If submitting a proxy by mail, please sign and date the card and fold and detach card at perforation before mailing.**  ⬇

---

### BRAEMAR HOTELS & RESORTS INC.                    WHITE PROXY CARD

#### 2024 ANNUAL MEETING OF STOCKHOLDERS

#### May 15, 2024

#### THIS WHITE PROXY IS SOLICITED ON BEHALF OF BLACKWELLS
#### AND NOT ON BEHALF OF THE BOARD OF DIRECTORS OF THE COMPANY

The undersigned hereby appoints Jason Aintabi and Bob Marese (together, as "Proxies"), and each of them acting individually or in the absence of others, with full power of substitution and re-substitution and all powers that the undersigned would possess if personally present, as proxies to vote all the shares of common stock, Series E Preferred Stock and Series M Preferred Stock of the Company that the undersigned is entitled to vote at the Annual Meeting of the Company to be held on May 15, 2024 at 9:00 A.M. Central Daylight Time.  By validly executing this proxy, the undersigned acknowledges receipt of the Notice of Annual Meeting and the accompanying Proxy Statement, the terms of which are incorporated by reference herein, and revokes any proxy previously given by the undersigned with respect to the Annual Meeting.

**BLACKWELLS CAPITAL LLC ("BLACKWELLS") RECOMMENDS YOU VOTE "FOR" THE ELECTION OF BLACKWELLS' FOUR DIRECTOR NOMINEES ON PROPOSAL 1, "FOR" PROPOSAL 2, "FOR" PROPOSAL 3, "FOR" PROPOSAL 4, "FOR" PROPOSAL 5, "AGAINST" PROPOSAL 6 AND "FOR" PROPOSAL 7 USING THE WHITE PROXY CARD.**

**THIS WHITE PROXY CARD, WHEN PROPERLY EXECUTED, WILL BE VOTED AS DIRECTED BY THE UNDERSIGNED. IF NO DIRECTION IS MADE AS TO ANY ITEM, THIS PROXY WILL BE VOTED "FOR" ALL OF THE BLACKWELLS NOMINEES IN PROPOSAL 1, "WITHHOLD" ON THE COMPANY NOMINEES, "FOR" PROPOSAL 2, "FOR" PROPOSAL 3, "FOR" PROPOSAL 4, "FOR" PROPOSAL 5, "AGAINST" PROPOSAL 6 AND "FOR" PROPOSAL 7 AND, TO THE EXTENT AUTHORIZED UNDER RULE 14A-4(C) UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, IN THE DISCRETION OF THE PROXIES NAMED HEREIN WITH RESPECT TO SUCH OTHER BUSINESS AS MAY PROPERLY COME BEFORE THE MEETING.  IMPORTANT – PLEASE MARK, SIGN, DATE AND RETURN YOUR WHITE PROXY CARD PROMPTLY.**

#### THANK YOU FOR VOTING.

(Continued and to be dated and signed on reverse side)

# EXHIBIT B

# Blackwells Files Definitive Proxy Statement for Braemar Hotels & Resorts Inc.'s 2024 Annual Meeting

10 avr. 2024 07h30  | Source: **Blackwells Capital HE                        LLC**

[ Suivre ]

Share

*Urges Shareholders to Hold Braemar's Board Accountable for Massive Value Destruction and Enrichment of Monty Bennett*

*Recommends Shareholders Elect Blackwells' Highly Qualified Candidates to Serve <u>All</u> Shareholders*

*Launches www.NoMoreMonty.com to Promote Transparency*



NEW YORK, April 10, 2024 (GLOBE NEWSWIRE) -- Blackwells Capital LLC ("Blackwells"), a shareholder of Braemar Hotels & Resorts Inc. ("Braemar" or the "Company") (NYSE: BHR) has filed a definitive proxy statement with the Securities and Exchange Commission (the "SEC") in connection with its nomination of four highly qualified candidates—Jennifer M. Hill, Betsy L. McCoy, Steven J. Pully and Michael Cricenti (collectively, the "Blackwells Nominees") —for election to the board of directors of Braemar (the "Board") at the Company's 2024 annual meeting of

APP.044

shareholders (the "2024 Annual Meeting") to be held on May 15, 2024.

<u>Jason Aintabi, Chief Investment Officer of Blackwells, said:</u>

"Braemar is in a pitiful state. Despite its exceptional assets, Monty Bennett's failed leadership has had shareholders suffer through an almost 90% decline in share price over the last 10 years.[i] During the same period, management fees paid to Ashford Hospitality Advisors, LLC ("Ashford LLC"), have grown by **over 575%.**[ii,iii] Braemar has become a thinly traded microcap stock with a measly $133 million market capitalization.[iv] Astonishingly, the termination fee Mr. Bennett and Ashford think they are owed—after having presided over this disaster—outstrips the entire market value of Braemar.[v] **If this is not corporate piracy, we simply do not know what is.**

Several months ago, Blackwells called on Braemar to investigate potential breaches of fiduciary duty and/or other wrongdoing by the Board and/or management in connection with the Company's relationship with Monty Bennett and Ashford. Blackwells also made a proposal to acquire Braemar in an offer that provided for a termination fee payable to Mr. Bennett of $35 million—a fraction of what we believe Mr. Bennett thinks he and Ashford are owed.[vi] Another institution may have recently made an offer to acquire Braemar, which

Blackwells believes the Board of Braemar, perhaps under Mr. Bennett's orders, swept under the rug as well.[vii]

The Braemar Board could have pursued a range of options beneficial to shareholders, including, among others:

- Engage in good faith with Blackwells on its proposal;

- Engage with the other institution that recently made an offer to acquire Braemar;

- Run a proper sale process to seek the highest value for shareholders; and,

- Compel Mr. Bennett and Ashford to "come down to earth" and reduce their termination fee, which we currently estimate as being **substantially** more than the **entire** market value of Braemar.

Instead of acting in shareholders' best interests as independent fiduciaries must, and in the face of Blackwells' impending director nominations, the Board and Mr. Bennett chose to:

- Modify the Company's Bylaws (the "Bylaws") to require extensive disclosure in connection with director nominations, such that Blackwells' nomination materials required the submission of a 445-page document package;

- File suit against Blackwells, its affiliates and its nominees in U.S. Federal Court to obstruct Blackwells' nominations;

- Hire a law firm that we understand has a history of personal business with Mr. Bennett to whitewash and obstruct Blackwells' demand for an independent investigation; and

- Use the "newspaper" Mr. Bennett publishes, *The Dallas Express*, to publish defamatory articles about Blackwells' CIO, Jason Aintabi.

Blackwells believes Mr. Bennett's behavior disqualifies him from being involved in any public company. More problematic still, is the ever-ballooning fee stream he and his affiliates

derive from Braemar—having increased from approximately $9 million in 2013 to a whopping $61 million in 2023.[viii] These fees represent **almost half** of the entire market value of Braemar, and have nearly doubled in the last two years alone.[ix,x] As one might imagine, Braemar's 'conflicts committee' is the subject of much examination by Blackwells, as will be revealed in upcoming materials.

Mr. Bennett can commission childish articles about Blackwells and its principals, he can continue to drive shareholders away from the real issues, and file meritless litigation meant to preserve his gravy train. This will not change the fact that Mr. Bennett must be removed from his roles at Braemar, and the external management agreement that Blackwells believes turns the Company into his personal "piggybank" must be terminated.

Braemar's current directors have cowered to poor governance practices, and have permitted the Company's management to entrench themselves at the expense of shareholder value. The Blackwells Nominees possess the skills necessary to transform the Board and business of Braemar, unlocking value for shareholders that the Board has incessantly decimated over the past decade.

We encourage shareholders to review our materials, the details of our engagement with the Company and other information at www.NoMoreMonty.com.

**About the Blackwells Nominees**

**Jennifer M. Hill**, currently serves as the Founder and CEO of Murphy Hill Consulting LLC, a Connecticut-based consulting business providing consulting services focused on the financial services, asset management, insurance and risk management industries, since January 2015. Ms. Hill served as the Chief Financial Officer of Bank of America Merrill Lynch, an investment bank and financial services holding company, from July 2011 to December 2014.[xi]

**Betsy L. McCoy**, currently serves as General Counsel and Vice President for The Related Group, a private real estate development company, a position she has served in since May 2010. In her role, Ms. McCoy oversees the in-house legal department, including all aspects of compliance, management of legal services, legal reporting to executives, and legal guidance and as legal and business counsel to an affiliated real estate management company. From January 2008 to May 2013, Ms. McCoy served as Associate General Counsel and Vice President of The Related Group.

**Steven J. Pully**, serves on public and private company boards, he provides investment banking and consulting services through Speyside Partners LLC, an investment banking firm he co-founded in 2017, and he serves as an expert witness in legal disputes, generally in connection with his expertise in governance matters. Over the course of his

board service, he has served on boards of companies involved in a variety of different industries, he has served as Executive Chairman, Chairman, and Lead Director of various boards, and he has chaired a variety of board committees.

**Michael Cricenti**, currently serves as Managing Partner and Chief Investment Officer of Magis Capital Partners, a private investment firm that employs a fundamental, value-oriented approach to investing in special situations, since January 2017. Mr. Cricenti also served as a Senior Real Estate Investment Advisor at IsZo Capital Management LP, a hedge fund, from January 2017 to November 2021. Previously, from September 2009 until January 2017, Mr. Cricenti served as Managing Director at Bluestem Asset Management ("Bluestem"), an investment firm with more than $1.5 billion in assets under management based in Charlottesville, Virginia.

**About the Blackwells Proposals**

Blackwells seeks Braemar shareholder support on proposals that include:

- The election of each Blackwells director nominees— Michael Cricenti, Jennifer M. Hill, Betsy L. McCoy and Steven J. Pully;
- The amendment of the Bylaws to remove the recently adopted provision that Blackwells believes is unlawful;
- The amendment of the Bylaws to preclude any current or former employee, director, officer, or control person of the Company or Ashford Inc. and Ashford's affiliates from serving as the Company's chairman of the Board;
- The requirement that the Board disclose all extraordinary transaction proposals made by shareholders, affiliates and third parties during the two most recently completed

calendar years and the terms of those proposed transactions; and

- The requirement that the Board disclose all compensation paid by the Company to members of the Bennett family, *The Dallas Express* and employees, directors or agents of *The Dallas Express*, including Louis Darrouzet.

**About Blackwells Capital**

Blackwells Capital was founded in 2016 by Jason Aintabi, its Chief Investment Officer. Since that time, it has made investments in public securities, engaging with management and boards, both publicly and privately, to help unlock value for stakeholders, including shareholders, employees and communities. Throughout their careers, Blackwells' principals have invested globally on behalf of leading public and private equity firms and have held operating roles and served on the boards of media, energy, technology, insurance and real estate enterprises. For more information, please visit www.blackwellscap.com.

**Contacts**

Shareholders

MacKenzie Partners, Inc.

Toll Free: +1 (800) 322-2885

proxy@mackenziepartners.com

Media

Gagnier Communications

Dan Gagnier & Riyaz Lalani

646-569-5897

blackwells@gagnierfc.com

# EXHIBIT C

# Vinson&Elkins

Lawrence S. Elbaum  lelbaum@velaw.com
**Tel** +1.212.237.0084  **Fax** +1.917.849.5379

March 26, 2024

**BY HAND DELIVERY AND ELECTRONIC MAIL**

Cadwalader, Wickersham & Taft LLP
200 Liberty Street
New York, New York  10281
Attn: Richard Brand

> Re:  **Supplement to Notice of Intention to Nominate Individuals for Election as Directors and to Submit Business Proposals for Stockholder Consideration at the 2024 Annual Meeting of Stockholders of Braemar Hotels & Resorts Inc.**

Dear Mr. Brand:

We write on behalf of our client, Blackwells Capital LLC (the "***Nominating Stockholder***"), to hereby submit this supplement (this "***Supplement***") to its notice of intention to nominate individuals for election as directors and to submit business proposals for stockholder consideration at the 2024 annual meeting of stockholders (including any other meeting of stockholders held in lieu thereof, and any adjournments, postponements, reschedulings or continuations thereof, the "***Annual Meeting***") of Braemar Hotels & Resorts Inc. (the "***Corporation***"), dated March 10, 2024 (such letter and all exhibits attached thereto, the "***Nomination Notice***"). Defined terms used but not defined herein shall have the meanings ascribed to them in the Nomination Notice. All matters disclosed in any part of this Supplement shall be deemed disclosed for purposes of the Nomination Notice, which for the avoidance of doubt shall also be deemed disclosed for the purposes of the questionnaires attached as <u>Exhibit G</u> thereto.

Article I, Section 11(c)(1) of the Bylaws purports to require that the Nominating Stockholder "notify the Corporation of any inaccuracy or change (within two Business Days of becoming aware of such inaccuracy or change)" in information disclosed in the Nomination Notice. Accordingly, the Nominating Stockholder is submitting this Supplement to update and supplement certain information set forth in the Nomination Notice, as specifically set forth below.

This Supplement should be read in conjunction with, and deemed to be a part of, the Nomination Notice. However, to the extent the following information differs from, updates or conflicts with information contained in the Nomination Notice for which the Bylaws may be properly interpreted to request supplemental information be provided to the Corporation following a stockholder's submission of notice of intent to nominate persons for election and submit proposals for stockholder consideration, the supplemental information below is more current and reflects information as of the date of this Supplement. The inclusion or incorporation by reference of the information contained in this Supplement shall not be deemed to constitute an admission that any such information is required by Article I, Section 11 of the

---

**Vinson & Elkins LLP  Attorneys at Law**
Austin  Dallas  Dubai  Houston  London  Los Angeles
New York  Richmond  San Francisco  Tokyo  Washington

The Grace Building, 1114 Avenue of the Americas, 32nd Floor
New York, NY 10036-7708
**Tel** +1.212.237.0000  **Fax** +1.212.237.0100  velaw.com

APP.052



Bylaws. Information included in any subsection below shall also be deemed to be information provided in response to items requested in any other subsection of the Notice, whether specifically set forth or not.

**The disclosure provided under Section D.(ii) of the Nomination Notice regarding a description of the investment strategy or objective, if any, of such stockholder and each such Stockholder Associated Person who is not an individual and a copy of the prospectus, offering memorandum or similar document and any presentation, document, offering memorandum or similar document and any presentation, document or marketing material provided to third parties (including investors and potential investors) to solicit an investment in such stockholder and each such Stockholder Associated Person that contains or describes such stockholder's and each such Stockholder Associated Person's performance, personnel or investment thesis or plans or proposals with respect to the Corporation is hereby supplemented with information as of the date of this Supplement as follows:**

In the process of preparing the Nomination Notice, the date listed on the first page of the presentation, attached as Exhibit C to the Nomination Notice (the "***December 2023 Presentation***"), was inadvertently changed from "December 2023" to "March 2024." The version of the December 2023 Presentation that was provided to Vinson & Elkins L.L.P. ("***V&E***") by the Nominating Stockholder was dated December 2023. In the process of redacting the name of the recipient of the December 2023 Presentation, V&E erroneously titled the presentation March 2024. Attached as <u>Exhibit A</u> is the actual version of the December 2023 Presentation that was provided to V&E, manually redacted to omit the name of the recipient. As stated in the Nomination Notice, the Nominating Stockholder will share information related to the individuals contacted in connection with the Proposed Acquisition of the Corporation pursuant to a suitable and mutually agreeable non-disclosure agreement. The Nomination Notice is hereby corrected to include the correct date of "December 2023" on the cover page of the December 2023 Presentation. The information in the December 2023 Presentation remains unchanged except that, as stated in the Nomination Notice, the Nominating Stockholder currently has no intention of pursuing an acquisition or similar transaction with respect to the Corporation.

**The disclosure provided under Section D.(iii) of the Nomination Notice regarding all information relating to the stockholder, the Nominees or the Stockholder Associated Person that would be required to be disclosed in connection with the solicitation of proxies pursuant to Regulation 14A (or any successor provision) under the Securities Exchange Act of 1934, as amended, is hereby supplemented to include the entry into the following agreements, arrangements or understandings as of the date of this Supplement as follows:**

On March 26, 2024, the Nominating Stockholder, Blackwells Onshore I LLC, Jason Aintabi and the Nominees (collectively, the "***Parties***") entered into a Joint Filing and Solicitation



Agreement pursuant to which the Parties agreed, among other things, to the joint filing of solicitation materials with the Securities and Exchange Commission on behalf of each of the Parties in connection with the joint solicitation of proxies for the election of the Nominees and in favor of the Proposals at the Annual Meeting. A copy of the Joint Filing and Solicitation Agreement is attached hereto as <u>Exhibit B</u> and is incorporated herein by reference.

Blackwells has engaged MacKenzie Partners, Inc. ("***MacKenzie***") as a proxy solicitor in connection with the Annual Meeting and anticipates that certain employees of MacKenzie may communicate in person, by telephone or otherwise with a limited number of institutions, brokers or other persons who are stockholders of the Corporation for the purpose of assisting in the solicitation of proxies for the Annual Meeting. Approximately 20 employees of MacKenzie will solicit holders of securities of the Corporation in connection with the Annual Meeting. Blackwells expects to pay MacKenzie a fee not to exceed $180,000 for its services in connection with the solicitation of proxies for the Annual Meeting.

**The disclosure provided under Section H. of the Nomination Notice regarding a completed Nominee questionnaire (which questionnaire shall be provided by the Corporation, upon request, to the stockholder providing the notice and shall include all information relating to the Nominee that would be required to be disclosed in connection with the solicitation of proxies for the election of the Nominee as a director in an election contest (even if an election contest is not involved), or would otherwise be required in connection with such solicitation, in each case pursuant to Regulation 14A (or any successor provision) under the Exchange Act and the rules thereunder, or would be required pursuant to the rules of any national securities exchange on which any securities of the Corporation are listed or over-the-counter market on which any securities of the Corporation are traded), is hereby supplemented as follows:**

As stated in the signature page to the questionnaire, Betsy L. McCoy completed the questionnaire to the best of her knowledge and agreed to notify the Corporation immediately if any information contained therein becomes inaccurate, incomplete or otherwise changes. Ms. McCoy has notified the Nominating Stockholder that she misread Question 14(b) in Part IA of the questionnaire to require responses only for the 2 years preceding the submission of the Nomination Notice. After receiving the March 24 Letter (defined below) referencing her failure to disclose information regarding "bankruptcy matters" and upon re-reading her questionnaire, she now supplements her response to Part IA, Question 14(b) of the questionnaire as follows:

In 2004 Ms. McCoy filed a petition for relief under chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida (the "***2004 Bankruptcy Proceeding***"). In connection with the 2004 Bankruptcy Proceeding, Ms. McCoy participated in a full plan of reorganization and made



monthly payments to the U.S. trustee, which payments were used to meet creditor obligations.

Accordingly, the questionnaire provided by Ms. McCoy, included in Exhibit G of the Nomination Notice, is hereby corrected to include the 2004 Bankruptcy Proceeding.

\*    \*    \*

The Nominating Stockholder is in receipt of a letter dated March 24, 2024 from Cadwalader, Wickersham & Taft LLP, counsel for the Corporation, purporting to notify the Nominating Stockholder that the Corporation has rejected and disregarded the nomination of the Nominees (the "**March 24 Letter**"). We and the Nominating Stockholder are reviewing the March 24 Letter and will provide a response in due course.

Please address any correspondence to Vinson & Elkins L.L.P., 1114 Avenue of the Americas, 32nd Floor, New York, New York 10036, Attention: Lawrence S. Elbaum, telephone: 212-237-0084, facsimile: 917-849-5379, email: lelbaum@velaw.com and C. Patrick Gadson, telephone: 212-237-0198, facsimile: 917-849-5386, email: pgadson@velaw.com (with a copy to Blackwells Capital LLC, 400 Park Ave., 4th Floor, New York, New York 10022, Attention: Jason Aintabi, telephone (212) 792-6096). The giving of this Supplement is not an admission that any purported procedures for notice concerning the nomination of directors to the Corporation's board of directors and submission of the business proposal are legal, valid or binding, and the Nominating Stockholder reserves the right to challenge their validity. If the Corporation contends this Supplement is incomplete or is otherwise deficient, please promptly notify the individuals listed in this paragraph setting forth the facts that the Corporation contends support its position and specifying any additional information believed to be required. In the absence of such prompt notice, the Nominating Stockholder will assume that the Corporation agrees that the Nomination Notice and this Supplement comply in all respects with the requirements of the Bylaws. The Nominating Stockholder reserves the right to withdraw, modify, correct and/or supplement in any way (including, without limitation, by adding or substituting Nominees) the Nomination Notice and/or this Supplement at any time.

Sincerely,

/s/ Lawrence S. Elbaum

Lawrence S. Elbaum



**Cadwalader, Wickersham & Taft LLP**  March 26, 2024   Page 5

## Exhibit A

**December 2023 Presentation**

**BW** BLACKWELLS CAPITAL

# PROJECT TIGER

**Braemar Hotels & Resorts Inc.**

DECEMBER 2023

# LEGAL DISCLAIMER

The views expressed in this presentation (the "Presentation") represent the opinions of Blackwells Capital LLC and/or certain affiliates ("Blackwells") and the investment funds it manages that hold shares in Braemar Hotels & Resorts ("BHR", "Braemar" or the "Company") (NYSE: BHR). This Presentation is for informational purposes only, and it does not have regard to the specific investment objective, financial situation, suitability or particular need of any specific person who may receive the Presentation and should not be taken as advice on the merits of any investment decision. The views expressed in the Presentation represent the opinions of Blackwells and are based on publicly available information and Blackwells' analyses.

Certain financial information and data used in the Presentation have been derived or obtained from filings made with the Securities and Exchange Commission ("SEC") by the Company or other companies that Blackwells considers comparable. Certain statements and information included herein have been sourced from third parties.  Blackwells has not sought or obtained consent from any third party to use any statements or information indicated in the Presentation as having been obtained or derived from a third party. Any such statements or information should not be viewed as indicating the support of such third party for the views expressed in the Presentation. Information contained in the Presentation has not been independently verified by Blackwells, and Blackwells disclaims any and all liability as to the completeness or accuracy of the information and for any omissions of material facts. Blackwells disclaims any obligation to correct, update or revise the Presentation or to otherwise provide any additional materials. Blackwells recognizes that the Company may possess confidential information that could lead it to disagree with Blackwells' views and/or conclusions.

Blackwells currently beneficially owns, and/or has an economic interest in, shares of the Company. Blackwells is in the business of trading—buying and selling—securities. Blackwells may buy or sell or otherwise change the form or substance of any of its investments in any manner permitted by law and expressly disclaims any obligation to notify any recipient of the Presentation of any such changes. There may be developments in the future that cause Blackwells to engage in transactions that change its beneficial ownership and/or economic interest in the Company.

The securities or investment ideas listed are not presented in order to suggest or show profitability of any or all transactions. There should be no assumption that any specific portfolio securities identified and described in the Presentation were or will be profitable. Under no circumstances is the Presentation to be used or considered as an offer to sell or a solicitation of an offer to buy any security.

This document is the property of Blackwells and may not be published or distributed without the express written consent of Blackwells. All registered or unregistered service marks, trademarks and trade names referred to in this Presentation are the property of their respective owners, and Blackwells' use herein does not imply an affiliation with, or endorsement by, the owners of these service marks, trademarks and trade names.

The information herein contains "forward-looking statements." Specific forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts and include, without limitation, words such as "may," "will," "expects," "believes," "anticipates," "plans," "estimates," "projects," "targets," "forecasts," "seeks," "could," "should" or the negative of such terms or other variations on such terms or comparable terminology. Similarly, statements that describe our objectives, plans or goals are forward-looking. Forward-looking statements are subject to various risks and uncertainties and assumptions. There can be no assurance that any idea or assumption herein is, or will be proven, correct. If one or more of the risks or uncertainties materialize, or if Blackwells' underlying assumptions prove to be incorrect, the actual results may vary materially from outcomes indicated by these statements. Accordingly, forward-looking statements should not be regarded as a representation by Blackwells that the future plans, estimates or expectations contemplated will ever be achieved.

**BW**   BLACKWELLS CAPITAL

APP.058

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I | Executive Summary | 4 |
| II | Financials Summary | 16 |
| III | Properties Overview | 25 |
| IV | LBO Model | 60 |
| V | Debt Overview | 68 |
| Appendix I | Comparable Hotel Sales By Brand | 75 |
| Appendix II | Comparable Hotel Sales By Property | 77 |
| Appendix III | Public Comps | 85 |
| Appendix IV | Board and Management | 87 |

**BW** BLACKWELLS CAPITAL

APP.059



# Executive Summary

# EXECUTIVE SUMMARY

**BHR Background**

- Externally managed, small cap luxury hotel REIT

- Has long traded at a discount given external management structure by AHT, which is owned and controlled by Monty Bennett

  – Bennett's AHT is also external manager for Ashford Hospitality, another small cap hospitality REIT

    • BW worked on a potential white knight financing in spring 2021 with AHT and it's CEO

- Monty Bennett has poor reputation among public equity investors for a number of reasons, most recently his use of PPP U.S. government funds for his real estate entities

- Bennett is highly litigious including with shareholders (e.g. Ashford)

- Based on historic M&A comps for similar hotel assets and historic M&A multiples paid for lodging/hotel companies, BHR stock trades at a significant discount to current market comparables

**Blackwells believes that an expensive/contentious proxy fight is unlikely to produce an optimal result, but that the unspoken threat of public criticism/action by Blackwells will compel Bennett to open discussions with Blackwells at which point an appeal to Bennetts pocketbook may produce a win-win-win (Shareholders, Take Private Interested Parties, Bennett) range of outcomes**

- BHR is Bennett's trophy portfolio

- BHR generated ~$20mm management fees per year to external manager pre-COVID

- Bennett has also received personal compensation for $1.7mm, $2.1mm, and $0.5mm for 2020, 2019 and 2018 respectively

- Baseline assumption is that Bennett/Company will put up strong resistance to a sale for anything other than a godfather offer plus a robust multiple on the management fee stream, but that in light of the current market dynamics Bennett may find some options favaorable enough to contemplate in earnest

**BW** BLACKWELLS CAPITAL

APP.061

# TAKE PRIVATE CONSIDERATIONS

- **Privatize a Large and High-Quality Luxury Hotel Portfolio Primed for Growth**

  - Sizeable portfolio of high-quality institutional real estate priced at discount to net asset value (NAV)

  - Significant option value in acquiring successful platform focused on these markets

  - Well-located in high growth markets that are poised to benefit from travel trends

  - Scaled platform provides immediate platform growth opportunity to capitalize on current market dislocations

- **Exceptional Returns with Significant Margin of Safety**

  - **Generates ~28.7% IRR and ~3.2x MOIC over 5 years**

  - $409k implied price per key at $5.00 per share takeout price

  - Attractive debt financing terms given underlying portfolio quality

  - Current valuation discount reflects misplaced negative sector sentiment on hotel portfolio and lack of institutional ownership given small cap

BW **BLACKWELLS CAPITAL**

APP.062

# GOVERNANCE & VALUATION OVERVIEW

**Poor Corporate Governance / Vulnerable to Proxy Contest**

- ISS and Glass Lewis have been negatively predisposed against company for the last five years:

  - ISS gave multiple low marks and called out governance failures

  - Made numerous withhold vote recommendations for Directors

**Valuation Discount:**

- BHR trades at a significant discount to its NAV

  - Primary reason: "Monty Discount"

  - Additional reasons:

    - Small equity market capitalization (<$500mm)

    - Limited sell side coverage

    - Lack of active ownership (given small capitalization; index and quant funds represent ~25% of outstanding shares among top 15 holders)

BW  **BLACKWELLS CAPITAL**

7

# SHAREPRICE PERFORMANCE



**Historical Share Price Performance**

Source: Company Presentations and filings.

BW BLACKWELLS CAPITAL

8

# FINANCIALS SYNOPSIS

| | | |
|---|---|---:|
| Current Price | $ | 2.74 |
| Shares Outstanding | | 65.9 |
| **Equity Value** | **$** | **180.6** |
| Cash | | 128 |
| Debt | | 1,136 |
| Preferreds | | 528 |
| **Enterprise Value** | | **$1,717** |
| | | |
| Number of Keys | | 4,184 |
| Implied Price per Key | $ | 410,351 |
| | | |
| 2022 NOI | $ | 201.5 |
| 2023E NOI | $ | 239.6 |
| 2024E NOI | $ | 248.8 |
| | | |
| **Cap Rate** | | |
| 2023E | | 11.74% |
| 2024E | | 13.96% |
| 2025E | | 14.49% |
| | | |
| **EV / EBITDA** | | |
| 2023E | | 8.5x |
| 2024E | | 7.2x |
| 2025E | | 6.9x |

- At the current price of $2.74, BHR currently has:

  – Market Cap = $181 mm

  – Enterprise Value = $1.7 bn

- These valuations imply:

  – $410k per key

  – 2023E Cap Rate = 11.74%

  – 2024E Cap Rate = 13.96%

  – EV / 2023E EBITDA = 8.5x

  – EV / 2024E EBITDA = 7.2x

**BW** BLACKWELLS CAPITAL

Source: Company Presentations and filings.

9

APP.065

# PRICE PER KEY (PPK)

- BHR is currently trading at an implied price per key of $408 based on NAV analysis

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rooms | 4,184 | 4,184 | 4,184 | 4,184 | 4,184 | 4,184 | 4,184 | 4,184 | 4,184 | 4,184 | 4,184 | 4,184 | 4,184 | 4,184 |
| Price Per Key *($ thousands)* | $408 | $650 | $675 | $700 | $725 | $750 | $775 | $800 | $825 | $850 | $875 | $900 | $925 | $950 |
| **Gross Asset Value** | **$1,707,398** | **$2,719,600** | **$2,824,200** | **$2,928,800** | **$3,033,400** | **$3,138,000** | **$3,242,600** | **$3,347,200** | **$3,451,800** | **$3,556,400** | **$3,661,000** | **$3,765,600** | **$3,870,200** | **$3,974,800** |
| **Balance Sheet Adjustments** | | | | | | | | | | | | | | |
| Net Balance Sheet Adjustments: | ($1,526,575) | ($1,526,575) | ($1,526,575) | ($1,526,575) | ($1,526,575) | ($1,526,575) | ($1,526,575) | ($1,526,575) | ($1,526,575) | ($1,526,575) | ($1,526,575) | ($1,526,575) | ($1,526,575) | ($1,526,575) |
| Net Asset Value | $180,823 | $1,193,025 | $1,297,625 | $1,402,225 | $1,506,825 | $1,611,425 | $1,716,025 | $1,820,625 | $1,925,225 | $2,029,825 | $2,134,425 | $2,239,025 | $2,343,625 | $2,448,225 |
| **Net Asset Value Per Share** | **$2.74** | **$18.08** | **$19.66** | **$21.25** | **$22.83** | **$24.42** | **$26.00** | **$27.59** | **$29.17** | **$30.76** | **$32.34** | **$33.93** | **$35.51** | **$37.10** |
| % from current | | 559.8% | 617.6% | 675.5% | 733.3% | 791.2% | 849.0% | 906.9% | 964.7% | 1022.5% | 1080.4% | 1138.2% | 1196.1% | 1253.9% |



Source: Company Presentations and filings.
Note: Current Price of $2.74 and 65.9 mm shares outstanding

APP.066

# HOTELS OVERVIEW

- At June 30th, 2023, the company owns interests in a high-quality, geographically diverse portfolio of 16 hotel properties located in seven states, the District of Columbia, Puerto Rico and St. Thomas, U.S. Virgin Islands.

- The properties have 4,181 total rooms, or 3,946 net rooms, excluding those attributable to the joint venture partner.

- All of the hotel properties in our portfolio are generally located in markets that exhibit strong growth characteristics resulting from multiple demand generators.

- Nine of the 16 hotel properties in our portfolio operate under premium brands affiliated with Marriott International, Inc. ("Marriott") and Hilton Worldwide, Inc. ("Hilton").

    – One hotel property is managed by Accor Management US Inc. ("Accor"),

    – One is managed by Hyatt Corporation ("Hyatt"),

    – One is managed by Four Seasons Hotels Limited ("Four Seasons") and

    – Four hotel properties are managed by Remington Hotels, a subsidiary of Ashford Inc.

- For the year ended December 31, 2022, approximately 79% of the rooms revenue was generated by transient business, approximately 19% was generated by group sales and 2% was generated by contract sales

BW  BLACKWELLS CAPITAL

APP.067

# PORTFOLIO LIST

| Hotel Property | Location | Market | Total Rooms |
|---|---|---|---|
| Hilton La Jolla Torrey Pines | La Jolla, CA | Resort | 394 |
| Capital Hilton | Washington, D.C. | Urban | 550 |
| Marriott Seattle Waterfront | Seattle, WA | Urban | 361 |
| The Clancy | San Francisco, CA | Urban | 410 |
| The Notary Hotel | Philadelphia, PA | Urban | 499 |
| The Ritz-Carlton Lake Tahoe | Truckee, CA | Resort | 170 |
| The Ritz-Carlton Sarasota | Sarasota, FL | Resort | 276 |
| Sofitel Chicago Magnificent Mile | Chicago, IL | Urban | 415 |
| Pier House Resort & Spa | Key West, FL | Resort | 142 |
| Bardessono Hotel and Spa | Napa Valley, CA | Resort | 65 |
| The Ritz-Carlton St. Thomas | St. Thomas, U.S. Virgin Islands | Resort | 180 |
| Park Hyatt Beaver Creek Resort & Spa | Beaver Creek, CO | Resort | 190 |
| Hotel Yountville | Napa Valley, CA | Resort | 80 |
| Mr. C Beverly Hills Hotel | Beverly Hills, CA | Urban | 143 |
| The Ritz-Carlton Reserve Dorado Beach | Puerto Rico | Resort | 96 |
| Four Seasons Resort Scottsdale | Scottsdale, AZ | Resort | 210 |
| **Total** | | | **4,181** |

## Select Properties










BW **BLACKWELLS CAPITAL**

Source: Company Presentations and filings.

12

APP.068

# HIGH QUALITY PORTFOLIO



Hotel Yountville
Yountville, CA



Park Hyatt Beaver Creek
Beaver Creek, CO



Pier House Resort & Spa
Key West, FL



Bardessono
Yountville, CA



Hilton La Jolla Torrey Pines
La Jolla, CA



The Four Seasons Scottsdale
Scottsdale, AZ



The Ritz-Carlton Lake Tahoe
Truckee, CA



The Ritz-Carlton Reserve Dorado Beach
Dorado, PR



The Ritz-Carlton Sarasota
Sarasota, FL



The Ritz-Carlton St. Thomas
St. Thomas, USVI





**Key (1)**

| Resort: 62% |
|---|
| Urban: 38% |



Marriott Seattle Waterfront
Seattle, WA



Mr. C Beverly Hills
Beverly Hills, CA



Sofitel Chicago Magnificent Mile
Chicago, IL



The Clancy
San Francisco, CA



Capital Hilton
Washington, D.C.



The Notary Hotel
Philadelphia, PA

Source: Company Presentations and filings.

BW  BLACKWELLS CAPITAL

APP.069

# LBO SYNOPSIS

## Sources

| Sources | | |
|---|---|---|
| Investor Cash Equity | $ | 717,987 |
| Cash on Target Balance Sheet | | 118,025 |
| Assumed Mortgage Debt | | - |
| CMBS Pool 1 | | 800,000 |
| CMBS Pool 2 | | - |
| CMBS Pool 3 | | - |
| Bridge Financing | | 800,000 |
| **Total Sources** | **$** | **2,436,012** |
| *Debt as a % of Net Sources* | | *69%* |

## Uses

| Uses | | |
|---|---|---|
| Outstanding Equity (at $5.00 Share Price) | $ | 434,136 |
| Repay Debt | | 1,054,430 |
| Assumed Mortgage Debt | | - |
| Repay Preferreds | | 577,777 |
| Buyout Park Minority Interest | | 69,250 |
| **Target Purchase Price** | **$** | **2,135,593** |
| Transaction Costs | | 300,419 |
| **Total Uses** | **$** | **2,436,012** |

## Cash Flow Summary

| Year: | | Year 1 | | Year 2 | | Year 3 | | Year 4 | | Year 5 | | Year 6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BHR Revenue** | | | | | | | | | | | | |
| Rooms | $ | 494,877 | $ | 516,112 | $ | 538,305 | $ | 560,962 | $ | 588,362 | $ | 613,051 |
| Food and Beverage | | 215,194 | | 223,493 | | 233,103 | | 242,933 | | 254,172 | | 264,817 |
| Other | | 86,943 | | 88,147 | | 91,937 | | 95,857 | | 98,845 | | 102,936 |
| **Total Hotel Revenue** | $ | 797,013 | $ | 827,752 | $ | 863,345 | $ | 899,752 | $ | 941,380 | $ | 980,804 |
| **NOI** | | | | | | | | | | | | |
| Total Hotel Revenue | $ | 797,013 | $ | 827,752 | $ | 863,345 | $ | 899,752 | $ | 941,380 | $ | 980,804 |
| Less: Hotel Operating Expenses | | (496,235) | | (515,374) | | (537,535) | | (560,202) | | (586,120) | | (610,667) |
| Less: Property Taxes and Insurance | | (37,271) | | (38,708) | | (40,373) | | (42,075) | | (44,022) | | (45,866) |
| Less: Hotel Management Services Fees *3.0% of revenue* | | (23,910) | | (24,833) | | (25,900) | | (26,993) | | (28,241) | | (29,424) |
| **Total Property Nominal NOI** | $ | 239,597 | $ | 248,837 | $ | 259,537 | $ | 270,482 | $ | 282,996 | $ | 294,847 |
| *Annual Growth* | | *NA* | | *3.9%* | | *4.3%* | | *4.2%* | | *4.6%* | | *4.2%* |
| Less: Total Capex *5.5% of revenue* | | (43,836) | | (45,526) | | (47,484) | | (49,486) | | (51,776) | | (53,944) |
| **Economic NOI** | $ | 195,761 | $ | 203,311 | $ | 212,053 | $ | 220,995 | $ | 231,220 | $ | 240,903 |
| *Annual Growth* | | *NA* | | *3.9%* | | *4.3%* | | *4.2%* | | *4.6%* | | *4.2%* |
| Less: General and Administrative | | (10,281) | | (10,347) | | (10,360) | | (10,347) | | (10,355) | | (10,298) |
| **Unlevered Cash Flow** | $ | 185,479 | $ | 192,964 | $ | 201,693 | $ | 210,648 | $ | 220,865 | $ | 230,605 |
| Less: Interest Expense | $ | (134,987) | $ | (123,026) | $ | (120,505) | $ | (119,886) | $ | (120,155) | $ | (60,222) |
| **Levered Cash Flow** | $ | 50,493 | $ | 69,938 | $ | 81,188 | $ | 90,763 | $ | 100,709 | $ | 170,383 |

**BW BLACKWELLS CAPITAL**

APP.070

# LBO SYNOPSIS (CONT.)

## Returns Summary

| Year: | | Year 0 | | Year 1 | | Year 2 | | Year 3 | | Year 4 | | Year 5 | | Year 6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Levered** | | | | | | | | | | | | | | |
| Unlevered Basis | $ | (2,317,987) | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - |
| Plus: Debt | | 1,600,000 | | - | | - | | - | | - | | - | | - |
| Plus: Bridge Debt Proceeds | | 800,000 | | - | | - | | - | | - | | - | | - |
| Less: Bridge Debt Repayment | | (800,000) | | - | | - | | - | | - | | - | | - |
| Levered Cash Flow | | - | | 50,493 | | 69,938 | | 81,188 | | 90,763 | | 100,709 | | - |
| Plus: Exit Value | | - | | - | | - | | - | | - | | 3,528,764 | | - |
| Less: Exit Transaction Costs | | - | | - | | - | | - | | - | | (35,288) | | - |
| Less: Debt Repayment | | - | | - | | - | | - | | - | | (1,600,000) | | - |
| **Total Levered Cash Flow** | $ | (717,987) | $ | 50,493 | $ | 69,938 | $ | 81,188 | $ | 90,763 | $ | 1,994,186 | $ | - |
| *Levered Yield (ex. Value-Add CapEx)* | | | | 3.3% | | 4.6% | | 5.3% | | 6.0% | | 6.6% | | - |

| | |
|---|---|
| **Levered IRR** | **28.7%** |
| **Levered Multiple** | **3.2x** |
| **Profit** | **$1,568,580** |
| **Cash Flow as a % of Profit** | **25.1%** |

BW  BLACKWELLS CAPITAL

APP.071



# Financials Summary

# HISTORICAL PERFORMANCE

| Hotel Property | Location | Market | Total Rooms | % Owned | FY 2022 Occupancy | ADR | RevPAR | EBITDA |
|---|---|---|---|---|---|---|---|---|
| Hilton La Jolla Torrey Pines | La Jolla, CA | Resort | 394 | 75% | 77.25% | $ 251 | $ 194 | $ 17,328 |
| Capital Hilton | Washington, D.C. | Urban | 550 | 75% | 65.17% | 228 | 149 | 10,174 |
| Marriott Seattle Waterfront | Seattle, WA | Urban | 361 | 100% | 56.88% | 286 | 163 | 9,217 |
| The Clancy | San Francisco, CA | Urban | 410 | 100% | 70.05% | 299 | 209 | 8,354 |
| The Notary Hotel | Philadelphia, PA | Urban | 499 | 100% | 55.92% | 218 | 122 | 7,673 |
| The Ritz-Carlton Lake Tahoe | Truckee, CA | Resort | 170 | 100% | 57.60% | 737 | 424 | 11,383 |
| The Ritz-Carlton Sarasota | Sarasota, FL | Resort | 276 | 100% | 74.47% | 618 | 460 | 30,377 |
| Sofitel Chicago Magnificent Mile | Chicago, IL | Urban | 415 | 100% | 65.36% | 251 | 164 | 8,288 |
| Pier House Resort & Spa | Key West, FL | Resort | 142 | 100% | 74.81% | 707 | 529 | 18,115 |
| Bardessono Hotel and Spa | Napa Valley, CA | Resort | 65 | 100% | 63.96% | 1,258 | 804 | 9,127 |
| The Ritz-Carlton St. Thomas | St. Thomas, U.S. Virgin Islands | Resort | 180 | 100% | 73.81% | 1,205 | 889 | 30,137 |
| Park Hyatt Beaver Creek Resort & Spa | Beaver Creek, CO | Resort | 190 | 100% | 60.58% | 601 | 364 | 13,620 |
| Hotel Yountville | Napa Valley, CA | Resort | 80 | 100% | 54.06% | 907 | 490 | 6,958 |
| Mr. C Beverly Hills Hotel | Beverly Hills, CA | Urban | 143 | 100% | 74.26% | 348 | 258 | 3,157 |
| The Ritz-Carlton Reserve Dorado Beach | Puerto Rico | Resort | 96 | 100% | 63.53% | 1,929 | 1,225 | 14,887 |
| Four Seasons Resort Scottsdale | Scottsdale, AZ | Resort | 210 | 100% | 45.15% | 1,057 | 477 | 1,710 |
| **Total / Weighted Average** | | | **4,181** | | **65.62%** | **$ 452** | **$ 296** | **$ 200,505** |

| Hotel Property | Location | Market | Total Rooms | % Owned | Q2 2023 Occupancy | ADR | RevPAR | TTM EBITDA |
|---|---|---|---|---|---|---|---|---|
| Hilton La Jolla Torrey Pines | La Jolla, CA | Resort | 394 | 75% | 82% | $ 246 | $ 202 | $ 17,204 |
| Capital Hilton | Washington, D.C. | Urban | 550 | 75% | 82% | 278 | 228 | 15,750 |
| Marriott Seattle Waterfront | Seattle, WA | Urban | 369 | 100% | 79% | 311 | 244 | 11,582 |
| The Clancy | San Francisco, CA | Urban | 410 | 100% | 75% | 292 | 220 | 9,348 |
| The Notary Hotel | Philadelphia, PA | Urban | 499 | 100% | 71% | 238 | 168 | 9,472 |
| The Ritz-Carlton Lake Tahoe | Truckee, CA | Resort | 170 | 100% | 53% | 513 | 272 | 10,904 |
| The Ritz-Carlton Sarasota | Sarasota, FL | Resort | 276 | 100% | 63% | 590 | 374 | 25,023 |
| Sofitel Chicago Magnificent Mile | Chicago, IL | Urban | 415 | 100% | 75% | 275 | 205 | 7,347 |
| Pier House Resort & Spa | Key West, FL | Resort | 142 | 100% | 71% | 642 | 457 | 15,925 |
| Bardessono Hotel and Spa | Napa Valley, CA | Resort | 65 | 100% | 73% | 1,105 | 805 | 7,179 |
| The Ritz-Carlton St. Thomas | St. Thomas, U.S. Virgin Islands | Resort | 180 | 100% | 76% | 1,065 | 804 | 24,970 |
| Park Hyatt Beaver Creek Resort & Spa | Beaver Creek, CO | Resort | 193 | 100% | 34% | 313 | 106 | 10,904 |
| Hotel Yountville | Napa Valley, CA | Resort | 80 | 100% | 59% | 764 | 447 | 3,014 |
| Mr. C Beverly Hills Hotel | Beverly Hills, CA | Urban | 143 | 100% | 80% | 319 | 254 | 2,641 |
| The Ritz-Carlton Reserve Dorado Beach | Puerto Rico | Resort | 96 | 100% | 64% | 2,270 | 1,454 | 20,040 |
| Four Seasons Resort Scottsdale | Scottsdale, AZ | Resort | 210 | 100% | 49% | 852 | 415 | 21,692 |
| **Total / Weighted Average** | | | **4,192** | | **71%** | **$ 436** | **$ 309** | **$ 212,995** |

Source: Company Presentations and filings.

**BW** BLACKWELLS CAPITAL

APP.073

# REVENUE BREAKDOWN - GEOGRAPHY

| Primary Geographical Market | FY 2022 | | | | |
|---|---|---|---|---|---|
| | # of Hotels | Rooms | Food and Bev | Other Hotel | Total |
| California | 6 | $ 134,635 | $ 45,952 | $ 19,152 | $ 199,739 |
| Puerto Rico | 1 | 38,077 | 14,238 | 8,931 | 61,246 |
| Arizona | 1 | 3,107 | 1,430 | 657 | 5,194 |
| Colorado | 1 | 25,253 | 16,397 | 8,965 | 50,615 |
| Florida | 2 | 73,629 | 34,068 | 24,771 | 132,468 |
| Illinois | 1 | 24,829 | 7,150 | 1,656 | 33,635 |
| Pennsylvania | 1 | 22,237 | 4,121 | 1,178 | 27,536 |
| Washington | 1 | 21,445 | 3,619 | 1,321 | 26,385 |
| Washington, D.C. | 1 | 29,877 | 13,276 | 1,960 | 45,113 |
| USVI | 1 | 58,426 | 18,990 | 10,238 | 87,654 |
| **Total** | **16** | **$ 431,515** | **$ 159,241** | **$ 78,829** | **$ 669,585** |

# EXPOSURE TO LUXURY HOTELS & RESORTS

### Ritz-Carlton Drives Q2 TTM Hotel EBITDA[1]



### Luxury Hotels Drive Q1 TTM Hotel EBITDA[1]



### High Transient Demand Drives Q2 TTM Revenue



### Resorts Drive Q2 TTM Results



BW  BLACKWELLS CAPITAL

19

APP.075

# 2024 REVPAR FORECAST



# OCCUPANCY AND ADR



**HOTEL OCCUPANCY(1)(2)**

- 2019: 78.9%
- 2020: 30.3%
- 2021: 51.9%
- 2022: 64.7%
- TTM Q2'23: 67.3%



**HOTEL ADR(1)(2)**

- 2019: $296
- 2020: $333
- 2021: $458
- 2022: $482
- TTM Q2'23: $468

(1) As reported in Earnings Releases: 2019 as reported on 2/25/2021; 2020 as reported on 2/24/2022; 2021 and 2022 as reported on 2/22/2023; TTM Q1'23 as reported on 5/2/23
(2) Due to the economic effects of the COVID-19 pandemic on the Company, the lodging industry and the broader economy, the information provided should not be relied upon as an accurate representation of the current or future financial condition or performance of the C
Source: Company Presentations and filings.

BLACKWELLS CAPITAL

21

APP.077

# ACQUISITIONS PERFORMANCE

| Property | Acq Date | Price | Price / Key | TTM EBITDA Multiple | TTM Yield on Cost |
|---|---|---|---|---|---|
| Sofitel Chicago Magnificent Mile | 2/24/2014 | $153.0M | $369K | 20.8x | 5.0% |
| Key West Pier House | 3/3/2014 | $92.7M | $653K | 5.8x | 17.8% |
| Bardessono | 7/9/2015 | $85.0M | $1.3M | 11.8x | 12.2% |
| Ritz-Carlton St. Thomas | 12/15/2015 | $64.0M | $356K | 2.6x | 18.0% |
| Park Hyatt Beaver Creek | 4/3/2017 | $145.5M | $754K | 10.6x | 8.3% |
| Hotel Yountville | 5/11/2017 | $96.5M | $1.2M | 16x | 6.4% |
| Ritz-Carlton Sarasota | 4/4/2018 | $171.0M | $620K | 6.8x | 12.6% |
| Ritz-Carlton Lake Tahoe | 1/15/2019 | $103.3M[1] | $608K | 9.5x | 6.9% |
| Mr. C Beverly Hills Hotel | 8/5/2021 | $77.9M | $545K[2] | 29.5x | 2.6% |
| Ritz-Carlton Reserve Dorado Beach | 3/11/22 | $193.0M | $1.8M[3] | 9.6x | 9.2% |
| Four Seasons Scottsdale | 12/1/22 | $250.0M[1] | $1.2M | 11.5x | 7.2% |
| Weighted Average: | | | | | **9.4%** |

BW  BLACKWELLS CAPITAL

Note: Yield on Cost is calculated as TTM NOI (EBITDA less FF&E Reserve) divided by Net Book Value
Source: Company Presentations and filings.

APP.078

# GROWTH DRIVERS – URBAN PROPERTIES



APP.079

# GROWTH DRIVERS – URBAN PROPERTIES (CONT.)



**RevPAR[1] Up – Q2 2019 to Q2 2023**

*Pandemic*

54.9%
23.9%
-6.3%

**Key:** Resort    Urban    Average

## Key Observations

**Urban properties nearing full recovery**

**Resort performance stabilizing**

**Average RevPAR is well above 2019 levels**

BW BLACKWELLS CAPITAL

(1) Same-store data for the current 16 hotel assets held by BHR
Resort: Bardessono, Hotel Yountville, Ritz-Carlton St. Thomas, Ritz-Carlton Sarasota, Ritz-Carlton Lake Tahoe, Ritz-Carlton Reserve Dorado Beach, Pier House, Hilton Torrey Pines, Park Hyatt Beaver Creek, and Four Seasons Scottsdale
Urban: The Clancy, The Notary Hotel, Marriott Seattle Waterfront, Capital Hilton, Sofitel Chicago and Mr. C

Source: Company Pr

24

APP.080



Properties Overview

APP.081

# PORTFOLIO LIST

| Hotel Property | Location | Market | Total Rooms | % Owned | Q2 2023 Occupancy | ADR | RevPAR | TTM EBITDA |
|---|---|---|---|---|---|---|---|---|
| Hilton La Jolla Torrey Pines | La Jolla, CA | Resort | 394 | 75% | 82% | $ 246 | $ 202 | $ 17,204 |
| Capital Hilton | Washington, D.C. | Urban | 550 | 75% | 82% | 278 | 228 | 15,750 |
| Marriott Seattle Waterfront | Seattle, WA | Urban | 369 | 100% | 79% | 311 | 244 | 11,582 |
| The Clancy | San Francisco, CA | Urban | 410 | 100% | 75% | 292 | 220 | 9,348 |
| The Notary Hotel | Philadelphia, PA | Urban | 499 | 100% | 71% | 238 | 168 | 9,472 |
| The Ritz-Carlton Lake Tahoe | Truckee, CA | Resort | 170 | 100% | 53% | 513 | 272 | 10,904 |
| The Ritz-Carlton Sarasota | Sarasota, FL | Resort | 276 | 100% | 63% | 590 | 374 | 25,023 |
| Sofitel Chicago Magnificent Mile | Chicago, IL | Urban | 415 | 100% | 75% | 275 | 205 | 7,347 |
| Pier House Resort & Spa | Key West, FL | Resort | 142 | 100% | 71% | 642 | 457 | 15,925 |
| Bardessono Hotel and Spa | Napa Valley, CA | Resort | 65 | 100% | 73% | 1,105 | 805 | 7,179 |
| The Ritz-Carlton St. Thomas | St. Thomas, U.S. Virgin Islands | Resort | 180 | 100% | 76% | 1,065 | 804 | 24,970 |
| Park Hyatt Beaver Creek Resort & Spa | Beaver Creek, CO | Resort | 193 | 100% | 34% | 313 | 106 | 10,904 |
| Hotel Yountville | Napa Valley, CA | Resort | 80 | 100% | 59% | 764 | 447 | 3,014 |
| Mr. C Beverly Hills Hotel | Beverly Hills, CA | Urban | 143 | 100% | 80% | 319 | 254 | 2,641 |
| The Ritz-Carlton Reserve Dorado Beach | Puerto Rico | Resort | 96 | 100% | 64% | 2,270 | 1,454 | 20,040 |
| Four Seasons Resort Scottsdale | Scottsdale, AZ | Resort | 210 | 100% | 49% | 852 | 415 | 21,692 |
| **Total / Weighted Average** | | | **4,192** | | **71%** | **$ 436** | **$ 309** | **$ 212,995** |

BW  BLACKWELLS CAPITAL

APP.082

# HILTON LA JOLLA TORREY PINES

| Location | La Jolla, CA |
|---|---|
| Rooms | 394 |
| Owned | 75% |
| Occupancy | 77.25% |

| | FY 2022 |
|---|---|
| ADR | $251 |
| RevPAR | $194 |
| Net Income | $13,162 |
| EBITDA | $17,328 |





BW BLACKWELLS CAPITAL

APP.083

# HILTON LA JOLLA TORREY PINES

- BHR owns a 75% partnership interest in Ashford HHC Partners III LP, which is subject to a ground lease in the Hilton La Jolla Torrey Pines expiring in 2067. CHH Torrey Pines Hotel Partners LP, a subsidiary of Ashford HHC Partners III LP, leases the Hilton La Jolla Torrey Pines hotel to CHH Torrey Pines Tenant Corp. The remaining 25% partnership interest in Ashford HHC Partners III LP is owned by Park Hotels & Resorts, Inc. The hotel opened in 1989 and is comprised of 394 guest rooms, including 232 king rooms, 152 queen/queen rooms and 10 suites. Approximately $32.3 million has been spent on capital expenditures since the acquisition of the hotel by Ashford HHC Partners III LP in 2007, which has included lobby, restaurant, meeting space and room renovations.

- The hotel's location attracts all three major demand segments: corporate transient, group meetings and leisure transient. The famous Torrey Pines Golf Course, located on the property's western boundary, appeals to each demand segment and provides exclusive tee times to guests staying at the hotel. In addition to the attraction of the golf course, the hotel is located within walking distance of the Torrey Pines State Nature Reserve with access to a number of outdoor activities and Pacific Ocean beaches. Numerous hospitals and research facilities are located within close proximity of the hotel.

- Additional property highlights include:

  – Meeting Space: Approximately 60,000 square feet of event space, including:

  – 21,000 square feet of function space in 21 rooms to accommodate up to 1,500 people;

  – over 32,000 square feet of outdoor function space; and

  – the 6,203 square foot Fairway Pavilion Ballroom overlooking the 18th fairway of Torrey Pines Golf Course South Course.

  – Food and Beverage: The Hilton La Jolla Torrey Pines hosts the Torreyana Grille and Lounge, an all-purpose, three-meal restaurant with 205 seats and the Horizons Coffee Cafe. Both outlets overlook the golf course and the Pacific Ocean.

  – Other Amenities: The hotel has a fitness center, outdoor pool, outdoor whirlpool, tennis courts, basketball court, business center, lush gardens and pathways, valet parking and a gift shop.

  – Location and Access. The hotel is located near the Pacific Ocean in a secluded area of the famous Torrey Pines Golf Course. The hotel is approximately 17 miles from the San Diego International Airport.

BW BLACKWELLS CAPITAL

APP.084

# CAPITAL HILTON

| Location | Washington, D.C. |
|---|---|
| **Rooms** | 550 |
| **Owned** | 75% |
| **Occupancy** | 65.17% |

| | **FY 2022** |
|---|---|
| **ADR** | $228 |
| **RevPAR** | $149 |
| **Net Income** | $1,125 |
| **EBITDA** | $10,174 |





# CAPITAL HILTON

- BHR owns a 75% partnership interest in Ashford HHC Partners III LP, which has a fee simple interest in the Capital Hilton. CHH Capital Hotel Partners LP, a subsidiary of Ashford HHC Partners III LP, leases the Capital Hilton to CHH Capital Tenant Corp. The remaining 25% partnership interest in Ashford HHC Partners III LP is owned by Park Hotels & Resorts, Inc. The hotel opened in 1943 and is comprised of 550 guest rooms, including 283 king rooms, 94 queen/queen rooms, 90 double/double rooms, 81 single queen rooms and two parlor suites. Approximately $77.0 million has been spent on capital expenditures since the acquisition of the hotel by Ashford HHC Partners III LP in 2007, which has included renovations to the guest rooms, public space, meeting space, lobby and restaurant.

- The hotel is strategically located at 16th and K Street, in close proximity to the White House and other government facilities. The hotel has significant historical connotations and is located near numerous Washington, D.C. attractions including the National Mall. The offices of a number of legal firms and national associations are located within walking distance of the property.

- Additional property highlights include:

  - Meeting Space: Approximately 31,000 square feet of contiguous meeting space located on the same floor.

  - Food and Beverage: The Capital Hilton hosts (i) the Northgate Grill, a full service restaurant with 130 seats and (ii) the Statler Lounge, a lobby bar with 72 seats.

  - Other Amenities: The hotel has a health club, gift shop, business center and valet parking.

  - Location and Access. The hotel is conveniently located in the center of Washington, D.C., north of the White House and near the National Mall and numerous tourist attractions. By virtue of its size and clear signage, it is visible from both directions on 16th street. The hotel is approximately five miles from Ronald Reagan Washington National Airport.

**BW** BLACKWELLS CAPITAL

APP.086

# MARRIOTT SEATTLE WATERFRONT

| Location | Seattle, WA |
|---|---|
| Rooms | 361 |
| Owned | 100% |
| Occupancy | 56.88% |

| | FY 2022 |
|---|---|
| ADR | $286 |
| RevPAR | $163 |
| Net Income | $3,790 |
| EBITDA | $9,217 |





APP.087

# MARRIOTT SEATTLE WATERFRONT

- BHR's subsidiary, Ashford Seattle Waterfront LP, owns a fee simple interest in the Marriott Seattle Waterfront. The hotel opened in 2003 and is comprised of 348 guest rooms and 13 suites, including 204 king rooms, 155 double/double rooms and two Murphy beds. About half of the hotel's guest rooms have water views overlooking Elliott Bay with the remaining guest rooms having partial water views. Approximately $34.2 million has been spent on capital expenditures since the acquisition of the hotel in 2007. Capital improvements in 2017 included the relocation of the M Club from the eighth floor to the lobby level, which recaptured three guest rooms. A transformative guest room and corridor renovation occurred in 2022 which included case goods, flooring, wall covering, soft goods, lighting, and bathrooms.

- The hotel is located on the Seattle Waterfront within walking distance of Pike Place Market, a unique retail experience and a major Seattle tourist attraction. Numerous food vendors providing locally produced food, retail shops offering a variety of merchandise and the original Starbucks Coffee Shop complement the venue. The Seattle Great Wheel, one of the tallest Ferris wheels in the western United States, and the Seattle Aquarium are located along Alaskan Way, which is in close proximity to the hotel. The hotel is also located directly across from the Pier 66 cruise terminal, a strong leisure demand generator during the six-month long cruise season.

- Additional property highlights include:

  - Meeting Space: Approximately 18,000 square feet of meeting space.

  - Food and Beverage: The Marriott Seattle Waterfront hosts: (i) Hook and Plow, a full-service restaurant with 192 seats; (ii) Lobby Bar/Library with 120 seats; and (iii) the "Market" offering snacks, drinks and sundry items.

  - Other Amenities: The hotel has a fitness center, indoor/outdoor connected pool, business center, guest laundry facilities, valet parking and three electric vehicle charging stations.

  - Location and Access. The hotel is conveniently located on the Seattle waterfront, just off of the Alaskan Way S. exit from Highway 99 N. The hotel is approximately 13 miles from the Seattle/Tacoma International Airport.

BW **BLACKWELLS CAPITAL**

APP.088

# THE CLANCY

| Location | San Francisco, CA |
|---|---|
| Rooms | 410 |
| Owned | 100% |
| Occupancy | 70.05% |

| | FY 2022 |
|---|---|
| ADR | $299 |
| RevPAR | $209 |
| Net Income | ($2,872) |
| EBITDA | $8,354 |





BW   BLACKWELLS CAPITAL

33

APP.089

# THE CLANCY

- BHR's subsidiary, Ashford San Francisco II LP, owns a fee simple interest in The Clancy. The hotel opened in 2001 and is comprised of 410 guest rooms, including 196 king rooms, 184 queen/queen rooms and 30 suites. Approximately $76.4 million has been spent on capital expenditures since the acquisition of the hotel in 2007, which included a restaurant renovation, a guest room soft goods renovation and a meeting space renovation. In early 2017, the hotel began an extensive custom designed guest room renovation. As part of this renovation the companyincreased the room count from 405 to 410 rooms utilizing former conference suites. The new guest rooms reflect the hotel's ideal location in the new and evolving SoMa district. Bold vibrant colors with calming grey undertones mimic the stunning visual beauty expressed in the iconic city of San Francisco. Innovative smart technology combined with comfort and luxury provide travelers with an intriguing and unique experience.

- On October 1, 2020, BHR announced the opening of The Clancy, a conversion of the Courtyard San Francisco Downtown into a full service hotel within Marriott's Autograph Collection®. The conversion included a complete redesign of the lobby, front desk, food and beverage outlets, meeting spaces, public areas and the façade. The custom designed guest rooms are commensurate with an upper upscale brand. Adding a few additional amenities and accessories completed their transition to an Autograph Collection Hotel. The reimaged public space and modern guest rooms elevate The Clancy within the upper upscale market. The hotel is located conveniently downtown in the heart of the SoMa district of San Francisco.

- The hotel is located near numerous high tech businesses and attractions, including the Moscone Convention Center, Transbay Transit Center, Oracle Park, Union Square and the Metreon Complex.

**BW** BLACKWELLS CAPITAL

APP.090

# THE CLANCY (CONT.)

- Additional property highlights include:

  – Meeting Space: Approximately 9,900 square feet of indoor meeting space and nearly 1,000 square feet of private outdoor reception areas. In 2022, the company converted the former indoor swimming pool space into an approximate 1,200 square foot meeting room, which includes an outdoor balcony space overlooking the Block 9 Courtyard. Located on the second floor adjacent to the majority of the hotel's meeting space, this new meeting room will allow the hotel to capture additional groups while providing much greater flexibility to the group meeting guests.

  – Food and Beverage: The transformed food and beverage outlets at The Clancy include completely reconfigured spaces to meet the requirements of today's discerning traveler. The Seven Square Tap Room, open for breakfast, lunch, dinner and cocktails, seats 118. The dining area seats 78. The bar and lounge area seats six at the bar and 34 in the lounge. The Lobby Lounge is configured with a bar, couches, small tables and a community table, seats 43 guests including 10 at the bar, 10 at the community table and 23 in various other seating configurations. The Radiator Coffee Salon, open for breakfast and light lunches seats 35 patrons at tables and stadium style seating. An exterior sales window allows the outlet to capture business from local residents and office commuters. Two exterior venues are available for both group and transient guests: the original outdoor courtyard, renamed Block 9 and a completely new space, the Parklet. Block 9 includes a fire pit and has been redesigned to be flexible enough to offer overflow seating for the Lobby Lounge and for private receptions. Total seating in Block 9 encompasses 56 seats in lounge, table and stadium seating configurations. The Parklet is completely covered and can be used for small receptions and outdoor seating.

  – Other Amenities: The hotel has a fully equipped 1,400 square foot fitness center. In 2022 the company expanded the fitness center by approximately 600 square feet. SOMA Mercantile, a gift shop of approximately 100 square feet contains food, beverage and retail items unique to San Francisco, along with national brand favorites. Valet parking is available in a two level subterranean garage

  – Original Art: During the conversion process, BHR commissioned two new outdoor murals, located in Block 9 and the Parklet and two sculptures, one located on a lobby wall and one on the exterior of the building. The hotel's original art piece, a globe representing San Francisco's unique position as a world class city, was moved from Block 9 to a prominent position in the Parklet.

  – Location and Access. The hotel is located in downtown San Francisco and is easily accessible from Interstate 80 and US 101. The hotel is approximately 14 miles from the San Francisco International Airport. The Montgomery Street BART (Bay Area Rapid Transit) station is approximately three blocks from the hotel providing convenient access to the airport and East Bay communities.

BW  BLACKWELLS CAPITAL

APP.091

# THE NOTARY HOTEL

| Location | Philadelphia, PA |
|---|---|
| Rooms | 499 |
| Owned | 100% |
| Occupancy | 55.92% |

| | FY 2022 |
|---|---|
| ADR | $218 |
| RevPAR | $122 |
| Net Income | ($505) |
| EBITDA | $7,673 |





# THE NOTARY HOTEL

- BHR's subsidiary, Ashford Philadelphia Annex LP, owns a fee simple interest in The Notary Hotel. The hotel opened in 1999 and is comprised of 499 guest rooms, including 311 king rooms, 109 queen/queen rooms, 77 double/double rooms and two parlor suites. Approximately $59.2 million has been spent on capital expenditures since the acquisition of the hotel in 2007.

- On July 17, 2019, BHR announced the opening of The Notary Hotel. Listed on the National Register of Historic Places, the former Courtyard by Marriott Philadelphia Downtown underwent a rebranding and renovation in excess of $20 million to create The Notary Hotel. Improvements included a complete renovation of the guest rooms, guest corridors, and lobby. Additionally the restaurant was renovated and repositioned as an upscale tapas bar.

- The property joined Marriott's Autograph Collection Hotels, a diverse portfolio of independent hotels around the world that reflect unique vision, design and environments. It is located in the center of Philadelphia's downtown business district, across from City Hall and one block from the Philadelphia Convention Center. The hotel is also conveniently located next to the Historical District, the Reading Terminal Market, the University of Pennsylvania and Independence Hall.

- Additional property highlights include:

  – Meeting Space: Approximately 10,000 square feet of meeting space throughout 12 event rooms.

  – Food and Beverage: The Notary Hotel hosts (i) Sabroso+Sorbo, an exciting restaurant with Latin-inspired fare and specialty cocktails and (ii) La Colombe®, the hotel's popular onsite coffee outlet featuring grab-and-go sandwiches, appetizing snacks, fresh salads and delectable pastries.

  – Other Amenities: The hotel has a fitness center, sundries shop/market, business center and valet parking.

  – Location and Access. The hotel is located in downtown Philadelphia and is accessible from Interstate 676. The hotel's corner location and clear signage make it easily visible from both Juniper Street and South Penn Square. The hotel is approximately 10 miles from the Philadelphia International Airport

**BW** BLACKWELLS CAPITAL

APP.093

# THE RITZ-CARLTON LAKE TAHOE

| Location | Truckee, CA |
|---|---|
| Rooms | 170 |
| Owned | 100% |
| Occupancy | 57.60% |

| | FY 2022 |
|---|---|
| ADR | $737 |
| RevPAR | $424 |
| Net Income | $5,020 |
| EBITDA | $11,383 |





# THE RITZ-CARLTON LAKE TAHOE

- On January 15, 2019, BHR acquired a 100% interest in the 170-room Ritz-Carlton Lake Tahoe located in Truckee, California for $120.0 million. Approximately $7.9 million has been spent on capital expenditures since the acquisition of the hotel in January 2019.

- The Ritz-Carlton Lake Tahoe was built in 2009 and has 170 luxurious and spacious rooms, including 17 suites. The resort also offers an array of amenities, including ski-in/ski-out access to Northstar Ski Mountain, the ultra-luxury Lake Club on the shore of Lake Tahoe, a 17,000 square foot full-service spa, six food and beverage outlets, including the acclaimed Manzanita restaurant, over 37,000 square feet of flexible indoor/outdoor meeting space, two outdoor pools, state-of-the-art fitness club and yoga studio, and the Ritz Kids Club.

- Additional property highlights include:

  – Meeting Space: The property has over 37,000 square feet of meeting space including 15,000 square feet of outdoor event space with the dramatic fireside terrace, two elegant ballrooms and the waterfront Lake Club, a multi-level venue for intimate events.

  – Food and Beverage: The property features six food and beverage outlets, including the extraordinary North Lake Tahoe dining in Manzanita, featuring artfully crafted cuisine and Backyard Bar and BBQ, featuring St. Louis style BBQ favorites.

  – Other Amenities: The property offers 170 luxurious guest rooms and suites with in-room gas fireplaces and floor-to-ceiling windows, a 17,000 square foot slope-side spa with treatments themed around nature and the Ritz Kids children's program.

  – Location and Access. Located in the North Lake Tahoe area, the property is situated mid-mountain at the Northstar Ski Area. With its premier location, luxury brand affiliation and world-class amenities, The Ritz-Carlton Lake Tahoe is positioned as the leading resort in one of the country's most popular tourist destinations. North Lake Tahoe, located approximately 45 minutes from Reno, Nevada and two hours from Sacramento, is a popular and growing upscale, year-round tourist destination. Beyond the first-class hotel experience, guests have easy access to the Lake Tahoe area's many amenities and activities, including world-class skiing and winter sports, boating, fishing, hiking, golfing, as well as exceptional dining and shops.

BW  BLACKWELLS CAPITAL

APP.095

# THE RITZ-CARLTON SARASOTA

| Location | Sarasota, FL |
|---|---|
| **Rooms** | 276 |
| **Owned** | 100% |
| **Occupancy** | 74.47% |

| | **FY 2022** |
|---|---|
| **ADR** | $618 |
| **RevPAR** | $460 |
| **Net Income** | $17,641 |
| **EBITDA** | $30,377 |





BW  BLACKWELLS CAPITAL

40

APP.096

# THE RITZ-CARLTON SARASOTA

- On April 4, 2018, BHR acquired a 100% interest in The Ritz-Carlton Sarasota in Sarasota, Florida for $171.4 million and a 22-acre plot of vacant land for $9.7 million. Approximately $17.2 million has been spent on capital expenditures since the acquisition of the hotel in April 2018.

- The Ritz-Carlton Sarasota was built in 2001 and has 276 luxurious and spacious rooms, including 31 suites. The resort also offers an array of amenities, including a 26,000 square foot Beach Club with 410 feet of beachfront, a private, luxury Tom Fazio designed Golf Club, the award-winning 15,000 square foot Ritz-Carlton Spa, eight food and beverage outlets, including the acclaimed Jack Dusty waterfront restaurant, 29,000 square feet of flexible indoor meeting space, two outdoor pools, 24-hour state-of-the-art fitness club and lighted tennis courts.

- Additional property highlights include:

  - Meeting Space: The property has a 26,000-square-foot conference center, outdoor venues for up to 1,200 guests as well as venues overlooking the Gulf of Mexico.

  - Food and Beverage: The property features four different restaurants, including the nautically inspired Jack Dusty and Ridley's Porch, the relaxed beachfront Lido key Tiki Bar, as well as the Golf Club Grille overlooking the entire golf course.

  - Other Amenities: The property offers 276 guest rooms with private balconies, a serene private beach club on Lido Key, 18 holes of championship golf and a luxurious spa.

  - Location and Access. Located on Sarasota Bay in downtown Sarasota, the property, with its premier location, luxury-brand affiliation and world-class amenities, is positioned as the leading resort in one of country's fastest growing markets. Sarasota, located approximately 60 miles south of Tampa, is a popular and growing upscale, year-round destination on the west coast of Florida. Beyond the first-class hotel experience, guests have easy access to the Sarasota area's many amenities and activities, including exceptional dining and shops, art galleries, beaches, museums, boating, fishing, and golfing.

**BW** BLACKWELLS CAPITAL

APP.097

# SOFITEL CHICAGO MAGNIFICENT MILE

| Location | Chicago, IL |
|---|---|
| Rooms | 415 |
| Owned | 100% |
| Occupancy | 65.36% |

| | FY 2022 |
|---|---|
| ADR | $251 |
| RevPAR | $164 |
| Net Income | $2,226 |
| EBITDA | $8,288 |





BW **BLACKWELLS CAPITAL**

APP.098

# SOFITEL CHICAGO MAGNIFICENT MILE

- On February 24, 2014, BHR acquired a fee simple interest in the Sofitel Chicago Magnificent Mile. The hotel opened in 2002 and is comprised of 415 guest rooms, including 63 suites. Approximately $19.9 million has been spent on capital expenditures at the hotel since the acquisition of the hotel in 2014. The fitness center and lobby bar were extensively renovated in the first quarter of 2017. A comprehensive guest room and corridor renovation began in the fourth quarter of 2017 and was completed in the second quarter of 2018.

- The 32-story building was designed by French architect Jean-Paul Viguier and has views of Lake Michigan and the Chicago skyline. It is located in the heart of the Gold Coast neighborhood, proximate to some of Chicago's largest leisure demand generators, on the corner of Chestnut Street and Wabash Avenue.

- Additional property highlights include:

  - Meeting Space: Approximately 10,000 square feet of meeting space.

  - Food and Beverage: The Sofitel Chicago Magnificent Mile includes (i) CDA, an 82 seat French inspired casual restaurant; (ii) Le Bar, a 45 seat modern cocktail lounge; (iii) La Tarrasse, a 40-seat outdoor patio and lounge serving the cuisine of CDA; and (iv) Cigale, a restaurant space featuring an exhibition kitchen and frontage on Wabash Avenue overlooking Connors Park (currently utilized only for event space).

  - Other Amenities: The hotel has a fitness center, a business center and valet parking.

  - Location and Access. The hotel is located one block west of Chicago's Magnificent Mile on a 0.6 acre parcel in an area of Chicago known as the Gold Coast. The hotel has easy access to the Chicago "L" train and is located approximately 18 miles from O'Hare International Airport and 13 miles from Midway International Airport.

BW  BLACKWELLS CAPITAL

APP.099

# PIER HOUSE RESORT AND SPA

| Location | Key West, FL |
|---|---|
| Rooms | 142 |
| Owned | 100% |
| Occupancy | 74.81% |

| | FY 2022 |
|---|---|
| ADR | $707 |
| RevPAR | $529 |
| Net Income | $12,377 |
| EBITDA | $18,115 |





APP.100

# PIER HOUSE RESORT AND SPA

▪ On March 1, 2014, the company acquired a fee simple interest in the Pier House Resort & Spa from Ashford Trust pursuant to an option agreement that the company entered into in connection with our spin-off from Ashford Trust. The hotel opened in 1968 and is comprised of 142 guest rooms, including 76 king rooms, 43 queen/queen rooms and 23 suites. Approximately $16.6 million has been spent on capital expenditures since the acquisition of the hotel in May 2013, which included spa, fitness center and guest rooms refresh renovations.

▪ The hotel is located on a six-acre parcel in Key West, Florida. In addition to its secluded private beach, the hotel is well-situated at the north end of Duval Street providing easy access to the heart of Key West and its many demand generators.

▪ Additional property highlights include:

  – Meeting Space: Approximately 2,600 square feet of conference space and 2,000 square feet of wedding space overlooking the Gulf of Mexico.

  – Food and Beverage: The Pier House Resort & Spa provides an al fresco beach bar, the 152-seat One Duval Restaurant as well as the 18-seat Chart Room.

  – Other Amenities: The hotel has a full-service spa, a private beach, a heated outdoor pool and a private dock for charter pick-ups.

  – Location and Access. The hotel is located on a six-acre compound in the historic district of Key West, Florida, on Duval Street, at the Gulf of Mexico. Key West, which is the southernmost point of the Florida peninsula, is 160 miles south of Miami. Key West International Airport is approximately four miles from the property. The Marathon and Miami airports are all within driving distance.

BW  BLACKWELLS CAPITAL

APP.101

# BARDESSONO HOTEL AND SPA

| Location | Yountville, CA |
|---|---|
| Rooms | 65 |
| Owned | 100% |
| Occupancy | 63.96% |

| | FY 2022 |
|---|---|
| ADR | $1,258 |
| RevPAR | $804 |
| Net Income | $4,488 |
| EBITDA | $9,127 |





# BARDESSONO HOTEL AND SPA

- On July 9, 2015, BHR acquired a 100% leasehold interest in the Bardessono Hotel and Spa in Yountville, California, which is subject to a ground lease that initially expires in 2065, with two 25-year extension options. The Bardessono Hotel and Spa was built in 2009 and has 65 luxurious rooms and suites. Built and operated with a primary focus on green practices and is LEED Platinum certified. In 2016 the meeting space was renovated. In 2019 the company completed construction of a 3,705 square foot Maple Grove Villa, which consists of three large suites, each of which boasts a distinctive great room, stately king bedroom, spa bathroom, courtyard and plunge pool. Approximately $8.8 million has been spent on capital expenditures since the acquisition of the hotel in July 2015.

- The hotel is located in Yountville, California and enjoys a central location in the heart of Napa Valley. It offers exceptional amenities, including large, well appointed guest rooms and suites with private patios/balconies. Guest rooms have fireplaces and oversized bathrooms, many featuring steam showers and a second shower located outdoors in a private garden.

- Additional property highlights include:

  – Meeting Space: Approximately 2,100 square feet of indoor and outdoor meeting space.

  – Food and Beverage: The Bardessono Hotel and Spa offers the acclaimed 84-seat Lucy restaurant and bar.

  – Other Amenities: The hotel offers an on-site spa and a fitness center. Outdoor amenities include a rooftop pool and a vegetable garden. Complimentary bicycles and five Lexus vehicles are available for guest use.

  – Location and Access. The hotel is approximately 60 miles north of San Francisco, approximately 68 miles from the San Francisco International Airport and approximately 60 miles from the Oakland International Airport. The hotel is located within the town of Yountville, offering numerous retail and restaurant establishments including the famed French Laundry. Yountville is in the heart of the Napa Valley, a premier wine and culinary destination with over 450 wineries. In addition to the valley's traditional wine and dining attractions, the region is also known as a popular leisure destination for hiking, biking, golfing, shopping and festivals.

**BW** BLACKWELLS CAPITAL

APP.103

# THE RITZ-CARLTON ST. THOMAS

| Location | St. Thomas, U.S. Virgin Islands |
|---|---|
| Rooms | 180 |
| Owned | 100% |
| Occupancy | 73.81% |

| | FY 2022 |
|---|---|
| ADR | $1,205 |
| RevPAR | $889 |
| Net Income | $18,920 |
| EBITDA | $30,137 |





BW  BLACKWELLS CAPITAL

48

APP.104

# THE RITZ-CARLTON ST. THOMAS

▪ On December 15, 2015, BHR acquired a 100% interest in The Ritz-Carlton St. Thomas on the island of St. Thomas, U.S. Virgin Islands. The Ritz-Carlton St. Thomas opened in 1996 and has 155 luxurious guest rooms and 25 suites, all featuring a spacious private balcony with ocean or resort views. Approximately $115.4 million has been spent on capital expenditures since the acquisition of the hotel in December 2015. Capital investment was primarily focused on remediation and reconstruction effort due to damage sustained after Hurricane Irma. The hotel operated as a 59-room Marriott-affiliated non-branded hotel for the majority of 2019 and re-opened as a full service Ritz-Carlton resort in late November 2019.

▪ Additional property highlights include:

– Meeting Space: The property has more than 10,000 square feet of indoor and outdoor meeting and function space offering stunning views of Great Bay and neighboring St. John.

– Food and Beverage: The property features (i) the 163 seat Bleuwater Restaurant; (ii) Alloro, a 100-seat Italian restaurant; (iii) Sails, a 155-seat beachside restaurant and bar; and (iv) Coconut Cove, a second beachside 118-seat restaurant, on the grounds of the adjacent Ritz-Carlton Destination Club. A new fresh service market, Southwind, opened in 2020, serving coffee, sandwiches, ice cream and other light fare.

– Other Amenities: The resort offers a beachfront infinity-edge pool, as well as a children's pool and hot tub, a 7,500 square foot full-service awardwinning spa and a 2,000 square foot fitness center. The resort also offers the Ritz Kids Club.

– Location and Access. The hotel is located on 30 oceanfront acres along Great Bay, St. Thomas, U.S. Virgin Islands. It is 1.6 miles from Urman Victor Fredericks Marine Terminal in Red Hook and 11 miles from Cyril E. King Airport.

BW **BLACKWELLS CAPITAL**

APP.105

# PARK HYATT BEAVER CREEK RESORT & SPA

| Location | Beaver Creek, CO |
|---|---|
| Rooms | 190 |
| Owned | 100% |
| Occupancy | 60.58% |

| | FY 2022 |
|---|---|
| ADR | $601 |
| RevPAR | $364 |
| Net Income | $5,668 |
| EBITDA | $13,620 |





# PARK HYATT BEAVER CREEK RESORT & SPA

- On March 31, 2017, BHR acquired a 100% interest in the 190-room Park Hyatt Beaver Creek Resort & Spa in Beaver Creek, Colorado. Located in the heart of Beaver Creek Village, approximately 100 miles west of Denver, it is located in one of the most exclusive resort destinations in North America. The Park Hyatt Beaver Creek Resort & Spa is an integral part of the Beaver Creek Village as the only full-service hotel with direct ski-in/ski-out access. The Park Hyatt Beaver Creek Resort & Spa was built in 1989 and has 190 luxurious and spacious rooms, including 81 king rooms, 66 double/double rooms, 20 double/queen rooms, 22 suites and one suite parlor. The hotel underwent a full lobby renovation in 2019, which included a new lobby bar and the addition of an epicurean market. Approximately $16.8 million has been spent on capital expenditures since the acquisition of the hotel in March 2017.

- Additional property highlights include:

  – Meeting Space: The property has over 20,000 square feet of flexible indoor and outdoor event space and is home to the largest ballroom in Vail Valley.

  – Food and Beverage: The property has four food and beverage outlets, including the world-class 8100 Mountainside Bar & Grill, the Brass Bear Bar, the Fall Line epicurean market and Powder 8 Kitchen & Tap, serving the Beaver Creek community and hotel guests during the ski season.

  – Other Amenities: The resort offers an array of amenities, including the award-winning 30,000 square foot Exhale Spa, a heated outdoor pool and five outdoor hot tubs beneath a mountain waterfall, 24-hour state-of-the-art fitness club, ski valet service, outdoor fire pits, guest access to two private championship golf courses and the Beaver Creek Tennis Center. The property also features over 18,800 square feet of fully leased, highly visible retail space in the heart of Beaver Creek.

  – Location and Access. Located in the heart of Beaver Creek Village, Colorado, the Park Hyatt Beaver Creek Resort & Spa is positioned as the leading resort in one of North America's most renowned luxury resort destinations. Beyond the world-class hotel, guests have easy access to Beaver Creek's famous amenities, including exceptional dining and luxury boutique shopping, the 535-seat Vilar Performing Arts Center where festivals and large events are held and an outdoor ice skating rink. While the Vail Valley is home to some of the top ski areas in the world and is a well-known winter destination, it has become very popular as a summer destination due to its proximity to diverse leisure activities, including hiking, biking, horseback riding, white water rafting, fishing, golfing and festivals.

BW  BLACKWELLS CAPITAL

APP.107

# HOTEL YOUNTVILLE

| Location | Yountville, CA |
|---|---|
| **Rooms** | 80 |
| **Owned** | 100% |
| **Occupancy** | 54.06% |

| | **FY 2022** |
|---|---|
| **ADR** | $907 |
| **RevPAR** | $490 |
| **Net Income** | $2,547 |
| **EBITDA** | $6,958 |





# HOTEL YOUNTVILLE

- On May 11, 2017, BHR acquired a 100% interest in the 80-room Hotel Yountville in Yountville, California. The Hotel Yountville was originally built in 1998 and, in 2011, underwent an extensive expansion and renovation that upgraded all guest rooms, adding 29 new guest rooms, and added a restaurant, spa, meeting and event space, an outdoor pool, and lounge patio. Currently, the property has 80 luxury rooms consisting of 62 king rooms, eight double/queen rooms and 10 suites. Approximately $3.2 million has been spent on capital expenditures since the acquisition of the hotel in May 2017.

- Additional property highlights include:

  - Meeting Space: The property has approximately 4,400 square feet of indoor and outdoor event space.

  - Food and Beverage: The property has the acclaimed 46-seat Heritage Oak restaurant and bar, in-room dining service and complimentary wine tastings.

  - Other Amenities: The property offers well-appointed guest rooms and suites with private patios/balconies and a 6,500 square foot on-site spa. Its outdoor amenities are notable as well, including a resort-style outdoor heated pool and lounge, landscaping and water features, and the availability of complimentary bicycles for guest use.

  - Location and Access. Located in the heart of Yountville, California, the Hotel Yountville is approximately 60 miles north of San Francisco and enjoys a central location in the heart of the Napa Valley, widely acclaimed as the continent's premier wine and culinary destination with over 450 wineries. Known as the "Culinary Capital of the Napa Valley," Yountville boasts an array of restaurants by famed chefs, earning more Michelin stars per capita than any other place in North America. In addition to the valley's traditional wine and dining attractions, the region is also known as a popular leisure destination for hiking, biking, golfing, shopping and festivals

**BW** BLACKWELLS CAPITAL

APP.109

# MR. C BEVERLY HILLS HOTEL

| Location | Los Angeles, CA |
|---|---|
| Rooms | 143 |
| Owned | 100% |
| Occupancy | 74.26% |

| | FY 2022 |
|---|---|
| ADR | $348 |
| RevPAR | $258 |
| Net Income | ($1,390) |
| EBITDA | $3,157 |





APP.110

# MR. C BEVERLY HILLS HOTEL

- On August 5, 2021, the Company acquired a 100% interest in the 138-room Mr. C Beverly Hills Hotel and five luxury residences adjacent to the hotel. Approximately $819,000 has been spent on capital expenditures since the acquisition.

- The Mr. C was built in 1965 and underwent an extensive renovation in 2011. It has 138 luxurious and spacious rooms, including 12 suites and 10 mini suites. It is a luxury hotel ideally located in close proximity to high-end shopping on Rodeo Drive and business demand from Century City and Culver City.

- Additional property highlights include:

  - Meeting Space: The property has over 24,000 sq. ft. of flexible indoor/outdoor meeting space. The 12 floor ballroom features unparalleled 360-degree panoramic views of Los Angeles.

  - Food and Beverage: The property also boasts the acclaimed The Restaurant at Mr. C, which entices travelers and Angelenos alike with its truly authentic Italian flavor by the fourth generation Cipriani.

  - Other Amenities: The property offers an outdoor pool terrace with daybeds and cabanas, state-of-the-art fitness center and a business center. Additionally, the property includes five newly-constructed and fully-furnished residences which blend contemporary architecture with elegant, minimalistic design and range in size from 2,000 to 3,400 sq. ft. The residences are currently offered for extended-stay rentals.

  - Location and Access. With its premier location in the heart of West Los Angeles, the property is in the middle of more than 45 million sq. ft. of office space, supporting substantial corporate demand and a wide array of world-renowned leisure demand generators, including unrivaled shopping with high-end retailers, vibrant restaurants and various art and cultural attractions.

BW **BLACKWELLS CAPITAL**

APP.111

| Location | Puerto Rico |
|---|---|
| Rooms | 96 |
| Owned | 100% |
| Occupancy | 63.53% |

| | FY 2022 |
|---|---|
| ADR | $1,929 |
| RevPAR | $1,225 |
| Net Income | $7,583 |
| EBITDA | $14,887 |





APP.112

# THE RITZ-CALRTON RESERVE DORADO BEACH

- On March 11, 2022, the Company acquired a 100% interest in the 96-room Ritz-Carlton Reserve Dorado Beach in Dorado, Puerto Rico. Approximately $1.3 million has been spent on capital expenditures since the acquisition.

- The Ritz-Carlton Reserve Dorado Beach opened in 2013. Situated on a portion of the original Rockefeller estate, the Ritz-Carlton Reserve Dorado Beach is an intimate refuge, infused with references to the surrounding natural landscape and diverse culture. It has 96 guest rooms, each of which features beautiful modern decor, a large wardrobe and marble floors. Some rooms also feature an en-suite plunge pool and spectacular ocean views.

- Additional property highlights include:

  - Meeting Space: The property offers entirely customizable meeting packages that combine ocean-view meeting space, bespoke services and meeting expertise. A private dining room and several lawns are also available for more social gatherings.

  - Food and Beverage: The property features three dining outlets including COA, the property's signature steakhouse and Positivo, offering upscale openair, ocean front dining with an Asian inspired influence.

  - Other Amenities: The property offers an award winning spa, fitness center, kids club and excellent views of the Caribbean Sea.

  - Location and Access. Puerto Rico's capital of San Juan is 25 miles away, and guests can reach Luis Muñoz Marín International Airport within a 50-minute drive of the property

**BW** BLACKWELLS CAPITAL

APP.113

# FOUR SEASONS RESORT SCOTTSDALE

| Location | Scottsdale, AZ |
|---|---|
| **Rooms** | 210 |
| **Owned** | 100% |
| **Occupancy** | 45.15% |

| | **FY 2022** |
|---|---|
| **ADR** | $1,057 |
| **RevPAR** | $477 |
| **Net Income** | $933 |
| **EBITDA** | $1,710 |





# FOUR SEASONS RESORT SCOTTSDALE

- On December 1, 2022, the Company acquired a 100% interest in the 210-room Four Seasons Resort Scottsdale at Troon North in Scottsdale, Arizona. Approximately $383,000 has been spent on capital expenditures since the acquisition.

- The Four Seasons Resort Scottsdale was opened in 1999. It has 210 luxurious and spacious guest rooms, including 22 suites that average 1,214 sq. ft. in size, all boasting private patios or balconies overlooking the colorful desert landscapes.

- Additional property highlights include:

    – Meeting Space: The property boasts 35,900 square feet of total indoor and landscaped outdoor event space including three ballrooms and a variety of private meeting rooms including two dedicated boardrooms

    – Food and Beverage: Guests have multiple dining options including indulging at the 100-seat Talavera steakhouse, sampling American homestyle fare at 180-seat Proof cantina, enjoying desert and pool views at the 55-seat Saguaro Blossom poolside restaurant, or enjoying handcrafted cocktails at the 100-seat Onyx Bar and Lounge.

    – Other Amenities: The property offers locally inspired spa treatments at the 9,000 sq. ft. spa, a bi-level pool. It also offers guests opportunities for outdoor adventure, including close shuttle access to two world-class golf courses, four pickleball and two tennis courts, as well as the opportunities to hike, bike or rock climb surrounding hills.

    – Location and Access. Set in the majestic Sonoran Desert, Four Seasons Resort Scottsdale at Troon North is minutes from outdoor adventures and two world-class golf courses. The bustling downtowns of Scottsdale and Phoenix are 30 and 40 minutes away, respectively, but dining, shopping and area attractions are only a short drive from the Resort

APP.115



# LBO Model

BLACKWELLS CAPITAL

# LBO MODEL – PURCHASE PRICE SUMMARY AND EXIT VALUE

## PURCHASE PRICE SUMMARY

| | | |
|---|---|---|
| Common Shares Outstanding | | 65,994 |
| OP Units Outstanding | | 7,224 |
| Plus: Dilution from Converted Shares | | 13,609 |
| **Total Shares and Units** | | **86,827** |
| Current Price Per Share | $ | 2.74 |
| **Current Equity Value** | $ | **237,907** |
| Offer Price Per Share | 82.5% Premium to Current Share Price $ | 5.00 |
| **Equity Value** | $ | **434,136** |
| Plus: Net Debt (Excl. Convert) | | 737,155 |
| Plus: Preferred Stock | | 460,827 |
| Plus: Convertible Preferreds | | 76,950 |
| **Total Enterprise Value** | $ | **1,709,068** |

## VALUATION MULTIPLES

| | | Current | | At Takeout |
|---|---|---|---|---|
| Purchase Price Per Key | $ | 361,569 | $ | 408,770 |
| Implied 2024E Cap Rate | | 15.8% | | 14.0% |
| 2024E Hotel EBITDA Multiple | | 6.3x | | 7.1x |
| 2025E Hotel EBITDA Multiple | | 6.1x | | 6.9x |

## EXIT VALUATION MULTIPLES

| | | |
|---|---|---|
| Average Price Per Key | $ | 844,000 |
| Implied 2029E Cap Rate | | 8.4% |
| 2029E Hotel EBITDA Multiple | | 12.0x |

## EXIT VALUE

| | | | |
|---|---|---|---|
| **Exit Year** | | | Year 5 |
| **Exit by Property** | | | |
| Property | | # of Keys | Exit Valuation |
| Hilton La Jolla Torrey Pines | | 394 | $  332,536 |
| Capital Hilton | | 550 | 464,200 |
| Marriott Seattle Waterfront | | 361 | 304,684 |
| The Clancy | | 410 | 346,040 |
| The Notary Hotel | | 499 | 421,156 |
| The Ritz-Carlton Lake Tahoe | | 170 | 143,480 |
| The Ritz-Carlton Sarasota | | 276 | 232,944 |
| Sofitel Chicago Magnificent Mile | | 415 | 350,260 |
| Pier House Resort & Spa | | 142 | 119,848 |
| Bardessono Hotel and Spa | | 65 | 54,860 |
| The Ritz-Carlton St. Thomas | | 180 | 151,920 |
| Park Hyatt Beaver Creek Resort & Spa | | 190 | 160,360 |
| Hotel Yountville | | 80 | 67,520 |
| Mr. C Beverly Hills Hotel | | 143 | 120,692 |
| The Ritz-Carlton Reserve Dorado Beach | | 96 | 81,024 |
| Four Seasons Resort Scottsdale | | 210 | 177,240 |
| **Gross Exit Value** | | **4,181** | $  **3,528,764** |
| Less: Transaction Costs | | | (35,288) |
| **Net Unlevered Proceeds** | | | $  **3,493,476** |
| Less: Net Debt | | | $  (1,600,000) |
| **Net Levered Proceeds** | | | $  **1,893,476** |

BW  BLACKWELLS CAPITAL

APP.117

# LBO MODEL – SOURCES AND USES

## SOURCES AND USES AT CLOSING

| Sources | | | Uses | | |
|---|---|---|---|---|---|
| Investor Cash Equity | $ | 717,987 | Outstanding Equity (at $5.00 Share Price) | $ | 434,136 |
| Cash on Target Balance Sheet | | 118,025 | Repay Debt | | 1,054,430 |
| Assumed Mortgage Debt | | - | Assumed Mortgage Debt | | - |
| CMBS Pool 1 | | 800,000 | Repay Preferreds | | 577,777 |
| CMBS Pool 2 | | - | Buyout Park Minority Interest | | 69,250 |
| CMBS Pool 3 | | - | **Target Purchase Price** | **$** | **2,135,593** |
| Bridge Financing | | 800,000 | Transaction Costs | | 300,419 |
| **Total Sources** | **$** | **2,436,012** | **Total Uses** | **$** | **2,436,012** |
| *Debt as a % of Net Sources* | | 69% | | | |

## SOURCES AND USES POST BRIDGE

| Sources | | | Uses | | |
|---|---|---|---|---|---|
| Incremental Equity Needed | $ | - | Repay Bridge Financing | $ | 800,000 |
| CMBS Pool 1 | | - | Working Capital Reserve | | - |
| CMBS Pool 2 | | 800,000 | | | |
| CMBS Pool 3 | | - | | | |
| **Total Sources** | **$** | **800,000** | **Total Uses** | **$** | **800,000** |

BW **BLACKWELLS CAPITAL**

APP.118

# LBO MODEL – CAPITALIZATION

**CAPITALIZATION**

| | Pro Forma 6/30/23 | Current Interest Rate | Current Maturity | Bucket (1/2/3) | Adjustments (+) / (-) | At Signing | Adjustments (+) / (-) | Permanent Cap Stack | % Of Total Cap |
|---|---|---|---|---|---|---|---|---|---|
| **Cash & Equivalents** | $ 128,025 | | | | $ (118,025) | $ 10,000 | $ - | $ 10,000 | 0.4% |
| | | | | | | | | | |
| **Existing Mortgage Debt** | | | | | | | | | |
| Mortgage loan - The Ritz-Carlton Sarasota | $ - | L+2.65% | Apr-24 | Already Paid | $ - | $ - | $ - | $ - | - |
| Mortgage loan - Hotel Yountville | | L+2.65% | May-24 | Already Paid | | | | | |
| Mortgage loan - Notary/Clancy/CHI /SEA | 293,180 | L+2.16% | Jun-25 | 1 | (293,180) | - | - | - | - |
| Mortgage loan - Bardessano Hotel & Spa | | S+2.65% | Aug-23 | Already Paid | - | - | - | - | - |
| Mortgage loan - Ritz St Thomas | 42,500 | L+3.95% | Aug-24 | 1 | (42,500) | - | - | - | - |
| Mortgage loan - Ritz Lake Tahoe | 54,000 | S+2.20% | Jan-24 | 1 | (54,000) | - | - | - | - |
| Mortgage loan - Capital Hilton / Torrey Pines | 195,000 | L+1.70% | Feb-24 | 1 | (195,000) | - | - | - | - |
| Mortgage loan - Park Hyatt Beaver Creek | 70,500 | S+2.86% | Feb-27 | 1 | (70,500) | - | - | - | - |
| Mortgage loan - Dorado Beach | | L+6.00% | Jan-00 | Already Paid | - | - | - | - | - |
| Mortgage loan - Mr. C Beverly Hills | 30,000 | L+3.60% | Aug-24 | 1 | (30,000) | - | - | - | - |
| Mortgage loan - Pier House | 80,000 | S+1.95% | Sep-24 | 1 | (80,000) | - | - | - | - |
| Mortgage loan - Four Seasons Scottsdale | 100,000 | S+3.75% | Dec-27 | 1 | (100,000) | - | - | - | - |
| | | | | | | | | | |
| **Existing Corporate Debt** | | | | | | | | | |
| Secured Term Loan Facility | $ 150,000 | | | 1 | $ (150,000) | $ - | $ - | $ - | - |
| Secured Revolving Credit Facility | 39,250 | | | 1 | (39,250) | - | - | - | - |
| Convertible Senior Notes | 86,250 | 4.50% | | Convert | - | - | - | - | - |
| | | | | | | | | | |
| **Preferreds** | | | | | | | | | |
| Series B | $ 76,950 | | | 1 | $ (76,950) | $ - | $ - | $ - | - |
| Series D | 40,000 | | | 1 | (40,000) | - | - | - | - |
| Series E | 411,818 | | | 1 | (411,818) | - | - | - | - |
| Series M | 49,008 | | | 1 | (49,008) | - | - | - | - |
| | | | | | | | | | |
| **New Debt** | | | | | | | | | |
| Bridge Financing | $ - | | | | $ 800,000 | 800,000 | $ (800,000) | $ - | - |
| CMBS Pool 1 | - | | | | 800,000 | 800,000 | - | 800,000 | 34.7% |
| CMBS Pool 2 | - | | | | | | 800,000 | 800,000 | 34.7% |
| CMBS Pool 3 | - | | | | | | - | - | - |
| **Total Debt** | $ 1,718,457 | | | | $ (32,207) | $ 1,600,000 | $ - | $ 1,600,000 | 69.3% |
| Net Debt | $ 1,590,432 | | | | | $ 1,590,000 | | $ 1,590,000 | 68.9% |
| Public Equity | $ 237,907 | | | | $ (237,907) | $ - | $ - | $ - | - |
| Private Equity | $ - | | | | $ 717,987 | 717,987 | $ - | 717,987 | 31.1% |
| **Total Capitalization** | $ 1,828,339 | | | | | $ 2,307,987 | | $ 2,307,987 | 100.0% |

BW BLACKWELLS CAPITAL

APP.119

# LBO MODEL – CASH FLOW SUMMARY

**CASH FLOW SUMMARY**

| | | 2024 Year 1 | 2025 Year 2 | 2026 Year 3 | 2027 Year 4 | 2028 Year 5 | 2029 Year 6 |
|---|---|---|---|---|---|---|---|
| **Year:** | | | | | | | |
| **BHR Revenue** | | | | | | | |
| Rooms | $ | 494,877 $ | 516,112 $ | 538,305 $ | 560,962 $ | 588,362 $ | 613,051 |
| Food and Beverage | | 215,194 | 223,493 | 233,103 | 242,933 | 254,172 | 264,817 |
| Other | | 86,943 | 88,147 | 91,937 | 95,857 | 98,845 | 102,936 |
| **Total Hotel Revenue** | $ | 797,013 $ | 827,752 $ | 863,345 $ | 899,752 $ | 941,380 $ | 980,804 |
| **NOI** | | | | | | | |
| Total Hotel Revenue | $ | 797,013 $ | 827,752 $ | 863,345 $ | 899,752 $ | 941,380 $ | 980,804 |
| Less: Hotel Operating Expenses | | (496,235) | (515,374) | (537,535) | (560,202) | (586,120) | (610,667) |
| Less: Property Taxes and Insurance | | (37,271) | (38,708) | (40,373) | (42,075) | (44,022) | (45,866) |
| Less: Hotel Management Services Fees | *3.0% of revenue* | (23,910) | (24,833) | (25,900) | (26,993) | (28,241) | (29,424) |
| **Total Property Nominal NOI** | $ | 239,597 $ | 248,837 $ | 259,537 $ | 270,482 $ | 282,996 $ | 294,847 |
| *Annual Growth* | | *NA* | *3.9%* | *4.3%* | *4.2%* | *4.6%* | *4.2%* |
| Less: Total Capex | *5.5% of revenue* | (43,836) | (45,526) | (47,484) | (49,486) | (51,776) | (53,944) |
| **Economic NOI** | $ | 195,761 $ | 203,311 $ | 212,053 $ | 220,995 $ | 231,220 $ | 240,903 |
| *Annual Growth* | | *NA* | *3.9%* | *4.3%* | *4.2%* | *4.6%* | *4.2%* |
| Less: General and Administrative | | (10,281) | (10,347) | (10,360) | (10,347) | (10,355) | (10,298) |
| **Unlevered Cash Flow** | $ | 185,479 $ | 192,964 $ | 201,693 $ | 210,648 $ | 220,865 $ | 230,605 |
| Less: Interest Expense | $ | (134,987) $ | (123,026) $ | (120,505) $ | (119,886) $ | (120,155) $ | (60,222) |
| **Levered Cash Flow** | $ | 50,493 $ | 69,938 $ | 81,188 $ | 90,763 $ | 100,709 $ | 170,383 |

**BW** BLACKWELLS CAPITAL

APP.120

# LBO MODEL – RETURNS SUMMARY

**RETURNS SUMMARY**

| Year: | | Year 0 | | Year 1 | | Year 2 | | Year 3 | | Year 4 | | Year 5 | | Year 6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Unlevered** | | | | | | | | | | | | | | |
| Purchase Price | $ | (2,066,343) | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - |
| Plus: Cash on Balance Sheet | | 118,025 | | - | | - | | - | | - | | - | | - |
| Less: Park Minority Interest | | (69,250) | | - | | - | | - | | - | | - | | - |
| Less: Transaction Costs | | (300,419) | | - | | - | | - | | - | | - | | - |
| Plus: Unlevered Cash Flow | | - | | 185,479 | | 192,964 | | 201,693 | | 210,648 | | 220,865 | | - |
| Plus: Exit Value | | - | | - | | - | | - | | - | | 3,528,764 | | - |
| Less: Exit Transaction Costs | | - | | - | | - | | - | | - | | (35,288) | | - |
| **Total Unlevered Cash Flow** | $ | (2,317,987) | $ | 185,479 | $ | 192,964 | $ | 201,693 | $ | 210,648 | $ | 3,714,341 | $ | - |

| **Unlevered IRR** | **16.0%** |
|---|---|
| **Unlevered Multiple** | **1.9x** |
| **Profit** | **$2,187,138** |
| **Cash Flow as a % of Profit** | **46.3%** |

| Year: | | Year 0 | | Year 1 | | Year 2 | | Year 3 | | Year 4 | | Year 5 | | Year 6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Levered** | | | | | | | | | | | | | | |
| Unlevered Basis | $ | (2,317,987) | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - |
| Plus: Debt | | 1,600,000 | | - | | - | | - | | - | | - | | - |
| Plus: Bridge Debt Proceeds | | 800,000 | | - | | - | | - | | - | | - | | - |
| Less: Bridge Debt Repayment | | (800,000) | | - | | - | | - | | - | | - | | - |
| Levered Cash Flow | | - | | 50,493 | | 69,938 | | 81,188 | | 90,763 | | 100,709 | | - |
| Plus: Exit Value | | - | | - | | - | | - | | - | | 3,528,764 | | - |
| Less: Exit Transaction Costs | | - | | - | | - | | - | | - | | (35,288) | | - |
| Less: Debt Repayment | | - | | - | | - | | - | | - | | (1,600,000) | | - |
| **Total Levered Cash Flow** | $ | (717,987) | $ | 50,493 | $ | 69,938 | $ | 81,188 | $ | 90,763 | $ | 1,994,186 | $ | - |
| *Levered Yield (ex. Value-Add CapEx)* | | | | 3.3% | | 4.6% | | 5.3% | | 6.0% | | 6.6% | | - |

| **Levered IRR** | **28.7%** |
|---|---|
| **Levered Multiple** | **3.2x** |
| **Profit** | **$1,568,580** |
| **Cash Flow as a % of Profit** | **25.1%** |

**BW** BLACKWELLS CAPITAL

APP.121

# LBO MODEL – DEBT SUMMARY

| | 2023 Year 0 | 2024 Year 1 | 2025 Year 2 | 2026 Year 3 | 2027 Year 4 | 2028 Year 5 | 2029 Year 6 |
|---|---|---|---|---|---|---|---|
| **Year:** | | | | | | | |
| LIBOR Curve | | 4.75% | 3.60% | 3.28% | 3.20% | 3.23% | 3.27% |
| SOFR Curve | | 4.62% | 3.48% | 3.16% | 3.09% | 3.12% | 3.16% |
| SOFR 3-Year Swap | | 3.43% | 3.43% | 3.43% | 3.09% | 3.12% | 3.16% |
| **Total Debt** | | | | | | | |
| Beginning Balance | - | $1,600,000 | $1,600,000 | $1,600,000 | $1,600,000 | $1,600,000 | $1,600,000 |
| Ending Balance | 1,600,000 | 1,600,000 | 1,600,000 | 1,600,000 | 1,600,000 | 1,600,000 | - |
| Interest Expense | | (134,987) | (123,026) | (120,505) | (119,886) | (120,155) | (60,222) |
| Amortization | | | | | | | |
| Lump-Sum Payments | (800,000) | (800,000) | - | - | - | - | (1,600,000) |
| **Total Debt Service** | **($800,000)** | **($934,987)** | **($123,026)** | **($120,505)** | **($119,886)** | **($120,155)** | **($1,660,222)** |
| **Bridge Loan** | SOFR Floor | | | | | | |
| Beginning Balance | | $800,000 | - | - | - | - | - |
| (+) Loan Funding | 1.00% $1,600,000 | - | - | - | - | - | - |
| (-) Principal Amortization | | - | - | - | - | - | - |
| (-) CMBS Takeout | (800,000) | (800,000) | - | - | - | - | - |
| (-) Lump-Sum Payment | | - | - | - | - | - | - |
| Interest Expense | 4.25% | (34,425) | - | - | - | - | - |
| **Ending Balance** | **$800,000** | **-** | **-** | **-** | **-** | **-** | |
| **CMBS Pool 1** | SOFR Floor | | | | | | |
| Beginning Balance | | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 |
| (+) Loan Funding | 1.00% $800,000 | - | - | - | - | - | - |
| (-) Principal Amortization | | - | - | - | - | - | - |
| (-) Lump-Sum Payment | | - | - | - | - | - | (800,000) |
| Interest Expense | S+4.000% | (68,962) | (59,826) | (57,305) | (56,686) | (56,955) | (28,622) |
| **Ending Balance** | **$800,000** | **$800,000** | **$800,000** | **$800,000** | **$800,000** | **$800,000** | **-** |
| **CMBS Pool 2** | SOFR Floor | | | | | | |
| Beginning Balance | | - | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 |
| (+) Loan Funding | 1.00% | - | $800,000 | - | - | - | - |
| (-) Principal Amortization | | - | - | - | - | - | - |
| (-) Lump-Sum Payment | | - | - | - | - | - | (800,000) |
| Interest Expense | 7.90% | (31,600) | (63,200) | (63,200) | (63,200) | (63,200) | (31,600) |
| **Ending Balance** | **-** | **$800,000** | **$800,000** | **$800,000** | **$800,000** | **$800,000** | **-** |

# LBO MODEL – SENSITIVITY ANALYSIS

**Interest Rate vs. Exit Price Per Key**

|  |  | Exit Price Per Key | | | | |
|---|---|---|---|---|---|---|
|  |  | **Upside** | | **Base** | **Downside** | |
|  |  | $750,000 | $800,000 | $844,000 | $875,000 | $900,000 |
|  | $4.25 | 27.5% / 3.0x | 30.2% / 3.3x | 32.4% / 3.6x | 33.9% / 3.8x | 35.0% / 4.0x |
|  | $4.50 | 25.8% / 2.8x | 28.5% / 3.1x | 30.6% / 3.4x | 32.1% / 3.6x | 33.2% / 3.8x |
| Acquisition | $4.75 | 24.8% / 2.7x | **27.5% / 3.0x** | **29.6% / 3.3x** | **31.1% / 3.5x** | 32.2% / 3.6x |
| Price | $5.00 | 23.9% / 2.6x | **26.5% / 2.9x** | **28.7% / 3.2x** | **30.1% / 3.4x** | 31.2% / 3.5x |
|  | $5.25 | 23.0% / 2.6x | **25.7% / 2.8x** | **27.8% / 3.1x** | **29.2% / 3.3x** | 30.3% / 3.4x |
|  | $5.50 | 22.2% / 2.5x | 24.9% / 2.8x | 27.0% / 3.0x | 28.4% / 3.2x | 29.5% / 3.3x |
|  | $5.75 | 21.5% / 2.4x | 24.1% / 2.7x | 26.2% / 2.9x | 27.6% / 3.1x | 28.7% / 3.2x |

BW    BLACKWELLS CAPITAL

APP.123



Debt Overview

# LIQUIDITY AND INDEBTEDNESS

| Cash Position | | (in $mms) |
|---|---|---|
| Cash and Cash Equivalents | $ | 128.0 |
| Restricted Cash | | 63.4 |
| Due from 3rd Party Managers | | 15.4 |
| Revolver Capacity | | 4.0 |
| **Total Cash** | **$** | **210.8** |

| YTD Operating Cash Flow | | (in $mms) |
|---|---|---|
| EBITDAre | $ | 112.3 |
| Preferred Dividends | | (21.2) |
| CapEx | | (36.2) |
| Debt Service | | (45.0) |
| **Cash Flow** | **$** | **9.9** |

**BHR Capitalization (Pro Forma, 6.30.2023)**

| ($ in millions, except per share amounts) | Security | Keys | PF 6/30/2023 Balance | Balance / Key |
|---|---|---|---|---|
| Credit Agricole Park Hyatt Beaver Creek - 1 hotel | Park Hyatt Beaver Creek | 193 | $71 | $365K |
| BAML - 4 Hotels (SASB) | Sofitel Chicago, The Clancy, Seattle Marriott, The Notary | 1,693 | 293 | $173K |
| Apollo Ritz-Carlton St. Thomas - 1 hotel | Ritz-Carlton St. Thomas | 180 | 43 | $236K |
| BAML - Lake Tahoe | Ritz-Carlton Lake Tahoe | 170 | 54 | $318K |
| Prudential - 2 hotels | Hilton DC, Hilton La Jolla | 944 | 195 | $207K |
| BAML Pier House - 1 hotel | Pier House | 142 | 80 | $563K |
| Mr. C Beverly Hills Hotel Mortgage | Mr. C Beverly Hills | 143 | 30 | $210K |
| Four Seasons Troon Mortgage | Four Seasons Scottsdale | 210 | 100 | $476K |
| Dorado Beach | Unencumbered Asset | 96 | - | - |
| Hotel Yountville | Unencumbered Asset | 80 | - | - |
| Bardessono | Unencumbered Asset | 65 | - | - |
| Sarasota | Unencumbered Asset | 276 | - | - |
| **Mortgage Debt / Hotel EBITDA** | | **4,192** | **$865** | **$206K** |
| $150mm Secured Term Loan Facility | Hotel Yountville, Bardessono, Ritz-Carlton Lake Tahoe | | 150 | $36K |
| $50mm Secured Revolving Credit Facility | Hotel Yountville, Bardessono, Ritz-Carlton Lake Tahoe | | 39 | $9K |
| 4.5% Convertible Senior Notes (Conv. Price of $6.34) | NA | | 86 | $21K |
| Less: Corporate G&A | | | | |
| **Total Debt / Corporate EBITDA** | | | **$1,141** | **$272K** |

BW BLACKWELLS CAPITAL

APP.125

# INDEBTEDNESS

**BHR Capitalization (Pro Forma, 6.30.2023)**

| ($ in millions, except per share amounts) | Security | Keys | PF 6/30/2023 Balance | Balance / Key | Book Value | Book Value / Key | TTM EBITDA Debt Yield | Maturity Excl. Ext. | Maturity Incl. Ext. | Interest Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| Credit Agricole Park Hyatt Beaver Creek - 1 hotel | Park Hyatt Beaver Creek | 193 | $71 | $365K | $157 | $812K | 19.4% | Feb-2024 | Feb-2027 | S+2.860% |
| BAML - 4 Hotels (SASB) [1] | Sofitel Chicago, The Clancy, Seattle Marriott, The Notary | 1,693 | 293 | $173K | 612 | $362K | 12.9% | Jun-2024 | Jun-2025 | L+2.160% |
| Apollo Ritz-Carlton St. Thomas - 1 hotel | Ritz-Carlton St. Thomas | 180 | 43 | $236K | 144 | $802K | 58.8% | Aug-2023 | Aug-2024 | L+3.950% |
| BAML - Lake Tahoe | Ritz-Carlton Lake Tahoe | 170 | 54 | $318K | 124 | $730K | 20.2% | Jan-2024 | Jan-2024 | S+2.200% |
| Prudential - 2 hotels [2] | Hilton DC, Hilton La Jolla | 944 | 195 | $207K | 314 | $333K | 16.9% | Feb-2024 | Feb-2024 | L+1.700% |
| BAML Pier House - 1 hotel | Pier House | 142 | 80 | $563K | 96 | $676K | 19.9% | Sep-2024 | Sep-2024 | S+1.950% |
| Mr. C Beverly Hills Hotel Mortgage | Mr. C Beverly Hills | 143 | 30 | $210K | 75 | $526K | 8.8% | Aug-2024 | Aug-2024 | L+3.600% |
| Four Seasons Troon Mortgage | Four Seasons Scottsdale | 210 | 100 | $476K | 268 | $1,277K | 21.7% | Dec-2025 | Dec-2027 | S+3.750% |
| Dorado Beach | Unencumbered Asset | 96 | - | - | 198 | $2,068K | NA | - | - | - |
| Hotel Yountville | Unencumbered Asset | 80 | - | - | 92 | $1,148K | NA | - | - | - |
| Bardessono | Unencumbered Asset | 65 | - | - | 66 | $1,017K | NA | - | - | - |
| Sarasota | Unencumbered Asset | 276 | - | - | 178 | $644K | NA | - | - | - |
| **Mortgage Debt / Hotel EBITDA** | | **4,192** | **$865** | **$206K** | **$2,325** | **$555K** | **23.2%** | **0.6yrs.** | **1.2yrs.** | **7.72%** |
| $150mm Secured Term Loan Facility | Hotel Yountville, Bardessono, Ritz-Carlton Lake Tahoe | | 150 | $36K | | | | Aug-2026 | Aug-2027 | S+2.850% |
| $50mm Secured Revolving Credit Facility | Hotel Yountville, Bardessono, Ritz-Carlton Lake Tahoe | | 39 | $9K | | | | Aug-2026 | Aug-2027 | S+2.850% |
| 4.5% Convertible Senior Notes (Conv. Price of $6.34) | NA | | 86 | $21K | | | | Jun-2026 | Jun-2026 | 4.50% |
| Less: Corporate G&A [3] | | | | | | | | | | |
| **Total Debt / Corporate EBITDA** | | | **$1,141** | **$272K** | | | | | | |

# DEBT MARKETS LANDSCAPE

| | 3-5 YEAR FLOATING-RATE MORTGAGES (1,2,4) | | | | 5/10 YEAR FIXED-RATE MORTGAGES (3,4) | |
|---|---|---|---|---|---|---|
| | **INDEX: SOFR** | | | | **INDEX: US Treasury** | |
| | **<60%LTV** | **>60%LTV** | **Lender Fee** | **Property Type** | **<60%LTV** | **>60%LTV** |
| | | | | **Residential** | | |
| | 170 - 220 | 190 - 250 | 50 - 85 | Apartments (non-agency) | 165/165 | 195/195 |
| | 180 - 225 | 210 - 260 | 50 - 85 | Apartments (agency) | 145/145 | 165/165 |
| | | | | **Retail** | | |
| | 285 - 345 | 305 - 400 | 50 - 100 | Malls | 265/265 | 300/295 |
| | 235 - 310 | 285 - 385 | 50 - 100 | Grocery Anchored | 195/195 | 220/220 |
| | 270 - 330 | 300 - 415 | 50 - 100 | Strip & Power Center | 250/245 | 285/280 |
| | | | | **Industrial** | | |
| | 195 - 255 | 205 - 270 | 50 - 85 | Multi-tenant | 180/170 | 205/195 |
| | | | | **Office** | | |
| | 245 - 320 | 265 - 320 | 65 - 100 | CBD | 260/260 | 305/290 |
| | 255 - 330 | 275 - 330 | 65 - 100 | Suburban | 290/290 | 330/320 |
| | | | | **Hotel** | | |
| | 335 - 435 | 385 - 535 | 50 - 125 | Full Service | 340/325 | 390/375 |
| | 385 - 460 | 435 - 560 | 50 - 125 | Limited Service | 370/355 | 420/405 |
| | 1-month LIBOR | 5.443% | | 5-Year Treasury | 4.33% | |
| | 3-month LIBOR | 5.664% | | 10-Year Treasury | 4.22% | |
| | 1-Month Term SOFR | 5.329% | | 5-Year SOFR Swap Rate | 4.02% | |
| | | | | 10-Year SOFR Swap Rate | 3.86% | |

**BW** BLACKWELLS CAPITAL

APP.127

# DEBT MARKETS LANDSCAPE (CONT.)

**Mezzanine Financing Matrix**          September 5, 2023

| DEBT PROVIDER | RATE | TERM | LTV RANGE (%) | LENDER FEE |
|---|---|---|---|---|
| Hedge/Opportunity Funds | 11 - 15% | 1 - 7 years | 60 - 80% | 1 - 2% |
| Investment Bank | 10 - 13% | 1 - 5 years | 60 - 75% | 1 - 2% |
| Pension / REIT / LifeCo | 9 - 11% | 3 - 10 years | 40 - 70% | 0 - 1% |
| Private Sources | 10 - 13% | 1 - 10 years | 55 - 80% | 2 - 3% |

**SENIOR & SUBORDINATE LENDING SPREADS**          September 5, 2023

| | Maximum Loan-to-Value | DSCR | Spreads |
|---|---|---|---|
| Fixed Rate - 5 Years | 60 - 75% (1) | 1.30 - 1.50 | T + 165 - 420 |
| Fixed Rate - 10 Years | 60 - 75% (1) | 1.30 - 1.50 | T + 165 - 410 |
| Floating Rate - 5 Years | | | |
| Core Asset | <65% (2) | 1.30 - 1.50 | SOFR + 190 - 345 |
| Value Add Asset | <65% (2) | 1.25 - 1.40 | SOFR + 220 - 440 |
| Mezzanine Moderate Leverage | 60 - 70% | 1.05 - 1.15 | SOFR + 525 - 725 |
| Mezzanine High Leverage | 70 - 80% | | SOFR + 650 - 1100 |

(1) 70-75% for Multi-Family (non-agency)   (2) SOFR floor of 0.00 - 0.25%

**10-YEAR FIXED RATE RANGES BY ASSET CLASS**          September 5, 2023

| | Maximum Loan-to-Value | Class A | Class B/C |
|---|---|---|---|
| Anchored Retail | 50 - 60% | 220 | 240 |
| Power Center | 50 - 60% | 280 | 300 |
| Multi-Family (non-agency) | 60 - 65% | 210 | 225 |
| Multi-Family (agency) | 65 - 75% | 185 | 185 |
| Distribution/Warehouse | 60 - 70% | 220 | 240 |
| R&D/Flex/Industrial | 60 - 70% | 235 | 255 |
| Office | 50 - 60% | 305 | 335 |
| Full Service Hotel | 50 - 60% | 385 | 410 |

**BW** BLACKWELLS CAPITAL

APP.128

# LBO FINANCING - COMMITTED BRIDGE LOAN FACILITY: INDICATIVE TERMS

## Detailed Terms & Conditions

| | |
|---|---|
| *Borrower:* | A single-purpose, bankruptcy remote entity ("Borrower"), which is indirectly owned and controlled by Sponsor |
| *Est. Loan Amount:* | $1.600 billion, subject to maximum LTV of 60.0% and minimum 11.75% NCF debt yield. |
| *Sponsor:* | Blackwells |
| *Portfolio:* | 16 luxury hotel properties located across the United States, Puerto Rico, and the US Virgin Islands |
| *Loan Term:* | 6+6 months |
| *Extension Conditions:* | Minimum 12.25% NCF debt yield and 1.30x NCF DSCR |
| *Extension Fees:* | 0.75% |
| *Spread:* | [425] bps |
| *Spread Steps:* | Spread increases to [450] bps in month seven (7) |
| *SOFR Floor:* | 0.0% |
| *Amortization:* | None |
| *Prepayment Protection:* | None |
| *Release Premiums:* | 110% |
| *Low Debt Yield Trigger:* | 10.0% for one (1) quarter in |
| *Recourse:* | Non-recourse, carry guaranty may be required |

## SOFR Caps

| UW NCF DY | Strike | Premium | UW NCF DSCR |
|---|---|---|---|
| 12.0% | 5.10% | 0.37% | 1.30x |
| 11.5% | 4.60% | 0.76% | 1.30x |
| 11.0% | 4.10% | 1.21% | 1.30x |

**BW** BLACKWELLS CAPITAL

APP.129

# LBO FINANCING - SPOT MARKET SASB CMBS EXECUTION

## Summary of Terms

| | | |
|---|---|---|
| *Property Description:* | The Tiger Portfolio, a 16-property, 4,181-key full-service luxury and upper upscale hotel portfolio | |
| *Sponsor:* | A single-purpose, bankruptcy remote entity ("Borrower"), which is indirectly owned and controlled by Sponsor | |
| *Target Execution Size:* | $500 million - $1 billion for each execution | |
| *Max UW Loan to Value:* | 60.0% | |
| *Min UW NCF DY / DSCR:* | 11.75% / 1.30x | |
| *Loan Type:* | Floating | Fixed |
| *Spread:* | [400] bps | [395] bps |
| *Index Floor:* | SOFR: 0.00% | 5yr USD Treasury: 3.95% |
| *Agent Structuring Fee:* | 1.00% | |
| *Initial Term:* | Two (2) years | Five (5) years |
| *Extension Options:* | Three (3), 12-month options | None |
| *Extension Criteria:* | (i) No event of default and (ii) purchase of a SOFR cap | N/A |
| *Hedging:* | SOFR strike shall be sized to a 1.30x NCF DSCR | N/A |
| *Prepay / Open Period:* | 12 months of spread maintenance | Six (6) months open commencing in month 55 |
| *Release Premium:* | 110% | 110%, subject to yield maintenance |
| *Upfront Reserves:* | 105% of all immediate life safety / ADA repairs | |
| *On-going Reserves:* | Only during a Cash Trigger Period: RET, Insurance & Ground Lease payments at 1/12th of projected amounts. Required FF&E (4% of revenue) | |
| *Cash Trigger Period:* | (i) Event of default and (ii) Low Debt Yield Trigger Event | |
| *Low DY Trigger Event:* | 10.0% for one (1) quarter and two (2) quarters out | |
| *Expenses:* | Borrower responsible for all securitization expenses; Borrower responsible for closing costs and OID (if applicable) | |
| *Recourse:* | Non-recourse with standard carveouts | |

**BW** BLACKWELLS CAPITAL

74

# Appendix I

## Comparable Sales By Brand

BW **BLACKWELLS CAPITAL**

# COMPARABLE SALES BY BRAND

## Four Seasons

| Property Name | City | State | Units | Yr Built | Purchase Price | PPK | Cap Rate | Owner/Buyer | Seller | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| Four Seasons at Troon North | Scottsdale | AZ | 210 | 1999 | 267,800,000.00 | 1,275,238 | | Braemar Hotels & Resorts | Anbang Insurance | Dec-22 |
| Four Seasons Resort Jackson Hole | Teton Village | WY | 125 | 2003 | 315,000,000.00 | 2,520,000 | 6.6% | Host Hotels & Resorts | Anbang Insurance | Nov-22 |
| Four Seasons Hotel | Nashville | TN | 235 | 2022 | 165,000,000.00 | 702,128 | | Stonebridge Companies, GD Holdings | AECOM Capital, Congress Group Ventures | Oct-22 |
| Four Seasons Resort | Irving | TX | 431 | 1986 | n/a | | | Trinity Investments, Partners Group | Extell | May-22 |
| Four Seasons Resort & Residences | Calistoga | CA | 85 | 2021 | 177,500,000.00 | 2,088,235 | | Sunstone Hotel | Alcion Ventures, Bald Mountain Development | Dec-21 |
| Four Seasons Hotel | Miami | FL | 221 | 2003 | 130,000,000.00 | 588,235 | | Fort Partners | Westbrook Partners | Jul-21 |
| Four Seasons Lodging | Mount Vernon | IN | 54 | 1968 | n/a | | | Jaimin Patel | Ramona J Cox | May-21 |
| Four Seasons Resort Orlando at Disney World | Bay Lake | FL | 444 | 2014 | 610,000,000.00 | 1,373,874 | | Host Hotels & Resorts | Dune RE Partners LP, Four Seasons Hotels, Silverstein Properties | Apr-21 |
| Four Seasons Resort Oahu at Ko Olina | Ko Olina | HI | 387 | 1993 | n/a | | | Henderson Land Dev | The Resort Group | Oct-20 |
| Four Seasons Resort | Irving | TX | 431 | 1986 | 235,000,000.00 | 545,244 | | Extell | Blackstone | Oct-18 |
| | | | | | | **1,298,993** | | | | |

## Ritz Carlton

| Property Name | City | State | Units | Yr Built | Purchase Price | PPK | Cap Rate | Owner/Buyer | Seller | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| Ritz-Carlton Key Biscayne | Key Biscayne | FL | 302 | 2001 | 214,311,953.90 | 709,642 | | Brookfield AM | Watermark Lodging Trust (WLT) | Oct-22 |
| Ritz Carlton San Francisco | San Francisco | CA | 336 | 1909 | 187,241,427.90 | 557,266 | | Brookfield AM | Watermark Lodging Trust (WLT) | Oct-22 |
| Ritz-Carlton Philadelphia | Philadelphia | PA | 300 | 1910 | 110,075,956.50 | 366,920 | | Brookfield AM | Watermark Lodging Trust (WLT) | Oct-22 |
| The Ritz-Carlton - Fort Lauderdale | Fort Lauderdale | FL | 198 | 2007 | 60,955,152.20 | 307,854 | | Brookfield AM | Watermark Lodging Trust (WLT) | Oct-22 |
| Ritz-Carlton Bacara | Goleta | CA | 358 | 2000 | 140,203,178.50 | 391,629 | | Brookfield AM | Watermark Lodging Trust (WLT) | Oct-22 |
| Ritz Carlton Hotel | Fort Lauderdale | FL | 166 | 2007 | 79,666,667.00 | 479,920 | | Watermark Lodging Trust (WLT) | Gencom Group | Nov-21 |
| The Whitley Atlanta Buckhead | Atlanta | GA | 507 | 1981 | 201,000,000.00 | 396,450 | | Lone Star Funds | Host Hotels & Resorts | Nov-21 |
| The Ritz Carlton Lake Tahoe | Colfax-Monumental Ridge | CA | 170 | 2009 | 103,300,000.00 | 607,647 | | Braemar Hotels & Resorts | Kennedy Wilson | Jan-19 |
| Ritz Carlton Grande Lakes | Orlando | FL | 584 | 2003 | 321,163,036.50 | 549,937 | | Elliott Management, Trinity Investments | Blackstone | Dec-18 |
| Ritz Carlton St Louis | Clayton | MO | 301 | 1990 | n/a | | | Mark Burkhart | Bruce Karsh | Aug-18 |
| Ritz-Carlton Denver | Denver | CO | 202 | 1983 | 100,250,000.00 | 496,287 | 6.9% | Xenia | Pearlmark RE Partners | Aug-18 |
| Ritz-Carlton Sarasota | Sarasota | FL | 266 | 2001 | 176,500,000.00 | 663,534 | 6.0% | Braemar Hotels & Resorts, Ashford Prime | C Robert Buford | Apr-18 |
| | | | | | | **502,462** | | | | |

## Park Hyatt

| Property Name | City | State | Units | Yr Built | Purchase Price | PPK | Cap Rate | Owner/Buyer | Seller | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| Park Hyatt Aviara Resort | Carlsbad | CA | 329 | 1997 | 170,000,000.00 | 516,717 | 4.4% | Xenia | Wachovia 2007-C30, CWCapital Asset Mgmt | Nov-18 |
| Park Hyatt Beaver Creek | Minturn-Red Cliff | CO | 190 | 1989 | 145,500,000.00 | 765,789 | 6.0% | Ashford Prime | Walton Street Capital, Oaktree | Mar-17 |
| | | | | | | **641,253** | | | | |

# Appendix II

## Comparable Sales By Property

BW BLACKWELLS CAPITAL

# COMPARABLE SALES BY PROPERTY

| Subject Property | City | State | Opened | Rooms |
|---|---|---|---|---|
| Hilton La Jolla Torrey Pines, Curio Collection | La Jolla | CA | Nov-89 | 394 |

Comparable Sales Analysis

| Hotel Proper Name | City | State | Opened | Rooms | Sale Price | Per Room | Sale Date |
|---|---|---|---|---|---|---|---|
| Hyatt Regency La Jolla | San Diego | CA | Dec/1989 | 416 | $227,250,000 | $546,274 | Jul/2022 |
| Embassy Suites La Jolla | San Diego | CA | Jul/1987 | 340 | $226,666,667 | $666,667 | Dec/2021 |
| Fairmont Grand Del Mar | San Diego | CA | Oct/2007 | 294 | $162,900,000 | $554,082 | Dec/2021 |
| Park Hyatt Aviara Resort Golf Club & Spa | Carlsbad | CA | Aug/1997 | 327 | $170,000,000 | $654,217 | Nov/2018 |
| | | | | | | | |
| Total/Average | | | | 1,377 | $786,816,667 | $571,399 | |
| | | | | | | | |

| Subject Property | City | State | Opened | Rooms |
|---|---|---|---|---|
| Capital Hilton | Washington | DC | Jan-43 | 550 |

Comparable Sales Analysis

| Hotel Proper Name | City | State | Opened | Rooms | Sale Price | Per Room | Sale Date |
|---|---|---|---|---|---|---|---|
| Salamander Washington DC | Washington | DC | Mar/2004 | 373 | $139,000,000 | $372,654 | Sep/2022 |
| Hotel Washington (Former W Hotel) | Washington | DC | Jun/1917 | 326 | $220,000,000 | $674,847 | Aug/2021 |
| Embassy Suites Washington DC Georgetown | Washington | DC | Oct/1987 | 197 | $90,375,000 | $458,756 | Feb/2020 |
| Hilton Embassy Row (Converted to Tribute Portfolio) | Washington | DC | Jun/1970 | 231 | $57,650,000 | $249,567 | Dec/2018 |
| Kimpton Carlyle Hotel Dupont Circle (Converted to Lyle Washington DC) | Washington | DC | Jun/1940 | 196 | $82,250,000 | $419,643 | Dec/2018 |
| | | | | | | | |
| Total/Average | | | | 1,323 | $589,275,000 | $445,408 | |
| | | | | | | | |

BW **BLACKWELLS CAPITAL**

APP.134

# COMPARABLE SALES BY PROPERTY (CONT.)

| Subject Property | City | State | Opened | Rooms |
|---|---|---|---|---|
| Seattle Marriott Waterfront | Seattle | WA | Apr-03 | 361 |

Comparable Sales Analysis

| Hotel Proper Name | City | State | Opened | Rooms | Sale Price | Per Room | Sale Date |
|---|---|---|---|---|---|---|---|
| Kimpton Hotel Monaco Seattle Downtown | Seattle | WA | Jun/1997 | 189 | $63,250,000 | $334,656 | May/2023 |
| Pan Pacific Seattle | Seattle | WA | Nov/2006 | 153 | $69,615,000 | $455,000 | Oct/2022 |
| The Charter Hotel Curio Collection by Hilton | Seattle | WA | Aug/2018 | 229 | $107,797,000 | $470,729 | Oct/2022 |
| Loews Regency (Converted to Hotel 1000, LXR) | Seattle | WA | Jun/2006 | 120 | $55,000,000 | $458,333 | Jun/2021 |
| Embassy Suites Seattle Bellevue | Bellevue | WA | Aug/1990 | 240 | $59,126,214 | $246,359 | Jan/2019 |
| Marriott Seattle Redmond | Redmond | WA | Jun/2004 | 264 | $70,000,000 | $265,152 | Mar/2018 |
| | | | | | | | |
| Total/Average | | | | 1,195 | $424,788,214 | $355,471 | |
| | | | | | | | |

| Subject Property | City | State | Opened | Rooms |
|---|---|---|---|---|
| The Clancy, Autograph Collection | San Francisco | CA | Oct-01 | 410 |

Comparable Sales Analysis

| Hotel Proper Name | City | State | Opened | Rooms | Sale Price | Per Room | Sale Date |
|---|---|---|---|---|---|---|---|
| Le Meridien San Francisco | San Francisco | CA | Jan/1989 | 360 | $221,500,000 | $615,278 | Sep/2021 |
| The Barnes San Francisco, Tapestry Collection by Hilton | San Francisco | CA | Jun/1908 | 189 | $87,500,000 | $462,963 | Sep/2021 |
| Hyatt Regency San Francisco Downtown SOMA | San Francisco | CA | Apr/1983 | 686 | $315,250,000 | $459,548 | Nov/2018 |
| | | | | | | | |
| Total/Average | | | | 1,235 | $624,250,000 | $505,466 | |
| | | | | | | | |

BW **BLACKWELLS CAPITAL**

APP.135

# COMPARABLE SALES BY PROPERTY (CONT.)

| Subject Property | City | State | Opened | Rooms |
|---|---|---|---|---|
| The Notary Hotel, Autograph Collection | Philadelphia | PA | Nov-99 | 499 |

Comparable Sales Analysis

| Hotel Proper Name | City | State | Opened | Rooms | Sale Price | Per Room | Sale Date |
|---|---|---|---|---|---|---|---|
| Sofitel Philadelphia Rittenhouse Square | Philadelphia | PA | May/2000 | 306 | $80,000,000 | $261,438 | Jul/2022 |
| Embassy Suites Center City (Converted to apartments in 2021) | Philadelphia | PA | Jan/1964 | 288 | $67,000,000 | $232,639 | Nov/2018 |
| Marriott Philadelphia Old City (Former Sheraton Society Hill) | Philadelphia | PA | Jul/1986 | 364 | $95,500,000 | $262,363 | Mar/2018 |
| **Total/Average** | | | | **958** | **$242,500,000** | **$253,132** | |

| Subject Property | City | State | Opened | Rooms |
|---|---|---|---|---|
| Ritz-Carlton Lake Tahoe | Truckee | CA | Dec-09 | 170 |

Comparable Sales Analysis

| Hotel Proper Name | City | State | Opened | Rooms | Sale Price | Per Room | Sale Date |
|---|---|---|---|---|---|---|---|
| Landing Lake Tahoe Resort & Spa | South Lake Tahoe | CA | Dec/2013 | 82 | $42,000,000 | $512,195 | Mar/2018 |
| **Total/Average** | | | | **82** | **$42,000,000** | **$512,195** | |

BW  BLACKWELLS CAPITAL

80

# COMPARABLE SALES BY PROPERTY (CONT.)

| Subject Property | City | State | Opened | Rooms |
|---|---|---|---|---|
| Ritz-Carlton Sarasota | Sarasota | FL | Nov-01 | 266 |

Comparable Sales Analysis

| Hotel Proper Name | City | State | Opened | Rooms | Sale Price | Per Room | Sale Date |
|---|---|---|---|---|---|---|---|
| Sirata Beach & Conference Center | St. Pete Beach | FL | Jun/1962 | 382 | $207,000,000 | $541,885 | Dec/2022 |
| Wyndham Grand Clearwater Beach | Clearwater Beach | FL | Mar/2017 | 343 | $170,000,000 | $495,627 | Mar/2022 |
| Renaissance Vinoy St. Petersburg Resort & Golf Club | Saint Petersburg | FL | Dec/1925 | 362 | $185,000,000 | $511,050 | Aug/2018 |
| Total/Average | | | | 1,087 | $562,000,000 | $517,019 | |

| Subject Property | City | State | Opened | Rooms |
|---|---|---|---|---|
| Chicago Sofitel Magnificent Mile | Chicago | IL | Jun-02 | 415 |

Comparable Sales Analysis

| Hotel Proper Name | City | State | Opened | Rooms | Sale Price | Per Room | Sale Date |
|---|---|---|---|---|---|---|---|
| CitizenM Chicago Downtown | Chicago | IL | Sep/2022 | 280 | $74,686,000 | $266,736 | Sep/2022 |
| The Eamily Hotel (Former Ace Hotel Chicago) | Chicago | IL | Jul/2017 | 159 | $61,000,000 | $383,648 | Jan/2022 |
| The Talbott Hotel | Chicago | IL | Jun/1926 | 178 | $54,000,000 | $303,371 | Sep/2021 |
| Thompson Chicago | Chicago | IL | Oct/2013 | 247 | $72,400,000 | $293,117 | Aug/2021 |
| Waldorf Astoria Chicago | Chicago | IL | Dec/2009 | 214 | $54,500,000 | $254,673 | Nov/2020 |
| Eurostars Hotel Magnificent Mile | Chicago | IL | May/2008 | 216 | $72,500,000 | $335,648 | May/2019 |
| Total/Average | | | | 1,294 | $389,086,000 | $300,685 | |

**BW** BLACKWELLS CAPITAL

APP.137

# COMPARABLE SALES BY PROPERTY (CONT.)

| Subject Property | City | State | Opened | Rooms | | | |
|---|---|---|---|---|---|---|---|
| Pier House Resort | Key West | FL | Jun-67 | 142 | | | |

Comparable Sales Analysis

| Hotel Proper Name | City | State | Opened | Rooms | Sale Price | Per Room | Sale Date |
|---|---|---|---|---|---|---|---|
| Tranquility Bay Beachfront Hotel & Resort | Marathon | FL | Nov/2005 | 103 | $63,000,000 | $611,650 | Jan/2022 |
| Baker's Cay Resort Key Largo (Converted to Hilton Baker's Cay, Curio Collection) | Key Largo | FL | Nov/1985 | 200 | $200,000,000 | $1,000,000 | Jul/2021 |
| Islander Resort | Islamorada | FL | Jun/1950 | 139 | $73,000,000 | $525,180 | Feb/2021 |
| | | | | | | | |
| Total/Average | | | | 442 | $336,000,000 | $760,181 | |

| Subject Property | City | State | Opened | Rooms | | | |
|---|---|---|---|---|---|---|---|
| Bardessono Hotel | Yountville | CA | Feb-09 | 65 | | | |

Comparable Sales Analysis

| Hotel Proper Name | City | State | Opened | Rooms | Sale Price | Per Room | Sale Date |
|---|---|---|---|---|---|---|---|
| Four Seasons Resort & Residences Napa Valley | Calistoga | CA | Oct/2021 | 85 | $113,420,453 | $1,334,358 | Dec/2021 |
| Estate Yountville (Converted to Vintage House at Estate Yountville) | Yountville | CA | Jun/1985 | 192 | $184,406,764 | $960,452 | Dec/2021 |
| Montage Healdsburg | Healdsburg | CA | Dec/2020 | 130 | $265,000,000 | $2,038,462 | Apr/2021 |
| | | | | | | | |
| Total/Average | | | | 407 | $562,827,217 | $1,382,868 | |

**BW** BLACKWELLS CAPITAL

APP.138

# COMPARABLE SALES BY PROPERTY (CONT.)

| Subject Property | City | State | Opened | Rooms |
|---|---|---|---|---|
| Park Hyatt Beaver Creek | Beaver Creek | CO | Dec-89 | 190 |

Comparable Sales Analysis

| Hotel Proper Name | City | State | Opened | Rooms | Sale Price | Per Room | Sale Date |
|---|---|---|---|---|---|---|---|
| Four Seasons Resort & Residences Jackson Hole | Teton Village | WY | Dec/2003 | 156 | $315,000,000 | $2,019,231 | Nov/2022 |
| Amangani | Jackson | WY | Oct/1998 | 40 | $79,500,000 | $1,987,500 | Feb/2022 |
| Total/Average | | | | 196 | $394,500,000 | $2,012,755 | |

| Subject Property | City | State | Opened | Rooms |
|---|---|---|---|---|
| Mr. C Beverly Hills | Beverly Hills | CA | May-65 | 143 |

Comparable Sales Analysis

| Hotel Proper Name | City | State | Opened | Rooms | Sale Price | Per Room | Sale Date |
|---|---|---|---|---|---|---|---|
| Godfrey Hotel Hollywood | Los Angeles | CA | Aug/2021 | 200 | $114,000,000 | $570,000 | Jun/2022 |
| Viceroy L'Ermitage Beverly Hills | Beverly Hills | CA | Jun/1976 | 116 | $100,000,000 | $862,069 | Oct/2020 |
| Hotel Amarano BurbankHollywood | Burbank | CA | Mar/2002 | 132 | $72,900,000 | $552,273 | Jul/2019 |
| DoubleTree Suites Santa Monica (Converted to Hilton Santa Monica) | Santa Monica | CA | Jan/1990 | 253 | $139,182,922 | $550,130 | Sep/2018 |
| Hotel MdR Marina del Ray, DoubleTree | Marina Del Ray | CA | Jun/1978 | 283 | $127,000,000 | $448,763 | Apr/2018 |
| Total/Average | | | | 984 | $553,082,922 | $562,076 | |

BW BLACKWELLS CAPITAL

APP.139

# COMPARABLE SALES BY PROPERTY (CONT.)

| Subject Property | City | State | Opened | Rooms |
|---|---|---|---|---|
| Hotel Yountville | Yountville | CA | Jun-98 | 80 |

Comparable Sales Analysis

| Hotel Proper Name | City | State | Opened | Rooms | Sale Price | Per Room | Sale Date |
|---|---|---|---|---|---|---|---|
| Four Seasons Resort & Residences Napa Valley | Calistoga | CA | Oct/2021 | 85 | $113,420,453 | $1,334,358 | Dec/2021 |
| Estate Yountville (Converted to Vintage House at Estate Yountville) | Yountville | CA | Jun/1985 | 192 | $184,406,764 | $960,452 | Dec/2021 |
| Montage Healdsburg | Healdsburg | CA | Dec/2020 | 130 | $265,000,000 | $2,038,462 | Apr/2021 |
| **Total/Average** | | | | **407** | **$562,827,217** | **$1,382,868** | |

| Subject Property | City | State | Opened | Rooms |
|---|---|---|---|---|
| Four Seasons Troon North | Scottsdale | AZ | Dec-99 | 210 |

Comparable Sales Analysis

| Hotel Proper Name | City | State | Opened | Rooms | Sale Price | Per Room | Sale Date |
|---|---|---|---|---|---|---|---|
| Sanctuary Camelback Mountain | Paradise Valley | AZ | Jun/1970 | 110 | $88,842,090 | $807,655 | Nov/2021 |
| JW Marriott Phoenix Desrt Ridge Resort & Spa | Phoenix | AZ | Nov/2002 | 950 | $605,000,000 | $636,842 | Aug/2019 |
| **Total/Average** | | | | **1,060** | **$693,842,090** | **$654,568** | |

BW  BLACKWELLS CAPITAL

APP.140



# PUBLIC COMPS

| Company | Ticker | Stock Price 8/11/23 | Dividend Amt. | Dividend Yield | Payout Ratio 2023E FFO | Payout Ratio 2023E AFFO | Shares & Units | Equity Market Capitalization | Total Market Capitalization | Net Debt/ EBITDA | Debt -To- TMC | Lvg. -To- TMC | Lvg. To Pvt. Mkt. Value | Est. NAV / Share | Prem/ (Disc) To NAV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ashford Hospitality | AHT | $2.96 | $0.00 | 0.0% | 0% | 0% | 36,147 | $106,995 | $4,095,283 | 12.7x | 93.4% | 97.4% | NA | NA | NA |
| Diamondrock Hospitality | DRH | $7.81 | $0.12 | 1.5% | 12% | 16% | 210,536 | $1,644,284 | $3,058,299 | 5.7x | 42.3% | 46.2% | 35.4% | $12.26 | (36.3%) |
| Host Hotels | HST | $16.29 | $0.60 | 3.7% | 33% | 41% | 711,200 | $11,585,448 | $16,363,448 | 9.3x | 29.2% | 29.2% | 21.9% | $23.94 | (32.0%) |
| Summit Hotel Properties | INN | $5.85 | $0.24 | 4.1% | 28% | 37% | 123,447 | $722,163 | $2,476,962 | 6.4x | 60.3% | 70.8% | 60.1% | $9.45 | (38.1%) |
| Pebblebrook Hotel Trust | PEB | $14.56 | $0.04 | 0.3% | 3% | 4% | 123,783 | $1,802,274 | $5,268,660 | NA | 52.2% | 65.8% | 55.6% | $22.40 | (35.0%) |
| RLJ Lodging Trust | RLJ | $9.82 | $0.40 | 4.1% | 25% | 27% | 160,078 | $1,571,964 | $3,907,441 | 5.8x | 59.8% | 59.8% | 43.7% | $18.79 | (47.7%) |
| Sunstone Hotel Investors | SHO | $9.09 | $0.28 | 3.1% | 31% | 40% | 207,410 | $1,885,357 | $2,999,087 | 3.2x | 27.8% | 37.1% | 28.2% | $13.70 | (33.7%) |
| **Property Type Total / Wtd. Average** | | | | 3.2% | 27% | 34% | | $19,318,486 | $38,169,181 | 7.1x | 45.4% | 49.4% | 33.6% | | (34.3%) |
| **REIT Industry Total / Wtd. Average** | | | | 4.2% | 66% | 73% | | $1,130,807,145 | $1,731,198,804 | 6.0x | 34.3% | 35.0% | 31.8% | | (9.3%) |

| Company | Ticker | EV/ EBITDA | FFO 2022 | FFO 2023E | FFO 2024E | AFFO 2022 | AFFO 2023E | AFFO 2024E | P/FFO 2022 | P/FFO 2023E | P/FFO 2024E | P/AFFO 2022 | P/AFFO 2023E | P/AFFO 2024E | 2022 Growth FFO | 2022 Growth AFFO | 2023E Growth FFO | 2023E Growth AFFO | 2024E Growth FFO | 2024E Growth AFFO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ashford Hospitality | AHT | 15.1x | $1.63 | $0.89 | $0.97 | $1.22 | ($0.84) | ($0.95) | 1.8x | 3.3x | 3.1x | 2.4x | -3.5x | -3.1x | (232.8%) | (1452.2%) | (45.5%) | NA | 8.4% | 13.1% |
| Diamondrock Hospitality | DRH | 15.2x | $0.99 | $0.97 | $1.03 | $0.76 | $0.75 | $0.82 | 7.9x | 8.0x | 7.6x | 10.3x | 10.4x | 9.5x | 726.7% | NA | (2.0%) | (0.4%) | 6.1% | 9.3% |
| Host Hotels | HST | 30.8x | $1.78 | $1.81 | $1.78 | $1.59 | $1.46 | $1.59 | 9.2x | 9.0x | 9.1x | 10.3x | 11.1x | 10.3x | 191.5% | NA | 1.9% | (7.8%) | (1.7%) | 8.6% |
| Summit Hotel Properties | INN | 11.0x | $0.89 | $0.86 | $0.70 | $0.70 | $0.65 | $0.69 | 6.6x | 6.8x | 8.3x | 8.4x | 9.1x | 8.5x | 152.9% | NA | (2.8%) | (7.9%) | (18.3%) | 7.0% |
| Pebblebrook Hotel Trust | PEB | NA | $1.63 | $1.57 | $1.65 | $1.08 | $1.14 | $1.33 | 9.0x | 9.3x | 8.8x | 13.5x | 12.8x | 11.0x | (607.8%) | NA | (3.3%) | 6.1% | 5.2% | 16.5% |
| RLJ Lodging Trust | RLJ | 12.6x | $1.34 | $1.59 | $1.66 | $1.35 | $1.47 | $1.57 | 7.3x | 6.2x | 5.9x | 7.3x | 6.7x | 6.3x | 605.8% | NA | 18.3% | 8.8% | 4.4% | 6.6% |
| Sunstone Hotel Investors | SHO | 13.2x | $0.80 | $0.92 | $0.93 | $0.81 | $0.70 | $0.73 | 11.3x | 9.9x | 9.7x | 11.3x | 12.9x | 12.4x | 1910.0% | NA | 13.9% | (12.6%) | 1.2% | 4.4% |
| **Property Type  Wtd. Average** | | 19.3x | | | | | | | 9.0x | 8.7x | 8.7x | 10.3x | 11.0x | 10.1x | NA | NA | 3.1% | -5.0% | -0.1% | 8.8% |
| **REIT Industry Total / Wtd. Average** | | 18.8x | | | | | | | 17.8x | 17.4x | 16.7x | 20.3x | 19.5x | 18.8x | 13.8% | 11.1% | 1.5% | 3.4% | 4.2% | 3.8% |

Source: J.P. Morgan Securities LLC, company reports, Bloomberg Finance L.P., SNL Financial.

BW BLACKWELLS CAPITAL

APP.142

# Appendix IV

## Board and Management

BW | BLACKWELLS CAPITAL

# MANAGEMENT

**Professionals**

| Name | Title |
|------|-------|
| Bennett IV, Montgomery Jack | Founder & Chairman of the Board |

**Background:**
- Founder of Braemar Hotels & Resorts, Inc. (formerly, Ashford Hospitality Prime, Inc.) and has been its Chairman since April 2013
- Served as Chief Executive Officer of Braemar Hotels & Resorts from April 2013 to November 14, 2016.
- Chairman and Chief Executive Officer of Ashford Inc. since November 2014 and has been its Director since 2014. He is the Founder of Ashford Inc.
- Founder of Ashford Hospitality Trust, Inc. and has been its Chairman since January 19, 2013.
- Chief Executive Officer of Ashford Hospitality Trust, Inc. since May 2003 until February 20, 2017 and serves as its Director since May 2003.
- Founder, Chief Executive Officer and Chairman of Ashford Hospitality Advisors.
- Executive Vice President, Director of Information Systems, General Manager and Operations Director at Remington Hotel Corporation
- Chairman of Ashford Investment Management, LLC ("AIM)
- Master's degree in Business Administration from the S.C. Johnson Graduate School of Management in 1989
- Bachelor of Science degree with distinction from the Cornell University School of Hotel Administration in 1988.

| Stockton, Richard J. | President, CEO & Director |
|------|-------|

**Background:**
- Director at Braemar Hotels & Resorts Inc. since July 28, 2020.
- Independent Trustee and Lead Independent Trustee at Spirit MTA REIT since May 30, 2018.
- Chief Executive Officer of Braemar Hotels & Resorts Inc. (formerly, Ashford Hospitality Prime, Inc.) since November 14, 2016 and its President since April 2017.
- Head of EMEA Real Estate Banking in London, at Morgan Stanley
- Global chief operating officer for Real Estate at Carval Investors, a subsidiary of Cargill.
- MBA in Finance and Real Estate from The Wharton School, University of Pennsylvania
- Bachelor of Science degree from Cornell University, School of Hotel Administration.

| Eubanks C.F.A., CFA, Deric S. | CFO & Treasurer |
|------|-------|

**Background:**
- Chief Financial Officer at Braemar Hotels & Resorts, Inc. (formerly, Ashford Hospitality Prime, Inc.) since June 13, 2014 and also serves as its Treasurer since June 2014
- Chief Financial Officer and Treasurer at Ashford Inc. since June 2014
- Chief Financial Officer and Treasurer at Ashford Trust since June 2014.
- Chief Financial Officer at Ashford Holding Corp., and Ashford Merger Sub Inc.
- Chief Financial Officer and Treasurer at Ashford Hospitality Trust, Inc. since June 14, 2014
- Vice President of Investments of Ashford Trust
- Manager of Financial Analysis at ClubCorp.
- Senior Vice President-Finance at Ashford Trust since September 2011.
- CFA charter holder and is a Member of the CFA Institute and the CFA Society of Dallas-Fort Worth. Mr. Eubanks earned a BBA from the Cox School of Business at Southern Methodist University.


BLACKWELLS CAPITAL

APP.144

# BOARD OF DIRECTORS

**Board Members**

| Name | Title |
|------|-------|
| Bennett IV, Montgomery Jack | Founder & Chairman of the Board |

**Background:**
- Founder of Braemar Hotels & Resorts, Inc. (formerly, Ashford Hospitality Prime, Inc.) and has been its Chairman since April 2013
- Served as Chief Executive Officer of Braemar Hotels & Resorts from April 2013 to November 14, 2016.
- Chairman and Chief Executive Officer of Ashford Inc. since November 2014 and has been its Director since 2014. He is the Founder of Ashford Inc.
- Founder of Ashford Hospitality Trust, Inc. and has been its Chairman since January 19, 2013.
- Chief Executive Officer of Ashford Hospitality Trust, Inc. since May 2003 until February 20, 2017 and serves as its Director since May 2003.
- Founder, Chief Executive Officer and Chairman of Ashford Hospitality Advisors.
- Executive Vice President, Director of Information Systems, General Manager and Operations Director at Remington Hotel Corporation
- Chairman of Ashford Investment Management, LLC ("AIM")
- Master's degree in Business Administration from the S.C. Johnson Graduate School of Management in 1989
- Bachelor of Science degree with distinction from the Cornell University School of Hotel Administration in 1988.

| Name | Title |
|------|-------|
| Stockton, Richard J. | President, CEO & Director |

**Background:**
- Director at Braemar Hotels & Resorts Inc. since July 28, 2020.
- Independent Trustee and Lead Independent Trustee at Spirit MTA REIT since May 30, 2018.
- Chief Executive Officer of Braemar Hotels & Resorts Inc. (formerly, Ashford Hospitality Prime, Inc.) since November 14, 2016 and its President since April 2017.
- Head of EMEA Real Estate Banking in London, at Morgan Stanley
- Global chief operating officer for Real Estate at Carval Investors, a subsidiary of Cargill.
- MBA in Finance and Real Estate from The Wharton School, University of Pennsylvania
- Bachelor of Science degree from Cornell University, School of Hotel Administration.

| Name | Title |
|------|-------|
| Carter, Stefani Danielle | Lead Independent Director |

**Background:**
- Independent Director of Axos Financial, Inc. since August 31, 2021.
- Independent Director of Axos Bank from August 31, 2021.
- Independent Director at Braemar Hotels & Resorts, Inc. (formerly, Ashford Hospitality Prime, Inc.) since November 5, 2013.
- Lead Independent Director at Braemar Hotels & Resorts Inc.
- Senior Counsel at the law firm of Estes Thorne & Carr PLLC, a position she has held since November 2017. From 2011 to November 2017
- Elected representative of Texas House District 102 in the Texas House of Representatives (the "Texas House") between 2011 and 2015
- Vice-Chair of the Texas House Committee on Criminal Jurisprudence during that period.
- Associate attorney at Vinson & Elkins from 2005 to 2007.
- Lead Director of the Board of Directors of Wheeler Real Estate Investment Trust, Inc. (NASDAQ: WHLR), a retail real estate investment trust ("REIT").
- Juris Doctor from Harvard Law School, a Master's in Public Policy from Harvard University's John F. Kennedy 8 School of Government
- Bachelor of Arts in Government and a Bachelor of Journalism in News/Public Affairs from The University of Texas at Austin.

| Name | Title |
|------|-------|
| Evans, Mary Candace | Independent Director |

**Background:**
- Independent Director at Braemar Hotels & Resorts Inc. since July 31, 2019.
- Founder & Publisher of CandysDirt.com and SecondShelters.com,
- M.S.J. from the Columbia University Graduate School of Journalism and her undergraduate degree at Wheaton College, and studied at Dartmouth College. She holds an active Texas real estate license.

 BLACKWELLS CAPITAL

# BOARD OF DIRECTORS (CONT.)

| Board Members | |
| --- | --- |
| **Name** | **Title** |
| Odino-Johnson, Rebeca | Independent Director |
| **Background:** | |

- Ms. Rebeca Odino-Johnson is the Executive Lead and National Vice-President of Direct Response Marketing and Constituent Experience at the American Heart Association, a position she has held since April 2018.
- She serves as Independent Director of Braemar Hotels & Resorts Inc. since May 11, 2022. Previously, Ms. Odino-Johnson served as the Chief Marketing and Sales Officer of Main Event Entertainment, LP from December 2015 to March 2018.
- Ms. Odino-Johnson served as the Chief Marketing and Culinary Officer of Bob Evans Farms from December 2013 to October 2015. Additionally, Ms. Odino-Johnson served as Senior Vice President and Chief Marketing and Culinary Officer at Dine Brands Global Inc. from November 2008 to July 2013, where she led marketing efforts for restaurant brands such as Applebees. From January 2004 to February 2008,
- Ms. Odino-Johnson served as Executive Vice President, Senior Vice President and Chief Marketing and Global Branding Officer for Brinker International, Inc.
- Ms. Odino-Johnson worked at PepsiCo, Inc. in various marketing and sales positions including General Manager and Vice-President of Marketing for Frito-Lay North America, with direct financial and strategic planning responsibility for the profitable growth and Cheetos business unit, representing 30% of Frito-Lay North America. She grew the Cheetos brand and launched Baked Lay representing Frito-Lay's most successful launch.
- Ms. Odino-Johnson received a Bachelor of Business Administration in Marketing and Finance from Dallas Baptist University, from which she graduated magna cum laude. She also graduated from the Harvard Business School Advanced Management Program.
- Ms. Odino-Johnson has served on the Alex Lee Family of Companies Board of Directors since February 2016. She has served on the Advisory Boards of Zubi Farms and Data Axie since July 2020 and May 2021, respectively, and previously served on PepsiCo's Latino/Hispanic Advisory Board.
- Ms. Odino-Johnson has been a Member of the Chief Marketing Officer Council since September 2020.
- Ms. Odino-Johnson brings extensive experience as a marketing executive, counseling companies and organizations on strategic and digital marketing strategies, to the Board of Directors.-

| | |
| --- | --- |
| Rinaldi, Matthew D. | Independent Director |
| **Background:** | |

- Independent Director of Braemar Hotels & Resorts, Inc. (formerly known as Ashford Hospitality Prime, Inc.) since November 05, 2013.
- General Counsel of Qantas Healthcare Management, LLC.
- Partner at Rinaldi Law Office. Prior to that he was Senior Counsel with the law firm of Dykema, a position he held since July 2014
- Elected representative of Texas House District 115 in the Texas House.
- Juris Doctor, cum laude, from Boston University
- Bachelor of Business Administration in Economics, cum laude, from James Madison University.

| | |
| --- | --- |
| Fearn Jr., Kenneth Hopkins | Independent Director |
| **Background:** | |

- Founder and Managing Partner at Integrated Capital LLC.
- Managing Director and Chief Financial Officer at Maritz, Wolff & Co.
- Chairman for the Santa Monica Bay Chapter at Young President' Organization.
- Advisory Board of the Medical Genetics Institute at Cedars-Sinai Medical Center
- Board of Commissioners of the Community Redevelopment Agency of the City of Los Angeles, the Board of the Los Angeles Area Chamber of Commerce, the Board of Directors of Berger Bros.
- Bachelor of Arts in Political Science from the University of California, Berkeley and a Master of Business Administration from the Harvard University Graduate School of Business.

| | |
| --- | --- |
| Vaziri J.D., Abteen | Independent Director |
| **Background:** | |

- Independent Director of Braemar Hotels & Resorts, Inc. (formerly known as Ashford Hospitality Prime, Inc.) since October 01, 2017.
- Analyst at Precept Capital Management.
- Managing Director at Brevet Capital Management, a hedge fund focused on debt financing of assets with government backing
- Bachelor of Science in Computer Science at the University of Texas at Dallas and a Masters of Business Administration in Finance from the Cox School of Business at Southern Methodist University.
- Juris Doctor degree from Fordham University School of Law with a concentration in Finance and Business Law.

 BLACKWELLS CAPITAL

APP.146



**Cadwalader, Wickersham & Taft LLP**  March 26, 2024   Page 6

<u>**Exhibit B**</u>

**Joint Filing and Solicitation Agreement**

## JOINT FILING AND SOLICITATION AGREEMENT

WHEREAS, certain of the undersigned are stockholders, direct or beneficial, of Braemar Hotels & Resorts Inc., a Maryland corporation (the "Company");

WHEREAS, Blackwells Capital LLC, a Delaware limited liability company ("Blackwells"), Blackwells Onshore I LLC, a Delaware limited liability company, Jason Aintabi, Michael Cricenti, Jennifer M. Hill, Betsy L. McCoy and Steven J. Pully wish to form a group for the purpose of seeking representation on the Company's Board of Directors (the "Board") at the 2024 annual meeting of stockholders of the Company (including any other meeting of stockholders held in lieu thereof, and any adjournments, postponements, reschedulings or continuations thereof, the "Annual Meeting") and for the purpose of taking all other action necessary to achieve the foregoing.

NOW, IT IS AGREED, this 26th day of March 2024 by the parties hereto:

1.      In accordance with Rule 13d-1(k)(1)(iii) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), each of the undersigned (collectively, the "Group") agrees to the joint filing on behalf of each of them of statements on Schedule 13D, and any amendments thereto, with respect to the securities of the Company in the event that the Group, in the aggregate, becomes the beneficial owner of 5% or greater of the outstanding shares of the Common Stock of the Company. Each member of the Group shall be responsible for the accuracy and completeness of his, her or its own disclosure therein, and is not responsible for the accuracy and completeness of the information concerning the other members, unless such member knows that such information is inaccurate. Blackwells or its representative shall provide each member of the Group with copies of all Schedule 13D filings and other public filings to be filed on behalf of such member as soon as practicable prior to the filing or submission thereof.

2.      So long as this Agreement is in effect, each of the undersigned shall provide written notice to Jason Aintabi of (i) any of their purchases or sales of securities of the Company, or (ii) any securities of the Company over which they acquire or dispose of beneficial ownership.  Notice shall be given no later than the following business day after each such transaction.

3.      Unless otherwise prohibited by any agreement in effect as of the date of this Agreement, each of the undersigned agrees to form the Group for the purpose of (i) soliciting proxies or written consents for proposals submitted to stockholders for approval and the election of the persons nominated by the Group to the Board, each at the Annual Meeting, (ii) taking such other actions as the parties deem advisable, and (iii) taking all other action necessary or advisable to achieve the foregoing.

4.      Blackwells shall have the right to pre-approve all expenses incurred in connection with the Group's activities and agree to pay directly all such pre-approved expenses.

5.      Each of the undersigned agrees that any SEC filing, press release or stockholder communication proposed to be made or issued by the Group or any member of the Group in connection with the Group's activities set forth in herein shall be first approved by Blackwells, or its representatives, which approval shall not be unreasonably withheld.

6.    The relationship of the parties hereto shall be limited to carrying on the business of the Group in accordance with the terms of this Agreement.  Such relationship shall be construed and deemed to be for the sole and limited purpose of carrying on such business as described herein. Nothing herein shall be construed to authorize any party to act as an agent for any other party, or to create a joint venture or partnership, or to constitute an indemnification.  Nothing herein shall restrict any party's right to purchase or sell securities of the Company, as he, she or it deems appropriate, in his, her or its sole discretion, provided that all such sales are made in compliance with all applicable securities laws.

7.    This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute but one and the same instrument, which may be sufficiently evidenced by one counterpart.

8.    In the event of any dispute arising out of the provisions of this Agreement or their investment in the Company, the parties hereto consent and submit to the exclusive jurisdiction of the Federal and State Courts in the State of New York.

9.    Any party hereto may terminate his, her or its obligations under this Agreement on 24 hours' written notice to all other parties, with a copy by email to Jason Aintabi, c/o: Blackwells Capital LLC, jaintabi@blackwellscap.com.

10.    Each party acknowledges that Blackwells shall, in its sole discretion, select and retain counsel for both the Group and Blackwells and its affiliates relating to their investment in the Company.

APP.149

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

BLACKWELLS CAPITAL LLC


By:    /s/ Jason Aintabi
Name:  Jason Aintabi
Title:   Managing Partner



BLACKWELLS ONSHORE I LLC


By:    /s/ Jason Aintabi
Name:  Jason Aintabi
Title:   President & Secretary



/s/ Jason Aintabi
JASON AINTABI

*[Signature Page to Joint Filing and Solicitation Agreement]*

/s/ Michael Cricenti
MICHAEL CRICENTI

[*Signature Page to Joint Filing and Solicitation Agreement*]

/s/ Jennifer M. Hill
JENNIFER M. HILL

/s/ Betsy L. McCoy
BETSY L. MCCOY

[*Signature Page to Joint Filing and Solicitation Agreement*]

/s/ Steven J. Pully
STEVEN J. PULLY

[*Signature Page to Joint Filing and Solicitation Agreement*]

# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| **BLACKWELLS CAPITAL LLC**, | |
| *Plaintiff*, | Civil Action No. 3:24-cv-894 |
| *v.* | **JURY TRIAL DEMANDED** |
| **BRAEMAR HOTELS & RESORTS INC.; MONTGOMERY J. BENNETT; STEFANI DANIELLE CARTER; RICHARD J. STOCKTON; KENNETH H. FEARN, JR.; ABTEEN VAZIRI; MARY CANDACE EVANS; MATTHEW D. RINALDI;** and **REBECA ODINO-JOHNSON**, | |
| *Defendants*. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Blackwells Capital LLC ("Blackwells"), by its undersigned attorneys, files this Complaint against Braemar Hotels & Resorts Inc. ("Braemar" or the "Company") and the members of Braemar's board of directors (Montgomery J. Bennett; Stefani Danielle Carter; Richard J. Stockton; Kenneth H. Fearn, Jr.; Abteen Vaziri; Mary Candace Evans; Matthew D. Rinaldi; and Rebeca Odino-Johnson). On information and belief, Blackwells alleges as follows:

## INTRODUCTION AND NATURE OF THE ACTION

**1.** This case is about the right to vote.

**2.** Defendant Braemar is an underperforming real estate company that has been egregiously mismanaged by its board of directors (the "Board"). The Board is chaired by Defendant Montgomery J. Bennett, who in recent years has engaged in a troubling series of self-dealing transactions designed to further his own financial interests.

**3.**     Under Mr. Bennett's leadership, the Company executed a series of three contracts under which it pays wildly above-market rates to so-called "external" firms. Those contracts are:

      a.     a management agreement with Ashford Hospitality Advisors LLC ("Ashford Hospitality"), under which the Company pays fees and reimbursements for "advisory" and "management" services;

      b.     management agreements with Remington Lodging & Hospitality, LLC ("Remington Lodging"), under which the Company pays fees and reimbursements for hotel management and hospitality services; and

      c.     an agreement with Premier Project Management LLC ("Premier"), under which the Company pays for certain maintenance and construction services.

**4.**     Ashford Hospitality, Remington Lodging, and Premier are all subsidiaries of Ashford Inc., in which Mr. Bennett owns a significant equity stake. Mr. Bennett is the Chief Executive Officer of Ashford Inc. and the Chairman of Ashford Inc.'s board of directors.

**5.**     The web of business dealings described above has allowed Mr. Bennett to use Braemar's resources to broker numerous transactions that have personally enriched Mr. Bennett and his family, but do not serve the best interests of the Company's shareholders.

**6.**     Plaintiff Blackwells is an investment manager with a reputation for unlocking shareholder value by spearheading governance reforms at mismanaged companies.

**7.**     After conducting extensive research on the Company, Blackwells reached the conclusion that changes in the composition of the Company's Board could unlock significant value for Blackwells and other shareholders of the Company. So in June 2023, Blackwells moved shares in the Company into record form.[1] And in January 2024, Blackwells sent the Company a letter requesting a copy of the questionnaire that nominees to the Company's Board must submit prior

---

[1] The Company's Bylaws do not permit shareholders that own shares of the Company only through their stockbrokers (in "street name") to nominate directors. Instead, the Bylaws only allow shareholders that own and hold shares with the Company's stock transfer agent and appear on a list of registered shareholders maintained by the transfer agent (in "record form") to do so.

APP.156

to standing for election to become directors (the "Questionnaire"). These steps initiated what is known as a "proxy contest," which occurs when a shareholder such as Blackwells attempts to persuade other shareholders in a company to use their proxy votes to install new corporate directors or force other reforms to corporate governance.

8.      The Board responded to Blackwells' request for the Questionnaire by voting in bad faith to amend the Company's Bylaws so as to make it unreasonably difficult—if not outright impossible—for shareholders to nominate candidates to oppose incumbent directors. The Bylaw amendments require nominating shareholders to make a wide variety of onerous disclosures. Those disclosure requirements go far beyond any similar requirements contained in the bylaws of the Company's peers; they are not proportionate to any legitimate information-gathering need, and they clearly serve no legitimate business purpose. The Bylaw amendments also contain numerous ambiguous and subjective phrases designed to function as "trip wires" that would allow the Company to reject supposedly "deficient" nominations in its unfettered discretion. The Bylaw amendments were purpose-built to chill shareholders' rights to participate in the corporate franchise, a pillar of which is shareholders' entitlement to free and fair elections for directors.

9.      The amendments were the exact inverse of legitimate Bylaw amendments effected on a proverbial "clear day": They were adopted just **one week** after the Company became aware of the forthcoming proxy fight, and they include features tailor-made to burden potential nominations by Blackwells in particular. These amendments were adopted in bad faith by the members of the Board in an effort to (1) entrench the incumbent directors' power and (2) stifle shareholder-led reforms that might imperil sweetheart deals those directors have brokered for themselves, or otherwise uncover the troubling details that enabled such deals to begin with.

APP.157

10.     In March 2024, Blackwells formally notified the Company of its intent to nominate four highly-qualified individuals for election to the Company's Board and submit business proposals for consideration at the upcoming May 15, 2024 Annual Meeting.  The Company sent Blackwells a letter two weeks later that purported to "reject and disregard" Blackwells' nominees. According to that letter, Blackwells' nomination notice supposedly failed to comply with certain of the Company's "advance notice bylaws," which require a shareholder who nominates director candidates or submits business proposals to make certain disclosures to the Company regarding those nominations or business proposals.   The Company's rejection letter was rife with inaccuracies, contained numerous misrepresentations and falsehoods, and rested at bottom on several objectively incorrect readings of the Company's Bylaws.

11.     After rejecting Blackwells' nominees, the Company embarked on an aggressive campaign to ensure that the Company's shareholders would not be able to leverage their voting rights to oust the incumbent directors.  As detailed below, the Company's conduct during the proxy fight has violated the securities laws in various respects.  Among other things, the Company made a number of false and misleading statements about Blackwells in a press release issued on March 25, 2024, and then failed to file that press release with the Securities and Exchange Commission ("SEC") as soliciting material, thus committing two independent violations of the Securities Exchange Act of 1934 ("Exchange Act") and the SEC's implementing regulations for the same.

12.     Moreover, the Company has unlawfully failed to disclose to the SEC and the public that an undisclosed participant in its proxy campaign is a "newspaper" called *The Dallas Express*. Mr. Bennett finances and publishes *The Dallas Express*.  Actual journalists have characterized *The Dallas Express* as a "propaganda site."  From November 2023 to January 2024, *The Dallas Express* ran a series of five articles about Blackwells and Jason Aintabi, who is Blackwells' Chief

4

Investment Officer. Those articles included a number of false and misleading claims about Blackwells and Mr. Aintabi, and were clearly published at Mr. Bennett's behest with the intent of influencing the Company's shareholders and directors with respect to a proxy contest that Mr. Bennett knew was impending. Mr. Bennett's efforts to leverage *The Dallas Express* as his personal mouthpiece during the proxy fight are consistent with his long-running pattern of engaging in "pay-to-play" journalism, which was previously the subject of a 2020 article in *The New York Times*. The Company's failure to disclose *The Dallas Express* as a proxy participant is a plain violation of the Exchange Act, as are *The Dallas Express*'s numerous false and misleading statements in the hit pieces it published against Mr. Aintabi.

13.    In lieu of attempting to engage with Blackwells regarding its concerns about the Company and its proposals for reform, the Company opted to sue Blackwells in this Court on the same day that they sent Blackwells the rejection letter. That lawsuit, styled *Braemar Hotels & Resorts Inc. v. Blackwells Capital LLC et al.*, was docketed as case number 3:24-cv-00707 and assigned to the Honorable Sam A. Lindsay. The Company's lawsuit seeks, among other things, a declaration that Blackwells' nominations were improper and were therefore validly rejected.

14.    But in fact the opposite is true. Blackwells' nomination notice fully complied with the advance-notice provisions in the Company's Bylaws, and the Company's rejection of that notice was therefore wrongful and illegal. And in any case, the amended Bylaws that Blackwells purportedly violated are themselves invalid under Maryland law because they improperly and unfairly infringe shareholders' rights to nominate and vote for directors of their choice.

15.    Through this lawsuit, Blackwells seeks a declaration that its nominations were valid. Blackwells also seeks to hold the Company accountable for breaching its Bylaws, which are a contract with the Company's shareholders. To the extent that the Blackwells nominations

APP.159

are found to be invalid under the Bylaws, Blackwells seeks in the alternative a declaration that the relevant provisions of the Bylaws are unlawful and unenforceable.  Blackwells also seeks through this lawsuit to hold the Company liable for numerous substantive and procedural violations of the securities laws, which are unfairly influencing the ongoing proxy contest.

## JURISDICTION AND VENUE

16.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this case arises under Section 14(a) of the Exchange Act and the implementing regulations promulgated thereunder by the SEC.  *See* 15 U.S.C. § 78n(a) ("Section 14(a)"); 17 C.F.R. § 240.14a ("Regulation 14A").  As detailed below, Blackwells alleges that Defendants have committed a variety of substantive and procedural violations of Section 14(a) and Regulation 14A.

17.    This Court also has competent subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and because the parties to this lawsuit are citizens of different States.

18.    This Court also has supplemental jurisdiction over Blackwells' state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to Blackwells' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

19.    This Court has authority to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, and under its inherent equitable powers.

20.    Venue is proper in this District because "a substantial part of the events or omissions giving rise to the claim occurred" in Dallas, Texas, 28 U.S.C. § 1391(b)(2), and because Defendants conduct business and may be found in Dallas, Texas, 15 U.S.C. § 78aa(a).  The Company maintains its principal place of business in Dallas, Texas; conducts its Board-level decisionmaking in Dallas, Texas; has violated Section 14(a) and Regulation 14A via speech and

APP.160

conduct that occurred in Dallas, Texas; and, on information and belief, prepared and sent various communications regarding the Blackwells Nomination Notice from Dallas, Texas.

21.    This Court has competent personal jurisdiction over the Defendants because the Company maintains its principal place of business in Dallas, Texas and because Defendants have personally availed themselves of conducting business in Texas.

## PARTIES

### A.    Plaintiff

22.    Plaintiff Blackwells Capital LLC is a Delaware limited liability company whose principal place of business is located at 400 Park Avenue, 4th Floor, in New York, New York 10022.  The sole member and 100% owner of Blackwells Capital LLC is Blackwells Holding Co. LLC, which is a Delaware limited liability company.  The sole member and 100% owner of Blackwells Holding Co. LLC is Vandewater Capital Holdings, LLC, which is a Delaware limited liability company.  The sole member and 100% owner of Vandewater Capital Holdings, LLC is Jason Aintabi, who is a natural person domiciled in Florida.  Mr. Aintabi is a U.S. citizen.

23.    Blackwells is a multi-strategy investment firm that was founded by Mr. Aintabi in 2016.  Blackwells makes investments in securities, and engages with management and boards, to help unlock value for stakeholders.  Although Blackwells has especially significant experience in the real estate investment trust ("REIT") sector, it has made investments in public and private companies across many different parts of the American economy.  Blackwells' principals have served on boards of heavy-industry, media, energy, technology, and real estate companies.

24.    Blackwells has been a record holder of common stock in the Company since June 27, 2023.  Blackwells (collectively with its affiliates Blackwells Onshore I LLC; Blackwells Holding Co. LLC; Vandewater Capital Holdings, LLC; Blackwells Asset Management LLC; BW Coinvest Management I LLC; and Mr. Aintabi) is the Company's tenth largest shareholder.

APP.161

B.     **Defendants**

25.     Defendant Braemar Hotels & Resorts Inc. is a publicly traded Maryland corporation (NYSE: BHR, BHR-PB, BHR-PD) that owns 16 hotel properties.  The Company is taxed as a REIT under the Internal Revenue Code.  The Company's principal place of business is located at 14185 Dallas Parkway, Suite 1100, Dallas, Texas 75254.

26.     The Company is externally managed by Ashford Inc. and its subsidiary, Ashford Hospitality.

27.     Defendant Montgomery J. Bennett is the Chairman of the Company's Board. Mr. Bennett is also the Chief Executive Officer and Chairman of the board of directors of Ashford Inc., in which he and his family own a significant equity stake.  *See infra* ¶ 43.  On information and belief, Mr. Bennett is a natural person domiciled in Texas.

28.     Defendant Stefani Danielle Carter is "Lead Director" on the Company's Board.  On information and belief, Ms. Carter is a natural person domiciled in Texas.

29.     Defendant Richard J. Stockton is a member of the Company's Board who also serves as Chief Executive Officer and President of the Company.  Mr. Stockton is also the Senior Managing Director and Head of Acquisitions for Ashford Inc.  On information and belief, Mr. Stockton is a natural person domiciled in Texas.

30.     Defendant Kenneth H. Fearn, Jr. is a member of the Company's Board.  On information and belief, Mr. Fearn is a natural person domiciled in California.

31.     Defendant Abteen Vaziri is a member of the Company's Board.  On information and belief, Mr. Vaziri is a natural person domiciled in Texas.

32.     Defendant Mary Candace Evans is a member of the Company's Board.  On information and belief, Ms. Evans is a natural person domiciled in Texas.

APP.162

**33.**     Defendant Matthew D. Rinaldi is a member of the Company's Board. On information and belief, Mr. Rinaldi is a natural person domiciled in Texas.

**34.**     Defendant Rebeca Odino-Johnson is a member of the Company's Board.   On information and belief, Ms. Odino-Johnson is a natural person domiciled in Texas.

<u>**FACTS**</u>

A.     <u>**The Company's Egregious Mismanagement and Self-Dealing**</u>

**35.**     Over the course of the last three-, five-, and ten-year periods, the Company has delivered abysmal returns for its shareholders.  The Company's stock price has declined by almost 90 percent in the last four years alone.  *See Braemar Hotels & Resorts Inc. (BHR:NYSE)*, CNBC, https://perma.cc/6Z9KMRYK  (showing decline of stock price from a high of $13.71 in April 2020 to below $2.00 in April 2024).

**36.**     One financial analyst noted in 2023 that the Company's "share price, a reflection of market sentiment, shows a long-term decline" and that the Company's "share price has fallen continuously over the past decade."  Philip Wang, *Braemar Hotels & Resorts: Bad Q2, Even Worse Balance Sheet*, Seeking Alpha (Aug. 8, 2023).

**37.**     The Company is managed pursuant to an external management agreement with Ashford Inc., through which the Company pays fees and reimbursements to Ashford Inc. and its subsidiaries that dramatically exceed market rates.  The Company's 2023 Form 10-K discloses that Ashford Hospitality acts as the Company's advisor.   The Company relies on Ashford Hospitality to provide, or obtain on the Company's behalf, the personnel and services necessary for the Company's business.  The Company has no employees of its own.  Ashford Hospitality has the right to require the Company to include two persons it designates as candidates for election as directors at any stockholder meeting at which Company directors are to be elected.

APP.163

**38.**    The Company's 2023 Form 10-K conceded that "[t]he aggregate amount of fees and expense reimbursements paid to our advisor will exceed the average of internalized expenses of our industry peers" and that "there may be times when the total amount of fees and incentives paid to our advisor greatly exceeds the average of internalized expenses of our industry peers." The same report conceded that the Company "must pay a minimum advisory fee to [Ashford Hospitality] regardless of [the Company's] performance."

**39.**    The Company's 2023 Form 10-K discloses that the Company is also "required to make minimum base hotel management fee payments under [its] hotel management agreements" with Remington Lodging, which is "a subsidiary of Ashford Inc."

**40.**    The Company's 2023 Form 10-K discloses that the Company receives design and construction services through Premier, which is yet another subsidiary of Ashford Inc.

**41.**    The Company disclosed in its most recent Form 10-K that in 2023 the Company paid advisory services fees of approximately $31.1 million and additional fees for products or services of approximately $30.2 million, all of which was paid to Ashford and its affiliates.[2]  Over the last ten years, management fees paid by the Company to Ashford Affiliates have grown by over **575 percent**.  Those fees now represent almost half the market value of the Company. Remarkably, the Company's operating load as a percentage of its market capitalization is higher than 70 percent, which is approximately **fourteen times higher** than the average among the Company's peer hotel REITs.  The Company's extraordinarily high operating expenses and "fee" obligations are a major cause for concern among the Company's shareholders.[3]

---

[2] This Complaint will refer to Ashford Inc., Ashford Hospitality, Remington Lodging, and Premier as the "Ashford Affiliates."

[3] Blackwells' recent dealings with the Company have revealed that Mr. Bennett and Ashford apparently believe they would be owed a comically high "termination fee" in the event that the Company's advisory agreement with Ashford Hospitality were terminated.  The exact amount of

42.    The Company's 2023 Form 10-K acknowledged that "[c]onflicts of interest with Remington Hospitality and Premier, each of which is a subsidiary of Ashford Inc., could result in [the Company's] management acting other than in our stockholders' best interest."

43.    Mr. Bennett is the Chairman of both the Company's Board and Ashford Inc.'s board, and he is personally enriched by the Company's agreements with the Ashford Affiliates. The Company's 2023 Form 10-K discloses that Mr. Bennett and his father own approximately 19 percent of Ashford Inc., plus convertible stock that, if converted, would increase their ownership percentage in Ashford Inc. to 65 percent.  Mr. Bennett told the *Dallas Morning News* in 2020 that "my family and I own the vast majority of preferred stock at Ashford Inc."  Natalie Walters, *Villain or Victim? How Dallas Hotelier Monty Bennett Became PPP's Face of Corporate Greed*, Dallas Morning News (July 5, 2020), https://perma.cc/67PL-3EST.

44.    In 2020, "Brookfield Asset Management, an Ashford lender, accused Ashford in a letter of committing a 'fraudulent scheme' by moving money between entities."  Patrick Sisson, *Monty Bennett's Fire and Brimstone Journey*, The Real Deal (May 1, 2023), https://perma.cc/Q2KR-B2A8.

45.    The Company's 2023 Form 10-K conceded that "[t]he potential for conflicts of interest as a result of our management structure may provoke dissident stockholder activities that result in significant costs" and that "actual and potential conflicts of interest with Ashford" were a "risk factor" that could lead the Company's financial results to vary from the Company's predictive, forward-looking statements.  The same Form 10-K acknowledged that some individuals

---

that termination fee depends on financial metrics of Ashford Hospitality and opaque formulas that the Ashford Affiliates have brokered among themselves.  In Blackwells' estimation, the "termination fee" that Mr. Bennett believes he and the Ashford Affiliates would be owed outstrips the entire market capitalization of Braemar, which is currently approximately $130 million.

11

have "dual responsibilities" as officers or directors of both the Company and Ashford Affiliates. According to that Form 10-K, those "dual responsibilities may create conflicts of interest" that result in decisions which benefit Ashford Affiliates "more than they benefit [the C]ompany."

46.     The Company's 2023 Form 10-K acknowledged that Mr. Bennett's "ownership interests in and management obligations to Ashford Inc. present him with conflicts of interest in making management decisions related to the commercial arrangements between [the Company] and Ashford Inc., and his management obligations to Ashford Inc. reduce the time and effort he spends overseeing [the Company]."

47.     In addition to Mr. Bennett, Ashford Inc. and the Company also share other officers and directors.  Defendant Richard J. Stockton is a member of the Company's Board who also serves as the Senior Managing Director and Head of Acquisitions for Ashford Inc.  Non-party Deric S. Eubanks is the Chief Financial Officer of both the Company and Ashford Inc.  And non-party Alex Rose is the General Counsel and Secretary of both the Board and Ashford Inc.

48.     One analyst recently noted that "it is clear" that "conflicts exist among the various Ashford entities."  Rob Schneider, *Braemar Hotels Faces Board Challenge from Activist Investor*, Hotel Investment Today (Mar. 25, 2024), https://perma.cc/WA62-T8MR.

49.     The Company's Form 10-K acknowledged that "Ashford [Hospitality] and its employees, some of whom are our executive officers, face competing demands relating to their time and this may adversely affect [the Company's] operations."  The Company's 2023 Form 10-K also stated that Ashford Hospitality and its affiliates are not obligated to dedicate any of their respective employees exclusively to the Company.

50.     Conflicts of interest are so ubiquitous at the Company and the Ashford Affiliates that the Company has created a Related Party Transactions Committee ("Conflicts Committee")

APP.166

with power to approve self-dealing transactions that affect the Company.  Committees of this type are exceedingly uncommon, especially at REITs.  According to the Company's most recent Form 10-K, the so-called "independent" members of the Conflicts Committee include Mr. Rinaldi and Ms. Carter—both of whom are long-time loyalists of Mr. Bennett.  *Texas Monthly* recently reported that Mr. Rinaldi "had been made an asset of the Bennett empire" when Mr. Bennett "made Rinaldi a director of one of his [REITs]" even though "[t]his was a dramatic departure from Rinaldi's work experience."  Christopher Hooks, *Sinners in the Hands of an Angry GOP*, Texas Monthly (Dec. 2023), https://perma.cc/X82Q-GC5G.  That article reported that Mr. Rinaldi "caught a lucky break" when "he met Monty Bennett," who helped "fund Rinaldi's tentative first steps into elected politics."  *Id.*  Mr. Rinaldi was later elected to the Texas Legislature.  The same article went on to report that "Rinaldi was not the only future state representative" that Mr. Bennett employed in his effort to "gain influence in the Legislature."  *Id.*  Mr. Bennett also "acquired . . . Stefani Carter, who represented a Dallas-area district in the [Texas] House from 2011 to 2015," and who now serves together with Mr. Rinaldi as an "independent" director of Braemar.  *Id.*[4]  The Company's most recent Form 10-K acknowledged, in an understatement for the ages, that the Conflicts Committee "may not be adequate to address all of the conflicts that may arise."

**51.**    In lieu of engaging with shareholders on potential reforms that might unlock value, the Board has opted to severely limit shareholder rights.  The Corporation's Bylaws vest unilateral power to amend the Bylaws in the Board, denying shareholders a voice in governance practices.

---

[4] In March 2016, the Company's predecessor entity claimed in a public presentation that Ms. Carter was an "independent" director despite the fact that "Monty Bennett has contributed to [her] political campaigns."  Questions and Answers, *Ashford Hospitality Prime* (Mar. 2016), https://perma.cc/GW9W-XBK2.

As described in paragraphs 68 to 76, the Board invoked that power to unilaterally amend the Bylaws to make notice requirements for Board nominations exceedingly stringent and onerous.

**B.      Blackwells Attempts to Unlock Value for the Company's Shareholders By Proposing to Acquire the Company**

52.      On October 21, 2023, Blackwells sent a letter to the Company (the "Blackwells October 21 Letter"). That letter expressed Blackwells' grave concern with the damage that had been caused to the Company and its shareholders by the Board's acquiescence in a management arrangement that enriches Mr. Bennett and the Ashford Affiliates, but causes material losses for shareholders. The Blackwells October 21 Letter demanded that the Board investigate potential breaches of fiduciary duty and suggested several reforms which would provide better returns for shareholders and prevent further self-dealing.

53.      On December 1, 2023, Mr. Aintabi sent a letter to the Company's Board (the "Blackwells December 1 Letter"). The Blackwells December 1 Letter made a "preliminary proposal" for Blackwells to acquire 100% of the outstanding equity interests in the Company (the "Proposed Acquisition"). Blackwells, in its opening salvo, proposed an all-cash deal in which it would acquire the Company for $4.50 a share, which was more than double the Company's then-existing stock price.

54.      On December 22, 2023, Blackwells sent the Company a second letter that reiterated Blackwells' interest in acquiring the Company. At the Company's request, this second letter also provided additional information on Blackwells' potential sources of funding for the Proposed Acquisition. The second letter also offered to provide additional confidential information related to potential financing sources if the Company were to confirm that it had interest in engaging in a confidential discussion with regard to Blackwells' Proposed Acquisition.

APP.168

55.    On January 9, 2024, two members of the Company's Board wrote a letter to Blackwells responding to the Blackwells October 21 Letter (the "Company's January 9 Letter"). The Company's January 9 Letter dismissed Blackwells' concerns and stated that the Company would refuse Blackwells' demands to take the actions requested in the Blackwells October 21 Letter.

56.    The stated basis for the Board's decision was an "internal investigation" conducted by Holland & Knight, which has previously represented Mr. Bennett and one of the Ashford Affiliates in responding to accusations of misconduct. That conflicted firm never bothered to contact Blackwells during its "investigation" concerning the Blackwells October 21 Letter.

C.    **Blackwells Nominates Four Individuals to Serve as Directors of the Company**

57.    Between late December and early January 2024, Blackwells reevaluated its interest in acquiring the Company.  Blackwells ultimately abandoned its intent to acquire the Company and instead decided to pursue a different course—*i.e.*, unlocking shareholder value by having new, reform-minded directors elected to the Company's Board.

58.    Blackwells' decision to abandon its effort to acquire the Company was based on a number of factors, including, among others: (1) the refusal of the Company's Board to reasonably consider Blackwells' Proposed Acquisition; (2) attempts by the Company, Mr. Bennett, and Mr. Bennett's agents to misrepresent Blackwells' intentions, including by having *The Dallas Express* publish hit pieces on Blackwells and Mr. Aintabi; (3) the Company's efforts to ignore Blackwells' demands to investigate the Company's external management arrangement; (4) recent amendments to the Company's Bylaws that had the effect of further enriching Mr. Bennett and complicating options to create shareholder value; and (5) Blackwells' belief that independent voices are needed in the Company's boardroom, among other reasons because those voices are necessary to ensure that any future transaction is in the best interests of shareholders and will not result in a windfall

APP.169

for Mr. Bennett and his loyalists.

59.    On January 2, 2024, Blackwells requested from the Company the Questionnaire that nominees to the Company's Board must submit to the Company prior to standing for election.

60.    On January 17, 2024, fifteen days after Blackwells' initial request, the Company sent Blackwells a copy of the Questionnaire.[5]

61.    On March 10, 2024, Blackwells sent the Company a letter (the "Blackwells March 10 Letter") formally re-confirming that it was "withdraw[ing] any interest [Blackwells] had in a transaction with Braemar."  The letter also explained that the Company's recent behavior had "reinforced [Blackwells'] belief that Braemar needs new voices in the boardroom."

62.    Also on March 10, 2024, Blackwells timely sent the Company a notice of its intent to nominate four highly qualified individuals for election to the Company's Board at its upcoming 2024 Annual Meeting (the "Blackwells Nomination Notice").  Blackwells nominated as director candidates Jennifer M. Hill, Betsy L. McCoy, Steven J. Pully, and Michael Cricenti (together, the "Blackwells Nominees")—all of whom are experienced business professionals who would facilitate much-needed changes at the Company.

63.    The Blackwells Nomination Notice also made a number of business proposals to be brought before the shareholders at the Company's 2024 Annual Meeting (the "Blackwells Business Proposals").  Blackwells proposed that the Company amend its unfair advance-notice Bylaws; revise its Corporate Governance Guidelines; disclose any extraordinary transactions

---

[5] The Questionnaire that was ultimately produced was off-market in a number of ways, and it required a level disclosure far beyond the disclosures that are ordinarily required to be included in director and officer questionnaires.  Among other things, the Questionnaire requires great detail about every single job that the nominees have ever held, **without any time limitation**.  Most questionnaires contain a reasonable lookback, often five years—the same as the requirement for disclosure about business experience contained in Item 401(e) of Regulation S-K.

APP.170

proposals made in the last two years; and disclose all compensation paid by the Company to *The Dallas Express* its employees, directors, or agents.

64.     The Blackwells Nomination Notice contained as its Exhibit C a 90-page slide deck (the "December 2023 Slide Deck").[6]   The December 2023 Slide Deck included information discussing the benefits of a potential "take private" transaction involving the Company.

65.     The Blackwells Nomination Notice stated that, "[w]hile [Blackwells] currently has no intention to pursue an acquisition of the [Company], [Blackwells] could in the future make a bid to acquire the [Company]."

### D.     The Company Responds to Blackwells' Campaign by Adopting Illegal Bylaws

66.     The Company's Bylaws, which are attached hereto as Exhibit A, are a contract between the Company and its shareholders.  The Bylaws, and any dispute related to a construction of those Bylaws, are governed by the law of Maryland, where the Company is incorporated.

67.     Article I, Section 11 of the Company's Bylaws contains "Advance Notice Requirements."  Advance notice bylaws impose limitations on when and how stockholders may nominate director candidates for election at a company's annual meeting.  When employed fairly, advance notice bylaws can serve the legitimate purpose of ensuring that a company's shareholders have information necessary to evaluate candidates to become directors.  However, advance notice bylaws can be abused by poorly performing companies to entrench the power of incumbent directors and combat attempts at shareholder-driven reform.  *See* Michael R. Levin, *Advance*

---

[6] Although the slide deck was prepared in December 2023, the cover of the slide deck that was sent to the Company incorrectly listed "March 2024" as its date.  As Blackwells later explained in a supplement to its nomination notice that was sent to the Company on March 26, 2024, the date listed on the first page of the slide deck was inadvertently changed from "December 2023" to "March 2024" during the redaction process performed by Blackwells' counsel prior to transmitting the deck to the Company as an exhibit to the Blackwells Nomination Notice.  *See infra* ¶ 123.  The version of the slide deck that was provided by Blackwells to its counsel was dated December 2023.

APP.171

*Notice in Bylaws*, The Activist Investor (2015), https://perma.cc/WAB4-RQ3U.

68.    On January 9, 2024, the Company adopted an amendment to its Bylaws which it claimed would "enhance[]" those Bylaws' Advance Notice Requirements. These Bylaw amendments were not made on a "clear day" because they were implemented (1) just **one week** after Blackwells requested the Questionnaire and (2) after Blackwells moved shares into record name some six months earlier, both of which were signals that made the Company aware of an impending proxy contest.

69.    The January 2024 Bylaw Amendments added a new provision at Article I, Section 11(a)(3)(D)(iv) of the Bylaws.  That new provision reads as follows:

> in the event that any of the stockholder, the Proposed Nominee or the Stockholder Associated Person has in the twenty-four months immediately preceding the date of such notice made a proposal to acquire control of the [Company] (whether through the acquisition of a majority of the outstanding securities of the [Company], the acquisition of all or substantially all of the [Company's] assets or otherwise), all information relating to the stockholder, the Proposed Nominee or the Stockholder Associated Person that would be disclosed in any notices, forms or filings required by U.S. federal laws or the rules and regulations of any agency, department or other instrumentality of the U.S. federal government ("U.S. Federal Agency") in connection with the direct or indirect acquisition by such person of control of the [Company] (including (i) all information that would be set forth under any U.S. federal laws or the rules and regulations of any U.S. Federal Agency that have been proposed and not withdrawn and (ii) all information that would be set forth in a voluntary filing made by an acquiror in connection with any transaction subject to the jurisdiction of any U.S. Federal Agency).

70.    This change to the Bylaws, which imposed especially burdensome disclosure burdens on anyone who had "made a proposal to acquire the Company" in "the twenty-four months immediately preceding" its nomination notice, appears to have been intended to target Blackwells. At the time of the January 2024 Bylaw Amendments, the Board knew that Blackwells was part of a tiny category of shareholders who had offered to purchase the Company in the preceding two years.

APP.172

71.    The January 2024 Bylaw Amendments also made material changes to Article I, Section 11(a)(6) of the Bylaws.  The post-amendment version of that section of the Bylaws is reproduced below, with the new amended material rendered in italics:

> For purposes of this Section 11, *a* "Stockholder Associated Person" of any stockholder shall mean *any person (and such person's affiliates and associates): (i)* acting in concert with such stockholder; (ii) *that has formed, or is acting together as, a group with such stockholder (or such stockholder's affiliates or associates) for the purposes of acquiring, holding, voting or disposing Company Securities, regardless of whether such person is party to any written or unwritten agreement, arrangement or understanding; (iii) that shares, or with which is shared, information about an upcoming Schedule 13D filing (or amendment thereto) that such person and/or such stockholder and/or their respective affiliates and associates will be required to make, to the extent such information is not yet public and communicated with the purpose of causing others to make purchases, and such person and/or such stockholder and/or their respective affiliates and associates subsequently purchases Company Securities based on such information; (iv) that has entered into any pooling arrangement, whether formal or informal, written or unwritten, with such stockholder; (v) that, together with such stockholder and/or its affiliates and associates, has engaged in activities*[7] *undertaken with the purpose or effect of changing or influencing control of the [Company] or in connection with or as a participant in any transaction having such purpose or effect; (vi) that has taken concerted actions related to Company Securities where such person and such stockholder are directly or indirectly obligated to take such concerted action; (vii) that is the* beneficial owner of shares of stock of the [Company] owned of record or beneficially by such stockholder (other than a stockholder that is a depositary)*; or (viii)* directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such stockholder or *any other* Stockholder Associated Person.

72.    When read together, the 2024 Bylaw Amendments require any nominating shareholder who has made a bid to acquire the Company within the preceding two years to disclose, with respect to both itself and any "Stockholder Associated Person," "all information . . . that would be disclosed in any notices, forms or filings required by U.S. federal laws or the rules and regulations of any agency," including voluntary filings.  That disclosure requirement is extremely onerous and serves no legitimate business purpose.  On information and belief, there is

---

[7] The term "engaged in activities" is not defined in the Bylaws.

APP.173

no other company incorporated in Maryland that requires this level of disclosure in connection with stockholder nominations.

73.    The January 2024 Bylaw Amendments are incoherent.  They are riddled with ambiguous language that was designed to (1) visit impossible burdens on nominating shareholders and (2) allow the Company's directors to reject **any** shareholder nomination.  The explanatory Current Report on Form 8-K that the Company filed with the SEC after adopting the January 2024 Bylaw Amendments did not provide any details on the meaning of the ambiguous Bylaw amendments, nor any clues about how the Company would interpret their subjective language.

74.    Article I, Section 11(a)(3)(D)(iv) of the Bylaws requires nominating shareholders to disclose "all information" that would be "disclosed in any notices," but does not state whether a nominating shareholder is required to (1) make only those disclosures that would have been required had the actual acquisition bid made by the nominating shareholder been formally proposed and consummated, or instead (2) make all disclosures that **any** potential acquiror would have had to make in connection with **any** hypothetical acquisition bid (*e.g.*, a stock/stock offer made by a public company, which would require a large amount of disclosures).

75.    On February 27, 2024, the Company adopted an additional amendment to its Bylaws.  That amendment reduced the quorum required for any matter proposed by the Board at an annual meeting from a simple majority to one-third of all votes entitled to be cast at the meeting.  The purpose of this amendment was to disenfranchise shareholders by enabling the Company to simultaneously (1) discard all votes made on Blackwells' proxy card and (2) nonetheless claim that the meeting was valid because more than one-third of all votes entitled to be cast at the meeting were cast.

76.    The 2024 Bylaw Amendments, which were made shortly after the Company

APP.174

became aware that Blackwells might wage a proxy campaign against the incumbent directors, were not made on a "clear day." They are egregious attempts to chill participation in corporate elections.

77. Before the 2024 Bylaw Amendments, the Company's Bylaws included a number of other Advance Notice Requirements. As relevant here, those requirements included:

    i.    Article I, Section 11(a)(3)(C)(iv) of the Bylaws, which requires a nominating stockholder to disclose any "substantial interest, direct or indirect (including, without limitation, any existing or prospective commercial, business or contractual relationship with the [Company]), by security holdings or otherwise, of such stockholder, Proposed Nominee or Stockholder Associated Person, in the [Company]";

    ii.    Article I, Section 11(a)(3)(D)(iii) of the Bylaws, which requires that the stockholder's notice set forth "all information relating to the stockholder, the Proposed Nominee or the Stockholder Associated Person that would be required to be disclosed in connection with the solicitation of proxies pursuant to Regulation 14A (or any successor provision) under the Exchange Act"[8]; and

    iii.    Article I, Section 11(a)(4) of the Bylaws, which requires that the notice be accompanied by "a completed Proposed Nominee questionnaire" that will "be provided by the [Company]."[9]

78. At all times relevant to this case, the Bylaws also included language specifying when shareholders could make, and correct, nomination notices. Article I, Section 11(a)(2) of the Bylaws requires that stockholders must give notice in writing to the Company if they intend to nominate a director, and that such notice "shall be delivered to the [Company's] secretary . . . not earlier than the 90th day nor later than 5:00 p.m., Eastern Time, on the 60th day prior to the first anniversary of the date of the preceding year's annual meeting."

79. Article I, Section 11(c)(1) of the Bylaws provides that, if any information submitted

---

[8] Regulation 14A requires disclosure of, among other things, "any arrangement or understanding . . . with respect to any future transactions to which the registrant or any of its affiliates will or may be a party." 17 C.F.R. § 240.14a-101, Item 5(b)(1).

[9] The Bylaws do not require that a nominating shareholder's disclosures be internally consistent.

APP.175

in a nomination notice "shall be inaccurate in any material respect," then the stockholder "shall notify the Corporation of any inaccuracy or change (within two Business Days of becoming aware of such inaccuracy or change) in any such information."

80.    A notification of an "inaccuracy or change" made by a nominating stockholder is timely if provided to the Company "within two Business Days" after the stockholder becomes "aware of such inaccuracy or change," regardless of whether the stockholder's notification is made within the 30-day window specified in Article I, Section 11(a)(2) of the Bylaws.  The provision of the Bylaws permitting supplements, changes, and revisions would be rendered meaningless if shareholders were not permitted to make such changes after their initial nomination notices had been sent to the Company.

**E.    Mr. Bennett Repeatedly Uses His Mouthpiece *The Dallas Express* to Spread False and Misleading Statements About Blackwells and Mr. Aintabi, Without Ever Disclosing His Pay-to-Play Journalism Tactics to the Public**

81.    In addition to serving as the chairman of the boards of both the Company and Ashford Inc., Mr. Bennett controls a "newspaper" known as *The Dallas Express.  The Dallas Express* is a tax-exempt 501(c)(3) nonprofit organization.  *The Dallas Express* has its principal place of business in Dallas, Texas, and is published in Dallas, Texas.

82.    Mr. Bennett is the publisher of *The Dallas Express*.

83.    Mr. Bennett is the President of *The Dallas Express*.

84.    Mr. Bennett is a director of *The Dallas Express*.

85.    Non-party Brian Wheeler is the "Lead Director" of Ashford Inc. and the Secretary of *The Dallas Express.*  Mr. Wheeler is also a director of *The Dallas Express.*

86.    Mr. Bennett became the publisher of *The Dallas Express* in 2021.  From 1892 until approximately 1970, a publication known as *The Dallas Express* published articles of interest to the Black community in Dallas.  The publication now known as *The Dallas Express* has published

22

what *D Magazine* recently described as "a mix of right-leaning opinion pieces, excitable crime reporting, and regurgitated press releases."  Peter Simek, *The Real Story Behind the* Dallas Express, D Magazine (June 11, 2021), https://perma.cc/G6M2-VHSX.  One journalist recently described *The Dallas Express* as having been "resurrected as [a] right wing propaganda site." Steven Monacelli, *Formerly Black Owned Dallas Express Resurrected As Right Wing Propaganda Site*, Dallas Weekly (Feb. 12, 2021), https://perma.cc/Z4FB-EM8J (capitalization altered).

87.    On information and belief, *The Dallas Express* is an unprofitable enterprise that is being propped up by Mr. Bennett.  In 2022, *The Dallas Express* had advertising revenues of approximately $24,000 and expenses of approximately $3 million.  In the last two years, Mr. Bennett has made over $3.4 million in "donations" to *The Dallas Express*.  The Company rejected a Blackwells Business Proposal that would have required disclosures regarding the connections between the Company, the Ashford Affiliates, and *The Dallas Express*.

88.    In October 2020, *The New York Times* published a story that discussed Mr. Bennett's history of engaging in pay-to-play fake journalism.  *See* Davey Alba & Jack Nicas, *As Local News Dies, a Pay-for-Play Network Rises in Its Place*, N.Y. Times (Oct. 18, 2020).  That article indicated that Mr. Bennett had "ordered" news articles for publication, including, among others, articles about foreign policy that appeared in *DC Business Daily*.  Mr. Bennett also ordered articles to lobby for the stimulus bill, which he believed would help Ashford Inc.  Ashford Inc. and its affiliates received $69 million in federal loans, making them (collectively) the largest recipient of such loans.  *See* Walters, *supra* ¶ 43; Sisson, *supra* ¶ 44.  After being "cast as a face of corporate greed," Mr. Bennett was forced to return the money.  Walters, *supra* ¶ 43.

89.    In continuation of his prior pattern of pay-to-play journalism, Mr. Bennett has in recent years leveraged *The Dallas Express* as a mouthpiece for the Company, the Ashford

Affiliates, and himself.  Mr. Bennett has repeatedly used *The Dallas Express* to disseminate false and misleading statements in an attempt to deceive and influence the Company's shareholders.

90.    Shortly after the Company received the Blackwells October 21 Letter, *The Dallas Express* began publishing articles about Blackwells and Mr. Aintabi, as detailed below.  Each of those articles was published after October 2023, which is when Mr. Bennett became aware of Blackwells' then-existing interest in acquiring the Company.  Each of these articles was published with the intent to discredit Blackwells and Mr. Aintabi in the eyes of the Company's shareholders.  Each of these articles was made with the intent of influencing the outcome of Blackwells' proxy fight against the Company.  Tellingly, among the hundreds of articles that have been published about Blackwells and/or Mr. Aintabi, Blackwells is not aware of any other articles that have attempted to paint a picture similar to the one confected by *The Dallas Express*—and certainly is not aware of any publication that has published a **series** of hit pieces about Mr. Aintabi in an effort to influence a matter in which the publication's publisher has a financial interest.

91.    The Company failed to file any of the articles referenced below as soliciting material, as is required by Section 14(a) and Regulation 14(A).

### 1.    The November 1, 2023 *Dallas Express* Article

92.    On November 1, 2023, *The Dallas Express* published an article entitled "Vinson & Elkins Helps New York Activist Investor Invade Texas."  A copy of that article is available at https://perma.cc/T4P8-TXEH.

93.    That article described Blackwells as a "corporate raider" and alleged that the Blackwells October 21 Letter, which was not then public but was available to Mr. Bennett in his capacity as one of the Company's directors, "ma[de] multiple unsupported claims."  This statement was materially false and misleading because it misconstrues Blackwells' business history in a way calculated to affect the Company's shareholders' perception of Blackwells in the anticipated proxy

contest between Blackwells and the Company, and because the Blackwells October 21 Letter did not contain "multiple unsupported claims."

94.     The article stated that Blackwells had previously "reached out to [the Company's] management team asking to enter a separate business partnership—a proposal that was rejected." This statement was also materially false and misleading.

95.     The article quoted Mr. Bennett as having said that Mr. Aintabi "operates with family money almost exclusively" and "hopes that by harassing [Braemar] he can prove that he's worthy of managing his parents' money." These statements were materially false and misleading because they misconstrue Blackwells' ownership structure and who wields ultimate control over Blackwells, both of which are issues that the Company's shareholders are likely to consider in the proxy contest between Blackwells and the Company. In reality, Mr. Aintabi owns 100% of the equity in and wields full control over Blackwells and all related entities.[10]

96.     The article reported that the Blackwells October 21 Letter had "urged the [C]ompany's leadership to terminate its advisory agreement with its advisor Ashford [Hospitality]," and opined that it was "unclear how this would help the shareholders of Braemar."

---

[10] One journalist recently noted that the November 1, 2023 *Dallas Express* article is an example of "how the publication operates as a mouthpiece for its wealthy publisher" and how "Bennett wields the *Dallas Express* to attack his perceived enemies" in articles that tellingly have no "named byline." Steven Monacelli (@stevanzetti), Twitter (Apr. 10, 2024, 10:01 a.m., 10:17 a.m., 10:22 a.m.), https://perma.cc/38MC-AJZ7, https://perma.cc/YMP8-H8FV, https://perma.cc/ZGM4-8VVV. The same journalist (who Mr. Bennett has previously unsuccessfully sued for defamation) noted that it was "[i]ronic[]" for Mr. Bennett to "attack" Mr. Aintabi for purportedly "managing family money" given that Mr. Bennett himself "inherited family wealth."

### 2.     The December 5, 2023 *Dallas Express* Article

**97.**     On December 5, 2023, *The Dallas Express* published an article entitled "Blackwells' Aintabi Accused of Improper Conduct in Past Hotel Dealings." A copy of that article is available at https://perma.cc/2PSU-ZQLB.

**98.**     That article again described the Blackwells October 21 Letter as "contain[ing] multiple unsupported claims." This statement was materially false and misleading because the Blackwells October 21 Letter did not "contain[] multiple unsupported claims."

**99.**     The article claimed that Blackwells had "urged the [C]ompany's leadership to breach its contract with its advisor, which would trigger hundreds of millions of dollars in damages at Braemar." This statement was also materially false and misleading.

**100.**     The article also alleged that Mr. Aintabi had made "a number of unsubstantiated claims" in an unrelated lawsuit. This statement was materially false and misleading because it misconstrues Mr. Aintabi's business history in a way calculated to discredit the reputation of Mr. Aintabi and Blackwells in advance of an anticipated proxy contest between the Company and Blackwells.

### 3.     The December 8, 2023 *Dallas Express* Article

**101.**     On December 8, 2023, *The Dallas Express* published an article entitled "Disney Shareholder: Self-Described 'Activist' Aintabi Has 'Questionable Personal and Business History.'" A copy of that article is available at https://perma.cc/Q5QP-5ST9.

**102.**     That Article asserted that Mr. Aintabi had a "questionable personal and business history," has "developed a reputation as a publicity seeker," and is "known to engage in what could be described as retaliatory litigation." These statements were materially false and misleading because they improperly impugn Mr. Aintabi's character in a way calculated to influence the

opinions held by the Company's shareholders about Mr. Aintabi and Blackwells in advance of an anticipated proxy contest between the Company and Blackwells.

### 4.    The December 17, 2023 *Dallas Express* Article

**103.**    On December 17, 2023, *The Dallas Express* published an article entitled "Litigious Investor Aintabi Has History of Petty Lawsuits."   A copy of that article is available at https://perma.cc/PL36-NQ5E.

**104.**    That article claimed to present what it called "[m]ore evidence of seemingly retaliatory litigation" by Mr. Aintabi.  This statement was materially false and misleading.

**105.**    The December 17, 2023 article did not include any disclaimer regarding the relationship between Mr. Bennett, who is both the publisher of *The Dallas Express* and the chairman of the Company.

### 5.    The January 9, 2024 *Dallas Express* Article

**106.**    On January 9, 2024, *The Dallas Express* published an article entitled "'Activist' Investor Aintabi Reportedly 'Lied' and 'Schemed' Against Business Partner."   A copy of that article is available at https://perma.cc/392E-T46T.

**107.**    That article alleged a purported "pattern of alleged unethical behavior on the part of 'activist' investor Jason Aintabi," who the article said "seeks to inject himself into activist disputes way above his past experience level."   These statements were materially false and misleading.

**108.**    The article again asserted that Aintabi has "seemingly demonstrated a pattern of retaliatory behavior" and had "recently threatened litigation against *The Dallas Express* as well." The article did not disclose **why** Mr. Aintabi had threatened litigation against *The Dallas Express.*

27

**109.** The January 9, 2024 article did not include any disclaimer regarding the relationship between Mr. Bennett, who is both the publisher of *The Dallas Express* and the chairman of the Company.

      **F.**     **The Company Wrongfully Rejects the Blackwells Nominees**

**110.** On March 22, 2024, Blackwells filed its preliminary proxy statement with the SEC. That proxy statement announced that Blackwells was soliciting proxies from the Company's stockholders on multiple matters, including the election of Blackwells' Nominees to the Company's Board. Blackwells has already spent more than $2 million in connection with its proxy contest, and will spend millions more if necessary to unlock value for shareholders.

**111.** On March 24, 2024, the Company sent Blackwells' counsel a letter (the "Company's Rejection Letter") that purported to "reject[] and disregard[]" the Blackwells Nominees and the Blackwells Business Proposals. The Company's Rejection Letter identified three purported deficiencies in the Blackwells Nomination Notice, as detailed below.

**112.** <u>First</u>, the Company's Rejection Letter wrongly claimed that Blackwells had violated Regulation 14A and Article I, Sections 11(a)(3)(C) and 11(a)(3)(D)(iii) of the Bylaws by stating in the Blackwells Nomination Notice that Blackwells "currently has no interest in making an offer to acquire the [C]ompany." The Company believed that representation to be "false" and "not credible." The Company's Rejection Letter interpreted the December 2023 Slide Deck to mean that, as of March 10, 2024, Blackwells continued to maintain an interest in acquiring the Company. The Company's Rejection Letter also stated that the "Company believes that Blackwells currently intends to pursue an acquisition of . . . the Company" because "spending $5,000,000 on a proxy campaign in light of Blackwells' small ownership stake defies economic sense" and would not be rational unless Blackwells intended to acquire the Company.

113.    The Company's first stated basis for rejecting the Blackwells Nomination Notice is wholly unreasonable, materially inaccurate, contrary to the Bylaws, and illegal.  The Blackwells Nomination Notice's representation that Blackwells had no present intent to acquire the Company was truthful and accurate, and the Company's contrary determination appears to have been based on its misimpression that the **December 2023** Slide Deck represented Blackwells' views as of **March 2024**.  Moreover, the fact that Blackwells owned what the Company described as a "small ownership stake" in the Company as of the time of the Blackwells Nomination Notice is irrelevant to the question of whether Blackwells had a present intent to acquire the Company at that time.  In any case, it is not clear what more Blackwells possibly could have disclosed, given that its Nomination Notice openly noted that Blackwells "could **in the future** make a bid to acquire the [Company]" (emphasis added).  If the Company wants to try to convince its shareholders that Blackwells was lying in its nomination notice, the Company is free to do so.  But what the Company **cannot** do is strip shareholders of the right to make their own decisions about the Blackwells Nominees.

114.    Second, the Company's Rejection Letter wrongly claimed that Blackwells had violated Article I, Section 11(a)(3) of the Bylaws by failing to provide certain information with respect to so-called "Stockholder Associated Persons."  The Company's Rejection Letter claimed that the potential debt and equity investors who might have provided financing for Blackwells' now-abandoned plan to acquire the Company were "Stockholder Associated Persons" for purposes of the Bylaws, and that Blackwells violated the Bylaws by failing to provide certain details about those investors in the Blackwells Nomination Notice.

115.    The Company's second stated basis for rejecting the Blackwells Nomination Notice is wholly unreasonable, materially inaccurate, contrary to the Bylaws, and illegal.  The Blackwells

APP.183

Nomination Notice provided all information regarding "Stockholder Associated Persons" that was required by the Bylaws. And even if that were not the case, Article I, Section 11(a)(3) of the Bylaws is illegal under Maryland law and therefore cannot be enforced against Blackwells.

116.    Article I, Section 11(a)(3) of the Bylaws was not amended on a "clear day" but instead amended just seven days after Blackwells requested the Questionnaire. Knowing that Blackwells had previously expressed an interest in acquiring the Company and may have discussed such plans with financing sources, the Board amended the Company's Bylaws in bad faith in order to unreasonably heighten the disclosure requirements that Blackwells in particular would face when it made its nominations. To make matters worse, the Company then interpreted the amended version of its Bylaws to require disclosure of information that a nominating stockholder might not even have access to. The new definition of "Stockholder Associated Person" includes any entity that "has engaged in activities undertaken with the purpose or effect of changing or influencing control of the [Company]." The Bylaws do not define the term "engaged in activities." The Bylaw amendments are illegal because they are wholly unfair to shareholders, serve no legitimate business purpose, are impermissibly vague and subjective, were not adopted on a "clear day," and were intended to chill the corporate franchise by requiring impossible and unnecessary disclosures. Because Article I, Section 11(a)(3) of the Bylaws is illegal, it cannot be enforced.[11]

117.    <u>Third</u>, the Company's Rejection Letter wrongly claimed that the Blackwells

---

[11] Assuming that this portion of the Bylaws is legal (and it is not), the Company never explained in the Rejection Letter why the onerous disclosure requirements contained in the Bylaws would not also apply to the Company itself (which is seeking the reelection of the incumbent directors) or to Ashford Hospitality (which has a right to designate nominees to the Company's Board). If the Bylaws are read to require those types of disclosures from the Company and the Ashford Affiliates, then the re-nomination of the incumbent directors is invalid, because the required disclosures were never made. If the Bylaws are read not to require the Company and the Ashford Affiliates to make such disclosures, then the bylaws are invalid because they create different classes of shareholders in violation of governing Maryland law and the Company's own charter.

APP.184

Nomination Notice contained "additional inaccuracies and omissions." For example, the Company claimed that the Questionnaires submitted by certain of the Blackwells Nominees contained misstatements and omissions, and therefore violated Article I, Section 11(a)(4) of the Bylaws. The Company also claimed that Blackwells violated Article I, Section 11(a)(3)(D)(iv) of the Bylaws because the Blackwells Nomination Notice did not contain certain disclosures that would have been required in a filing made with the Committee on Foreign Investment in the United States ("CFIUS").

118.    The Company's third stated basis for rejecting the Blackwells Nomination Notice is wholly unreasonable, materially inaccurate, contrary to the Bylaws, and illegal. The statements identified in the Company's Rejection Letter are not material misstatements or omissions, and in any event the Bylaws require only that the Questionnaires be "complete[]" rather than accurate. The Company's decision to reject the Blackwells Nominees based on supposed deficiencies in the Questionnaire was plainly inequitable, especially in light of the information provided in the Blackwells Supplement. *See infra* ¶¶ 120–125. Moreover, Article I, Sections 11(a)(3)(D)(iv) and 11(a)(4) of the Bylaws do not require the types of CFIUS disclosures referenced in the Company's Rejection Letter. And in any case, Article I, Section 11(a)(3)(D)(iv) of the Bylaws is illegal under Maryland law and therefore cannot be enforced against Blackwells.

119.    Section 11(a)(3)(D)(iv) of the Bylaws is illegal because it is wholly unfair to shareholders, serves no legitimate business purpose, was not adopted on a "clear day," and is intended to chill the corporate franchise by requiring onerous and unnecessary disclosures. When the Bylaws were amended, the Board knew that Blackwells had made an offer to acquire the Company within the last two years. The Company's Rejection Letter baselessly asserted that Blackwells should be required to make disclosures under CFIUS, which is one of the most

APP.185

burdensome regulatory review processes implemented by the federal government. That assertion was apparently premised on the Company's incorrect belief that Mr. Aintabi is a foreign national. It appears that the Company's amendments to Section 11(a)(3)(D)(iv) of the Bylaws were designed with the specific intent of complicating nominations by Mr. Aintabi and Blackwells specifically, based on the false premise that Mr. Aintabi is not a U.S. citizen.

> **G.**    **Blackwells Timely Provides a Supplement to its Nomination Notice**

120.    For the reasons explained above, the Blackwells Nomination Notice fully complied with the Company's Bylaws and should not have been rejected.

121.    In the spirit of disclosure and in hopes of avoiding needless litigation, Blackwells sent the Company a supplement to the Blackwells Nomination Notice on March 26, 2024 (the "Blackwells Supplement"). The Blackwells Supplement was sent within two business days after Blackwells received the Company's Rejection Letter, and was therefore timely under the Bylaws.

122.    In the Blackwells Supplement, Blackwells provided additional information that was relevant to certain of the arguments made by the Board in the Company's Rejection Letter.

123.    The Blackwells Supplement explained that:

[i]n the process of preparing the Nomination Notice, the date listed on the first page of the [December 2023 Slide Deck] was inadvertently changed from "December 2023" to "March 2024." The version of the December 2023 Presentation that was provided to [Blackwells' counsel] by the Nominating Stockholder was dated December 2023. In the process of redacting the name of the recipient of the December 2023 Presentation, [Blackwells' counsel] erroneously titled the presentation March 2024. . . . [A]s stated in the Nomination Notice, the Nominating Stockholder currently has no intention of pursuing an acquisition or similar transaction with respect to the Corporation

124.    The Blackwells Supplement also explained that Ms. McCoy was supplementing her answer to Question 14(b) of the Questionnaire, which sought information concerning bankruptcy proceedings in which the nominee may previously have been involved. Question 14(b) is worded confusingly, and Ms. McCoy reasonably interpreted that question to only be seeking information

APP.186

about bankruptcies that occurred within the two years prior to submission of the Questionnaire.  In the interest of full disclosure, the Blackwells Supplement explained that Ms. McCoy had filed a petition for bankruptcy in Florida some twenty years earlier, in 2004.

125.    On April 4, 2024, the Company sent Blackwells a letter that purported to "reject[] and disregard[]" the Blackwells Supplement because that supplement was supposedly untimely.

### H.    The Company Conducts an Illegal Proxy Campaign

#### 1.    The Company's March 25, 2024 News Release

126.    On March 25, 2024, the Company issued a so-called "News Release" (the "March 25 News Release") entitled "Braemar Hotels & Resorts Announces Rejection of Materially Deficient Director Nomination Notice from Blackwells Capital."

127.    The March 25 News Release stated that the Blackwells Nomination Notice contains "False Statements and Material Omissions."  This statement in the March 25, 2024 News Release was materially false and misleading because the Blackwells Nomination Notice does not contain "false statements and material omissions."

128.    The March 25 News Release stated that Blackwells has a "Plan" to "Sell the Company Below its Intrinsic Value to Blackwells and its Affiliates."  This statement in the March 25 News Release was materially false and misleading because it incorrectly implied that Blackwells' incentives are misaligned with those of other shareholders, when in reality Blackwells has abandoned its intent to acquire the Company and now seeks to unlock value for all shareholders by having reform-minded directors elected to the Board.

129.    The March 25 News Release stated that the Blackwells Nomination Notice "fail[ed] to disclose the fund's true objectives," which it characterized as "an underhanded attempt to effectuate a takeover of the Company without paying an adequate price."  These statements in the March 25 News Release were materially false and misleading because, in addition to incorrectly

implying that Blackwells' incentives were misaligned with other shareholders, they impugned the character and motivations of Blackwells and Mr. Aintabi without basis.

130.    The March 25 News Release quoted Mr. Bennett as having said that Blackwells "disregarded Braemar's bylaws," "mask[ed] its real intentions," and intended to "wag[e] . . . an illegal proxy contest."  These statements in the March 25 News Release were materially false and misleading because they wrongly assert that Blackwells has behaved illegally and been untruthful, when in fact it is the Company that has disregarded and misapplied its own Bylaws to entrench its incumbent directors.

131.    The March 25 News Release accused Blackwells of "refus[ing] to provide the Company with the basic information needed to assess the viability of [Blackwells'] bid" to buy the Company.  This statement in the March 25 News Release was materially false and misleading because it accused Blackwells of withholding information regarding its 2023 Proposed Acquisition, when in fact it was the Company that failed to reasonably engage with Blackwells.

132.    The March 25 News Release stated:  "Although its preliminary proxy statement filed on March 22, 2024 asserts that Blackwells has 'withdrawn' any interest it had in acquiring the Company, the facts contradict this."  This statement in the March 25 News Release was materially false and misleading because the Company had no legitimate basis for saying that "the facts contradict" that Blackwells withdrew its interest in acquiring the Company.  Blackwells has no current intent to acquire the Company and has said so multiple times.

133.    Also on March 25, 2024, the Company filed with the SEC a Current Report on Form 8-K.  That Form 8-K attached the March 25 News Release as Exhibit 99.1.

134.    The Company's Form 8-K stated that the Company's "Board has unanimously determined that the Blackwells Nomination Notice is invalid due to numerous deficiencies, most

notably a failure to disclose the fund's true objectives, which the Company believes include an underhanded attempt to effectuate a takeover of the Company without paying an adequate price."

135.    The March 25 News Release was a "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy."  17 C.F.R. § 240.14a-1(*l*)(iii) (defining "solicitation").

136.    The Company did not file the March 25 News Release with the SEC as soliciting material, in violation of Rule 14a-12, 17 C.F.R. § 240.14a-12(b).

137.    The March 25 News Release omits required legends, in violation of Rule 14a-12, 17 C.F.R. § 240.14a-12(b).

### 2.    The Company's March 28, 2024 Definitive Proxy Statement

138.    On March 28, 2024, the Company filed a definitive proxy statement with the SEC.

139.    The Company's decision to file a definitive proxy statement without having first filed a preliminary proxy statement violated the Exchange Act.  *See* 17 C.F.R. § 240.14a-6.

140.    The Company's March 28, 2024 definitive proxy statement announced that the Company will hold its 2024 Annual Meeting on May 15, 2024.  Under the Company's Bylaws and Maryland law, the date of the Annual Meeting is set in the Company's unilateral discretion, subject only to the limitation that it must occur at some point in 2024.

### 3.    The Company's April 2, 2024 Preliminary Proxy Statement

141.    On April 2, 2024, the Company filed a preliminary proxy statement with the SEC.

142.    The Company's preliminary proxy statement contains a number of materially false and misleading claims, and violates SEC Rules in a variety of respects.  The purposes of these violations were to (1) obscure the extent of control that Ashford Hospitality and the other Ashford Affiliates wield over the Company; (2) conceal the details of Mr. Bennett's ongoing efforts to use *The Dallas Express* to spread materially false and misleading claims about Blackwells; and (3)

continue to impugn the character, motive, and credentials of Blackwells and Mr. Aintabi.

143.    Although the Company's preliminary proxy statement does disclose that it is required to nominate director candidates hand-picked by Ashford Hospitality, it failed to disclose certain information about Ashford Hospitality required by Schedule 14A, and failed to identify which directors were selected by Ashford Hospitality.

144.    And while the preliminary proxy statement revealed that Mr. Bennett is the publisher of *The Dallas Express*, it did not disclose Mr. Bennett's other titles held at *The Dallas Express*, and failed to provide the additional information required by Schedule 14A with respect to Mr. Bennett's relationship with *The Dallas Express*.

145.    The preliminary proxy statement failed to disclose *The Dallas Express* as a proxy participant, despite its frequent publication of what amount to Company press releases slandering a party the Company either knew or suspected would soon be filing a solicitation in opposition.

146.    The preliminary proxy statement also falsely claimed that Blackwells was "acting in its own interest" rather than "on behalf of all shareholders" when it sought to buy the Company in December 2023.  But when Blackwells offered to purchase the Company at a substantial premium, the transaction would have benefitted all stockholders.  The Company's Board nonetheless declined to give Blackwells' Proposed Acquisition the attention it deserved, because that acquisition would have ended the profiteering of Mr. Bennett and his loyalists.

147.    The preliminary proxy statement also falsely stated that it had "substantial evidence—including a *March 2024* investor presentation . . . —indicating that Blackwells had ongoing interest in an acquisition, and that its interest was a motivation for its proxy campaign."

148.    But Blackwells informed the Company well before it filed its preliminary proxy statement that the March date on the referenced investor presentation was a clerical error, and that

APP.190

the actual presentation was from December 2023. The Company ignored this information and insisted on publishing materially false and misleading claims in its preliminary proxy statement.

**149.** The Company's preliminary proxy statement impugns Mr. Aintabi's character without foundation by suggesting his purported "lack of candor, reputation in the business community, and personal history" contributed to the Board's rejection of the Blackwells Nomination Notice. These statements are materially false and misleading because they could influence shareholders into voting against Blackwells nominees based on an incorrect perception of Blackwells' and Mr. Aintabi's business history.

### I.    Company Initiates Meritless Litigation

**150.** On March 24, 2024, within mere hours of sending its Rejection Letter to Blackwells, the Company filed a Complaint against Blackwells and certain Blackwells-related entities in this Court (the "Company's Complaint"). That case, styled *Braemar Hotels & Resorts Inc. v. Blackwells Capital LLC et al.*, was docketed as number 3:24-cv-00707 and assigned to the Honorable Sam Lindsay.

**151.** The Company's meritless Complaint is consistent with its past practice of leveraging litigation to stop proxy contests involving the Company and/or the Ashford Affiliates.

**152.** The Company's Complaint seeks (1) to enjoin Blackwells' solicitation of proxies, (2) a declaratory judgment that the Blackwells Nomination Notice violated the Bylaws and that Blackwells' Nominees are therefore invalid, and (3) a declaratory judgment that Blackwells cannot "cure" the purported deficiencies in the Blackwells Nomination Notice.

**153.** On March 24, 2024, the Company filed a motion for a preliminary injunction. The Court has not yet acted on the Company's motion.

APP.191

## CLAIMS FOR RELIEF

### Count 1 (Declaratory Relief): The Blackwells Nomination Notice Is Proper and Valid

154.     Blackwells incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

155.     There is a real and justiciable controversy between Blackwells and the Defendants concerning the validity of the Blackwells Nomination Notice—and, more specifically, on the question whether the Defendants properly rejected the Blackwells Nominees and the Blackwells Business Proposals.

156.     The Blackwells Nomination Notice timely provided all information that the Company's Bylaws required Blackwells to provide in connection with its nominations and business proposals.

157.     The Blackwells Nomination Notice did not violate the Bylaws and is not invalid.

158.     Because the Blackwells Nomination Notice was proper and valid, the Company acted wrongfully, and violated its own Bylaws, by rejecting the Blackwells Nominees and the Blackwells Business Proposals.

159.     The Company's rejection of the Blackwells Nominees and the Blackwells Business Proposals was impermissibly inequitable.

160.     If a declaratory judgment is not provided and the Blackwells Nominees are not permitted to stand for election, the rights of Blackwells and the Company's other stockholders will be adversely affected, and Blackwells and the Company's stockholders will suffer harm.

161.     Blackwells is entitled to a declaratory judgment that (1) the Blackwells Nomination Notice was valid under the Company's Bylaws, (2) the Blackwells Nominees are eligible to stand for election to the Board at the Company's upcoming 2024 Annual Meeting, and (3) the Blackwells

APP.192

Business Proposals are eligible to be considered and voted on at the Company's upcoming 2024 Annual Meeting.

### Count 2 (Declaratory Relief):  The Blackwells Supplement Was Timely

**162.**    Blackwells incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

**163.**    The four corners of the Blackwells Nomination Notice provided all information required by the Bylaws, and the Blackwells Nomination Notice should not have been rejected.

**164.**    In the spirit of full disclosure, Blackwells sent the Blackwells Supplement to the Company two days after receiving the Company's Rejection Letter.  The Blackwells Supplement provided information concerning the December 2023 Slide Deck and Ms. McCoy's bankruptcy.

**165.**    To the extent that the information in Ms. McCoy's initial Questionnaire might be construed as having been incomplete or inaccurate, the Blackwells Supplement fully corrected and cured any conceivable omission or inaccuracy.

**166.**    To the extent that any information in the December 2023 Slide Deck might be construed as suggesting that Blackwells had an intent to acquire the Company as of March 2024, the Blackwells Supplement re-confirmed that no such intent existed at that time.

**167.**    The Blackwells Supplement was timely under Article I, Section 11(c)(1) of the Bylaws because it was sent "within two Business Days" of the Company's Rejection Letter.

**168.**    By letter of April 4, 2024, the Company purported to "reject[] and disregard[]" the Blackwells Supplement because the Blackwells Supplement was supposedly untimely.

**169.**    There is a real and justiciable controversy between Blackwells and the Defendants concerning the timeliness of the Blackwells Supplement.

**170.**    Because the Blackwells Supplement was timely, the Company acted wrongfully, and breached its Bylaws, by rejecting the Blackwells Supplement as untimely.

APP.193

**171.**    The Company's decision to "reject[]" the Blackwells Supplement as untimely was impermissibly inequitable.

**172.**    If a declaratory judgment is not provided and the Blackwells Supplement is not determined to be timely, the rights of Blackwells and the Company's other stockholders will be adversely affected, and Blackwells and the Company's stockholders will suffer harm.

**173.**    Blackwells is entitled to a declaratory judgment that the Blackwells Supplement is timely and cured any conceivable omission or misstatement contained in the Blackwells Nomination Notice.

<u>**Count 3: Breach of Contract**</u>

**174.**    Blackwells incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

**175.**    Under Maryland law, the Companies' Bylaws are a contract between the Company and its shareholders.

**176.**    By purporting to reject the Blackwells Nominees and Blackwells Business Proposals based on spurious claims that the Blackwells Nomination Notice did not comply with the Bylaws, the Company violated its own Bylaws, and in so doing breached obligations owed to Blackwells and other stockholders under the Company's Bylaws.

**177.**    By purporting to reject the Blackwells Supplement as untimely, the Company violated its own Bylaws, and in so doing breached obligations owed to Blackwells and other stockholders under the Company's Bylaws.

**178.**    Blackwells has suffered damages as a result of the Company's breaches. Blackwells' damages exceed $75,000 and will be proven with particularity at trial.

APP.194

**Count 4 (Declaratory Relief): The 2024 Bylaw Amendments Violate**
**Maryland Code (Corporations and Associations) § 2-404 and Are Null and Void**

179.    Blackwells incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

180.    Count 1 of this Complaint seeks a declaration that Blackwells' nominations were valid under the Bylaws. In the event that the Court determines that the Blackwells nominations were invalid under the Bylaws, Count 4 seeks, in the alternative, a declaration that the relevant Bylaws are null and void, and therefore cannot be enforced against Blackwells.

181.    Section 2-404(b)(1) of the Maryland Corporations and Associations Code provides that, "at each annual meeting of stockholders, the stockholders shall elect directors to hold office."

182.    Under Section 2-404(b)(1) of the Maryland Corporations and Associations Code, shareholders are entitled to nominate and vote for directors of their choice. The right of stockholders to elect directors is the cornerstone of American corporate law.

183.    Defendants advance an interpretation of the Company's Bylaws which would violate Blackwells' rights as stockholder to nominate candidates for election to the Company's Board, and to have an election on those nominations take place at the 2024 Annual Meeting.

184.    Under Defendants' application of the Bylaws, Blackwells would face onerous disclosure burdens that serve no legitimate business purpose and would create unreasonable obstacles to Blackwells' lawful exercise of its shareholder nomination and voting rights.

185.    The amended Bylaws include language that is impermissibly vague and ambiguous, including but not limited to the use of the undefined term "engaged in activities."

186.    If the Defendants' interpretation of the 2024 Bylaw Amendments is correct, then the 2024 Bylaw Amendments violate Section 2-404(b)(1) of the Maryland Corporations and Associations Code.

APP.195

**187.**    There is a real and justiciable controversy between Blackwells and the Defendants concerning the validity of the 2024 Bylaw Amendments under Maryland law.

**188.**    Blackwells is entitled to a declaratory judgment that the 2024 Bylaw Amendments violate the Maryland Corporations and Associations Code and thus cannot be enforced by the Company.

### Count 5: Defendants Breached their Common Law, Fiduciary, and Statutory Duties to Enact Bylaws Containing Fair Voting Procedures

**189.**    Blackwells incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

**190.**    Count 1 of this Complaint seeks a declaration that Blackwells' nominations were valid under the Bylaws.  In the event that the Court determines that the Blackwells nominations were invalid under the Bylaws, Count 5 seeks, in the alternative, a ruling that the Company and its directors breached their common law, fiduciary, and statutory duties when enacting the relevant Bylaws, and that the Bylaws therefore cannot be enforced against Blackwells.

**191.**    Under Maryland law, a company and its directors cannot enact bylaws for the purpose of entrenching the current management of the company.  Maryland law is especially skeptical of bylaws that were not adopted on the proverbial "clear day" and were instead adopted in direct response to a proxy contest.

**192.**    Defendants adopted the 2024 Bylaw Amendments in direct response to Blackwells' anticipated proxy contest, and for the purpose of entrenching the current directors.

**193.**    Defendants failed to enact Bylaws that provide fair and reasonable voting procedures, and in so doing they breached their common law, fiduciary, and statutory duties under Maryland law.

APP.196

**194.** Moreover, Defendants have prejudicially interpreted the Bylaws in the most restrictive way possible, for the sole purpose of excluding Blackwells' duly nominated director candidates from election to the Company's Board. Under Defendants' interpretation, the Bylaws violate shareholders' nomination and voting rights and are therefore illegal. Insofar as the Bylaws can be read in a manner that would support Defendants' interpretation, the Bylaws allow for an impermissible degree of discretion in Board decisionmaking, which Defendants then exercised against Blackwells' shareholder rights, in violation of Defendants' common law, fiduciary, and statutory duties.

**195.** The Company's Bylaws are null and void and cannot be applied to "reject" Blackwells' nominations of candidates to the Company's Board.

### Count 6 (Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-12): Unlawful Solicitation — March 25 News Release

**196.** Blackwells incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

**197.** Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), prohibits soliciting proxies in violation of SEC rules.

**198.** Rule 14a-12(a) requires all solicitations "made before furnishing security holders with a proxy statement" to identify "the participants in the solicitation" and carry a "prominent legend in clear, plain language advising security holders to read the proxy statement when it is available."

**199.** Rule 14a-12(a) requires all solicitations "made before furnishing security holders with a proxy statement" to be filed with the SEC "no later than the date the material is first published." Such material "must include a cover page in the form set forth in Schedule 14A . . . and the appropriate box on the cover page must be marked."

APP.197

**200.** Rule 14a-12(c) applies to solicitations "by any person or group of persons for the purpose of opposing a solicitation," and subjects such solicitations to additional requirements.

**201.** On March 25, 2024, the Company issued a "News Release" containing numerous materially false and misleading statements regarding Blackwells. *See supra* ¶¶ 127–134.

**202.** Rather than file the March 25 News Release as soliciting material using the cover page required by Schedule 14A, the Company sought to disguise its press release as an 8-K Current Report.

**203.** The March 25 News Release is an improper filing and is confusing to shareholders seeking to gain information about the ongoing proxy contest.

**204.** The Company further violated Rule 14a-12(a) by failing to include the legends required by that Rule and thereby depriving stockholders of relevant information.

**205.** The March 25 News Release violates Section 14(a) of the Exchange Act and Rule 14a-12. Defendants should immediately provide complete and accurate corrective disclosures by filing such disclosures with the SEC.

### Count 7 (Violation of Section 14(a) of the Exchange Act and SEC <u>Rule 14a-9): False and Misleading Statements — March 25 News Release</u>

**206.** Blackwells incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

**207.** Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), prohibits soliciting proxies in violation of SEC rules.

**208.** Rule 14a-9 prohibits making a solicitation "by means of any . . . communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."

APP.198

209.    On March 25, 2024, the Company issued a News Release containing numerous materially false and misleading statements regarding Blackwells.  These materially false and misleading statements are detailed in paragraphs 127 to 134 above.

210.    The false statements in the March 25 News Release violate Rule 14a-9 because they are false, misleading, and material to stockholders' consideration of the ongoing proxy contest between Blackwells and the Company.  The misstatements in the March 25 News Release were calculated by the Company to give shareholders the false impression that Blackwells still harbored an intent to purchase the Company and that Blackwells' incentives were therefore misaligned with other shareholders.  This is not true.  Blackwells had abandoned its intent to acquire the Company by March 2024, as the Board well knows.

211.    Defendants consequently violated Section 14(a) of the Exchange Act and Rule 14a-9.  Defendants should immediately provide complete and accurate corrective disclosures by filing such disclosures with the SEC.

### Count 8 (Violation of Section 14(a) of the Exchange Act and SEC Rules 14a-9 and 14a-12):  Unlawful Solicitation Through *The Dallas Express*

212.    Blackwells incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

213.    Section 14(a) of the  Exchange Act, 15 U.S.C. § 78n(a), prohibits soliciting proxies in violation of SEC rules.

214.    Under Rule 14a-1, "solicitation" includes "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy."

215.    Rule 14a-12(a) requires all solicitations "made before furnishing security holders with a proxy statement" to identify "the participants in the solicitation" and carry a "prominent

45

legend in clear, plain language advising security holders to read the proxy statement when it is available."

216.     Rule 14a-12(a) requires all solicitations "made before furnishing security holders with a proxy statement" to be filed with the SEC "no later than the date the material is first published." Such material "must include a cover page in the form set forth in Schedule 14A . . . and the appropriate box on the cover page must be marked."

217.     Rule 14a-12(c) applies to solicitations "by any person or group of persons for the purpose of opposing a solicitation," and subjects such solicitations to additional requirements.

218.     Rule 14a-9 prohibits making a solicitation "by means of any . . . communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."

219.     As described in paragraphs 89 to 109 above, *The Dallas Express* published several articles between November 2023 and January 2024 which were clearly intended to disparage Blackwells and Mr. Aintabi in anticipation of an expected proxy contest.

220.     At that time, the Company, Mr. Bennett, Ashford Inc., and *The Dallas Express* were all aware that Blackwells was likely to launch a proxy contest against the Company.

221.     *The Dallas Express* is an undisclosed participant in a proxy contest because it has engaged in solicitation of Company shareholders by publishing articles "reasonably calculated" to influence shareholder voting in an anticipated proxy contest between Blackwells and the Company.

222.     The articles published in *The Dallas Express* violate Rule 14a-12(a) by failing to include the required legend or identify the participants in Defendants' proxy solicitation.

APP.200

223. The articles published in *The Dallas Express* violate Rule 14a-12(b) because they were not filed with the SEC as soliciting materials on the day they were published.

224. The articles published in *The Dallas Express* violate Rule 14a-9 because failing to include the information required by Rule 14a-12 renders the statements materially false and misleading. As presented, a shareholder reading *The Dallas Express* articles could conclude that the articles present the neutral point of view of a disinterested and professional news organization, when, in fact, *The Dallas Express* serves as a mouthpiece for Mr. Bennett and the Company.

225. Defendants consequently violated Section 14(a) of the Exchange Act and Rules 14a-9 and 14a-12. Defendants should immediately provide complete and accurate corrective disclosures by filing such disclosures with the SEC.

### Count 9 (Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9): False and Misleading Statements by *The Dallas Express*

226. Blackwells incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

227. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), prohibits soliciting proxies in violation of SEC rules.

228. Rule 14a-9 prohibits making a solicitation "by means of any . . . communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."

229. The Note to Rule 14a-9 further advises that, depending on the circumstances, among other things, "[m]aterial which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or

APP.201

immoral conduct or association, without factual foundation" can be "misleading" for purposes of Rule 14a-9.

     **230.**    As detailed in paragraphs 89 to 109 above, numerous statements in *The Dallas Express* articles published between November 2023 and January 2024 contained materially false and misleading information.

     **231.**    Defendants consequently violated Section 14(a) of the Exchange Act and Rule 14a-9. Defendants should immediately provide complete and accurate corrective disclosures by filing such disclosures with the SEC.

**Count 10 (Violation of Section 14(a) of the Exchange Act and SEC Rules 14a-3 and 14a-9): False and Misleading Statements — Company's Preliminary Proxy Statement**

     **232.**    Blackwells incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

     **233.**    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), prohibits soliciting proxies in violation of SEC rules.

     **234.**    Rule 14a-3 requires that each person solicited shall be furnished with a "publicly-filed preliminary or definitive proxy statement" containing the information specified in Schedule 14A.

     **235.**    The Company violated Rule 14a-3 by failing to include all information required in Schedule 14A in its preliminary proxy statement.

     **236.**    Schedule 14A Item 5(b)(1) instructs proxy statement filers in contested elections to disclose certain information about "each participant" in a proxy contest, including the identity of all participants. A "participant" is defined in Instruction 3 to Item 4 of Schedule 14A to include "any person who solicits proxies." And per Rule 14a-1, "solicitation" includes "communication

48

to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy."

237.    As described in paragraphs 81 to 109 above, *The Dallas Express* has acted as an undisclosed participant in this proxy contest. The Company violated Rule 14a-3 by omitting to disclose *The Dallas Express* as a participant in the proxy contest, materially misrepresenting the identity of the proxy participants, and failing to include in its preliminary proxy statement all of the information about *The Dallas Express* that is called for in Item 5(b)(1) of Regulation 14A.

238.    Schedule 14A Item 5(b)(2) requires the disclosure of "any substantial interest, direct or indirect, by security holdings or otherwise" for "any person, other than a director or executive officer of the registrant acting solely in that capacity, who is a party to an arrangement or understanding pursuant to which a nominee for election as director is proposed to be elected." For each such person, Item 5(b)(2) also requires the disclosure of certain additional information outlined in Item 5(b)(1)(xi) and (xii).

239.    The Company's preliminary proxy statement also materially misstates the Company's relationship with Ashford Hospitality. The preliminary proxy disclosed that the Company is required to nominate directors designated by Ashford Hospitality, but failed to describe any substantial interest of Ashford Hospitality to be acted on at the Annual Meeting and failed to include the information about Ashford Hospitality called for in Schedule 14A, Item 5(b)(1)(xi) and (xii). These material misstatements constitute violations of Rule 14a-3.

240.    Schedule 14A Item 7(b) requires disclosure of, among other things, the information required by Item 401(e)(1) of Regulation S-K, which includes "the business experience during the past five years of each director, executive officer, person nominated or chosen to become a director or executive officer."

APP.203

241.    In the section titled "Background of the Solicitation," the preliminary proxy statement revealed that Mr. Bennett is the publisher of *The Dallas Express*, but materially misstated Mr. Bennett's other titles held at *The Dallas Express*, failed to provide the additional information required by Item 401(e)(1) with respect to Mr. Bennett's time at *The Dallas Express*, and failed to disclose Mr. Bennett's role in his biography.  These material misstatements violate Rule 14a-3.

242.    Rule 14a-9 prohibits making a solicitation "by means of any . . . communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."

243.    The Note to Rule 14a-9 further advises that, depending on the circumstances, among other things, "[m]aterial which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or association, without factual foundation" can be "misleading" for purposes of Rule 14a-9.

244.    The Company's preliminary proxy violates Rule 14a-9 by including numerous materially false and misleading statements.

245.    On page 8 of its preliminary proxy statement, the Company falsely stated that it had "substantial evidence—including a *March 2024* investor presentation . . . —indicating that Blackwells had ongoing interest in an acquisition, and that its interest was a motivation for its proxy campaign."  But Blackwells informed the Company on March 26, 2024 that the March 2024 date on the referenced investor presentation was a clerical error, and that the slide deck was actually prepared in December 2023.  The Company ignored this information and insisted on

APP.204

publishing fiction in its preliminary proxy statement. The Company's statements about the December 2023 Slide Deck are materially false and misleading because they intentionally disregard the facts presented to the Company by Blackwells and persist in misconstruing Blackwells motives in the proxy contest. These misstatements are calculated by the Company to cause shareholders to believe that Blackwells' incentives are misaligned with other shareholders, when in fact Blackwells' goal is to unlock value for all shareholders.

246.    Also on page 8 of its preliminary proxy statement, the Company impugns, without foundation, Mr. Aintabi's character by suggesting his purported "lack of candor, reputation in the business community, and personal history" contributed to the Board's rejection of the Blackwells Nomination Notice. These statements are materially false and misleading because they are spurious and unfounded, and are clearly calculated to influence shareholder opinion of Blackwells and Mr. Aintabi.

247.    On page 10 of its preliminary proxy statement, the Company omits key facts, thus rendering its statements materially false and misleading. The Company states that its "Nominating and Corporate Governance Committee" recommended eight candidates for election as directors. Later in the preliminary proxy statement, the Company reveals that Ashford Hospitality controls the nomination of two directors. The preliminary proxy materially misstates the nomination process for these candidates by failing to include the names of the candidates nominated by Ashford Hospitality. This material misstatement renders all statements by the Company about its nomination of director candidates misleading. As written, the preliminary proxy statement gives the impression that a Board committee was responsible for all nominations. But in reality, Ashford Hospitality, which profits handsomely from maintaining its grip on the Company, is directly responsible for two nominations.

**248.** Defendants consequently violated Section 14(a) of the Exchange Act and Rules 14a-3 and 14a-9.  Defendants should immediately provide complete and accurate corrective disclosures by filing such disclosures with the SEC.

### JURY DEMAND

Blackwells demands a trial by jury on all issues triable as such.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Blackwells Capital LLC respectfully requests that the Court enter each of the following forms of relief:

a.    Granting the forms of declaratory relief set forth above;

b.    Enjoining the Company from continuing to obstruct Blackwells from nominating candidates to the Company's Board of directors;

c.    Ordering that the Company must count votes cast in favor of the Blackwells Nominees at the Annual Meeting;

d.    Ordering that the Company publicly correct the material misstatements and omissions outlined above, including by filing with the SEC complete and accurate disclosures required by Section 14(a) of the Exchange Act and the SEC Rules;

e.    Enjoining the Company from soliciting proxies until such corrective disclosures are issued;

f.    Awarding Blackwells money damages in an amount to be proven at trial;

g.    An award of the attorneys' fees, costs, and expenses that Blackwells has or will incur in connection with this action; and

h.    Such other relief as is just and proper.

APP.206

Date:  April 11, 2024                              Respectfully submitted,

                                                   */s/ Robert Ritchie*
                                                   _____

                                                   Robert Ritchie
                                                     Texas Bar No. 24079213
                                                   K. Virginia Burke DeBeer
                                                     Texas Bar No. 24097437
                                                   VINSON & ELKINS LLP
                                                   2001 Ross Avenue, Suite 3900
                                                   Dallas, Texas 75201
                                                   Phone: (214) 220-7823
                                                   Email: rritchie@velaw.com
                                                   Email: vdebeer@velaw.com

                                                   *Counsel for Plaintiff*

APP.207

# Exhibit A

Fifth Amended and Restated Bylaws of Braemar Hotels & Resorts Inc.

**EXHIBIT 3.2**

BRAEMAR HOTELS & RESORTS INC.

FIFTH AMENDED AND RESTATED BYLAWS

February 27, 2024

as amended by

Amendment No. 1 on February 27, 2024

BRAEMAR HOTELS & RESORTS INC.

FIFTH AMENDED AND RESTATED BYLAWS

ARTICLE I
STOCKHOLDERS

Section 1. <u>Place</u>. All meetings of stockholders shall be held at the principal executive office of Braemar Hotels & Resorts Inc. (the "<u>Corporation</u>") or at such other place as shall be set by the Board of Directors (the "<u>Board</u>") in accordance with these Bylaws and stated in the notice of the meeting.

Section 2. <u>Annual Meeting</u>. An annual meeting of stockholders for the election of directors and the transaction of any business within the powers of the Corporation shall be held on the date and at the time and place set by the Board of Directors.

Section 3. <u>Special Meetings</u>.

(a) <u>General</u>. Each of the Chairman of the Board, Chief Executive Officer and Board of Directors may call a special meeting of stockholders. Except as provided in subsection (b)(4) of this Section 3, a special meeting of stockholders shall be held on the date and at the time and place set by the Chairman of the Board, Chief Executive Officer or Board of Directors, whoever has called the meeting. Subject to subsection (b) of this Section 3, a special meeting of stockholders shall also be called by the secretary of the Corporation to act on any matter that may properly be considered at a meeting of stockholders upon the written request of stockholders entitled to cast not less than a majority of all the votes entitled to be cast on such matter at such meeting.

(b) <u>Stockholder-Requested Special Meetings</u>.

(1) Any stockholder of record seeking to have stockholders request a special meeting shall, by sending written notice to the secretary (the "<u>Record Date Request Notice</u>") by registered mail, return receipt requested, request the Board of Directors to fix a record date to determine the stockholders entitled to request a special meeting (the "<u>Request Record Date</u>"). The Record Date Request Notice shall set forth the purpose of the meeting and the matters proposed to be acted on at it, shall be signed by one or more stockholders of record as of the date of signature (or their agents duly authorized in a writing accompanying the Record Date Request Notice), shall bear the date of signature of each such stockholder (or such agent) and shall set forth all information relating to each such stockholder and each matter proposed to be acted on at the meeting that would be required to be disclosed in connection with the solicitation of proxies for the election of directors in an election contest (even if an election contest is not involved), or would otherwise be required in connection with such a solicitation, in each case pursuant to Regulation 14A (or any successor provision) under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (the "<u>Exchange Act</u>"). Upon receiving the Record Date Request Notice, the Board of Directors may fix a Request Record Date. The Request Record Date shall not precede and shall not be more than ten days after the close of business on the date on which the resolution fixing the Request Record Date is adopted by the Board of Directors. If the Board of

Directors, within ten days after the date on which a valid Record Date Request Notice is received, fails to adopt a resolution fixing the Record Date, the Request Record Date shall be the close of business on the tenth day after the first date on which a Record Date Request Notice is received by the secretary.

(2)  In order for any stockholder to request a special meeting to act on any matter that may properly be considered at a meeting of stockholders, one or more written requests for a special meeting (collectively, the "Special Meeting Request") signed by stockholders of record (or their agents duly authorized in a writing accompanying the request) as of the Request Record Date entitled to cast not less than a majority of all of the votes entitled to be cast on such matter at such meeting (the "Special Meeting Percentage") shall be delivered to the secretary. In addition, the Special Meeting Request shall (a) set forth the purpose of the meeting and the matters proposed to be acted on at it (which shall be limited to those lawful matters set forth in the Record Date Request Notice received by the secretary), (b) bear the date of signature of each such stockholder (or such agent) signing the Special Meeting Request, (c) set forth (i) the name and address, as they appear in the Corporation's books, of each stockholder signing such request (or on whose behalf the Special Meeting Request is signed), (ii) the class, series and number of all shares of stock of the Corporation which are owned (beneficially or of record) by each such stockholder and (iii) the nominee holder for, and number of, shares of stock of the Corporation owned beneficially but not of record by such stockholder, (d) be sent to the secretary by registered mail, return receipt requested, and (e) be received by the secretary within 30 days after the Request Record Date. Any requesting stockholder (or agent duly authorized in a writing accompanying the revocation of the Special Meeting Request) may revoke his, her or its request for a special meeting at any time by written revocation delivered to the secretary.

(3)  The secretary shall inform the requesting stockholders of the reasonably estimated cost of preparing and mailing or delivering the notice of the meeting (including the Corporation's proxy materials). The secretary shall not be required to call a special meeting upon stockholder request and such meeting shall not be held unless, in addition to the documents required by paragraph (2) of this Section 3(b), the secretary receives payment of such reasonably estimated cost prior to the preparation and mailing or delivery of such notice of the meeting.

(4)  In the case of any special meeting called by the secretary upon the request of stockholders (a "Stockholder-Requested Meeting"), such meeting shall be held at such place, date and time as may be designated by the Board of Directors; provided, however, that the date of any Stockholder-Requested Meeting shall be not more than 90 days after the record date for such meeting (the "Meeting Record Date"); and provided further that if the Board of Directors fails to designate, within ten days after the date that a valid Special Meeting Request is actually received by the secretary (the "Delivery Date"), a date and time for a Stockholder-Requested Meeting, then such meeting shall be held at 2:00 p.m., local time, on the 90th day after the Meeting Record Date or, if such 90th day is not a Business Day (as defined below), on the first preceding

Business Day; and provided further that in the event that the Board of Directors fails to designate a place for a Stockholder-Requested Meeting within ten days after the Delivery Date, then such meeting shall be held at the principal executive office of the Corporation. In fixing a date for a Stockholder-Requested Meeting, the Board of Directors may consider such factors as it deems relevant, including, without limitation, the nature of the matters to be considered, the facts and circumstances surrounding any request for the meeting and any plan of the Board of Directors to call an annual meeting or a special meeting. In the case of any Stockholder-Requested Meeting, if the Board of Directors fails to fix a Meeting Record Date that is a date within 30 days after the Delivery Date, then the close of business on the 30th day after the Delivery Date shall be the Meeting Record Date. The Board of Directors may revoke the notice for any Stockholder-Requested Meeting in the event that the requesting stockholders fail to comply with the provisions of paragraph (3) of this Section 3(b).

(5) If written revocations of the Special Meeting Request have been delivered to the secretary and the result is that stockholders of record (or their agents duly authorized in writing), as of the Request Record Date, entitled to cast less than the Special Meeting Percentage have delivered, and not revoked, requests for a special meeting on the matter to the secretary: (i) if the notice of meeting has not already been delivered, the secretary shall refrain from delivering the notice of the meeting and send to all requesting stockholders who have not revoked such requests written notice of any revocation of a request for a special meeting on the matter, or (ii) if the notice of meeting has been delivered and if the secretary first sends to all requesting stockholders who have not revoked requests for a special meeting on the matter written notice of any revocation of a request for the special meeting and written notice of the Corporation's intention to revoke the notice of the meeting or for the chairman of the meeting to adjourn the meeting without action on the matter, (A) the secretary may revoke the notice of the meeting at any time before ten days before the commencement of the meeting or (B) the chairman of the meeting may call the meeting to order and adjourn the meeting without acting on the matter. Any request for a special meeting received after a revocation by the secretary of a notice of a meeting shall be considered a request for a new special meeting.

(6)  The Chairman of the Board, Chief Executive Officer or Board of Directors may appoint regionally or nationally recognized independent inspectors of elections to act as the agent of the Corporation for the purpose of promptly performing a ministerial review of the validity of any purported Special Meeting Request received by the secretary. For the purpose of permitting the inspectors to perform such review, no such purported Special Meeting Request shall be deemed to have been received by the secretary until the earlier of (i) five Business Days after actual receipt by the secretary of such purported request and (ii) such date as the independent inspectors certify to the Corporation that the valid requests received by the secretary represent, as of the Request Record Date, stockholders of record entitled to cast not less than the Special Meeting Percentage. Nothing contained in this paragraph (6) shall in any way be construed to suggest or imply that the Corporation or any stockholder shall not be entitled to contest the validity of any request, whether during or

-3-

after such five Business Day period, or to take any other action (including, without limitation, the commencement, prosecution or defense of any litigation with respect thereto, and the seeking of injunctive relief in such litigation).

(7) For purposes of these Bylaws, "Business Day" shall mean any day other than a Saturday, a Sunday or a day on which banking institutions in the State of New York are authorized or obligated by law or executive order to close.

Section 4. Notice. A written notice of all annual meetings of stockholders stating the hour, date and place of such annual meetings and, to the extent required by the Maryland General Corporation Law, the purpose for which the meeting has been called shall be given by the Secretary or an Assistant Secretary (or other person authorized by these Bylaws or by law) not less than 10 days nor more than 90 days before the meeting, unless any provisions of the Maryland General Corporation Law prescribe a different period of notice, to each stockholder entitled to vote at such meeting or to each stockholder who, under the Corporation's charter, as amended from time to time (the "Charter") or under these Bylaws, is entitled to such notice, by delivering such notice, by mailing it, postage prepaid, addressed to such stockholder at the address of such stockholder as it appears on the Corporation's stock transfer books, by electronic transmission or by any other means permitted by Maryland law. If mailed, such notice shall be deemed to be given when deposited in the United States mail addressed to the stockholder at the stockholder's address as it appears on the records of the Corporation, with postage thereon prepaid. If transmitted electronically, such notice shall be deemed to be given when transmitted to the stockholder by an electronic transmission to any address or number of the stockholder at which the stockholder receives electronic transmissions. The Corporation may give a single notice to all stockholders who share an address, which single notice shall be effective as to any stockholder at such address, unless such stockholder objects to receiving such single notice or revokes a prior consent to receiving such single notice. Failure to give notice of any meeting to one or more stockholders, or any irregularity in such notice, shall not affect the validity of any meeting fixed in accordance with this Article I or the validity of any proceedings at any such meeting.

Subject to Section 11(a) of this Article I, any business of the Corporation may be transacted at an annual meeting of stockholders without being specifically designated in the notice, except such business as is required by any statute to be stated in such notice. No business shall be transacted at a special meeting of stockholders except as specifically designated in the notice. The Corporation may postpone or cancel a meeting of stockholders by making a public announcement (as defined in Section 11(c)(3) of this Article I) of such postponement or cancellation prior to the meeting. Notice of the date, time and place to which the meeting is postponed shall be given not less than ten days prior to such date and otherwise in the manner set forth in this section.

Section 5. Organization and Conduct. Every meeting of stockholders shall be conducted by the Chairman of the Board or, in the case of a vacancy in the office or absence of the Chairman of the Board, by one of the following officers present at the meeting in the following order: the Vice Chairman of the Board, if there is one, the Chief Executive Officer, the President, the Vice Presidents in their order of rank and seniority, the Secretary, or, in the absence of such officers, a chairman chosen by the stockholders by the vote of a majority of the votes cast by stockholders present in person or by proxy. The Secretary, or, in the Secretary's absence, an Assistant Secretary, or, in the absence of both the Secretary and Assistant Secretaries, an individual appointed by the Board of Directors or, in the absence of such appointment, an individual appointed by the chairman of the meeting shall act as secretary. In the event that the Secretary presides at a meeting of stockholders, an Assistant Secretary, or, in the

-4-

absence of all Assistant Secretaries, an individual appointed by the Board of Directors or the chairman of the meeting, shall record the minutes of the meeting. The order of business and all other matters of procedure at any meeting of stockholders shall be determined by the chairman of the meeting. The chairman of the meeting may prescribe such rules, regulations and procedures and take such action as, in the discretion of the chairman and without any action by the stockholders, are appropriate for the proper conduct of the meeting, including, without limitation, (a) restricting admission to the time set for the commencement of the meeting; (b) limiting attendance at the meeting to stockholders of record of the Corporation, their duly authorized proxies and such other individuals as the chairman of the meeting may determine; (c) limiting participation at the meeting on any matter to stockholders of record of the Corporation entitled to vote on such matter, their duly authorized proxies and other such individuals as the chairman of the meeting may determine; (d) limiting the time allotted to questions or comments; (e) determining when and for how long the polls should be opened and when the polls should be closed; (f) maintaining order and security at the meeting; (g) removing any stockholder or any other individual who refuses to comply with meeting procedures, rules or guidelines as set forth by the chairman of the meeting;

(a) concluding a meeting or recessing or adjourning the meeting to a later date and time and at a place announced at the meeting; and (i) complying with any state and local laws and regulations concerning safety and security. Unless otherwise determined by the chairman of the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.

Section 6. <u>Quorum</u>. At any meeting of stockholders, the presence in person or by proxy of stockholders entitled to cast a majority of all the votes entitled to be cast at such meeting on any matter shall constitute a quorum except, that the quorum for any matter proposed by the Board of Directors shall be one-third of all the votes entitled to be cast at an annual meeting of stockholders called by the Board of Directors. This section shall not affect any requirement under any statute or the charter of the Corporation for the vote necessary for the approval of any matter. If such quorum is not established at any meeting of the stockholders, the chairman of the meeting may adjourn the meeting sine die or from time to time to a date not more than 120 days after the original record date without notice other than announcement at the meeting. At such adjourned meeting at which a quorum shall be present, any business may be transacted which might have been transacted at the meeting as originally notified.

The stockholders present either in person or by proxy, at a meeting which has been duly called and at which a quorum has been established, may continue to transact business until adjournment, notwithstanding the withdrawal from the meeting of enough stockholders to leave fewer than would be required to establish a quorum.

Section 7. <u>Voting</u>. Directors of the Corporation shall be elected by a plurality of the votes cast at any meeting of stockholders at which directors are to be elected and at which a quorum is present; provided, however, subject to the stockholders' approval of the amendment to the Corporation's charter at the next meeting of the Corporation's stockholders and the filing and acceptance for record of Articles of Amendment and Restatement implementing such amendment with the Maryland State Department of Assessments and Taxation, effective as of the date on which the Corporation's stockholders approve the amendment to the Corporation's charter, a nominee for director shall be elected to the Board of Directors if the votes cast for such nominee's election exceed the votes cast against such nominee's election (with "withholds," "abstentions" and "broker nonvotes" not counted as a vote cast either "for" or "against" that nominee's election); provided, however, that in the case of a contested election, directors shall be elected by a plurality of the votes cast (in which case stockholders shall not be permitted to cast votes against the election of directors). In the election of directors, each share may be voted for as many individuals as there are directors to be elected and for whose election the share is

-5-

entitled to be voted. Cumulative voting is not permitted. For purposes of this Bylaw provision, a "contested election" shall mean any election of directors with respect to which (i) the Corporation receives notice that any stockholder has nominated an individual for election as a director in compliance with the requirements set forth in these Bylaws and (ii) all such nominations have not been withdrawn by such stockholder(s) on or prior to the date the Corporation first mails its notice of meeting for such meeting to the stockholders, and, as a result of which, there are more nominees than directorships.

A majority of the votes cast at a meeting of stockholders duly called and at which a quorum is present shall be sufficient to approve any other matter which may properly come before the meeting, unless more than a majority of the votes cast is required by law or by the charter of the Corporation. Unless otherwise provided by statute or by the charter, each outstanding share, regardless of class, shall be entitled to one vote on each matter submitted to a vote at a meeting of stockholders. Voting on any question or in any election may be viva voce unless the chairman of the meeting shall order that voting be by ballot or otherwise.

Section 8. Proxies. A holder of record of shares of stock of the Corporation may cast votes in person or by proxy executed by the stockholder or by the stockholder's duly authorized agent in any manner permitted by law. Such proxy or evidence of authorization of such proxy shall be filed with the secretary of the Corporation before or at the meeting. No proxy shall be valid more than eleven months after its date unless otherwise provided in the proxy.

Section 9. Voting of Stock by Certain Holders. Stock of the Corporation registered in the name of a corporation, partnership, trust, limited liability company or other entity, if entitled to be voted, may be voted by the president or a vice president, general partner, trustee or managing member thereof, as the case may be, or a proxy appointed by any of the foregoing individuals, unless some other person who has been appointed to vote such stock pursuant to a bylaw or a resolution of the governing body of such corporation or other entity or agreement of the partners of a partnership presents a certified copy of such bylaw, resolution or agreement, in which case such person may vote such stock. Any director or fiduciary may vote stock registered in the name of such person in the capacity of such director or fiduciary, either in person or by proxy.

Shares of stock of the Corporation directly or indirectly owned by it shall not be voted at any meeting and shall not be counted in determining the total number of outstanding shares entitled to be voted at any given time, unless they are held by it in a fiduciary capacity, in which case they may be voted and shall be counted in determining the total number of outstanding shares at any given time.

The Board of Directors may adopt by resolution a procedure by which a stockholder may certify in writing to the Corporation that any shares of stock registered in the name of the stockholder are held for the account of a specified person other than the stockholder. The resolution shall set forth the class of stockholders who may make the certification, the purpose for which the certification may be made, the form of certification and the information to be contained in it; if the certification is with respect to a record date, the time after the record date within which the certification must be received by the Corporation; and any other provisions with respect to the procedure which the Board of Directors considers necessary or desirable. On receipt by the Corporation of such certification, the person specified in the certification shall be regarded as, for the purposes set forth in the certification, the holder of record of the specified stock in place of the stockholder who makes the certification.

Section 10. Inspectors. The Board of Directors or the chairman of the meeting may appoint, before or at the meeting, one or more inspectors for the meeting and any successor to the inspector. Except as otherwise provided by the chairman of the meeting, the inspectors, if

-6-

any, shall (i) determine the number of shares of stock represented at the meeting, in person or by proxy, and the validity and effect of proxies, (ii) receive and tabulate all votes, ballots or consents, (iii) report such tabulation to the chairman of the meeting, (iv) hear and determine all challenges and questions arising in connection with the right to vote, and (v) do such acts as are proper to fairly conduct the election or vote. Each such report shall be in writing and signed by the inspector or by a majority of them if there is more than one inspector acting at such meeting. If there is more than one inspector, the report of a majority shall be the report of the inspectors. The report of the inspector or inspectors on the number of shares represented at the meeting and the results of the voting shall be prima facie evidence thereof.

Section 11. <u>Advance Notice of Stockholder Nominees for Director and Other Stockholder Proposals.</u>

(a) <u>Annual Meetings of Stockholders.</u>

(1) Nominations of individuals for election to the Board of Directors and the proposal of other business to be considered by the stockholders may be made at an annual meeting of stockholders (i) pursuant to the Corporation's notice of meeting, (ii) by or at the direction of the Board of Directors, (iii) by any stockholder of the Corporation who was a stockholder of record both at the time of giving of notice by the stockholder as provided for in this Section 11(a) and at the time of the annual meeting, who is entitled to vote at the meeting in the election of each individual so nominated or on any such other business and who has complied with this Section 11(a), or (iv) by any Eligible Holder (as defined in Article I, Section 12 below) whose Nominee (as defined in Article I, Section 12 below) is included in the Corporation's proxy materials for the relevant annual meeting. For the avoidance of doubt, the foregoing clauses (iii) and (iv) shall be the exclusive means for a stockholder to make director nominations, and the foregoing clause (iii) shall be the exclusive means for a stockholder to propose other business (other than a proposal included in the Corporation's proxy materials pursuant to and in compliance with Exchange Act Rule 14a-8), at an annual meeting of stockholders.

(2) For any nomination or other business to be properly brought before an annual meeting by a stockholder pursuant to clause (iii) of paragraph (a)(1) of this Section 11, the stockholder must have given timely notice thereof in writing to the secretary of the Corporation and any such other business must otherwise be a proper matter for action by the stockholders. To be timely, a stockholder's notice shall set forth all information required under this Section 11 and shall be delivered to the secretary at the principal executive office of the Corporation not earlier than the 90th day nor later than 5:00 p.m., Eastern Time, on the 60th day prior to the first anniversary of the date of the preceding year's annual meeting; provided, however, that in the event that the date of the annual meeting is advanced or delayed by more than 30 days from the first anniversary of the date of the preceding year's annual meeting, in order for notice by the stockholder to be timely, such notice must be so delivered not earlier than the 90th day prior to the date of such annual meeting and not later than 5:00 p.m., Eastern Time, on the later of the 60th day prior to the date of such annual meeting or the tenth day following the day on which public announcement of the date of such meeting is first made. The postponement or adjournment of an annual meeting, or the public

-7-

announcement thereof, shall not commence a new time period for the giving of a stockholder's notice as described above.

(3) Such stockholder's notice shall set forth:

(A) as to any business other than the nomination of an individual for election or reelection as a director that the stockholder proposes to bring before the meeting, a description of such business, the stockholder's reasons for proposing such business at the meeting and any material interest in such business of such stockholder or any Stockholder Associated Person (as defined below), individually or in the aggregate, including any anticipated benefit to the stockholder or the Stockholder Associated Person therefrom;

(B) as to the stockholder giving notice and any Stockholder Associated Person, the information required pursuant to Rule 14a-19(b) promulgated under the Exchange Act if the stockholder, such Stockholder Associated Person or any of their respective affiliates, associates or others acting in concert intends to engage in a solicitation in support of director nominees other than the Corporation's nominees;

(C) as to the stockholder giving the notice, any individual whom the stockholder proposes to nominate for election or reelection as a director (each, a "Proposed Nominee") and any Stockholder Associated Person:

(i) the class, series and number of all shares of stock or other securities of the Corporation or any affiliate thereof (collectively, the "Company Securities"), if any, which are owned (beneficially or of record) by such stockholder, Proposed Nominee or Stockholder Associated Person, the date on which each such Company Security was acquired and the investment intent of such acquisition, and any short interest (including any opportunity to profit or share in any benefit from any decrease in the price of such stock or other security) in any Company Securities of any such person,

(ii) the nominee holder for, and number of, any Company Securities owned beneficially but not of record by such stockholder, Proposed Nominee or Stockholder Associated Person,

(iii) whether and the extent to which such stockholder, Proposed Nominee or Stockholder Associated Person, directly or indirectly (through brokers, nominees or otherwise), is subject to or during the last six months has engaged in any hedging, derivative or other transaction or series of transactions or entered into any other agreement, arrangement or understanding (including any short interest, any borrowing or lending of securities or any proxy or voting agreement), the effect or intent of which is to (I) manage risk or benefit from changes in the price of Company Securities for such stockholder, Proposed Nominee or Stockholder Associated Person or (II) increase or decrease the voting power of such stockholder, Proposed Nominee or Stockholder Associated Person in the Corporation or any affiliate thereof

-8-

disproportionately to such person's economic interest in the Company Securities, and

(iv) any substantial interest, direct or indirect (including, without limitation, any existing or prospective commercial, business or contractual relationship with the Corporation), by security holdings or otherwise, of such stockholder, Proposed Nominee or Stockholder Associated Person, in the Corporation or any affiliate thereof, other than an interest arising from the ownership of Company Securities where such stockholder, Proposed Nominee or Stockholder Associated Person receives no extra or special benefit not shared on a pro rata basis by all other holders of the same class or series;

(D) as to the stockholder giving the notice, any Stockholder Associated Person with an interest or ownership referred to in clauses (i) or (iii) of paragraph (3)(C) of this Section 11(a) and any Proposed Nominee:

(i) the name and address of such stockholder, as they appear on the Corporation's stock ledger, and the current name and business address, if different, of each such Stockholder Associated Person and any Proposed Nominee;

(ii) (i) a description of the investment strategy or objective, if any, of such stockholder and each such Stockholder Associated Person who is not an individual and (ii) a copy of the prospectus, offering memorandum or similar document and any presentation, document or marketing material provided to third parties (including investors and potential investors) to solicit an investment in such stockholder and each such Stockholder Associated Person that contains or describes such stockholder's and each such Stockholder Associated Person's performance, personnel or investment thesis or plans or proposals with respect to the Corporation;

(iii) all information relating to the stockholder, the Proposed Nominee or the Stockholder Associated Person that would be required to be disclosed in connection with the solicitation of proxies pursuant to Regulation 14A (or any successor provision) under the Exchange Act; and

(iv) in the event that any of the stockholder, the Proposed Nominee or the Stockholder Associated Person has in the twenty-four months immediately preceding the date of such notice made a proposal to acquire control of the Corporation (whether through the acquisition of a majority of the outstanding securities of the Corporation, the acquisition of all or substantially all of the Corporation's assets or otherwise), all information relating to the stockholder, the Proposed Nominee or the Stockholder Associated Person that would be disclosed in any notices, forms or filings required by U.S. federal laws or the rules and regulations of any agency, department or other instrumentality of the U.S. federal government ("U.S. Federal Agency") in connection with the direct

-9-

or indirect acquisition by such person of control of the Corporation (including (i) all information that would be set forth under any U.S. federal laws or the rules and regulations of any U.S. Federal Agency that have been proposed and not withdrawn and (ii) all information that would be set forth in a voluntary filing made by an acquiror in connection with any transaction subject to the jurisdiction of any U.S. Federal Agency);

(E) the name and address of any person who contacted or was contacted by the stockholder giving the notice or any Stockholder Associated Person about the Proposed Nominee or other business proposal prior to the date of such stockholder's notice and;

(F) to the extent known by the stockholder giving the notice, the name and address of any other stockholder supporting the nominee for election or reelection as a director or the proposal of other business on the date of such stockholder's notice.

(4) Such stockholder's notice shall, with respect to any Proposed Nominee, be accompanied by a certificate executed by the Proposed Nominee (i) certifying that such Proposed Nominee (a) is not, and will not become, a party to any agreement, arrangement or understanding with any person or entity other than the Corporation in connection with service or action as a director that has not been disclosed to the Corporation and (b) will serve as a director of the Corporation if elected; and (ii) attaching a completed Proposed Nominee questionnaire (which questionnaire shall be provided by the Corporation, upon request, to the stockholder providing the notice and shall include all information relating to the Proposed Nominee that would be required to be disclosed in connection with the solicitation of proxies for the election of the Proposed Nominee as a director in an election contest (even if an election contest is not involved), or would otherwise be required in connection with such solicitation, in each case pursuant to Regulation 14A (or any successor provision) under the Exchange Act and the rules thereunder, or would be required pursuant to the rules of any national securities exchange on which any securities of the Corporation are listed or over-the-counter market on which any securities of the Corporation are traded).

(5) Notwithstanding anything in this subsection (a) of this Section 11 to the contrary, in the event that the number of directors to be elected to the Board of Directors is increased, and there is no public announcement of such action at least 130 days prior to the first anniversary of the date of the proxy statement (as defined in Section 11(c)(3) of this Article I) for the preceding year's annual meeting, a stockholder's notice required by this Section 1(a) shall also be considered timely, but only with respect to nominees for any new positions created by such increase, if it shall be delivered to the secretary at the principal executive office of the Corporation not later than 5:00 p.m., Eastern Time, on the tenth day following the day on which such public announcement is first made by the Corporation.

(6) For purposes of this Section 11, a "Stockholder Associated Person" of any stockholder shall mean any person (and such person's affiliates and associates): (i) acting in concert with such stockholder; (ii)

-10-

that has formed, or is acting together as, a group with such stockholder (or such stockholder's affiliates or associates) for the purposes of acquiring, holding, voting or disposing Company Securities, regardless of whether such person is party to any written or unwritten agreement, arrangement or understanding; (iii) that shares, or with which is shared, information about an upcoming Schedule 13D filing (or amendment thereto) that such person and/or such stockholder and/or their respective affiliates and associates will be required to make, to the extent such information is not yet public and communicated with the purpose of causing others to make purchases, and such person and/or such stockholder and/or their respective affiliates and associates subsequently purchases Company Securities based on such information; (iv) that has entered into any pooling arrangement, whether formal or informal, written or unwritten, with such stockholder; (v) that, together with such stockholder and/or its affiliates and associates, has engaged in activities undertaken with the purpose or effect of changing or influencing control of the Corporation or in connection with or as a participant in any transaction having such purpose or effect; (vi) that has taken concerted actions related to Company Securities where such person and such stockholder are directly or indirectly obligated to take such concerted action; (vii) that is the beneficial owner of shares of stock of the Corporation owned of record or beneficially by such stockholder (other than a stockholder that is a depositary); or (viii) directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such stockholder or any other Stockholder Associated Person.

(b) Special Meetings of Stockholders. Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the Corporation's notice of meeting. Nominations of individuals for election to the Board of Directors may be made at a special meeting of stockholders at which directors are to be elected only (i) by or at the direction of the Board of Directors or (ii) provided that the special meeting has been called in accordance with Section 3(a) of this Article I for the purpose of electing directors, by any stockholder of the Corporation who is a stockholder of record both at the time of giving of notice provided for in this Section 11 and at the time of the special meeting, who is entitled to vote at the meeting in the election of each individual so nominated and who has complied with the notice procedures set forth in this Section 11. In the event the Corporation calls a special meeting of stockholders for the purpose of electing one or more individuals to the Board of Directors, any stockholder may nominate an individual or individuals (as the case may be) for election as a director as specified in the Corporation's notice of meeting, if the stockholder's notice, containing the information required by paragraphs (a)(3) and (4) of this Section 11, is delivered to the secretary at the principal executive office of the Corporation not earlier than the 90th day prior to such special meeting and not later than 5:00 p.m., Eastern Time, on the later of the 60th day prior to such special meeting or the tenth day following the day on which public announcement is first made of the date of the special meeting and of the nominees proposed by the Board of Directors to be elected at such meeting. The public announcement of a postponement or adjournment of a special meeting shall not commence a new time period for the giving of a stockholder's notice as described above.

(c) General.

(1) If information submitted pursuant to this Section 11 by any stockholder proposing a nominee for election as a director or any proposal

-11-

for other business at a meeting of stockholders shall be inaccurate in any material respect, such information may be deemed not to have been provided in accordance with this Section 11. Any such stockholder shall notify the Corporation of any inaccuracy or change (within two Business Days of becoming aware of such inaccuracy or change) in any such information. Upon written request by the secretary or the Board of Directors, any such stockholder shall provide, within five Business Days of delivery of such request (or such other period as may be specified in such request), (A) written verification, satisfactory, in the discretion of the Board of Directors or any authorized officer of the Corporation, to demonstrate the accuracy of any information submitted by the stockholder pursuant to this Section 11, and (B) a written update of any information (including, if requested by the Corporation, written confirmation by such stockholder that it continues to intend to bring such nomination or other business proposal before the meeting) submitted by the stockholder pursuant to this Section 11 as of an earlier date. If a stockholder fails to provide such written verification or written update within such period, the information as to which written verification or a written update was requested may be deemed not to have been provided in accordance with this Section 11.

(2) Only such individuals who are nominated in accordance with this Section 11 shall be eligible for election by stockholders as directors, and only such business shall be conducted at a meeting of stockholders as shall have been brought before the meeting in accordance with this Section 11. The chairman of the meeting shall have the power to determine whether a nomination or any other business proposed to be brought before the meeting was made or proposed, as the case may be, in accordance with this Section 11.

(3) For purposes of this Section 11, "the date of the proxy statement" shall have the same meaning as "the date of the company's proxy statement released to shareholders" as used in Rule 14a-8(e) promulgated under the Exchange Act, as interpreted by the Securities and Exchange Commission (the "SEC") from time to time. "Public announcement" shall mean disclosure (A) in a press release reported by the Dow Jones News Service, Associated Press, Business Wire, PR Newswire or other widely circulated news or wire service or (B) in a document publicly filed by the Corporation with the SEC pursuant to the Exchange Act.

(4) Notwithstanding the foregoing provisions of this Section 11, (i) a stockholder shall also comply with all applicable requirements of state law and of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth in this Section 11, (ii) no stockholder, Stockholder Associated Person, or any of their respective affiliates, associates and other persons acting in concert therewith shall solicit proxies in support of any nominees other than the nominees of the Board of Directors unless such person has complied with Rule 14a-19 promulgated under the Exchange Act in connection with the solicitation of such proxies, including the provision to the Corporation of notices required thereunder in a timely manner and (iii) if such stockholder, Stockholder Associated Person, or any of their respective affiliates, representatives or others acting in concert therewith (1) provides notice

-12-

pursuant to Rule 14a-19(b) promulgated under the Exchange Act as required by Article I, Section 11(a)(3)(B) and (2) subsequently fails to comply with any of the requirements of Rule 14a-19 promulgated under the Exchange Act, then the Corporation shall disregard any proxies or votes solicited for such stockholder's nominees. Upon request by the Corporation, if any stockholder, Stockholder Associated Person, or any of their respective affiliates, associates and other persons acting in concert therewith provides notice pursuant to Rule 14a-19(b) promulgated under the Exchange Act, such stockholder shall deliver to the Corporation, no later than five (5) business days prior to the applicable meeting, reasonable evidence that such stockholder, Stockholder Associated Person, and any of their respective affiliates, associates or other persons acting in concert therewith have met the requirements of Rule 14a-19 promulgated under the Exchange Act. Except to the extent provided by Rule 14a-19 promulgated under the Exchange Act with respect to a nomination made pursuant to Article I, Section 11(a) and that otherwise complies with the applicable provisions of these Bylaws, nothing in these Bylaws shall be construed to grant any stockholder the right to include or have disseminated or described in the Corporation's proxy statement any such nomination of directors. Nothing in this Section 11 shall be deemed to affect any right of a stockholder to request inclusion of a proposal in, or the right of the Corporation to omit a proposal from, the Corporation's proxy statement pursuant to Rule 14a-8 (or any successor provision) under the Exchange Act. Nothing in this Section 11 shall require disclosure of revocable proxies received by the stockholder or Stockholder Associated Person pursuant to a solicitation of proxies after the filing of an effective Schedule 14A by such stockholder or Stockholder Associated Person under Section 14(a) of the Exchange Act.

Section 12. <u>Proxy Access for Director Nominations</u>.

(a) Inclusion of Stockholder Nominee in Proxy Materials. Subject to the provisions of this Section 12, if expressly requested in the relevant Nomination Notice (as defined below), the Corporation shall include in its proxy statement for any annual meeting of stockholders:

(1) the names of any person or persons nominated for election for whom notice is provided in accordance with this Section 12 (each such nominee, a "<u>Stockholder Nominee</u>"), which shall also be included on the Corporation's form of proxy and ballot, by any Eligible Holder (as defined below) or group of up to 20 Eligible Holders that has (individually and collectively, in the case of a group) satisfied, as determined by the Board of Directors or any committee thereof, all applicable conditions and complied with all applicable procedures set forth in this Section 12 (such Eligible Holder or group of Eligible Holders being a "<u>Nominating Stockholder</u>");

(2) disclosure about each Stockholder Nominee and the Stockholder required under the rules of the SEC in the proxy statement;

(3) any statement included by the Nominating Stockholder in the Nomination Notice for inclusion in the proxy statement in support of each Stockholder Nominee's election to the Board of Directors (subject, without limitation, to Section 12(e)(2)), if such statement does not exceed

-13-

500 words and fully complies with Section 14 of the Exchange Act and the rules and regulations thereunder, including Rule 14a-9 (the "Supporting Statement"); and

(4) nothing in this Section 12 shall limit the Corporation's ability to solicit against and include in its proxy materials any statement in opposition to the nomination, any of the information provided pursuant to this Section 12 and any solicitation materials or related information with respect to a Stockholder Nominee.

For purposes of this Section 12, any determination to be made by the Board of Directors may be made by the Board of Directors, a committee of the Board of Directors or any officer of the Corporation designated by the Board of Directors or a committee of the Board of Directors, and any such determination shall be final and binding on the Corporation, any Eligible Holder, any Nominating Stockholder, any Stockholder Nominee and any other person so long as made in good faith (without any further requirements). The chairman of any annual meeting of stockholders, in addition to making any other determinations that may be appropriate to the conduct of the meeting, shall have the power and duty to determine whether a Stockholder Nominee has been nominated in accordance with the requirements of this Section 12 and, if not so nominated, shall direct and declare at the meeting that such Stockholder Nominee shall not be considered. This Section 12 shall be the exclusive method for stockholders to include nominees for Director election in the Corporation's proxy materials.

(b) Maximum Number of Stockholder Nominees.

(1) The Corporation shall not be required to include in the proxy statement for an annual meeting of stockholders more Stockholder Nominees than that number of directors constituting the greater of (i) two or (ii) 20% of the total number of directors of the Corporation on the last day on which a Nomination Notice may be submitted pursuant to this Section 12 (rounded down to the nearest whole number) (the "Maximum Number"). The Maximum Number for a particular annual meeting shall be reduced by: (i) Stockholder Nominees who the Board of Directors itself decides to nominate for election at such annual meeting; (ii) Stockholder Nominees who cease to satisfy, or Stockholder Nominees of Nominating Stockholders that cease to satisfy, the eligibility requirements in this Section 12, as determined by the Board of Directors; (iii) Stockholder Nominees whose nomination is withdrawn by the Nominating Stockholder or who become unwilling to serve on the Board of Directors; and (iv) the number of incumbent directors who had been Stockholder Nominees with respect to any of the preceding two annual meetings of stockholders and whose reelection at the upcoming annual meeting is being recommended by the Board of Directors. In the event that one or more vacancies for any reason occurs on the Board of Directors after the deadline for submitting a Nomination Notice as set forth in Section 12(d) below but before the date of the annual meeting, and the Board of Directors resolves to reduce the size of the board in connection therewith, the Maximum Number shall be calculated based on the number of directors in office as so reduced.

(2) If the number of Stockholder Nominees pursuant to this Section 12 for any annual meeting of stockholders exceeds the Maximum Number then, promptly upon notice from the Corporation, each Nominating Stockholder will select one Stockholder Nominee for inclusion in the proxy statement until the Maximum Number is reached,

-14-

going in order of the amount (largest to smallest) of the ownership position as disclosed in each Nominating Stockholder's Nomination Notice and if the amount of the ownership position is tied, in the order of the date of the Nominating Stockholder's Nomination Notice (earliest to latest), with the process repeated if the Maximum Number is not reached after each Nominating Stockholder has selected one Stockholder Nominee. If, after the deadline for submitting a Nomination Notice as set forth in Section 12(d), a Nominating Stockholder or a Stockholder Nominee ceases to satisfy the eligibility requirements in this Section 12, as determined by the Board of Directors, a Nominating Stockholder withdraws its nomination or a Stockholder Nominee becomes unwilling to serve on the Board of Directors, whether before or after the mailing or other distribution of the definitive proxy statement, then the nomination shall be disregarded, and the Corporation: (i) shall not be required to include in its proxy statement or on any ballot or form of proxy the disregarded Stockholder Nominee or any successor or replacement nominee proposed by the Nominating Stockholder or by any other Nominating Stockholder and (ii) may otherwise communicate to its stockholders, including without limitation by amending or supplementing its proxy statement or ballot or form of proxy, that a Stockholder Nominee will not be included as a nominee in the proxy statement or on any ballot or form of proxy and will not be voted on at the annual meeting.

(c) Eligibility of Nominating Stockholder.

(1) An "Eligible Holder" is a person who has either (i) been a record holder of the shares of common stock used to satisfy the eligibility requirements in this Section 12(c) continuously for the three-year period specified in Subsection (2) below or (ii) provides to the Secretary of the Corporation, within the time period referred to in Section 12(d), evidence of continuous ownership (as defined below) of such shares for such three-year period from one or more securities intermediaries in a form that the Board of Directors or any committee thereof determines would be deemed acceptable for purposes of a stockholder proposal under Rule 14a-8(b)(2) under the Exchange Act (or any successor rule).

(2) An Eligible Holder or group of up to 20 Eligible Holders may submit a nomination in accordance with this Section 12 only if the person or group (in the aggregate) has continuously owned at least the Minimum Number (as defined below) of shares of the Corporation's common stock throughout the three-year period preceding and including the date of submission of the Nomination Notice, and continues to own at least the Minimum Number through the date of the annual meeting. Two or more funds that are (x) under common management and investment control, (y) under common management and funded primarily by a single employer or (z) a "group of investment companies," as such term is defined in Section 12(d)(1)(G)(ii) of the Investment Company Act of 1940, as amended, shall be treated as one Eligible Holder if such Eligible Holder shall provide together with the Nomination Notice documentation reasonably satisfactory to the Corporation that demonstrates that the funds meet the criteria set forth in (x), (y) or (z) hereof. For the avoidance of doubt, in the event of a nomination by a group of Eligible Holders, any and all requirements and obligations for an individual Eligible Holder that are set forth in this Section 12, including the minimum holding period,

-15-

shall apply to each member of such group; provided, however, that the Minimum Number shall apply to the ownership of the group in the aggregate. Should any stockholder cease to satisfy the eligibility requirements in this Section 12, as determined by the Board of Directors, or withdraw from a group of Eligible Holders at any time prior to the annual meeting of stockholders, the group of Eligible Stockholders shall only be deemed to own the shares held by the remaining members of the group.

(3) The "Minimum Number" of shares of the Corporation's common stock means 3% of the number of outstanding shares of common stock as of the most recent date for which such amount is given in any filing by the Corporation with the SEC prior to the submission of the Nomination Notice.

(4) For purposes of this Section 12, an Eligible Holder "owns" only those outstanding shares of the Corporation as to which the Eligible Holder possesses both:

(A) the full voting and investment rights pertaining to the shares; and

(B) the full economic interest in (including the opportunity for profit and risk of loss on) such shares; provided that the number of shares calculated in accordance with clauses (A) and (B) shall not include any shares: (1) purchased or sold by such Eligible Holder or any of its affiliates in any transaction that has not been settled or closed, (2) sold short by such Eligible Holder, (3) borrowed by such Eligible Holder or any of its affiliates for any purpose or purchased by such Eligible Holder or any of its affiliates pursuant to an agreement to resell or subject to any other obligation to resell to another person, or (4) subject to any option, warrant, forward contract, swap, contract of sale, other derivative or similar agreement entered into by such Eligible Holder or any of its affiliates, whether any such instrument or agreement is to be settled with shares or with cash based on the notional amount or value of outstanding shares of the Corporation, in any such case which instrument or agreement has, or is intended to have, the purpose or effect of: (x) reducing in any manner, to any extent or at any time in the future, such Eligible Holder's or any of its affiliates' full right to vote or direct the voting of any such shares, and/or (y) hedging, offsetting, or altering to any degree, gain or loss arising from the full economic ownership of such shares by such Eligible Holder or any of its affiliates.

An Eligible Holder "owns" shares held in the name of a nominee or other intermediary so long as the Eligible Holder retains the right to instruct how the shares are voted with respect to the election of directors and possesses the full economic interest in the shares. An Eligible Holder's ownership of shares shall be deemed to continue during any period in which the Eligible Holder has delegated any voting power by means of a proxy, power of attorney, or other similar instrument or arrangement that is revocable at any time by the Eligible Holder. An Eligible Holder's ownership of shares shall be deemed to continue during any period in which the Eligible Holder has loaned such shares provided that the Eligible Holder has the power to recall such loaned shares on three business days' notice, has recalled such loaned shares as of the date of the Nomination Notice and continues to hold such shares through the date of the annual meeting. The terms "owned,"

-16-

"owning" and other variations of the word "own" shall have correlative meanings. Whether outstanding shares of the Corporation are "owned" for these purposes shall be determined by the Board.

(5) No Eligible Holder shall be permitted to be in more than one group constituting a Nominating Stockholder, and if any Eligible Holder appears as a member of more than one group, it shall be deemed to be a member of the group that has the largest ownership position as reflected in the Nomination Notice.

(d) <u>Nomination Notice</u>. To nominate a Stockholder Nominee, the Nominating Stockholder must, no earlier than the 120th day and no later than 5:00 p.m., Eastern Time, on the 90th day prior to the first anniversary of the date of the proxy statement for the preceding year's annual meeting, submit to the Secretary of the Corporation at the principal executive office of the Corporation all of the following information and documents (collectively, the "<u>Nomination Notice</u>"); provided, however, that in the event that the date of the annual meeting is advanced or delayed by more than 30 days from the first anniversary of the date of the preceding year's annual meeting, the Nomination Notice shall be given in the manner provided herein not earlier than the 120th day prior to the date of such annual meeting and not later than 5:00 p.m., Eastern Time, on the later of the 90th day prior to the date of such annual meeting or the tenth day following the day on which public announcement of the date of such meeting is first made:

(1) A Schedule 14N (or any successor form) relating to each Stockholder Nominee, completed and filed with the SEC by the Nominating Stockholder as applicable, in accordance with SEC rules;

(2) A written notice, in a form deemed satisfactory by the Board of Directors, of the nomination of each Stockholder Nominee that includes the following additional information, agreements, representations and warranties by the Nominating Stockholder (including each group member):

(A) the information required with respect to the nomination of directors pursuant to Section 11 of these Bylaws;

(B) the details of any relationship that existed within the past three years and that would have been described pursuant to Item 6(e) of Schedule 14N (or any successor item) if it existed on the date of submission of the Schedule 14N;

(C) a representation and warranty that the Nominating Stockholder acquired the securities of the Corporation in the ordinary course of business and did not acquire, and is not holding, securities of the Corporation for the purpose or with the effect of influencing or changing control of the Corporation;

(D) a representation and warranty that each Stockholder Nominee's candidacy or, if elected, Board membership would not violate applicable state or federal law or the rules of any stock exchange on which the Corporation's securities are traded;

-17-

(E) a representation and warranty that each Stockholder Nominee:

(i) does not have any direct or indirect relationship with the Corporation that would cause the Stockholder Nominee to be considered not independent pursuant to the Corporation's policy on director independence contained in the Corporation's Corporate Governance Guidelines as most recently published on its website and otherwise qualifies as independent under the rules of the New York Stock Exchange;

(ii) meets the audit committee and compensation committee independence requirements under the rules of the New York Stock Exchange;

(iii) is a "non-employee director" for the purposes of Rule 16b-3 under the Exchange Act (or any successor rule);

(iv) is an "outside director" for the purposes of Section 162(m) of the Internal Revenue Code (or any successor provision);

(v) [reserved]; and

(vi) is not and has not been subject to any event specified in Rule 506(d)(1) of Regulation D (or any successor rule) under the Securities Act of 1933 or Item 401(f) of Regulation S-K (or any successor rule) under the Exchange Act, without reference to whether the event is material to an evaluation of the ability or integrity of such Stockholder Nominee;

(F) a representation and warranty that the Nominating Stockholder satisfies the eligibility requirements set forth in Section 12(c) and has provided evidence of ownership to the extent required by Section 12(c)(1);

(G) a representation and warranty that the Nominating Stockholder intends to continue to satisfy the eligibility requirements described in Section 12(c) through the date of the annual meeting and intends to continue to hold the Minimum Number of shares for at least one year following the annual meeting;

(H) details of any position of a Stockholder Nominee as an officer or director of any competitor (that is, any entity that produces products or provides services that compete with or are alternatives to the principal products produced or services provided by the Corporation or its affiliates) of the Corporation, within the three years preceding the submission of the Nomination Notice;

(I) a representation and warranty that the Nominating Stockholder will not engage in a "solicitation" within the meaning of Rule 14a-1(l) (without reference to the exception in Section 14a-(l)(2)(iv)) (or any successor rules) with respect to the annual meeting, other than with respect to a Stockholder Nominee or any nominee of the Board of the Directors;

-18-

(J) a representation and warranty that the Nominating Stockholder will not use any proxy card other than the Corporation's proxy card in soliciting stockholders in connection with the election of a Stockholder Nominee at the annual meeting;

(K) if desired, a Supporting Statement; and

(L) in the case of a nomination by a group, the designation by all group members or one group member that is authorized to act on behalf of all group members with respect to matters relating to the nomination, including withdrawal of the nomination;

(3) An executed agreement, in a form deemed satisfactory by the Board of Directors or any committee thereof pursuant to which the Nominating Stockholder (including each group member) agrees:

(A) to comply with all applicable laws, rules and regulations in connection with the nomination, solicitation and election;

(B) to file any written solicitation or other communication with the Corporation's stockholders relating to one or more of the Corporation's directors or director nominees or any Stockholder Nominee with the SEC, regardless of whether any such filing is required under rule or regulation or whether any exemption from filing is available for such materials under any rule or regulation;

(C) to assume all liability stemming from an action, suit or proceeding concerning any actual or alleged legal or regulatory violation arising out of any communication by the Nominating Stockholder or any of its Stockholder Nominees with the Corporation, its stockholders or any other person in connection with the nomination or election of directors, including, without limitation, the Nomination Notice;

(D) to indemnify and hold harmless (jointly with all other group members, in the case of a group member) the Corporation and each of its directors, officers and employees individually against any liability, loss, damages, expenses or other costs (including attorneys' fees) incurred in connection with any threatened or pending action, suit or proceeding, whether legal, administrative or investigative, against the Corporation or any of its directors, officers or employees arising out of or relating to a failure or alleged failure of the Nominating Stockholder or any of its Stockholder Nominees to comply with, or any breach or alleged breach of, it or their obligations, agreements or representations under this Section 12;

(E) in the event that any information included in the Nomination Notice, or any other communication by the Nominating Stockholder (including with respect to any group member), with the Corporation, its stockholders or any other person in connection with the nomination or election ceases to be true and accurate in all material respects (or omits a material fact necessary to make the statements made not misleading), or that the Nominating Stockholder (including any group member) has failed to continue to satisfy the eligibility requirements described in Section 12(c), to promptly (and in any event within 48 hours of discovering such misstatement, omission or failure) notify the

-19-

APP.228

Corporation and any other recipient of such communication of (A) the misstatement or omission in such previously provided information and of the information that is required to correct the misstatement or omission or (B) such failure; and

(4) An executed agreement, in a form deemed satisfactory by the Board of Directors or any committee thereof or by each Stockholder Nominee:

(A) to provide to the Corporation such other information and certifications, including completion of the Corporation's director questionnaire, as it may reasonably request;

(B) at the reasonable request of the Nominating and Corporate Governance Committee, to meet with the Nominating and Corporate Governance Committee to discuss matters relating to the nomination of such Stockholder Nominee to the Board of Directors, including the information provided by such Stockholder Nominee to the Corporation in connection with his or her nomination and such Stockholder Nominee's eligibility to serve as a member of the Board of Directors;

(C) that such Stockholder Nominee has read and agrees, if elected, to serve as a member of the Board of Directors, to adhere to the Corporation's Corporate Governance Guidelines and Code of Business Conduct and Ethics and any other Corporation policies and guidelines applicable to directors; and

(D) that such Stockholder Nominee is not and will not become a party to (i) any compensatory, payment or other financial agreement, arrangement or understanding with any person or entity in connection with his or her nomination, service or action as a director of the Corporation that has not been disclosed to the Corporation, (ii) any agreement, arrangement or understanding with any person or entity as to how such Stockholder Nominee would vote or act on any issue or question as a director (a "Voting Commitment") that has not been disclosed to the Corporation or (iii) any Voting Commitment that could limit or interfere with such Stockholder Nominee's ability to comply, if elected as a director of the Corporation, with its director duties under applicable law.

The information and documents required by this Section 12(d) to be provided by the Nominating Stockholder shall be: (i) provided with respect to and executed by each group member, in the case of information applicable to group members; and (ii) provided with respect to the persons specified in Instruction 1 to Items 6(c) and (d) of Schedule 14N (or any successor item) in the case of a Nominating Stockholder or group member that is an entity. The Nomination Notice shall be deemed submitted on the date on which all the information and documents referred to in this Section 12(d) (other than such information and documents contemplated to be provided after the date the Nomination Notice is provided) have been delivered to or, if sent by mail, received by the Secretary of the Corporation.

(e) Exceptions.

(1) Notwithstanding anything to the contrary contained in this Section 12, the Corporation may omit from its proxy statement any Stockholder Nominee and any information concerning such Stockholder

-20-

Nominee (including a Nominating Stockholder's Supporting Statement) and no vote on such Stockholder Nominee will occur (notwithstanding that proxies in respect of such vote may have been received by the Corporation), and the Nominating Stockholder may not, after the last day on which a Nomination Notice would be timely, cure in any way any defect preventing the nomination of such Stockholder Nominee, if:

(A) the Corporation receives a notice pursuant to Section 11 of these Bylaws that a stockholder intends to nominate a candidate for director at the annual meeting, whether or not such notice is subsequently withdrawn or made the subject of a settlement with the Corporation;

(B) the Nominating Stockholder or the designated lead group member, as applicable, or any qualified representative thereof, does not appear at the meeting of stockholders to present the nomination submitted pursuant to this Section 12 or the Nominating Stockholder withdraws its nomination or the chairman of the annual meeting declares that such nomination was not made in accordance with the procedures prescribed by this Section 12 and shall therefore be disregarded;

(C) the Board of Directors determines that such Stockholder Nominee's nomination or election to the Board of Directors would result in the Corporation violating or failing to be in compliance with the Corporation's bylaws or charter or any applicable law, rule or regulation to which the Corporation is subject, including any rules or regulations of the New York Stock Exchange;

(D) such Stockholder Nominee was nominated for election to the Board of Directors pursuant to this Section 12 at one of the Corporation's two preceding annual meetings of stockholders and either withdrew or became ineligible or received a vote of less than 25% of the votes cast in favor of such Stockholder Nominee's election;

(E) such Stockholder Nominee has been, within the past three years, an officer or director of a competitor, as defined for purposes of Section 8 of the Clayton Antitrust Act of 1914, as amended; or

(F) the Corporation is notified, or the Board of Directors determines, that the Nominating Stockholder or the Stockholder Nominee has failed to continue to satisfy the eligibility requirements described in Section 12(c), any of the representations and warranties made in the Nomination Notice ceases to be true and accurate in all material respects (or omits a material fact necessary to make the statements made not misleading), such Stockholder Nominee becomes unwilling or unable to serve on the Board of Directors or any material violation or breach occurs of the obligations, agreements, representations or warranties of the Nominating Stockholder or such Stockholder Nominee under this Section 12.

(2) Notwithstanding anything to the contrary contained in this Section 12, the Corporation may omit from its proxy statement, or may supplement or correct, any information, including all or any portion of the Supporting Statement or any other statement in support of a Stockholder

-21-

Nominee included in the Nomination Notice, if the Board of Directors determines that:

  (A) such information is not true in all material respects or omits a material statement necessary to make the statements made not misleading; or

  (B) the inclusion of such information in the proxy statement would otherwise violate the SEC proxy rules or any other applicable law, rule or regulation.

The Corporation may solicit against, and include in the proxy statement its own statement relating to, any Stockholder Nominee.

ARTICLE II
DIRECTORS

Section 1. <u>Powers</u>. All of the powers of the Corporation shall be exercised by or under the direction of the Board of Directors except as otherwise provided by the Charter or required by law.

Section 2. <u>Number and Terms</u>. The Board of Directors shall establish and may increase or decrease the number of directors of the Corporation, provided, that the number thereof shall never be less than the minimum number permitted under the Maryland General Corporation Law nor more than 15, and further provided, that the tenure of office of a director shall not be affected by any decrease in the number of directors. A majority of the directors shall have been affirmatively determined by the Board to be independent, as defined and to the extent required in the applicable rules of the SEC and the listing standards of the New York Stock Exchange. The directors shall be elected at the annual meeting of the stockholders and each director shall be elected to serve for a term of one year and until his successor shall be elected and shall qualify or until his earlier resignation or removal.

Section 3. <u>Director Nominations</u>. Nomination of candidates for election as directors of the Corporation at any annual or special meeting of stockholders may be made (a) by, or at the direction of, a majority of the Board of Directors or (b) by any stockholder entitled to vote at such annual meeting and has complied with Article 1, Section 11.

Section 4. <u>Stockholder Status</u>. No Director need be a stockholder of the Corporation.

Section 5. <u>Vacancies</u>. Any vacancy occurring on the Board of Directors, including any vacancy created by reason of an increase in the number of directors, shall be filled in the manner provided in Article VII, Section 6 of the Charter.

Section 6. <u>Resignation</u>. Any Director may resign at any time by giving written notice to the Board of Directors, effective upon execution and delivery to the Corporation of such written notice or upon any future date specified in the notice, unless the resignation otherwise provides.

Section 7. <u>Regular Meetings</u>. The regular annual meeting of the Board of Directors shall be held, without other notice than this Bylaw, on the same date and at the same place as the annual meeting of stockholders following the close of such meeting of stockholders. Other regular meetings of the Board of Directors may be held at such hour, date and place as the

-22-

Board of Directors may by resolution from time to time determine without other notice than such resolution.

        Section 8.  Executive Sessions. To ensure free and open discussion and communication among the non-management directors, the non-management directors shall meet in executive session at least twice a year with no members of management present.

        Section 9. Special Meetings. Special meetings of the Board of Directors may be called, orally or in writing, by or at the request of a majority of the Directors, the Chairman of the Board, if one is elected, the Lead Director, if one is elected, or the Chief Executive Officer. The person calling any such special meeting of the Board of Directors may fix the hour, date and place thereof.

        Section 10.  Notice of Meetings. Notice of the hour, date and place of all special meetings of the Board of Directors shall be given to each Director by the Secretary or an Assistant Secretary, or in case of the death, absence, incapacity or refusal of such persons, by the Chairman of the Board, if one is elected, or the Chief Executive Officer or such other officer designated by the Chairman of the Board, if one is elected, or the Chief Executive Officer. Notice of any special meeting of the Board of Directors shall be given to each Director in person or by telephone, electronic mail, facsimile transmission or by telegram sent to his business or home address at least 24 hours in advance of the meeting, or by written notice mailed to his business or home address at least 48 hours in advance of the meeting. Such notice shall be deemed to be delivered when hand delivered to such address, when read to such Director by telephone, when deposited in the mail so addressed with postage thereon prepaid, upon transmission of the message by electronic mail, upon completion of transmission of a facsimile message and receipt of a completed answer back indicating receipt or when delivered to the telegraph company if sent by telegram.

        When any Board of Directors meeting, either regular or special, is adjourned for more than 30 days, notice of the adjourned meeting shall be given as in the case of an original meeting. It shall not be necessary to give any notice of the hour, date or place of any meeting adjourned for 30 days or less or of the business to be transacted at such meeting, other than an announcement at the meeting at which such adjournment is taken of the hour, date and place to which the meeting is adjourned.

        A written waiver of notice executed before or after a meeting by a director and filed with the records of the meeting shall be deemed to be equivalent to an effective notice of the meeting. The attendance of a director at a meeting shall constitute a waiver of notice of such meeting. Except as otherwise required by law, by the Charter or by these Bylaws, neither the business to be transacted at, nor the purpose of, any meeting of the Board of Directors need be specified in the notice or waiver of notice of such meeting.

        Section 11. Quorum. At any meeting of the Board of Directors, a majority of the Directors then in office shall constitute a quorum for the transaction of business, but if less than a quorum is present at a meeting, a majority of the directors present may adjourn the meeting from time to time, and the meeting may be held as adjourned without further notice, except as provided in Section 10 of this Article II. Any business which might have been transacted at the meeting as originally noticed may be transacted at such adjourned meeting at which a quorum is present.

        Section 12. Action at Meeting. At any meeting of the Board of Directors at which a quorum is present and subject to Section 8 of Article VII of the Charter, a majority of the Directors present may take any action on behalf of the Board of Directors, unless otherwise required by law, by the Charter or these Bylaws.

Section 13. <u>Action by Consent</u>. Any action required or permitted to be taken at any meeting of the Board of Directors may be taken without a meeting if all members of the Board of Directors consent thereto in writing. Such written consent shall be filed with the records of the proceedings of the Board of Directors and shall be treated for all purposes as a vote at a meeting of the Board of Directors.

Section 14. <u>Manner of Participation</u>. Members of the Board of Directors or of committees elected by the Board pursuant to Section 15 of this Article II may participate in meetings of the Board or of such committees by means of telephone conference or similar communications equipment by means of which all directors participating in the meeting can hear each other at the same time, and participation in a meeting in accordance herewith shall constitute presence in person at such meeting for purposes of these Bylaws.

Section 15. <u>Committees</u>. The Board of Directors, by the affirmative vote of a majority of the directors then in office may elect from its number directors to serve on one or more committees, including an Audit Committee, a Compensation Committee and an Nominating/Corporate Governance Committee, and may delegate thereto some or all of its powers except those which by law, by the Charter or by these Bylaws, may not be delegated. Except as the Board of Directors may otherwise determine or as required by law, by the Charter or by these Bylaws, any such committee may make rules for conduct of its business, but unless otherwise provided by the Board of Directors or in such rules, its business shall be conducted so far as possible in the same manner as is provided by the Charter and by these Bylaws for the Board of Directors. Any committee to which the Board of Directors delegates any of its powers or duties shall keep records of its meetings and shall report its action to the Board of Directors.

The Board of Directors shall have power to rescind any action of any committee, other than the Audit Committee, but no such rescission shall have retroactive effect. With the approval of the Board of Directors, the Chief Executive Officer may appoint such other committees consisting of such directors as the Chief Executive Officer shall select. Any recommendations of such committees appointed by the Chief Executive Officer shall be submitted to the Board of Directors.

Section 16. <u>Compensation of Directors</u>. Directors shall receive compensation for their services as shall be determined by a majority of the Board of Directors, provided that Directors who are serving the Corporation as officers or employees and who receive compensation for their services as such ("<u>Employee Directors</u>") shall not receive any salary or other compensation for their services as Directors of the Corporation; provided, however, that such Employee Directors may be paid their reasonable expenses incurred as a director.

ARTICLE III
OFFICERS

Section 1. <u>Enumeration</u>. The officers of the Corporation shall consist of a Chief Executive Officer, a President, a Secretary and a Treasurer and such other officers, including without limitation a Chairman of the Board, a Chief Operating Officer, a Chief Legal Officer, a Chief Financial Officer, a Chief Accounting Officer, one or more Vice Presidents (including Executive Vice Presidents or Senior Vice Presidents), Assistant Vice Presidents, Assistant Treasurers and Assistant Secretaries, as the Board of Directors may determine. Effective on the date on which the Corporation hires a Chief Executive Officer that is not also the Chairman of the Board, any number of offices may be held by the same person, except the offices of Chairman of the Board and the Chief Executive Officer.

-24-

Section 2. <u>Election and Appointment</u>. At the regular annual meeting of the Board of Directors following the annual meeting of stockholders, the Board of Directors shall elect the Chief Executive Officer, the President, the Treasurer and the Secretary. Other officers may be appointed by the Board of Directors at such regular annual meeting of the Board of Directors or at any other regular or special meeting, or other officers may be appointed by the Chief Executive Officer.

Section 3. <u>Qualification</u>. No officer need be a stockholder or a director. Any person may occupy more than one office of the Corporation at any time except the offices of President and Vice President. Any officer may be required by the Board of Directors to give bond, at the Corporation's expense, for the faithful performance of his duties in such amount and with such sureties as the Board of Directors may determine.

Section 4. <u>Tenure</u>. Except as otherwise provided by the Charter or by these Bylaws, each of the officers of the Corporation shall hold office until the regular annual meeting of the Board of Directors following the next annual meeting of stockholders and until his successor is elected and qualified or until his earlier resignation or removal. Election or appointment of an officer, employee or agent shall not of itself create contract rights. The Board of Directors may, however, authorize the Corporation to enter into an employment contract with any officer in accordance with law, but no such contract right shall prohibit the right of the Board of Directors to remove any officer at any time in accordance with Section 6 of this Article III.

Section 5. <u>Resignation</u>. Any officer may resign by delivering his written resignation to the Corporation addressed to the Chief Executive Officer or the Secretary, and such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.

Section 6. <u>Removal</u>. If the Board of Directors in its judgment finds that the best interests of the Corporation will be served, the Board of Directors may remove any officer by the affirmative vote of a majority of the Directors then in office. Such removal shall be without prejudice to the contract rights, if any, of the person so removed.

Section 7. <u>Absence or Disability</u>. In the event of the absence or disability of any officer, the Board of Directors may designate another officer to act temporarily in place of such absent or disabled officer.

Section 8. <u>Vacancies</u>. Any vacancy in any office may be filled for the unexpired portion of the term by the Board of Directors.

Section 9. <u>Chief Executive Officer</u>. The President may be the Chief Executive Officer or the Board of Directors may elect another person to be the Chief Executive Officer. In the absence of the Chairman of the Board, the Chief Executive Officer shall preside, when present, at all meetings by the Board of Directors. The Chief Executive Officer shall, subject to the direction of the Board of Directors, have general supervision and control of the Corporation's business and shall preside, if the Chairman of the Board is not present, at all meetings of the stockholders. Effective on the date on which the Corporation hires a Chief Executive Officer that is not also the Chairman of the Board, the Chief Executive Officer shall not concurrently serve as the Chairman of the Board.

Section 10. <u>Chairman of the Board</u>. The Chairman of the Board shall preside at all meetings of the Board of Directors and at all meetings of stockholders. If the Chairman of the Board is absent, the Chief Executive Officer shall preside at meetings of the Board of Directors and at meetings of stockholders. The Chairman of the Board shall have such other powers and

-25-

shall perform such other duties as the Board of Directors may from time to time designate and shall act as an officer of the Corporation if so designated by the Board.

Section 11.  President. If the President is not the Chief Executive Officer or Chairman of the Board and in the absence of such persons, the President shall preside, when present, at all meetings of the stockholders. If the President is not the Chief Executive Officer, he shall have such powers and perform such duties as the Board of Directors or the Chief Executive Officer may from time to time designate.

Section 12.  Chief Operating Officer, Chief Legal Officer, Chief Financial Officer and Chief Accounting Officer. Any Chief Operating Officer, Chief Legal Officer, Chief Financial Officer or Chief Accounting Officer shall have such powers and shall perform such duties as the Board of Directors or the Chief Executive Officer may from time to time designate.

Section 13.  Vice Presidents and Assistant Vice Presidents. Any Vice President (including any Executive Vice President or Senior Vice President) and Assistant Vice President shall have such powers and shall perform such duties as the Board of Directors or the Chief Executive Officer may from time to time designate.

Section 14.  Treasurer and Assistant Treasurers. The Chief Financial Officer shall be the Treasurer, unless the Board of Directors shall elect another officer to be the Treasurer. The Treasurer shall, subject to the direction of the Board of Directors and except as the Board of Directors or the Chief Executive Officer may otherwise provide, have general charge of the financial affairs of the Corporation and shall cause to be kept accurate books of account. He shall have custody of all funds, securities and valuable documents of the qCorporation. He shall have such other duties and powers as may be designated from time to time by the Board of Directors or the Chief Executive Officer. In the absence of a Chief Financial Officer, the office of the Treasurer shall be deemed to be the office of the Chief Financial Officer of the Corporation whenever the signature of the Chief Financial Officer is required on any document or instrument, by the laws of the United States or any state, or elsewhere in the Bylaws, and the Treasurer shall have authority to affix his signature in such capacity.

The office of the Chief Accounting Officer shall be deemed an Assistant Treasurer of the Corporation whenever the signature of an Assistant Treasurer is required on any document or instrument, by the laws of the United States or any state, or elsewhere in these Bylaws, and the Vice President of Finance and Accounting shall have authority to affix his signature in such capacity. Any Treasurer or Assistant Treasurer shall have such powers and perform such duties as the Board of Directors or the Chief Executive Officer may from time to time designate.

Section 15.  Secretary and Assistant Secretaries. The Secretary shall record all the proceedings of the meetings of the stockholders and the Board of Directors (including committees of the Board) in books kept for that purpose. In the absence of the Secretary from any such meeting, a temporary secretary chosen at the meeting shall record the proceedings thereof. The Secretary shall have charge of the stock ledger (which may, however, be kept by any transfer or other agent of the Corporation). The secretary shall have custody of the seal of the Corporation, and the Secretary, or an Assistant Secretary, shall have authority to affix it to any instrument requiring it, and, when so affixed, the seal may be attested by the signature of the Secretary or an Assistant Secretary. The Secretary shall have such other duties and powers as may be designated from time to time by the Board of Directors or the Chief Executive Officer. In the absence of the Secretary, any Assistant Secretary may perform the duties and responsibilities of the Secretary.

Any Assistant Secretary shall have such powers and perform such duties as the Board of Directors or the Chief Executive Officer may from time to time designate.

Section 16. Other Powers and Duties. Subject to these Bylaws and to such limitations as the Board of Directors may from time to time prescribe, the officers of the Corporation shall each have such powers and duties as generally pertain to their respective offices, as well as such powers and duties as from time to time may be conferred by the Board of Directors or the Chief Executive Officer.

ARTICLE IV
STOCK

Section 1. Certificates of Stock. Unless otherwise provided by the Board of Directors or by law, each stockholder shall be entitled to a certificate of the stock of the Corporation in such form as may from time to time be prescribed by the Board of Directors. Such certificate shall bear the seal of the Corporation, if one has been adopted, and shall be signed by the Chairman of the Board of Directors, Chief Executive Officer or President and countersigned by the Treasurer or an Assistant Treasurer or the Secretary or an Assistant Secretary. The seal of the Corporation, if one has been adopted, and any and all signatures on the certificate may be a facsimile, including those of any transfer agent or registrar. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed on such certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he were such officer, transfer agent or registrar at the time of its issue. Every certificate for shares of stock which are subject to any restriction on transfer and every certificate issued when the Corporation is authorized to issue more than one class or series of stock shall contain such legend with respect thereto as is required by law.

Section 2. Transfers. Subject to any restrictions on transfer and unless otherwise provided by the Board of Directors, shares of stock may be transferred only on the books of the Corporation by the surrender to the Corporation or its transfer agent of the certificate therefor properly endorsed or accompanied by a written assignment or power of attorney properly executed, with transfer stamps (if necessary) affixed, and with such proof of the authenticity of signature as the Corporation or its transfer agent may reasonably require.

Section 3. Record Holders. Except as may otherwise be required by law, by the Charter or by these Bylaws, the Corporation shall be entitled to treat the record holder of stock as shown on its books as the owner of such stock for all purposes, including the payment of dividends and the right to vote with respect thereto, regardless of any transfer, pledge or other disposition of such stock, until the shares have been transferred on the books of the Corporation in accordance with the requirements of these Bylaws.

It shall be the duty of each stockholder to notify the Corporation or its transfer agent of his post office address and any changes thereto.

Section 4. Record Date. In order that the Corporation may determine the stockholders entitled to receive notice of or to vote at any meeting of stockholders or any adjournments thereof, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix, in advance, a record date, which shall not be more than 90 days nor less than 10 days before the date of such meeting, nor more than 90 days prior to any other action. In such case, only

-27-

stockholders of record on such record date shall be so entitled, notwithstanding any transfer of stock on the stock transfer books of the Corporation after the record date.

If no record date is fixed:

(a) the record date for determining stockholders entitled to receive notice of or to vote at a meeting of stockholders shall be the later of (i) the close of business on the day on which notice is mailed or (ii) the 30th day before the meeting; and

(b) the record date for determining stockholders entitled to receive payment of a dividend or an allotment of any rights shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 5. <u>Replacement of Certificates</u>. In case of the alleged loss, destruction or mutilation of a certificate of stock, a duplicate certificate may be issued in place thereof upon such terms as the Corporation or its transfer agent may prescribe.

Section 6. <u>Transfer Agents and Registrars</u>. The Corporation may serve as the transfer agent and registrar of the shares of stock, or the Board of Directors may, in its discretion, appoint one or more responsible bank, trust company or other entity as the Board of Directors may deem advisable, from time to time, to act as transfer agent and registrar of shares of stock. No certificate for shares of stock shall be valid until countersigned by the transfer agent and registered by the registrar.

Section 7. <u>Stockholders' Addresses</u>. Every stockholder or transferee shall furnish the Secretary or a transfer agent with the address to which notice of meetings and all other notices may be served upon or mailed to such stockholder or transferee, and in default thereof, such stockholder or transferee shall not be entitled to service or mailing of any such notice.

Section 8. <u>Repurchase of Shares of Stock</u>. The Corporation may purchase its shares of stock and invest its assets in its own shares of stock, provided that in each case the consent of the Board of Directors shall have been obtained.

ARTICLE V
INDEMNIFICATION

Section 1. <u>Right to Indemnification</u>. The Corporation shall, to the maximum extent permitted by the Maryland General Corporation Law in effect from time to time, indemnify, and, without a preliminary determination of the ultimate entitlement to indemnification, pay or reimburse reasonable expenses in advance of final disposition of a proceeding to (a) any individual who is a present or former director or officer of the Corporation or (b) any individual who, while a director or officer of the Corporation and at the request of the Corporation, serves or has served another corporation, real estate investment trust, partnership, joint venture, trust, employee benefit plan or any other enterprise as a director, officer, partner or trustee and, in each case, shall indemnify such person from and against any claim or liability to which such person may become subject or which such person may incur by reason of his status as a present or former director or officer of the Corporation or director, officer, partner or trustee of such other entity (each, an "<u>Indemnitee</u>"). The Corporation shall, to the maximum extent permitted by the Maryland General Corporation Law in effect from time to time, provide such indemnification and advancement of expenses to a person who served a predecessor of the Corporation in any of the capacities described above (any such person shall also be deemed to be an "<u>Indemnitee</u>").

-28-

Section 2. <u>Indemnification of Employees and Agents of the Corporation</u>. With the approval of the Board of Directors, the Corporation shall, to the maximum extent permitted by the Maryland General Corporation Law in effect from time to time, and to such further extent as it shall deem appropriate under the circumstances, provide such indemnification and advancement of expenses as described in Section 1 above, to any employee or agent of the Corporation or a predecessor of the Corporation (each such person shall also be deemed to be an "<u>Indemnitee</u>").

Section 3. <u>Right of Indemnitee to Bring Suit</u>. If a claim under this Article V is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the Indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. If the Indemnitee is successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Indemnitee shall also be entitled to be paid the expense of prosecuting or defending such suit. In any suit brought by an Indemnitee who is a present or former director to enforce a right to indemnification hereunder (but not in a suit brought by the Indemnitee to enforce a right to an advancement of expenses), it shall be a defense that such Indemnitee has not met the applicable standard of conduct set forth in the Maryland General Corporation Law. In addition, in any suit by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that the Indemnitee who is a present or former director has not met the applicable standard of conduct set forth in the Maryland General Corporation Law. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or stockholders) to have made a determination prior to the commencement of such suit that indemnification of the Indemnitee is proper in the circumstances because the Indemnitee has met the applicable standard of conduct set forth in the Maryland General Corporation Law, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel or stockholders) that the Indemnitee has not met such applicable standard of conduct, shall create a presumption that the Indemnitee has not met the applicable standard of conduct. In any suit brought by the Indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this Article V or otherwise shall be on the Corporation.

Section 4. <u>Non-Exclusivity of Rights</u>. The rights to indemnification and to advancement of expenses conferred in this Article V shall not be exclusive of any other right that any person may have or hereafter acquire under these Bylaws, the Charter or any statute, agreement, vote of stockholders or disinterested directors or otherwise.

Section 5. <u>Insurance</u>. The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or any director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Maryland General Corporation Law.

ARTICLE VI
MISCELLANEOUS PROVISIONS

Section 1. <u>Fiscal Year</u>. The fiscal year of the Corporation shall end on December 31 of each year or on such other date as may be fixed by the Board of Directors.

-29-

Section 2. <u>Seal</u>. The seal of the Corporation shall be in the form of a circle and shall have inscribed thereon the name of the Corporation and the year of its organization. The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced.

Section 3. <u>Investment Policies</u>. The directors may from time to time adopt, amend, revise or terminate any policy or policies with respect to investments by the Corporation as they shall deem appropriate in their sole discretion.

Section 4. <u>Execution of Instruments</u>. All deeds, leases, transfers, contracts, bonds, notes and other obligations to be entered into by the Corporation in the ordinary course of its business without director action may be executed on behalf of the Corporation by the Chairman of the Board, if one is elected, the Chief Executive Officer, the President or the Treasurer or any other officer, employee or agent of the Corporation as the Board of Directors may authorize.

Section 5. <u>Voting of Securities</u>. Unless the Board of Directors otherwise provides, the Chairman of the Board, if one is elected, the Chief Executive Officer, the President or the Treasurer may waive notice of and act on behalf of this Corporation, or appoint another person or persons to act as proxy or attorney in fact for this Corporation with or without discretionary power and/or power of substitutions at any meeting of stockholders or stockholders of any other corporation or organization, any of whose securities are held by this Corporation.

Section 6. <u>Resident Agent</u>. The Board of Directors may appoint a resident agent upon whom legal process may be served in any action or proceeding against the Corporation.

Section 7. <u>Corporate Records</u>. The original or attested copies of the Charter, Bylaws and records of all meetings of the incorporators, stockholders and the Board of Directors and the stock transfer books, which shall contain the names of all stockholders, their record addresses and the amount of stock held by each, may be kept outside the State of Maryland and shall be kept at the principal office of the Corporation, at the office of its counselor at an office of its transfer agent.

Section 8. <u>Amendments</u>. The exclusive power to alter, amend or repeal these bylaws, and to adopt new bylaws, shall be vested in the Board of Directors.

Section 9. <u>Offices</u>. The principal office of the Corporation within the State of Maryland shall be located at such place as the Board of Directors may designate. The Corporation may have additional offices, including a principal executive office, at such place or places both within and without the State of Maryland as the Board of Directors may from time to time determine or the business of the Corporation may require.

APP.239

# EXHIBIT E

8-K 1 tm2020161-1_8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

———————————

# FORM 8-K

### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the
### Securities Exchange Act of 1934
Date of Report (Date of earliest event reported): **May 14, 2020**

———————————

# BRAEMAR HOTELS & RESORTS INC.
(Exact name of registrant as specified in its charter)

———————————

| **Maryland** | **001-35972** | **46-2488594** |
|:---:|:---:|:---:|
| (State or other jurisdiction of incorporation or organization) | (Commission file number) | (I.R.S. Employer Identification Number) |

| **14185 Dallas Parkway, Suite 1100** **Dallas, Texas** | **75254** |
|:---:|:---:|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(972) 490-9600**

**N/A**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐     Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐     Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐     Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐     Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933(§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|:---:|:---:|:---:|
|  |  |  |

| Common Stock | BHR | New York Stock Exchange |
| Preferred Stock, Series B | BHR-PB | New York Stock Exchange |
| Preferred Stock, Series D | BHR-PD | New York Stock Exchange |

**Item 5.07**        **Submission of Matters to a Vote of Security Holders.**

(a) On May 14, 2020, Braemar Hotels & Resorts Inc. (the "Company") held its Annual Meeting of Stockholders (the "Annual Meeting"). As of March 20, 2020, the record date for the Annual Meeting, there were 33,519,263 shares of common stock outstanding and entitled to vote. At the Annual Meeting, 25,668,905 shares, or approximately 76.57% of the eligible voting shares, were represented either in person or by proxy.

(b) At the Annual Meeting, the stockholders voted on the following items:

1. Proposal 1 – To elect seven nominees to the Board of Directors to hold office until the next annual meeting of stockholders and until their successors are elected and qualified. The following nominees were elected to the Company's Board of Directors (constituting the entire Board of Directors), with the voting results for each nominee as shown:

| Name | For | Withheld | Broker Non-votes |
|---|---|---|---|
| Monty J. Bennett | 19,215,410 | 2,541,022 | 3,912,473 |
| Stefani D. Carter | 16,863,707 | 4,892,725 | 3,912,473 |
| Candace Evans | 21,645,369 | 111,063 | 3,912,473 |
| Kenneth H. Fearn, Jr. | 21,524,035 | 232,397 | 3,912,473 |
| Curtis B. McWilliams | 21,066,008 | 690,424 | 3,912,473 |
| Matthew D. Rinaldi | 21,059,934 | 696,498 | 3,912,473 |
| Abteen Vaziri | 17,652,141 | 4,104,291 | 3,912,473 |

2. Proposal 2 – To obtain advisory approval of the Company's executive compensation. This proposal was approved by the votes indicated below:

| For | Against | Abstain | Broker Non-votes |
|---|---|---|---|
| 20,894,105 | 827,148 | 35,179 | 3,912,473 |

3. Proposal 3 – To recommend the frequency of advisory votes on the Company's executive compensation. "1 Year" was approved by the votes indicated below:

| 1 Year | 2 Years | 3 Years | Abstain | Broker Non-votes |
|---|---|---|---|---|
| 20,710,374 | 12,077 | 997,137 | 36,844 | 3,912,473 |

Based on these voting results, the Company will hold an advisory vote on executive compensation every year until the next stockholder vote on the frequency of votes on executive compensation. A stockholder vote on the frequency of votes on executive compensation is required to be held at least once every six years.

4. Proposal 4 – To ratify the appointment of BDO USA, LLP, a national public accounting firm, as the Company's independent auditors for the fiscal year ending December 31, 2020. This proposal was approved by the votes indicated below:

| For | Against | Abstain |
|---|---|---|
| 25,564,294 | 68,590 | 36,021 |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**BRAEMAR HOTELS & RESORTS INC.**

By:  /s/ Robert G. Haiman
      Robert G. Haiman
      Executive Vice President, General Counsel & Secretary

Date: May 19, 2020

# EXHIBIT F

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**

**PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of Report (date of earliest event reported): May 11, 2021**

# BRAEMAR HOTELS & RESORTS INC.

**(Exact name of registrant as specified in its charter)**

| Maryland | 001-35972 | 46-2488594 |
|---|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(Commission File Number)* | *(IRS employer identification number)* |

| 14185 Dallas Parkway | | |
| Suite 1200 | | |
| Dallas | | |
| Texas | | 75254 |
| *(Address of principal executive offices)* | | *(Zip code)* |

**Registrant's telephone number, including area code: (972) 490-9600**

**Not Applicable**
**(Former name or former address, if changed since last report)**

Check the appropriate box if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14-a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company  ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock** | **BHR** | **New York Stock Exchange** |
| **Preferred Stock, Series B** | **BHR-PB** | **New York Stock Exchange** |
| **Preferred Stock, Series D** | **BHR-PD** | **New York Stock Exchange** |

**ITEM 5.07    SUBMISSION OF MATTERS TO A VOTE OF SECURITIES HOLDERS.**

(a) On May 11, 2021, Braemar Hotels & Resorts Inc. (the "Company") held its Annual Meeting of Stockholders (the "Annual Meeting"). As of March 15, 2021, the record date for the Annual Meeting, there were 41,124,073 shares of common stock outstanding and entitled to vote. At the Annual Meeting, 22,237,566 shares, or approximately 54.07% of the eligible voting shares, were represented either in person or by proxy.

(b) At the Annual Meeting, the stockholders voted on the following items:

1. Proposal 1 – To elect eight nominees to the Board of Directors to hold office until the next annual meeting of stockholders and until their successors are elected and qualified. The following nominees were elected to the Company's Board of Directors (constituting the entire Board of Directors), with the voting results for each nominee as shown:

| Name | For | Withheld | Broker Non-votes |
|------|-----|----------|------------------|
| Monty J. Bennett | 10,887,055 | 1,660,267 | 9,690,244 |
| Stefani D. Carter | 9,819,456 | 2,727,866 | 9,690,244 |
| Candace Evans | 12,278,479 | 268,843 | 9,690,244 |
| Kenneth H. Fearn, Jr. | 12,272,772 | 274,550 | 9,690,244 |
| Curtis B. McWilliams | 11,865,715 | 681,607 | 9,690,244 |
| Matthew D. Rinaldi | 11,811,432 | 735,890 | 9,690,244 |
| Richard J. Stockton | 12,255,770 | 291,552 | 9,690,244 |
| Abteen Vaziri | 9,820,075 | 2,727,247 | 9,690,244 |

2. Proposal 2 – To obtain advisory approval of the Company's executive compensation. This proposal was approved by the votes indicated below:

| For | Against | Abstain | Broker Non-votes |
|-----|---------|---------|------------------|
| 10,824,261 | 1,603,839 | 119,222 | 9,690,244 |

3. Proposal 3 – To ratify the appointment of BDO USA, LLP, a national public accounting firm, as the Company's independent auditors for the fiscal year ending December 31, 2021. This proposal was approved by the votes indicated below:

| For | Against | Abstain |
|-----|---------|---------|
| 21,928,058 | 226,397 | 83,111 |

4. Proposal 4 – To approve Amendment No. 2 to the Company's Second Amended and Restated 2013 Equity Incentive Plan. This proposal was approved by the votes indicated below:

| For | Against | Abstain | Broker Non-votes |
|-----|---------|---------|------------------|
| 9,936,141 | 2,540,171 | 71,010 | 9,690,244 |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Dated: May 11, 2021

BRAEMAR HOTELS & RESORTS INC.

By:  /s/ ROBERT G. HAIMAN
       Robert G. Haiman
       Executive Vice President, General Counsel & Secretary

# EXHIBIT G

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**

**PURSUANT TO SECTION 13 OR 15(D)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of Report (date of earliest event reported): May 11, 2022**

# BRAEMAR HOTELS & RESORTS INC.

**(Exact name of registrant as specified in its charter)**

| Maryland | 001-35972 | 46-2488594 |
|---|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(Commission File Number)* | *(IRS employer identification number)* |

| 14185 Dallas Parkway | | |
| Suite 1100 | | |
| Dallas | | |
| Texas | | 75254 |
| *(Address of principal executive offices)* | | *(Zip code)* |

**Registrant's telephone number, including area code: (972) 490-9600**

**Not Applicable**
**(Former name or former address, if changed since last report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company    ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock** | **BHR** | **New York Stock Exchange** |
| **Preferred Stock, Series B** | **BHR-PB** | **New York Stock Exchange** |
| **Preferred Stock, Series D** | **BHR-PD** | **New York Stock Exchange** |

**ITEM 5.02    DEPARTURE OF DIRECTORS OR CERTAIN OFFICERS; ELECTION OF DIRECTORS; APPOINTMENT OF CERTAIN OFFICERS; COMPENSATORY ARRANGEMENTS OF CERTAIN OFFICERS.**

On May 11, 2022, the stockholders of Braemar Hotels & Resorts Inc. (the "Company") approved an amendment to the Company's Second Amended and Restated 2013 Equity Incentive Plan (as amended, the "2013 Plan") at the Company's Annual Meeting of Stockholders (the "Annual Meeting") in accordance with the voting results set forth below under item 5.07.

The amendment increases the amount of common stock available for issuance under the 2013 Plan by 1,600,000 shares. A summary of the amendment and the 2013 Plan, as amended, is included in the Company's definitive proxy statement for the Annual Meeting, which was filed with the Securities and Exchange Commission on March 30, 2022 as updated by the supplement to the proxy statement filed on April 22, 2022. The summary is incorporated by reference herein.

**ITEM 5.07    SUBMISSION OF MATTERS TO A VOTE OF SECURITIES HOLDERS.**

(a)    On May 11, 2022, the Company held its Annual Meeting. As of March 11, 2022, the record date for the Annual Meeting, there were 74,276,341 shares of voting stock outstanding and entitled to vote, consisting of 71,327,378 shares of common stock, 2,912,159 shares of Series E Preferred Stock and 36,804 shares of Series M Preferred Stock. At the Annual Meeting, 46,155,936 shares, or approximately 62.1% of the eligible voting shares, were represented either in person or by proxy.

(b)    At the Annual Meeting, the stockholders voted on the following items:

1. Proposal One – To elect eight nominees to the Board of Directors to hold office until the next annual meeting of stockholders and until their successors are duly elected and qualified. The following nominees were elected to the Company's Board of Directors (constituting the entire Board of Directors), with the voting results for each nominee as shown:

| Name | For | Withheld | Broker Non-Votes |
|------|-----|----------|------------------|
| Monty J. Bennett | 31,987,119 | 4,789,668 | 9,379,149 |
| Stefani D. Carter | 25,286,894 | 11,489,893 | 9,379,149 |
| Candace Evans | 34,852,345 | 1,924,442 | 9,379,149 |
| Kenneth H. Fearn, Jr. | 34,702,307 | 2,074,480 | 9,379,149 |
| Rebeca Odino-Johnson | 35,064,833 | 1,711,954 | 9,379,149 |
| Matthew D. Rinaldi | 34,311,871 | 2,464,916 | 9,379,149 |
| Richard J. Stockton | 34,843,132 | 1,933,655 | 9,379,149 |
| Abteen Vaziri | 26,130,969 | 10,645,818 | 9,379,149 |

2. Proposal Two – To obtain advisory approval of the Company's executive compensation. This proposal was approved by the votes indicated below:

| For | Against | Abstain | Broker Non-Votes |
|-----|---------|---------|------------------|
| 31,037,628 | 2,469,011 | 3,270,148 | 9,379,149 |

3. Proposal Three – To ratify the appointment of BDO USA, LLP, a national public accounting firm, as the Company's independent auditors for the fiscal year ending December 31, 2022. This proposal was approved by the votes indicated below:

| For | Against | Abstain |
|-----|---------|---------|
| 42,237,657 | 49,324 | 3,868,955 |

4. Proposal Four – To approve Amendment No. 3 to the Company's Second Amended and Restated 2013 Equity Incentive Plan. This proposal was approved by the votes indicated below:

| For | Against | Abstain | Broker Non-Votes |
|---|---|---|---|
| 30,098,423 | 3,443,333 | 3,235,031 | 9,379,149 |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

BRAEMAR HOTELS & RESORTS INC.

Dated: May 11, 2022                           By:    /s/ Alex Rose
                                                     _____
                                                     Alex Rose
                                                     Executive Vice President, General Counsel & Secretary

# EXHIBIT H

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 8-K

**CURRENT REPORT**

**PURSUANT TO SECTION 13 OR 15(D)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (date of earliest event reported): May 10, 2023

# BRAEMAR HOTELS & RESORTS INC.

**(Exact name of registrant as specified in its charter)**

| Maryland | 001-35972 | 46-2488594 |
|---|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(Commission File Number)* | *(IRS employer identification number)* |

| 14185 Dallas Parkway | | |
| Suite 1200 | | |
| Dallas | | |
| Texas | | 75254 |
| *(Address of principal executive offices)* | | *(Zip code)* |

**Registrant's telephone number, including area code: (972) 490-9600**

**Not Applicable**
**(Former name or former address, if changed since last report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company    ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock** | **BHR** | **New York Stock Exchange** |
| **Preferred Stock, Series B** | **BHR-PB** | **New York Stock Exchange** |
| **Preferred Stock, Series D** | **BHR-PD** | **New York Stock Exchange** |

**ITEM 5.02   DEPARTURE OF DIRECTORS OR CERTAIN OFFICERS; ELECTION OF DIRECTORS; APPOINTMENT OF CERTAIN OFFICERS; COMPENSATORY ARRANGEMENTS OF CERTAIN OFFICERS.**

On May 10, 2023, the stockholders of Braemar Hotels & Resorts Inc. (the "Company") approved an amendment to the Company's Second Amended and Restated 2013 Equity Incentive Plan (as amended, the "2013 Plan") at the Company's Annual Meeting of Stockholders (the "Annual Meeting") in accordance with the voting results set forth below under item 5.07.

The amendment increases the amount of common stock available for issuance under the 2013 Plan by 1,200,000 shares. A summary of the amendment and the 2013 Plan, as amended, is included in the Company's definitive proxy statement for the Annual Meeting, which was filed with the Securities and Exchange Commission on March 28, 2023. The summary is incorporated by reference herein.

**ITEM 5.07   SUBMISSION OF MATTERS TO A VOTE OF SECURITIES HOLDERS.**

(a)    On May 10, 2023, the Company held its Annual Meeting. As of March 10, 2023, the record date for the Annual Meeting, there were 84,458,550 shares of voting stock outstanding and entitled to vote, consisting of 66,032,496 shares of common stock, 16,466,721 shares of Series E Preferred Stock and 1,959,333 shares of Series M Preferred Stock. At the Annual Meeting, 61,276,237 shares, or approximately 72.55% of the eligible voting shares, were represented either in person or by proxy.

(b)    At the Annual Meeting, the stockholders voted on the following items:

1.    Proposal One – To elect eight nominees to the Board of Directors to hold office until the next annual meeting of stockholders and until their successors are duly elected and qualified. The following nominees were elected to the Company's Board of Directors (constituting the entire Board of Directors), with the voting results for each nominee as shown:

| Name | For | Withheld | Broker Non-Votes |
|------|-----|----------|------------------|
| Monty J. Bennett | 34,612,576 | 6,832,961 | 19,830,700 |
| Stefani D. Carter | 29,001,569 | 12,443,968 | 19,830,700 |
| Candace Evans | 37,717,785 | 3,727,752 | 19,830,700 |
| Kenneth H. Fearn, Jr. | 36,046,273 | 5,399,264 | 19,830,700 |
| Rebeca Odino-Johnson | 36,011,684 | 5,433,853 | 19,830,700 |
| Matthew D. Rinaldi | 37,345,719 | 4,099,818 | 19,830,700 |
| Richard J. Stockton | 37,813,193 | 3,632,344 | 19,830,700 |
| Abteen Vaziri | 28,347,336 | 13,098,201 | 19,830,700 |

2.    Proposal Two – To obtain advisory approval of the Company's executive compensation. This proposal was approved by the votes indicated below:

| For | Against | Abstain | Broker Non-Votes |
|-----|---------|---------|------------------|
| 36,504,535 | 3,264,357 | 1,676,645 | 19,830,700 |

3.    Proposal Three – To ratify the appointment of BDO USA, LLP, a national public accounting firm, as the Company's independent auditors for the fiscal year ending December 31, 2023. This proposal was approved by the votes indicated below:

| For | Against | Abstain |
|-----|---------|---------|
| 58,823,481 | 907,899 | 1,544,857 |

4.    Proposal Four – To approve Amendment No. 4 to the Company's Second Amended and Restated 2013 Equity Incentive Plan. This proposal was approved by the votes indicated below:

| For | Against | Abstain | Broker Non-Votes |
|---|---|---|---|
| 37,529,807 | 2,299,290 | 1,616,440 | 19,830,700 |

### SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

BRAEMAR HOTELS & RESORTS INC.

Dated: May 10, 2023                    By:    /s/ Alex Rose
                                               Alex Rose
                                               Executive Vice President, General Counsel & Secretary

# EXHIBIT I

TABLE OF CONTENTS

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
**SCHEDULE 14A**
Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No.)

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐    Preliminary Proxy Statement

☐    **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒    Definitive Proxy Statement

☐    Definitive Additional Materials

☐    Soliciting Material under §240.14a-12

# Braemar Hotels & Resorts Inc.
**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☒    No fee required.

☐    Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1)    Title of each class of securities to which transaction applies:

_____

(2)    Aggregate number of securities to which transaction applies:

_____

(3)    Per unit price of other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

_____

(4)    Proposed maximum aggregate value of transaction

_____

(5)    Total fee paid:

_____

☐    Fee paid previously with preliminary materials.

☐    Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offset fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)    Amount Previously Paid:

_____

(2)    Form, Schedule or Registration Statement No.:

_____

(3)    Filing Party:

_____

(4)    Date Filed:

_____

TABLE OF CONTENTS



# 2024 Proxy Statement Annual Meeting of Stockholders



**Wednesday, May 15, 2024**

**9:00 A.M., Central Daylight Time**

**Braemar Hotels & Resorts Inc.**

**14185 Dallas Parkway, Suite 1200
Dallas, Texas 75254**

TABLE OF CONTENTS



March 28, 2024

Dear Stockholders of Braemar Hotels & Resorts Inc.:

On behalf of the Board of Directors of Braemar Hotels & Resorts Inc., I cordially invite you to attend the 2024 annual meeting of stockholders of the Company, which will be held at 9:00 A.M., Central Daylight Time, on Wednesday, May 15, 2024 at our offices located at 14185 Dallas Parkway, Suite 1200, Dallas, Texas 75254.

The year started with an unsettling fear of recession hanging over the industry. However, with the support of full employment, our economy continued to demonstrate growth. The recession never came. But the Fed remained hawkish and pushed up interest rates to quell inflation. And it worked. The COVID-inspired inflation started to subside and soon we were talking about a pivot to lower interest rates in 2024.

Early in 2023 global travel restrictions were lifted, and Americans started traveling internationally again. Unfortunately, this resulted in some softening of demand for domestic resorts. But conventions and meetings were back on the calendar as companies started to insist that their employees spend at least some of their time back in the office. But unfortunately, the work from home trend started a malaise within the office property sector, which now looks to be with us for many years to come. Values are down as much as 40% and refinancing is proving difficult and costly. Fortunately, these loans do not comprise a high proportion of the book within our money center banks. Nevertheless, some regional banks will be more acutely impacted. For the lodging industry, the result of this trend has been slightly lower occupancies, but higher average daily rates, placing RevPAR for the industry solidly above 2019 levels.

In 2023 our portfolio fared well, albeit generating RevPAR and EBITDA results below 2022. 2024 looks to be shaping up nicely, with very strong group pace and an industry forecast of 4% RevPAR growth across the industry and over 5% for the luxury segment. Expenses continue to be in focus, but will be very manageable, with unemployment ticking up slightly and having already booked significant increases in property taxes and insurance over the past two years.

Looking at our balance sheet, we have already addressed all of our 2024 debt maturities through a combination of extensions, refinancings and planned repayments. As we look forward, we anticipate more constructive debt capital markets for lodging, including lower interest costs in the form of lower base rates and credit spreads.

As always, we will continue to look at ways to fulfill our mission to create and protect stockholder value. Thank you for your continued interest in Braemar. We encourage you to read this proxy statement carefully and to vote your gold proxy as soon as possible so that your shares will be represented at the meeting.

Sincerely,



Monty J. Bennett
*Founder and Chairman of the Board*

**TABLE OF CONTENTS**



**Notice of 2024 Annual Meeting of Stockholders**

| | |
|---|---|
| **Meeting Date:** | Wednesday, May 15, 2024 |
| **Meeting Time:** | 9:00 A.M., Central Daylight Time |
| **Location:** | Braemar Hotels & Resorts Inc. |
| | 14185 Dallas Parkway, Suite 1200 |
| | Dallas, Texas 75254 |

**Agenda**

1.  Election of eight directors;
2.  Advisory approval of our executive compensation;
3.  Ratification of the appointment of BDO USA, P.C. as our independent auditor for 2024; and
4.  Transaction of any other business that may properly come before the annual meeting.

**Record Date**

You may vote at the 2024 annual meeting of stockholders the shares of common stock, Series E Preferred Stock and Series M Preferred Stock of which you were a holder of record at the close of business on March 14, 2024.

**Review your proxy statement and vote in one of four ways:**

•   In person: Attend the annual meeting and vote by ballot.

•   By telephone: Call the telephone number and follow the instructions on your gold proxy card.

•   Via the internet: Go to the website address shown on your gold proxy card and follow the instructions on the website.

•   By mail: Mark, sign, date and return the enclosed gold proxy card in the postage paid envelope.

By order of the Board of Directors,

*[signature]*

Deric S. Eubanks
*Chief Financial Officer*

14185 Dallas Parkway, Suite 1200
Dallas, Texas 75254
March 28, 2024

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

BRAEMAR HOTELS & RESORTS INC.,

                          Plaintiff,

          -against-

BLACKWELLS CAPITAL LLC, BLACKWELLS
ONSHORE I, LLC, BLACKWELLS HOLDING CO. LLC,
VANDEWATER CAPITAL HOLDINGS, LLC,
BLACKWELLS ASSET MANAGEMENT LLC, BW
COINVEST MANAGEMENT I LLC, JASON AINTABI,
MICHAEL CRICENTI, JENNIFER M. HILL, BETSY L.
MCCOY, AND STEVEN J. PULLY,

                          Defendants.

Civil Action No. 3:24-cv-707-L

## DECLARATION OF PAUL SCHULMAN

      My name is Paul Schulman.  I am over 21 years old, and the information contained in this

Declaration is based upon my personal knowledge

          1.      I am Senior Managing Director and Co-Head of the M&A and Activism

Advisory Group of Morrow Sodali Global LLC ("Morrow Sodali"), a provider of strategic advice

and shareholder services to corporate clients.  Braemar Hotels & Resorts Inc. ("Braemar") has

retained Morrow Sodali for certain advisory and proxy solicitation services.

          2.      Broadridge Financial Solutions ("Broadridge") is the proxy mailing and

tabulation agent for a significant majority of banks and brokers holding shares in "street" name on

behalf of the underlying beneficial owners of shares.

          3.      On Thursday, April 11, 2024, Broadridge informed me that Blackwells

Capital LLC's ("Blackwells") printed proxy materials had been delivered to Broadridge for

-1-

mailing and that Blackwells had given instructions to Broadridge to mail the proxy materials to Braemar's shareholders with 1,000 shares and up.   Based on information we have from Broadridge, these accounts hold in the aggregate approximately 66,500,000 Braemar shares  (including common shares, Series E and Series M preferred shares.)

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed in New York, New York on April 15, 2024.

_____
PAUL SCHULMAN

-2-