**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| BRAEMAR HOTELS & RESORTS INC.,<br><br>Plaintiff,<br><br>-against-<br><br>BLACKWELLS CAPITAL LLC, BLACKWELLS ONSHORE I, LLC, BLACKWELLS HOLDING CO. LLC, VANDEWATER CAPITAL HOLDINGS, LLC, BLACKWELLS ASSET MANAGEMENT LLC, BW COINVEST MANAGEMENT I LLC, JASON AINTABI, MICHAEL CRICENTI, JENNIFER M. HILL, BETSY L. MCCOY, AND STEVEN J. PULLY,<br><br>Defendants. | Civil Action No. 3:24-cv-00707 |

**DEFENDANTS' RESPONSE IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ........ 1

FACTUAL BACKGROUND ........ 4

A. The parties. ........ 4

B. Braemar's mismanagement and self-dealing. ........ 5

C. Blackwells attempts to unlock value for Braemar's stockholders by proposing to acquire Braemar. ........ 6

D. Blackwells ends pursuit of its intent to acquire Braemar and instead nominates four individuals for election to Braemar's Board of Directors. ........ 7

E. Braemar rejects Blackwells' nominees and initiates this litigation. ........ 8

LEGAL STANDARD ........ 8

ARGUMENT ........ 9

A. Braemar is unlikely to succeed on the merits. ........ 9

1. Braemar cannot succeed on the merits because it lacks standing to assert its sole claim that could invoke the jurisdiction of this Court ........ 9

a) Braemar lacks standing to bring its claim under Section 14(a) of the Exchange Act because it is an issuer, not a stockholder with voting rights. ........ 9

b) Absent Braemar's Section 14(a) claim, there is no basis for federal jurisdiction over this action. ........ 11

2. Braemar's claims under Section 14(a) fail under the heightened pleading standards of the PSLRA. ........ 12

3. Braemar has no likelihood of success on its state-law, bylaw compliance claims. ........ 16

B. Braemar would not face "irreparable harm" absent an injunction. ........ 23

C. The balance of equities disfavors an injunction. ........ 24

D. The public interest would not be served by an injunction. ........ 25

CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*,
38 F.3d 211 (5th Cir. 1994) ....................10

*Anderson Adventures, LLC v. Sam & Murphy, Inc.*,
176 Md. App. 164 (2007) ....................17

*Anderson v. Abbott Labs.*,
140 F. Supp. 2d 894 (N.D. Ill. 2001), *aff'd sub nom. Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001)....................14

*Anderson v. Oakley*,
77 F.3d 475 (5th Cir. Dec. 20, 1995) ....................9

*Ashford Hosp. Prime Inc. v. Sessa Capital (Master) LP*,
2017 WL 2955366 (N.D. Tex. Feb. 17, 2017)....................3, 9, 10

*Barbosa v. Barr*,
502 F. Supp. 3d 1115 (N.D. Tex. 2020) ....................9, 12

*Bertoglio v. Texas Int'l Co.*,
488 F. Supp. 630 (D. Del. 1980)....................15

*Blackwells Onshore I LLC v. Global Net Lease, Inc.*
(Cir. Ct. Baltimore City Apr. 14, 2023)....................22

*Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*,
577 F.3d 250 (5th Cir. 2009) ....................25

*Bo Shen v. Exela Techs., Inc.*,
2021 WL 2589584 (N.D. Tex. June 24, 2021) ....................14

*Boswell v. Panera Bread Co.*,
879 F.3d 296 (8th Cir. 2018) ....................15

*Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*,
554 F.3d 595 (5th Cir. 2009) ....................11

*Butts v. Aultman*,
953 F.3d 353 (5th Cir. 2020) ....................12

*CAE Integrated, L.L.C. v. Moov Techs., Inc.*,
44 F.4th 257 (5th Cir. 2022) ....................9

*Clendenin Bros., Inc. v. U.S. Fire Ins. Co.*,
390 Md. 449 (2006) ....................17

*Cohen v. CASSM Realty Corp.*,
39 N.Y.S.3d 597 (Sup. Ct. 2016)....................17

*Coster v. UIP Cos., Inc.*,
300 A.3d 656 (Del. 2023)....................18

*Daniels v. New Germany Fund*,
2006 WL 4523622 (D. Md. Mar. 29, 2006)....................17, 22

*Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*,
2021 WL 4443258 (S.D.N.Y. Sept. 27, 2021)....................15, 16

*Fed. Exp. Corp. v. Robrad, L.L.C.*,
2014 WL 3880806 (N.D. Tex. Aug. 7, 2014)....................23

*Ferro v. Blankenship*,
1995 WL 18236650 (W.D. Tex. Mar. 17, 1995)....................13

*In re Gaylord Container Corp. S'holders Litig.*,
747 A.2d 71 (Del. Ch. 1999)....................25

*Glob. Net Lease, Inc. v. Blackwells Capital LLC*,
2023 WL 3222417 (S.D.N.Y. May 3, 2023)....................19

*Heinze v. Tesco Corp.*,
971 F.3d 475 (5th Cir. 2020)....................13

*Hinojosa v. Guidant Corp.*,
2006 WL 903720 (S.D. Tex. Apr. 7, 2006)....................11

*Hubbard v. Hollywood Park Realty Enters, Inc.*,
1991 WL 3151 (Del. Ch. Jan. 14, 1991)....................18, 24

*Impac Mortg. Holdings, Inc. v. Timm*,
474 Md. 495 (2021)....................17, 22

*Int'l Banknote Co. v. Muller*,
713 F. Supp. 612 (S.D.N.Y. 1989)....................25

*KBR Inc. v. Chevedden*,
776 F. Supp. 2d 415 (S.D. Tex. 2011)....................10

*Kellner v. AIM ImmunoTech Inc.*,
307 A.3d 998 (Del. Ch. 2023)....................17, 23

*Kimberly-Clark Corp. v. Factory Mut. Ins. Co.*,
2007 WL 9712214 (N.D. Tex. Sept. 21, 2007)....................16

*Kugelman v. PVF Capital Corp.*,
972 F. Supp. 2d 993 (N.D. Ohio 2013)....................13

*Lee v. Fisher*,
70 F.4th 1129 (9th Cir. 2023)....................10

*Louisiana Mun. Police Emps. Ret. Sys. v. Cooper Indus. plc*,
2012 WL 4958561 (N.D. Ohio Oct. 16, 2012)....................13

*Malone v. CST Brands, Inc.*,
2016 WL 8258791 (W.D. Tex. Nov. 10, 2016)....................13

*Mgmt. Assistance Inc. v. Edelman*,
584 F. Supp. 1021 (S.D.N.Y. 1984)....................24, 25

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
135 S. Ct. 1318 (2015)....................14

*Phillips v. LCI Int'l, Inc.*,
190 F.3d 609 (4th Cir. 1999)....................24

*Rabbani v. Enzo Biochem, Inc.*,
682 F. Supp. 2d 400 (S.D.N.Y. 2010)....................13

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012)....................14

*Rosenbaum v. CytoDyn Inc.*,
2021 WL 4775140 (Del. Ch. Oct. 13, 2021)....................18

*Schnell v. Chris-Craft Indus., Inc.*,
285 A.2d 437 (Del. 1971)....................17, 18

*Shaker v. Foxby Corp.*,
2005 WL 914385 (Md. Cir. Ct. Mar. 15, 2005)....................17, 18, 22

*Shenker v. Laureate Educ., Inc.*,
411 Md. 317 (2009)....................17, 19

*In re Sinclair Broad. Grp., Inc. Sec. Litig.*,
2020 WL 571724 (D. Md. Feb. 4, 2020)....................24

*Solera Nat'l Bancorp, Inc. v. Quagliano*,
2014 WL 2058120 (D. Colo. May 19, 2014)....................11, 12

*Standard Metals Corp. v. Tomlin*,
503 F. Supp. 586 (S.D.N.Y. 1980)....................25

*Stockman v. Heartland Indus. P'rs, L.P.*,
2009 WL 2096213 (Del. Ch. July 14, 2009)....................17

*Tenet Healthcare Corp. v. Cmty. Health Sys., Inc.*,
839 F. Supp. 2d 869 (N.D. Tex. 2012) ....................10

*In re Tenneco Sec. Litig.*,
449 F. Supp. 528 (S.D. Tex. 1978) ....................11

*Todd Shipyards Corp. v. Madison Fund, Inc.*,
547 F. Supp. 1383 (S.D.N.Y. 1982)....................16, 19

*In re United Am. Healthcare Corp. Sec. Litig.*,
2007 WL 313491 (E.D. Mich. Jan. 30, 2007)....................15

*United States v. Decay*,
639 F. Supp. 2d 686 (E.D. La. 2009)....................14

*Villareal v. Saenz*,
2021 WL 1940620 (W.D. Tex. May 14, 2021) ....................23

**Statutes**

15 U.S.C. § 78n(a) ....................13

15 U.S.C. § 78u-4(b)(1) ....................12, 14

Md. Corp. & Ass'ns Code § 2-404(b)....................22

Md. Corp. & Ass'ns Code § 2-501 ....................23

Private Securities Litigation Reform Act of 1995 .................... *passim*

Securities Exchange Act of 1934 Section 14(a) .................... *passim*

**Other Authorities**

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice
& Procedure § 2948.1 (3d ed. 2023)....................23

Defendants Blackwells Capital LLC ("Blackwells"), Blackwells Onshore I LLC, Blackwells Holding Co. LLC, Vandewater Capital Holdings LLC, Blackwells Asset Management LLC, BW Coinvest Management I LLC, Jason Aintabi, Jennifer M. Hill, Betsy L. McCoy, Steven J. Pully, and Michael Cricenti (collectively "Defendants") respectfully submit this opposition to the Motion for Preliminary Injunction (ECF No. 4) and Memorandum in Support (ECF No. 4-1) (collectively, the "Motion") of Plaintiff Braemar Hotels & Resorts Inc. ("Braemar" or "the Company").

## PRELIMINARY STATEMENT

In American corporate law, the power of directors to govern companies derives from the stockholder franchise. A board's power is thus legitimate only to the extent that it has been granted through unimpeded stockholder elections. In this case, however, the board of a company that has consistently failed stockholders through underperformance and self-dealing transactions seeks to obtain from the Court what it knows a free and fair stockholder election would not grant it: another term to continue its failed and self-interested corporate governance practices. Braemar has not carried its heavy burden to obtain this extraordinary result. In fact, because corporations are creatures of state law and Braemar has no valid alternative basis to invoke the subject-matter jurisdiction of this Court, the Court cannot hear this dispute at all. The Motion should be denied.

Braemar is a real estate investment trust ("REIT") that invests in hotels and resorts. Montgomery J. Bennett is the chairman of Braemar's Board of Directors (the "Board"). Mr. Bennett is also the Chief Executive Officer of Ashford Inc. Under Mr. Bennett's leadership, Braemar's board has executed a series of contracts through which Braemar pays steep fees to multiple affiliates of Ashford. These contracts have allowed Mr. Bennett and his loyalists to funnel money that belongs to Braemar's stockholders into various Ashford-affiliated entities, which, in turn, benefits Mr. Bennett's personal accounts.

The market has taken notice: Braemar's stock price has declined by more than 85 percent in the last five years. Braemar's decline sparked the interest of Blackwells, an innovative investment fund that specializes in unlocking stockholder value by spearheading governance reforms at mismanaged REITs. In January 2024, Blackwells formally requested the questionnaire that nominees to the Company's board must submit in order to stand for election as directors. That initiated what is known as a "proxy contest," which occurs when a stockholder such as Blackwells attempts to persuade other stockholders to install new directors at a company.

A healthy company would have responded to Blackwells' interest by welcoming a broader range of choices for its stockholders at its upcoming director elections. Braemar responded with massive resistance. Just one week after Braemar learned of Blackwells' interest in a proxy contest, Braemar amended its bylaws to complicate and make more expensive the process of nominating directors. Then, after Blackwells submitted its nominations, Braemar purported to reject them and launched this lawsuit seeking to enjoin Defendants from taking any actions to solicit stockholder support for Blackwells' director nominees. Braemar is not entitled to this relief, Blackwells is entitled to run its proxy contest, and the Motion should be denied.

Under the familiar standard, a party seeking a preliminary injunction must demonstrate (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) that his substantial injury outweighs the threatened harm to the party that would be enjoined, and that (4) granting the preliminary injunction will not disserve the public interest. A movant's failure to carry its burden on even one of the factors is grounds to refuse the extraordinary remedy of a preliminary injunction. Here, Braemar has not shown that ***any*** of the factors support the issuance of its requested injunction.

*First*, Braemar has no likelihood of success on the merits. In the American system,

corporations are creatures of state law. Braemar has nonetheless sought to invoke the jurisdiction of this Court by appending to its Complaint a claim for purported violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). But Braemar knows full well that it does not have standing to bring a Section 14(a) claim. In 2017, Braemar's predecessor sought to bring Section 14(a) claims against a stockholder. Judge Godbey dismissed the claims, holding that "[b]ecause the Court views section 14(a) as protecting those with voting rights, [a corporation] lacks standing to bring a section 14(a) claim" against one of its stockholders. *Ashford Hosp. Prime Inc. v. Sessa Capital (Master) LP*, 2017 WL 2955366, at *9 (N.D. Tex. Feb. 17, 2017). Because Braemar lacks standing to bring the one claim that could invoke the jurisdiction of this Court, all of Braemar's claims fail for lack of subject matter jurisdiction and it has no likelihood of success.

The Court can stop its analysis there. While Braemar cannot show a likelihood of establishing the elements of its claims, without subject-matter jurisdiction the Court need not consider them. And the Fifth Circuit has held that district courts can dispense with the remaining preliminary injunction factors if the movant cannot carry the threshold burden of establishing a substantial likelihood of success on the merits.

*Second*, Braemar cannot establish that it is likely to suffer "imminent, irreparable harm" absent a preliminary injunction. Braemar's attempt to do so hinges on its purported need for relief before its director elections take place at its May 15, 2024 annual meeting of stockholders (the "Annual Meeting"). But Braemar itself set the Annual Meeting for that date and is free to change it to ***any*** date in 2024. Thus the imminence of Braemar's purported harm is entirely self-inflicted and avoidable. Federal courts will not grant a preliminary injunction to shield a party from harm it has inflicted on itself. Moreover, Braemar cannot point to any "harm" it would face in any event. Braemar speculates that Blackwells may make misleading statements in the future. But Braemar

cannot obtain the extraordinary remedy of a preliminary injunction based on speculation about hypothetical conduct.

*Third*, the balance of the equities weighs heavily against a preliminary injunction. Braemar seeks to altogether prevent Blackwells from soliciting stockholder support for its nominees and to prevent stockholders from voting for them. That harm greatly outweighs Braemar's speculative and avoidable concerns about potential stockholder confusion at its Annual Meeting should Defendants be permitted to proceed with their proxy contest.

*Finally*, the public interest would not be served by an injunction. In the context of a corporate election, the public interest favors free and fair stockholder voting. This is precisely the result that the Motion seeks to prevent. Issuance of an injunction would serve to advance Braemar's incumbent board's entrenching scheme at the expense of thousands of stockholders. The public interest weighs heavily in favor of denying the Motion and permitting Braemar's stockholders to cast votes for the directors of their choosing.

## FACTUAL BACKGROUND

### A. The parties.

Defendant Blackwells is a multi-strategy investment fund run by Jason Aintabi focused on unlocking value and improving corporate governance particularly in the REIT sector. Blackwells is also one of Braemar's largest stockholders. Defendants Blackwells Onshore I LLC, Blackwells Holding Co. LLC, Vandewater Capital Holdings LLC, Blackwells Asset Management LLC, and BW Coinvest Management I LLC are affiliates of Blackwells. App. 72 (Blackwells Nomination Notice).[1] Defendants Jennifer M. Hill, Betsy L. McCoy, Steven J. Pully, and Michael Cricenti (the "Blackwells Nominees") are individuals that Blackwells nominated for election to Braemar's

[1] Citations to "App." refer to the Appendix in Support of Braemar's Motion (ECF 4-2).

board of directors at Braemar's 2024 Annual Meeting. Plaintiff Braemar is a publicly traded Maryland REIT that manages a portfolio of luxury hotels. Compl. ¶ 4.

**B. Braemar's mismanagement and self-dealing.**

Over the last five years, the price of Braemar's stock has dropped by more than 85 percent. *See* Opp. 14-15 (Ex. 1, Braemar Website-investor-stocks-common stock).[2] Braemar's stockholders have paid a steep price for a variety of poor governance decisions made by Braemar's directors, including their decision to approve a series of self-dealing transactions. *See* Opp. 20, 72, 80-82 (Ex. 2, Braemar Form 10-K) (noting various contracts with Ashford and its affiliates were not negotiated at arm's length and "the total amount of fees and incentives paid to [Braemar's] advisor greatly exceeds the average of…our industry peers").

Under the leadership of Chairman Monty Bennett, Braemar has executed a series of contracts under which it pays steep fees to affiliates of Ashford Inc. Among other things, the Company has inked an external "advisory agreement" with Ashford Hospitality Advisors, LLC ("Ashford Hospitality"); hotel "management contracts" with Remington Lodging & Hospitality, LLC ("Remington Lodging"); and a contract for maintenance and construction services with Premier Project Management LLC ("Premier"). *See* Opp. 136, 163 (Ex. 2, Braemar Form 10-K). Ashford Hospitality, Remington Lodging, and Premier (together, the "Ashford Affiliates") are all Ashford Inc. subsidiaries. *See id*. Mr. Bennett is the CEO of Ashford Inc. and the Chairman of Ashford Inc.'s board of directors, and he and his family own convertible stock that, if converted, give them a 65% ownership interest in Ashford Inc. *See* Opp. 21 (Ex. 2, Braemar Form 10-K).

Taking notice of this management, Blackwells has recently sought to find ways to unlock Braemar's inherent value for the benefit of all Braemar stockholders.

[2] Citations to "Opp." refer to the Appendix in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction.

**C. Blackwells attempts to unlock value for Braemar's stockholders by proposing to acquire Braemar.**

On October 21, 2023, Blackwells sent a letter to Braemar. That letter expressed Blackwells' grave concern with the damage that had been caused to Braemar and its stockholders by the Board's acquiescence in a management arrangement that enriches Mr. Bennett and the Ashford Affiliates, but causes material losses for stockholders. App. 39. The October 21 letter suggested several reforms intended to enhance returns for stockholders and prevent further self-dealing. App. 39-40.

On December 1, 2023, Mr. Aintabi sent a letter to Braemar's Board. The December 1 letter made a "preliminary proposal" for Blackwells to acquire 100% of the outstanding equity interests in Braemar. App. 52. Blackwells proposed an all-cash deal in which it would acquire Braemar for $4.50 a share, which was more than double Braemar's then-existing stock price. *Id.*

On December 6, 2023, Braemar sent a letter to Blackwells seeking additional information about Blackwells' bid, including, among other things, information about financing sources and advisors. App. 522-524. Blackwells responded on December 22, 2023, providing additional information on Blackwells' potential sources of funding for the contemplated acquisition. App. 525. The December 22 letter reiterated Blackwells' interest in acquiring Braemar and offered to provide additional confidential information related to financing sources if Braemar were to confirm that it had interest in engaging in a confidential discussion with regard to Blackwells' proposal. *Id.* While Blackwells offered to provide additional information about potential financing sources, discussions with such sources had only reached preliminary stages. Opp. 5 (Aintabi Decl. ¶ 7). There were no signed agreements or commitment letters. *Id.*

Braemar responded to Blackwells' December 22 letter via email on January 2, 2024. The email stated "the board does not view your client's proposal as actionable." App. 532.

**D. Blackwells ends pursuit of its intent to acquire Braemar and instead nominates four individuals for election to Braemar's Board of Directors.**

In early 2024, after Braemar informed Blackwells that it found its December offer non-actionable, Blackwells ended pursuit of its intent to acquire Braemar. Opp. 5-6 (Aintabi Decl. ¶ 8). On March 10, 2024, Aintabi wrote a letter to the Board confirming that Blackwells had "withdraw[n] any interest we had in a transaction with Braemar." App. 517. Blackwells' decision was based on a number of factors, including, among others: (1) the refusal of the Board to consider reasonably and fulsomely Blackwells' acquisition proposal; (2) attempts by Braemar, Mr. Bennett, and Mr. Bennett's agents to misrepresent Blackwells' intentions; and (3) recent amendments to Braemar's Bylaws that had the effect of further lining Mr. Bennett's pockets and chilling viable options to create stockholder value. *Id.*; *see also* Opp. 5 (Aintabi Decl. ¶ 7).

Also on March 10, 2024, Blackwells timely sent the Company a notice of its intent to nominate four individuals for election to the Company's Board at its upcoming Annual Meeting (the "Blackwells Nomination Notice" or "Nomination Notice"). App. 72-516. Blackwells nominated as director candidates Jennifer M. Hill, Betsy L. McCoy, Steven J. Pully, and Michael Cricenti—experienced business professionals who, in the opinion of Blackwells, would facilitate much-needed changes at Braemar. App. 72.

The Blackwells Nomination Notice contained as its Exhibit C a 90-page slide deck (the "December 2023 Slide Deck").[3] App. 152-242. The December 2023 Slide Deck included

[3] Although the slide deck was prepared in December 2023, the cover of the slide deck that was sent to the Company incorrectly listed "March 2024" as its date. Opp. 5-6 (Aintabi Decl. ¶ 8). As Blackwells later explained in a supplement to the Blackwells Nomination Notice that was sent to the Company on March 26, 2024, the date listed on the first page of the slide deck was inadvertently changed from "December 2023" to "March 2024" during the redaction process performed by Blackwells' counsel prior to transmitting the slide deck to the Company as an exhibit to the Blackwells Nomination Notice. *Id.* The version of the slide deck that was provided by Blackwells to its counsel was dated December 2023. *Id.*

information discussing the benefits of a potential "take private" transaction involving the Company. *Id.* As discussed above, Blackwells pursued a "take private" acquisition in December 2023 consistent with the December 2023 Slide Deck, but subsequently abandoned any interest in such transaction. App. 517 (Blackwells March 10, 2024 Letter); App. 81 (Blackwells Nomination Notice). Consistent with this, Blackwells' Nomination Notice stated that, "[w]hile [Blackwells] currently has no intention to pursue an acquisition of the [Company], [Blackwells] could in the future make a bid to acquire the [Company]." App. 78.

### E. Braemar rejects Blackwells' nominees and initiates this litigation.

On March 24, 2024, Braemar sent Blackwells' counsel a letter that purported to "reject[] and disregard[]" the Blackwells Nominees and the Blackwells business proposals (the "Rejection Letter"). Opp. 229-233 (Ex. 3, Rejection Letter).

Within hours of sending its Rejection Letter to Blackwells, Braemar filed a complaint against Blackwells and certain Blackwells-related entities in this Court. On the same day, the Company filed the Motion that is the subject of this response.

On March 28, 2024, before filing a preliminary proxy statement as required by 17 C.F.R. § 240.13a-6, Braemar filed its definitive proxy statement announcing that it will hold its Annual Meeting on May 15, 2024. Opp. 236 (Ex. 4, Braemar Definitive Proxy Statement). Under the Company's Bylaws and Maryland law, the date of the Annual Meeting is set in the Company's discretion, subject only to the limiter that it must occur at some point in 2024.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" and "warranted only when the movant shows '(1) a substantial likelihood of success on the merits, (2) irreparable injury if the injunction is not granted, (3) that the injury outweighs any harm to the other party, and (4) that granting the injunction will not disserve the public interest.'" *CAE Integrated, L.L.C. v. Moov*

*Techs., Inc.*, 44 F.4th 257, 261 (5th Cir. 2022) (citation omitted). "The 'burden of persuasion on all of the four requirements…is at all times upon the plaintiff.'" *Id.* (citation omitted).

## ARGUMENT

### A. Braemar is unlikely to succeed on the merits.

Braemar cannot show a substantial likelihood of success on the merits for several reasons.

#### 1. Braemar cannot succeed on the merits because it lacks standing to assert its sole claim that could invoke the jurisdiction of this Court.

A party "cannot establish a 'substantial likelihood of success on the merits' of his claim if the court concludes that it lacks jurisdiction to adjudicate the claim altogether." *Barbosa v. Barr*, 502 F. Supp. 3d 1115, 1119 (N.D. Tex. 2020) (citation omitted); *Anderson v. Oakley*, 77 F.3d 475, 1995 WL 798510, at *1 (5th Cir. Dec. 20, 1995) (per curiam) (movant "failed to demonstrate a substantial likelihood of success on the merits because the district court lacked federal jurisdiction."). "Standing is a component of subject matter jurisdiction." *Sessa*, 2017 WL 2955366, at *2.

##### a) Braemar lacks standing to bring its claim under Section 14(a) of the Exchange Act because it is an issuer, not a stockholder with voting rights.

In the Complaint, Braemar seeks to invoke federal question jurisdiction by bringing a claim "under Section 14(a) of the Exchange Act and the rules and regulations promulgated thereunder." Compl. ¶ 30. But Braemar—the sole plaintiff in this action—lacks standing to bring a Section 14(a) claim against Defendants.

Rather than "open a Pandora's box by extending" the judicially created private right of action under Section 14(a) to "any person potentially injured by a proxy statement," the Fifth Circuit has made clear that only stockholders "with voting rights" have standing to pursue a Section 14(a) claim. *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 229-30

(5th Cir. 1994) (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1106-08 (1991)). Braemar does not have "voting rights" in its own elections. Rather, it is the "target corporation" in any such election. *Tenet Healthcare Corp. v. Cmty. Health Sys., Inc.*, 839 F. Supp. 2d 869, 871-72 (N.D. Tex. 2012). As a result, Braemar lacks standing to bring a claim pursuant to Section 14(a) and the rules promulgated thereunder. Braemar's Section 14(a) claim is thus subject to dismissal at the pleadings stage. *Id.* (dismissing target corporation's Section 14(a) claim).

This result will come as no surprise to Braemar. As the Motion notes, "Braemar was previously known as Ashford Hospitality Prime, Inc." Memo at 16 n.8.[4] Under that name, Braemar brought claims "for injunctive relief and monetary damages for violations of Section 14(a)" in a 2017 case in this District before Judge Godbey. *Sessa*, 2017 WL 2955366, at *9.[5] Judge Godbey dismissed those claims, holding that "[b]ecause the Court views section 14(a) as protecting those with voting rights, Ashford Prime lacks standing to bring a section 14(a) claim."

---

[4] Citations to Braemar's Memorandum in Support of its Motion for Preliminary Injunction are cited as "Memo at __."

[5] In its Reply in Support of its Motion for Expedited Discovery (ECF 37), Braemar argues that some courts in other circuits have found that issuers have standing to bring claims under Section 14(a). *See* ECF 37 at 10. But this is irrelevant. Under binding Fifth Circuit law, "voting rights are critical to standing under section 14(a)." *7547*, 38 F.3d at 230. The sole authority within this circuit that Braemar cites in favor of its position is inapposite. It applies, as *Sessa* points out, only where a plaintiff is seeking "a declaration of non-liability" under Section 14(a). *Sessa*, 2017 WL 2955366, at *9 (distinguishing *KBR Inc. v. Chevedden*, 776 F. Supp. 2d 415, 427 (S.D. Tex. 2011)). Where, as here, a Section 14(a) claim "does not seek a declaration of nonliability" that principle is inapplicable. *Id.* Braemar also seeks to distinguish *Sessa* on the ground that it did not involve a party "seeking injunctive relief." *See* ECF 37 at 10. But, far from relying on any such distinction, Judge Godbey in *Sessa* treated the claim as one "for ***injunctive*** relief and monetary damages for violations of Section 14(a)." *Sessa*, 2017 WL 2955366, at *9 (emphasis added); *see also 7547*, 38 F.3d at 230 (holding, ***without*** any limitation as to the remedy sought, that the Fifth Circuit is "unwilling to expand standing under section 14(a) of the Exchange Act to interest-holders who are not qualified to vote"); *Lee v. Fisher*, 70 F.4th 1129, 1137, 1149-50 (9th Cir. 2023) (noting, in the context of a complaint that did "not seek any monetary damages for the proxy law violations," that "[b]ecause the shareholders, not the corporation itself, vote to approve corporate transactions…the corporation lacks standing to sue under § 14(a)").

*Id.* This Court should reach the same conclusion.

**b) Absent Braemar's Section 14(a) claim, there is no basis for federal jurisdiction over this action.**

Braemar's remaining claims are governed by Maryland state law. *See* Memo at 18 n.10. Braemar argues that the Court has "supplemental jurisdiction" over these claims. Compl. ¶ 33. But in the Fifth Circuit, "[t]he general rule is that a court should decline to exercise jurisdiction over remaining state-law claims when all the federal-law claims are eliminated before trial." *Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009); *see also In re Tenneco Sec. Litig.*, 449 F. Supp. 528, 532 (S.D. Tex. 1978).

Braemar's only attempt to avoid this result is its argument that its state law claims rely on portions of Braemar's Bylaws that "embed and incorporate disclosure requirements of Regulation 14A of the Exchange Act and the rules and regulations of agencies of the U.S. federal government in connection with acquisitions of control of a company." Compl. ¶ 32. This attempt fails. "It is well-settled that the mere incorporation of a federal standard of conduct into a state law cause of action cannot alone support federal question jurisdiction." *Hinojosa v. Guidant Corp.*, 2006 WL 903720, at *3 (S.D. Tex. Apr. 7, 2006). And Braemar's claims do not fall within the "special and small category" of state law claims that arise under federal law. *Solera Nat'l Bancorp, Inc. v. Quagliano*, 2014 WL 2058120, at *1 (D. Colo. May 19, 2014) (quoting *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013)).

*Solera* is squarely on point. There, a corporation brought claims "seeking declaratory relief based on Defendant['s] [] alleged failure to comply with [its] bylaws concerning advance-notice governing proposed nominees for election as directors." *Id.* As here, the corporation alleged that the defendant failed to comply with a bylaw requiring disclosure of "any information related to a nominee that would be required to be disclosed under SEC Regulation 14A." *Id.* The court held

that, even assuming this claim necessarily raised a disputed question concerning the interpretation of Rule 14a, it "does not fall within that 'special and small category' of cases which are considered to arise under federal law for purposes of federal question jurisdiction." *Id.* The resolution of this issue—in a state court action that would not be binding on federal courts considering true securities law actions in the future—would not be "substantial…to the federal system as a whole." *Id.* at *2. And, because corporations are creatures of state law, "the issue of whether there has been compliance with [a corporation's] bylaws is not capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.* The court thus found federal question jurisdiction lacking. This Court should reach the same result.

There is thus no basis for this Court to exercise jurisdiction over any of Braemar's claims. In the absence of such jurisdiction, Braemar cannot establish a likelihood of success on the merits of any of its claims. *Barbosa*, 502 F. Supp. 3d at 1119, 1122-23. The Court thus need go no further in its analysis. The Motion must be denied. *Butts v. Aultman*, 953 F.3d 353, 361 (5th Cir. 2020).

**2. Braemar's claims under Section 14(a) fail under the heightened pleading standards of the PSLRA.**

In addition to failing because of Braemar's lack of standing to bring them, Braemar's Section 14(a) claims fail because Braemar has not pled sufficient facts to support them. Section 14(a) claims are subject to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). *See* 15 U.S.C. § 78u-4(b)(1) (explaining that the PSLRA's pleading standard applies to "any private action arising under [the Exchange Act]"). Among other things, the PSLRA contains "particularity pleading requirements, which are applicable to § 14a claims." *Malone v. CST Brands, Inc.*, 2016 WL 8258791, at *6 (W.D. Tex. Nov. 10, 2016). To satisfy these requirements, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons

why the statement is misleading." *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)).

A plaintiff cannot meet this requirement based on a "pure-omission theory that is untethered to any specific false or misleading representation." *Heinze v. Tesco Corp.*, 971 F.3d 475, 483 (5th Cir. 2020). Nor can a plaintiff meet this requirement by vaguely alleging that "broad swaths" of an SEC filing—as opposed to a specific misstatement—are false or misleading. *See Kugelman v. PVF Capital Corp.*, 972 F. Supp. 2d 993, 999 (N.D. Ohio 2013) (dismissing complaint on this basis); *see also Louisiana Mun. Police Emps. Ret. Sys. v. Cooper Indus. plc*, 2012 WL 4958561, at *2-3, 6 (N.D. Ohio Oct. 16, 2012) (similar). Moreover, Section 14(a) does not apply to all statements, but only statements within stockholder solicitations. 15 U.S.C. § 78n(a); *see also Rabbani v. Enzo Biochem, Inc.*, 682 F. Supp. 2d 400, 410 (S.D.N.Y. 2010) (letter nominating candidates for board of directors was not a solicitation because it was not directed to the stockholders, and it "was not a request for a proxy, to execute or revoke a proxy, or to furnish a form of proxy"); *Ferro v. Blankenship*, 1995 WL 18236650, at *3 (W.D. Tex. Mar. 17, 1995) ("a preliminary proxy statement is not a solicitation" under Rule 14(a)).

In light of these principles, Braemar's Section 14(a) claim has no likelihood of success on the merits because Braemar has not identified any specific false or misleading statement in a proxy solicitation. In the Motion, Braemar seeks to take issue with statements that Blackwells *might* make in the future. For example, Braemar states that "Defendants ***will***…suggest[] that the Purported Nominees are eligible director candidates" and "***will*** also inject…that Blackwells has 'withdrawn' any interest in acquiring Braemar." Memo at 15 (emphasis added). That is, the Motion attacks hypothetical misstatements that have not been made. This does not suffice to "specify" a misleading "statement," as required by the PSLRA. 15 U.S.C. § 78u-4(b)(1).[6]

---

[6] There is good reason the PSLRA does not allow this. For one, a hypothetical future statement

Separately, Braemar's Section 14(a) claims have no likelihood of success on the merits because the (hypothetical) statements they seek to attack are not actionable under the securities laws. The Motion first takes issue with the possibility that Defendants may suggest in a proxy solicitation that the Blackwells "[n]ominees are eligible director candidates." Memo at 15. But to allege falsity under the federal securities laws, a complaint must plead facts sufficient to demonstrate that the challenged statement's alleged shortcomings are "not merely the difference between two permissible judgments, but rather the result of a falsehood." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012). As a result, a party cannot state a securities law claim by raising a disagreement on a legal issue. *E.g., Bo Shen v. Exela Techs., Inc.*, 2021 WL 2589584, at *6 (N.D. Tex. June 24, 2021) (holding that litigation disclosure was not misleading, noting, "[a]bsent an allegation that [defendant] knew at the time of the litigation disclosures how the Chancery Court would ultimately rule (an allegation that the complaint does not make), the law does not require more of [defendant].").[7]

may never be made. As a result, a request that a court rule on an unmade decision is unripe and seeks an impermissible advisory opinion. *See United States v. Decay*, 639 F. Supp. 2d 686, 693 (E.D. La. 2009) (finding that "it is well settled that federal courts cannot render advisory opinions," which is what is requested when one seeks "concerns regarding possible future action"). For another, until a statement is made it is impossible to evaluate whether the *actual* statement is materially misleading in *context*. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1330 (2015) (finding that whether a statement is materially misleading "always depends on context"). Here, Braemar's claims would require the Court to weigh in on hypothetical statements "in a vacuum," which is impermissible. *Id.* ("[A]n omission that renders misleading a statement…when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame.").

[7] *See also Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 906-07 (N.D. Ill. 2001) ("Abbott's maintenance of its innocence is not fraud. SEC rules do not create a duty to confess contested charges…Investors can evaluate this sort of posturing for what it is worth."), *aff'd sub nom. Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001); *In re United Am. Healthcare Corp. Sec. Litig.*, 2007 WL 313491, at *12 (E.D. Mich. Jan. 30, 2007) ("UAHC informed investors that it had been paying Senator Ford for consulting work and of its opinion that these payments were legal. 'Investors can evaluate this sort of posturing for what it is worth.'" (quoting *Abbott*, 140 F. Supp. 2d at 907)).

Here, the parties dispute whether the Blackwells Nominees were properly nominated and eligible. As Defendants explain below, Braemar's legal contentions on this subject are incorrect. But regardless of which side ultimately prevails on this hotly contested issue, Braemar's attempt to turn a difference in legal opinion into a Section 14(a) claim fails.

The Motion next takes issue with the possibility that Blackwells will state that it has "withdrawn" any interest in acquiring Braemar. Memo at 16. As an initial matter, it is unclear what Braemar believes will be omitted from this hypothetical statement. After all, Blackwells indisputably ***did*** withdraw its December 1, 2023 proposal. *See* App. 81 (Blackwells Nomination Notice); *see also Boswell v. Panera Bread Co.*, 879 F.3d 296, 302 (8th Cir. 2018) ("Generally, an offeror can withdraw an offer at any time before the offeree accepts it."). And Blackwells already informed Braemar that it "could in the future make a bid to acquire the [Company]." Memo at 11 (quoting App. 78). Thus, any Blackwells statement in future proxy materials that it has withdrawn its prior interest in acquiring Braemar but may renew it at a later date would be entirely truthful.

To the extent Braemar's complaint about such a statement would be that it does not provide additional details about a possible, future bid by Blackwells to acquire Braemar, that complaint is not actionable under the federal securities laws. "Section 14(a) of the Act and Rule 14a-9 do not require, and in fact do not condone, speculation and predictions by proxy solicitors as to future market activities." *Bertoglio v. Texas Int'l Co.*, 488 F. Supp. 630, 641 (D. Del. 1980). For example, in *Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, a plaintiff's attempt to state a Section 14(a) claim was based on its contention that an activist investor "failed to disclose its 'plan to take control of the Board and force a fire sale of the Company.'" 2021 WL 4443258, at *13 (S.D.N.Y. Sept. 27, 2021). The court found that "whether that undisclosed motive is true or false is of no importance" because purported omissions about plans for future actions are "unactionable

under Section 14(a)." *Id.* Accordingly, federal courts "cannot impose liability for such omissions as a matter of law." *Id.*[8] Braemar has no likelihood of success on its Section 14(a) claim.

### 3. Braemar has no likelihood of success on its state-law, bylaw compliance claims.

Braemar's remaining claims, which concern Blackwells' compliance with its advance notice bylaws, arise under Maryland state law. *See* Memo at 18 n.10. As explained above, because Braemar's claims under federal law fail as a matter of law, the Court lacks jurisdiction to hear these claims. Braemar thus has no likelihood of success on them.

Moreover, beyond its jurisdictional flaws, there are additional fatal shortcomings in Braemar's state law claims. As the Motion acknowledges, under Maryland law, Braemar's Bylaws constitute a contract between the Company and its stockholders. Memo at 19. Braemar's contention that this Court should defer to its business judgment as to whether the Blackwells Nomination Notice complied with the Bylaws is thus incorrect. *See* Memo at 20-22. "[T]he business judgment rule does not serve as a defense to actions for breach of contract." *Kimberly-Clark Corp. v. Factory Mut. Ins. Co.*, 2007 WL 9712214, at *7 (N.D. Tex. Sept. 21, 2007) (citing *Dinicu v. Groff Studios Corp.*, 257 A.D.2d 218, 222-23 (N.Y. App. Div. 1999) ("[W]hile it may be good business judgment to walk away from a contract, this is no defense to a breach of contract claim."); *Willmschen v. Trinity Lakes Improvement Ass'n*, 840 N.E.2d 1275, 1279-80 (Ill. App. Ct. 2005) (same)); *see also Cohen v. CASSM Realty Corp.*, 39 N.Y.S.3d 597, 612 (Sup. Ct. 2016)

---

[8] In a conclusory footnote, Braemar also suggests that a hypothetical future solicitation that does not "fairly disclose Blackwells acquisition interest would violate Item 5(b)(1), Rule 14a-101 of Regulation 14A." Memo at 17 n.9. But that provision requires an "arrangement or understanding" that is sufficiently concrete that a party can "state the names of the parties thereto." 17 C.F.R. § 240.14a-101. Braemar has not—and cannot—allege (let alone with the particularity the PSLRA requires) that any such "arrangement or understanding" exists, because it does not. And Item 5(b)(1) does not apply to an entirely hypothetical possible future action. *See Todd Shipyards Corp. v. Madison Fund, Inc.*, 547 F. Supp. 1383, 1388-89 (S.D.N.Y. 1982) (interpreting almost identical language of Item 6 of Schedule 13D to require something "ris[ing] to the level of firm plans").

("The business judgment rule is inapplicable as a defense to a breach of the By-Laws…").[9]

Instead, as the Motion elsewhere acknowledges, a Maryland corporation's bylaws are interpreted under "ordinary principles of contract interpretation." Memo at 19. Under these "ordinary principles," the only deference the Court should apply is to interpret ambiguous clauses ***against*** Braemar under the doctrine of *contra proferentem*. *See Impac Mortg. Holdings, Inc. v. Timm*, 474 Md. 495, 509, 546 (2021) (company, and not its stockholders, was the author of a disputed provision in its corporate articles, and therefore that provision had to be "construed against" the company).[10] Moreover, even if a nomination notice may contain minor deficiencies, a company's rejection of nominees cannot be upheld if there is "a 'basis in equity to excuse strict compliance' with the bylaws." *Kellner v. AIM ImmunoTech Inc.*, 307 A.3d 998, 1037 (Del. Ch. 2023) (citation omitted). "[I]nequitable action does not become permissible simply because it is legally possible." *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971). Thus, courts often set aside rejections of nominees when those rejections, though perhaps plausible based on a highly technical reading of the bylaws, evince an intent to obstruct the right to vote. *See id.*; *Shaker*, 2005 WL 914385, at *3-4 (citing *Schnell* and noting that "Maryland law provides the same

---

[9] The business judgment rule could also not be applicable here in any event because it does not apply when the board's decision "interfere[d] with stockholder voting rights." *Daniels v. New Germany Fund*, 2006 WL 4523622, at *3-4 (D. Md. Mar. 29, 2006); *see Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 345 (2009); *Shaker v. Foxby Corp.*, 2005 WL 914385, at *5-6 (Md. Cir. Ct. Mar. 15, 2005).

[10] *See also Anderson Adventures, LLC v. Sam & Murphy, Inc.*, 176 Md. App. 164, 179 (2007) ("where an ambiguity exists in a contract, the ambiguity is 'resolved against the party who made it or caused it to be made, because that party had the better opportunity to understand and explain his meaning.'" (citation omitted)); *Clendenin Bros., Inc. v. U.S. Fire Ins. Co.*, 390 Md. 449, 456 (2006) (similar); *Stockman v. Heartland Indus. P'rs, L.P.*, 2009 WL 2096213, at *1, 5 (Del. Ch. July 14, 2009) (any ambiguity in terms of company's governing instruments must be resolved against company, not former directors who relied on the terms of the governing instruments as written).

protection to shareholder voting rights that obtains in Delaware").[11]

Under these principles, Braemar's bylaw claims have no likelihood of success. The Motion first argues that Blackwells "violated Bylaw Sections 11(a)(3)(D)(iii) and 11(a)(3)(c) by failing to disclose its interest in an acquisition." Memo at 19. But the Blackwells Nomination Notice in fact ***makes*** the very disclosure Braemar contends was omitted: it discloses that Blackwells had made a bid to buy the Company in December 2023, App. 81; notes that this acquisition offer had since been "withdrawn," *id.*; discloses that "[Blackwells] ***could*** in the future make a bid to acquire the [Company]," App. 78 (emphasis added); and then provides ***443 pages*** of material concerning Blackwells and its nominees. It is difficult to imagine what more Blackwells possibly could have disclosed about this issue.

The Bylaws do not require anything more. Section 11(a)(3)(D)(iii) of the Bylaws requires a nominating stockholder to make all disclosures that would be required under Regulation 14A, which in turn requires disclosure of "any ***arrangement or understanding*** . . . with respect to any future transactions to which the registrant or any of its affiliates will or may be a party." 17 C.F.R. § 240.14a-101, Item 5(b)(1) (emphasis added). At the time of the Blackwells Nomination Notice, Blackwells had no "arrangement or understanding" about a "future transaction" other than the one it disclosed—*i.e.*, the hypothetical, long-term possibility that "[Blackwells] could in the future make a bid to acquire the [Company]." App. 78 (Blackwells Nomination Notice); *see Todd Shipyards*, 547 F. Supp. at 1388-89 (explaining that the term "arrangement [or] understanding" as

[11] *See Rosenbaum v. CytoDyn Inc.*, 2021 WL 4775140, at *15 (Del. Ch. Oct. 13, 2021) ("[E]quity [may] address the inequitable *application* of even validly-enacted advance notice bylaws"); *Hubbard v. Hollywood Park Realty Enters, Inc.*, 1991 WL 3151, at *11 (Del. Ch. Jan. 14, 1991) ("[T]he inquiry ultimately focuses on whether the by-law, as applied in these circumstances, has afforded the shareholders a fair opportunity to nominate director candidates."); *Coster v. UIP Cos., Inc.*, 300 A.3d 656, 666-67 (Del. 2023) (similar).

used in the Exchange Act means something "ris[ing] to the level of firm plans"). The Blackwells Nomination Notice thus satisfied Section 11(a)(3)(D)(iii) of the Bylaws.

In fact, Braemar's accusation that Blackwells "secretly" intended to acquire Braemar bears close resemblance to a similar accusation made against Blackwells in a separate proxy fight last year. There the incumbent board claimed that Blackwells' "secret motive" for nominating directors was an undisclosed intent to replace the target company's investment advisor. *Glob. Net Lease, Inc. v. Blackwells Capital LLC*, 2023 WL 3222417, at *2 (S.D.N.Y. May 3, 2023). The Court rejected that argument because the board had no actual "proof" of the "nefarious picture" it tried to paint for its other stockholders, and because the board's "speculation" was "not a sufficient basis on which to infer the existence of an apparently nonexistent" plan for Blackwells to make changes at the target company. *Id.* at *2-4.[12]

Nor does Braemar's speculation make sense in any event. Blackwells' proxy contest seeks to place four independent directors on Braemar's eight-member board. These independent directors would be obliged to work for the benefit of all stockholders, consistent with their fiduciary duties. *See Shenker*, 983 A.2d at 419. Moreover, once elected, the Blackwells Nominees will not have the ability to force a sale of Braemar without the consent of its stockholders. In fact, stockholders would be entitled to vote on any change-of-control transaction. Braemar's contention that Blackwells' Nomination Notice is a ploy to force a sale of Braemar can thus only be

[12] Around the same time as Blackwells' bid, Braemar claims that one of Blackwells' disclosed funding sources—an investor—sent Braemar an indication of interest to the Company. *See* Memo at 13. Blackwells was not aware of, was not working with, and has no knowledge of the indication of interest that one of Blackwells' potential funding sources allegedly sent to the Company. Opp. 4 (Aintabi Decl. ¶ 5). Braemar's allegation that the indication of interest received from one of Blackwells' disclosed funding sources has some relation to Blackwells is based on bald speculation. *See* Memo at 13. And, as the Declaration of Jason Aintabi shows, this allegation is untrue. Opp. 4 (Aintabi Decl. ¶ 5). It thus gives rise to no disclosure obligation under the Bylaws.

interpreted as a pretextual gambit meant to avoid a contested director election. Moreover, if Braemar truly believes that the election of four independent directors could (impossibly) result in Braemar being sold from beneath stockholders, they are welcome to present that argument to whomever they like in their solicitation for votes in the director elections. But Braemar apparently prefers to use this as a false pretext in an attempt to avoid a contested election altogether—presumably because Braemar is well aware that stockholders simply are not buying what the incumbent directors are selling.

Similarly, Section 11(a)(3)(c) requires disclosure of any "substantial interest…by security holdings or otherwise" that Blackwells possesses in Braemar. App. 17 (Braemar Bylaws). By its terms, this provision applies only to ***existing*** financial arrangements, not to hypothetically possible future ones. The Blackwells Nomination Notice disclosed the only such interests that actually existed. Opp. 6 (Aintabi Decl. ¶ 9). Blackwells thus satisfied this provision of Braemar's Bylaws.

The Motion next argues that Blackwells violated numerous Bylaw provisions by failing to provide requisite information for "Stockholder Associated Persons." Memo at 20. Article I, Section 11(a)(6) of the Bylaws defines the term "Stockholder Associated Person" to mean:

> any person . . . acting in concert with such stockholder . . . [or] that, together with such stockholder . . . has ***engaged in activities*** undertaken with the purpose or effect of changing or influencing control of the Company or in connection with or as a participant in any transaction having such purpose or effect.

App. 18-19 (Braemar Bylaws) (emphasis added). Braemar contends that Blackwells' "financing sources on debt and equity with respect to its [December] acquisition bid" and other "investors" to whom it provided "marketing materials" in connection with the December 2023 proposal are "Stockholder Associated Persons" under this definition. Memo at 12-13.

The problem with this argument is simple: There were no "equity and debt investors" with whom Blackwells "engaged in activities" for the purpose of changing control of Braemar.

Although, the Bylaws do not define the term "engaged in activities," Braemar's Rejection Letter suggests that anyone "with whom [Blackwells] admittedly communicated with respect to a potential acquisition" would qualify as a "Stockholder Associated Person." Opp. 231-32 (Ex. 3, Rejection Letter). With respect, that is absurd. If it is true that "communicat[ing]" with Blackwells or its affiliates about a "potential acquisition" is sufficient to render someone a "Stockholder Associated Person," that term would capture a host of entities and individuals with vanishingly little relevance to this proxy fight—*e.g.*, an Uber driver or Starbucks barista with whom Mr. Aintabi chatted about his day, or a Kinkos hired by Blackwells to print marketing materials. That cannot be right.

The better reading is that, in order to qualify as a "Stockholder Associated Person" by virtue of having "engaged in activities" with Blackwells, an entity or person would need to have gone beyond preliminary discussions about the mere possibility of an engagement by taking actual, concrete steps to lend material assistance to Blackwells in connection with a potential change-of-control transaction. For example, if Blackwells signed a letter of intent with a private equity firm to co-purchase Braemar, that could render the private equity firm a "Stockholder Associated Person" for purposes of the Bylaws. That is how any reasonable reader of the Bylaws would interpret the term "engaged in activities," and it is how Mr. Aintabi and Blackwells interpreted it as well. Opp. 6 (Aintabi Decl. ¶ 9). And given the term's ambiguity, Blackwells is entitled to the benefit of the doubt. That is so because Maryland law requires application of the *contra proferentem* doctrine, under which ambiguities in unilaterally drafted contracts like the Bylaws are interpreted against their drafters, *i.e.*, the Company. *See Timm*, 474 Md. at 509, 546.

Under this or any other reasonable definition of the term "engaged in activities," there is no one with whom Blackwells "engaged in activities undertaken with the purpose or effect of

changing or influencing control of the [Company]." *See* Opp. 231 (Ex. 3, Rejection Letter); Opp. 6 (Aintabi Decl. ¶ 9). Because no firm or entity engaged in such activities, there were no "Stockholder Associated Persons" other than the Blackwells affiliates disclosed in the Nomination Notice. Blackwells made the required disclosures for those affiliates. Blackwells was not required to do anything more.[13]

Indeed, if "Stockholder Associated Persons" meant what Braemar contends it means (and it does not), that provision would be illegal under Maryland law. Section 2-404(b) of the Maryland Corporations Code imposes on a Maryland corporation's board "a statutory and common law duty to enact by-laws containing fair voting procedures." *Shaker*, 2005 WL 914385, at *6; *see also Daniels*, 2006 WL 4523622, at *4 (following *Shaker*). A company violates Section 2-404(b) if it enacts "[un]fair voting procedures" or otherwise improperly impairs "the plaintiff's ability to vote." *See id.*[14] Under this principle, Braemar cannot require disclosures with respect to anyone who "engaged in activities" with Blackwells, refuse to define that term, wait to receive a stockholder's nomination notice, and only then claim that the nomination notice is deficient because it failed to disclose information about a party with whom Braemar believes (for reasons

[13] The logical flaw in the Company's Rejection Letter is its unfounded assumption that, when Blackwells referred to "debt and equity from internal and external sources," it was referring to known "sources." Opp. 231. It was not. Blackwells never had a funding arrangement in place with any counterparty, nor did it ever say otherwise; on the contrary, Blackwells made clear that this funding arrangement was merely an "expectation." App. 53 (Blackwells Dec. 1, 2023 Letter). The phrase "debt and equity from internal and external sources," App. 525 (Blackwells Dec. 22, 2023 Letter), was intended to convey that the funding was unlikely to be all debt or all equity, and was unlikely to be all internal or all external. Blackwells referred to its funding "sources" in the same way as would a startup founder or a potential home buyer in need of a mortgage: They might have an expectation of future funding via "debt and equity from internal and external sources," but yet have no insight into which particular entities might provide that funding.

[14] *See also* Opp. 341 (Ex. 5, Hearing Transcript and Ruling, *Blackwells Onshore I LLC v. Global Net Lease, Inc.* (Cir. Ct. Baltimore City Apr. 14, 2023)) ("if the bylaws mean what the defendants say they mean," then they improperly impaired "the plaintiff's ability to vote" and thus might constitute "a violation of [Section 2-404]").

not stated) the stockholder "engaged in activities." Bylaws of this kind are patently unlawful because they are "more akin to a tripwire than an information gathering tool." *Kellner v. AIM ImmunoTech Inc.*, 307 A.3d 998, 1037 (Del. Ch. 2023).

**B. Braemar would not face "irreparable harm" absent an injunction.**

The second preliminary injunction factor—"a substantial threat that [the movant] will suffer irreparable injury absent the injunction"—also weighs heavily against the extraordinary remedy of a preliminary injunction. *Fed. Exp. Corp. v. Robrad, L.L.C.*, 2014 WL 3880806, at *1 (N.D. Tex. Aug. 7, 2014). "To be considered irreparable, the injury in question must be *imminent* and cannot be speculative." *Id.* at *2 (citation omitted).

In an attempt to conjure a threat of imminent irreparable harm, Braemar points primarily to the purported prospect of "an uninformed stockholder vote" at its Annual Meeting, now scheduled to take place on May 15, 2024. Memo at 23. But at the time Braemar filed its motion for preliminary injunction, it had not set the date for its Annual Meeting. And Maryland law permits Braemar to schedule its Annual Meeting at any time during the calendar year of 2024. *See* Md. Corp. & Ass'ns Code § 2-501 (merely requiring "an annual meeting"). As a result, absent an injunction, Braemar does not face imminent irreparable harm—or any imminent harm at all—beyond what it has inflicted on itself, and could avoid by the stroke of a pen by rescheduling the meeting. Such self-inflicted, avoidable harm does not suffice to justify injunctive relief. *See Villareal v. Saenz*, 2021 WL 1940620, at *5 (W.D. Tex. May 14, 2021), *report and recommendation adopted*, 2021 WL 4057570 (W.D. Tex. Aug. 4, 2021) ("Avoidable harm isn't irreparable."); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2948.1 (3d ed. 2023) (similar).

Braemar's purported concern about "confusion and misinformation among the Company's stockholders" is likewise speculative and avoidable. Memo at 23. The Motion seeks to impose a

blanket prior restraint on ***any*** future statements from Defendants. But without knowing the content and context of the statements, one cannot know if they would mislead stockholders. Indeed, this is especially so here. After all, no statement will support a claim under the securities laws "when an investor 'possesses information sufficient to call the [mis]representation into question.'" *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 617 (4th Cir. 1999) (alteration in original) (citation omitted). Thus if Braemar disputes the Blackwells Nominees' eligibility, or any other hypothetical statement of Defendants, they can avoid any harm simply by itself issuing a disclosure stating its own position. *E.g.*, *In re Sinclair Broad. Grp., Inc. Sec. Litig.*, 2020 WL 571724, at *10 (D. Md. Feb. 4, 2020) (allegedly misleading statement that transaction was with an "unrelated party" was inactionable where "the details of that transaction…were already in the public domain").

**C. The balance of equities disfavors an injunction.**

"To prove that the balance of hardships tips in its favor, a movant must show that the harm it would suffer without the relief sought is decidedly greater than the harm its opponent would suffer if injunctive relief was granted." *Mgmt. Assistance Inc. v. Edelman*, 584 F. Supp. 1021, 1025 (S.D.N.Y. 1984) (denying preliminary injunction). Here, not only has Braemar not met this heavy burden, the equities strongly favor the Defendants.

If the requested injunction is granted, Defendants would be precluded from conducting a proxy contest altogether. *See Hubbard*, 1991 WL 3151, at *5 ("[B]lock[ing] the nomination of any competing slate [of directors] is an actionable interference with the shareholders' exercise of their corporate franchise" that "would result in irreparable harm by thwarting shareholders' voting rights."). The harm to Defendants from that result greatly outweighs Braemar's speculative and avoidable concerns about potential stockholder confusion should Defendants be permitted to proceed with their proxy contest. *See Edelman*, 584 F. Supp. at 1025 ("The hardship alleged by plaintiff, which is essentially denial of fully informed corporate suffrage, is not greater than the

hardship that would result from denial of the right of corporate suffrage altogether."); *In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 84 (Del. Ch. 1999) (similar). The balance of the equities thus tips decidedly in favor of denying the Motion.

**D. The public interest would not be served by an injunction.**

Finally, the Court should deny the Motion because the public interest would not be served by an injunction. *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 252-53 (5th Cir. 2009). In the context of this case, the public interest is represented by the non-party stockholders. These individuals—a significant number of whom have expressed support for the Blackwells Nominees—would be deprived of their right to vote on alternative slate of director candidates if an injunction is granted. *See* Opp. 6 (Aintabi Decl. ¶ 10). This harm is irreparable and strongly militates in favor of denying the Motion. *See Int'l Banknote Co. v. Muller*, 713 F. Supp. 612, 623 (S.D.N.Y. 1989) ("Courts have consistently found that corporate management subjects shareholders to irreparable harm by denying them the right to vote their shares or unnecessarily frustrating them in their attempt to obtain representation on the board of directors."); *Standard Metals Corp. v. Tomlin*, 503 F. Supp. 586, 589 (S.D.N.Y. 1980) ("To grant a preliminary injunction under such circumstances would unfairly provide plaintiff's management with a weapon to discourage take-over bids, contrary to the purpose of Section 13(d).").

## CONCLUSION

For the foregoing reasons, Braemar's Motion for preliminary injunction should be denied.

Date: April 15, 2024

Respectfully submitted,

*/s/ Robert Ritchie*

Robert Ritchie
State Bar No. 24079213
K. Virginia Burke DeBeer
State Bar No. 24097437
VINSON & ELKINS LLP
2001 Ross Avenue
Dallas, Texas 75201
Phone: (214) 220-7823
Email: rritchie@velaw.com
Email: vdebeer@velaw.com

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 15, 2024, a true and correct copy of the foregoing document was filed via the Court's CM/ECF filing system and served on all counsel of record.

*/s/ Robert Ritchie*
Robert Ritchie